Steven G. Sklaver
California State Bar No. 237612
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 789-3100
Fax:  (310) 789-3150
Email:  ssklaver@susmangodfrey.com

Max L. Tribble
(Appearance *Pro Hac Vice*)
Vineet Bhatia
(Appearance *Pro Hac Vice*)
 Sandeep Seth
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
Email: mtribble@susmangodfrey.com
Email: vbhatia@susmangodfrey.com
Email: sseth@susmangodfrey.com

Seth Ard
(Appearance *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone:  (212) 336-8330
Fax:  (212) 336-8340
Email: sard@susmangodfrey.com

*Attorneys for Sentius International, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SENTIUS INTERNATIONAL, LLC, | Case No. C-13-0825-PSG |
| Plaintiff, | |
| vs. | **SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF** |
| MICROSOFT CORPORATION, | |
| Defendant. | |

1

2

## **TABLE OF CONTENTS**

3                                                                                        **Page(s)**

4

5   I.      Introduction ................................................................................................................ 1

6   II.     Legal Standards ......................................................................................................... 3

7   III.    Terms for Construction............................................................................................. 5

8           A.      "Database" ..................................................................................................... 5

9           B.      "Link"/"Linking"........................................................................................... 8

10          C.      "Syndicating/Syndicated"............................................................................11

11          D.      "Receiving"/"Received" ...............................................................................14

12          E.      "Parsing"......................................................................................................15

13
            F.      MPF: "Term Module," "Processing Module," "Processor," and
14                  "Module" ......................................................................................................17

15                  1.      The "Module"/ "Processor" Limitations Are Not MPF ...........................17

16                  2.      Alternative Means-Plus-Function Construction .......................................19

17
            G.      "Term Module" and "Processor"..................................................................21
18
            H.      "Processing Module" and "Module" ...........................................................23
19

20  IV.     Order of Claims ......................................................................................................24

21

22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

3

**Page(s)**

4

**Cases**

5

*Alcatel USA Sourcing, Inc. v. Microsoft Corp.,*
    2008 WL 3914889 (E.D. Tex. 2008)................................................................20

6

7

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed. Cir. 2003) ....................................................................24

8

9

*Apple v. Samsung Electronics Co., Ltd.,*
    2013 WL 1502181  (N.D. Cal. 2013)................................................................19

10

11

*Autobytel, Inc. v. Dealix Corp.,*
    2006 WL 155683 (E.D. Tex. Jan. 18, 2006) ....................................................20

12

13

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.,*
    512 F.3d 1338 (Fed. Cir. 2008) ....................................................................25

14

15

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.,*
    183 F.3d 1334 (Fed. Cir. 1999) ......................................................................3

16

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002) ....................................................................17

17

18

*Finisar Corp. v. DirecTV Grp., Inc.,*
    523 F.3d 1323 (Fed. Cir. 2008) ....................................................................21

19

20

*Foundry Networks v. Lucent Techs., Inc.,*
    2005 WL 6217420 (E.D. Tex. May 24, 2005) ................................................19

21

*Harris Corp. v. Ericsson Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005) ....................................................................20

22

23

*In re Cygnus Telecommunications Technology, LLC, Patent Litigation,*
    481 F. Supp. 2d 1029 (N.D. Cal. 2007)........................................................25

24

*Informatica Corp. v. Business Objects Data Integration, Inc.,*
    2005 WL 6220492  (N.D. Cal. 2005)................................................................8

25

26

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004) ......................................................................3

27

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001) ....................................................................24

28

ii

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*,
    649 F.3d 1350 (Fed. Cir. 2011) ...............................................................................17, 18

*Jajah Inc v. Stanacard LLC*,
    2010 WL 1838970  (N.D. Cal. 2010) ..................................................................................19

*Kara Tech., Inc. v. Stamps.com, Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ..........................................................................................4, 9

*Level 3 Communications, LLC v. Limelight Networks, Inc.*,
    589 F. Supp. 2d 664 (E.D. Va. 2008) ..................................................................................6

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .............................................................................................4

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) ...........................................................................................17

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004) ...........................................................................................18

*Linksmart Wireless Technology v. T-Mobile USA, Inc.*,
    2010 WL 2640402  (E.D. Tex. 2010) ...................................................................................6

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) .............................................................................................................3

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), ..............................................................................................5

*MySpace, Inc. v. GraphOn Corp.*,
    756 F. Supp. 2d 1218 (N.D. Cal. 2010) ...........................................................................6, 7

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) ...........................................................................................19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................................................3, 4, 5

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ...........................................................................................4

*Roche Diagnostics Corp. v. Apex Biotechnology Corp.*,
    455 F. Supp. 2d 840 (S.D. Ind. 2005) ................................................................................19

*SimpleAir, Inc. v. AWS Convergence Technologies, Inc., et. al.*,
    2011 WL 3880525 (E.D. Tex. 2011) ...................................................................................16

iii

*TecSec, Inc. v. International Business Machines Corp.*,
  731 F.3d 1336 (Fed. Cir. 2013) ...................................................................................................18

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ..............................................................................................20, 21

*Vasudevan Software, Inc. v. IBM Corp.*,
  2011 WL 196884 (N.D. Cal. 2011) ...............................................................................................6

*Verizon Services Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ....................................................................................................5

*Visto Corp. v. Good Tech, Inc.*,
  No. 2:06–CV–039, 2008 WL 163576 (E.D. Tex. Jan. 16, 2008).....................................20

*Visto Corp. v. Research in Motion, Ltd.*,
  623 F. Supp. 2d 756 (E.D. Tex. 2008) ........................................................................................20

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................................................4, 5

*Wi-Lan USA, Inc. v. Alcatel-Lucent USA, Inc.*,
  2013 WL 4811233 (S.D. Fla. 2013) ..................................................................................18, 19, 21

**Statutes**

35 U.S.C. § 112 ........................................................................................................................passim

35 U.S.C. §102(e) .........................................................................................................................13

## I.   INTRODUCTION

Sentius developed, marketed and licensed software for over 13 years.  Sentius owns four patents that relate to database linking and updating software technology invented by Sentius' founder, Marc Bookman, and three other former Sentius employees.  The inventors began their work in this area in 1991, filed for the first patent in February of 1995, and have continued to work as known experts in related fields.   The patents-in-suit disclose and claim features incorporated into particular versions of Sentius's Richlink and Mikan technologies, which practiced the patented inventions.  After Marc Bookman demonstrated the earlier technology to Microsoft in 1998, ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ Ex. 1.   After Marc Bookman demonstrated later technology to Microsoft in 2003, Microsoft employees again praised the technology.

The four patents-at-issue are U.S. Patent Nos. RE 40,371 (the "'731 Patent"), RE 43,633 (the "'633 Patent"), 7,672,985 (the "'985 Patent"), and 8,214,349 (the "'349 Patent"). Exs. 2-5. The first patent family includes the '731 and '633 patent, and is directed to a specific method for linking source material to external reference materials for display.   The '731 was originally issued as US Patent No. 5,822,720 in 1998, which was asserted in previous litigation against Flyswat, Inc., No. C00-02233 (SBA) (NDCA).   In both instances where Judge Armstrong construed a term in that litigation that the parties now dispute (database and link), Sentius proposes an identical or simplified version of Judge Armstrong's construction.   *See* Ex. 6 (*Flyswat* Claims Construction Ruling).   In both instances, Microsoft's proposed construction varies considerably from Judge Armstrong's.

In the *Flyswat* litigation, Judge Armstrong ultimately held that claims at issue there were invalid based upon 35 U.S.C. § 112.  Sentius appealed and the parties settled out-of-court.  Sentius filed a reissue application on February 24, 2005 to correct the §112 deficiencies identified by the district court.  The '720 patent reissued on June 9, 2009 as '731.  Before reissuing, the reissue patent went through a triple re-examination with an examiner, his supervisor and then an independent review by another examination team.

The '731 Patent teaches an indexing scheme for displaying content associated with specific terms and phrases in a document.  The method taught by the '731 Patent is useful in many contexts, one exemplary use being foreign language learning.  Fig. 2 illustrates a flow diagram for indexing and linking text to external references so that associated content may be retrieved and displayed in a pop-up window for a selected term or phrase, such as shown in Fig. 3.  In particular, the starting and ending offset positions of the identified words or phrases of interest are determined and recorded in a lookup table.  Along with such offset positions, a link to external materials is recorded in the lookup table.  The link may be a dynamic link to an external dictionary.  When a user points to a word, for example by right-clicking on it, the link is used to retrieve content from the dictionary associated with the word.  That retrieved content is displayed in a pop-up window.   The '731 patent claims priority to application serial no. 08/197,157 filed Feb 16, 1994.

The second patent family includes the '985 and '349 patents, and is directed to a specific method for automatically processing database content.  Here again, dictionaries are used to link content for display associated with a given word.  Building on the foundations of the first patent family, the second patent family stems from research work Sentius started in 1997-98, which led to release of commercial products in 1998-99.  It discloses how dictionary content may be syndicated over a network so that the programs that use the dictionary to compare identified

2

words or phrases to its content in order to retrieve associated content from the dictionary can automatically receive any dictionary updates over the network.  The patents in the second patent family have not been through any litigation.  Sentius refers the Court to its tutorials for further background on the patents and technology at issue.

## II.   LEGAL STANDARDS

The scope of a patent is determined by its claims.  35 U.S.C. § 112, ¶ 2; *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Pursuant to the Supreme Court's Markman decision, the Court construes the scope and meaning of disputed claim terms as a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996).

Patents are presumed to be written for persons skilled in the field of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  For that reason, the proper construction of a disputed claim term requires interpreting the term as it would be understood by a skilled artisan at the time of the invention.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  In determining a term's proper meaning, "[a] court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean,'" including "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'"  *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

The components of the intrinsic evidence form a natural hierarchy of interpretive guides and outline a claim construction methodology in which the claims, the patent specification, and the prosecution history (to the extent it is in evidence) must all be reviewed to reach a proper understanding of the disputed claim terms.  The claims form the first tier of the hierarchy and can "provide substantial guidance as to the meaning of particular claim terms" through context and

3

by relation to other claims.  *Phillips*, 415 F.3d at 1314-15.  The remainder of the specification forms the second tier of the hierarchy.  "[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Finally, the third tier of intrinsic evidence is the prosecution history of the patent.  The prosecution history, however, "often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.

Although the specification, prosecution history, and extrinsic evidence are available as tools for construing disputed claim terms, "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citations omitted).  The specification may inform the meaning of claim terms, but it does not change those meanings unless the patentee has chosen to be his own lexicographer by clearly setting out his intended meaning either expressly or by implication.  *See Phillips*, 415 F.3d at 1321; *Vitronics*, 90 F.3d at 1582.  Additionally, claims should not be interpreted by importing limitations from the specification into the claims.  *See Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("[W]e will not … import a limitation from the specification into the claims.").

Following from the above guidelines, several canons of construction emerge from the Federal Circuit's decisions.  First, the "claims, not specification embodiments, define the scope of patent protection."  *Kara Tech*, 582 F.3d at 1348.  Similarly, claims are not limited to the preferred embodiment.  *See id.* ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment . . ."); *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Liebel-Flarsheim Co. v. Medrad*,

SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF                                        Case No. C-13-0825-PSG

*Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).   Finally, patent claims are rarely interpreted in a manner that would exclude the examples disclosed in the specification.   *See Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *Vitronics*, 90 F.3d at 1583 (explaining that a construction that excludes the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support . . .").

In addition to "intrinsic" evidence, the Federal Circuit has sanctioned the use of "extrinsic evidence" in the claim construction process to educate the court about the field of the invention and the viewpoint of a person of ordinary skill in that field.   Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).   While acknowledging the value of extrinsic evidence in some cases, the Federal Circuit has also warned against giving it too much weight. The use of extrinsic evidence must be tempered against the context provided by the intrinsic record.   *See Phillips*, 415 F.3d at 1318.

## III.   TERMS FOR CONSTRUCTION

The parties disagree on the definitions for the following terms:   (A) "database"; (B) "link"/"linking"; (C) "syndicating"/"syndicated"; (D) "receiving"/"received"; (E) "parsing"; (F) "term module"; (G) "processing module"; (H) "processor"; and (I) "module."

### A.   "Database"

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| **Database** ('731/'633) | a collection of data with a given structure for accepting, storing and providing, on demand, data for at least one user | A collection of data organized and searchable via records and fields. A record is one complete entry in a database, e.g., Gerry  Friesen, 12 West |

5

| | | 21 Street, New York, NY 10010, 212-691-8215. A field would be the street address field, namely 12 West 21 Street. |
|---|---|---|

The parties' principal dispute regarding the term 'database' is whether a database is limited to a specific form of database that is organized and searchable by "records and fields," or can also include other forms of databases.  Defendant has not clearly defined "records and fields," but it appears that Defendant proposes to limit the term 'database' to a relational database.  Defendant cannot justify its negative, and ill-defined, limitation.  In contrast, Plaintiff's proposed construction is identical to the construction that Flyswat and Sentius agreed to and the court adopted in the *Flyswat* litigation, which itself was identical to a general definition of the term from a 1994 technical dictionary.[1]  The term "database" has also been similarly construed in at least two previous cases in the Northern District of California.[2]

Defendant's construction is improper because, contrary to the broad use of the term "database" in the specification, Defendant improperly excludes any database that cannot be broken into specific "fields" and "records" and it does not even clearly define what a field is.

[1] In *Sentius Corp. v. Flyswat, Inc.*, the Court adopted the parties agreed construction for "database" as "a collection of data with a given structure for accepting, storing and providing, on demand, data for at least one user."  The fact that both Sentius and Flyswat were able to agree on this same construction despite being on opposite sides of the lawsuit is further evidence that the construction was both reasonable and proper.  *Level 3 Communications, LLC v. Limelight Networks, Inc.*, 589 F. Supp. 2d 664, 689 (E.D. Va. 2008) ("The fact that Plaintiff's proposed construction here was agreed upon by parties to an unrelated litigation that are non-parties here is useful, but certainly not dispositive." (footnote omitted)).  *See also* Ex. 7, IBM Dictionary of Computing (1994), p. 165 ("database (1) A collection of data with a given structure for accepting, storing, and providing, on demand, data for multiple users."); Ex. 8, IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Ed. (2000) ("database (data management) (software). A. A collection of logically related data stored together in one or more computerized files.").

[2] *See MySpace, Inc. v. GraphOn Corp.*, 756 F. Supp. 2d 1218, 1232 (N.D. Cal. 2010) (construing "database" as "a collection of data with a given structure that can be stored and retrieved."); *Vasudevan Software, Inc. v. IBM Corp.*, 2011 WL 196884, *4 (N.D. Cal. 2011) (construing 'database' as "a structured set of data"); *see also Linksmart Wireless Technology v. T-Mobile USA, Inc.*, 2010 WL 2640402 *12 (E.D. Tex. 2010) (construing "database" as "a structured set of data held in a computer").

6

Furthermore, Defendant's construction is confusing and circular because it defines a "record" as "one complete entry in the database" (without defining what a "complete entry" is) and limits the operation of databases to ones that operate having "complete entries."

Turning to the claims themselves, "[n]otably, the term 'relational' is not found anywhere in the patent claims, which lends support to Plaintiff's argument that the term 'database' is not limited to a relational database as advanced by Defendant."[3]

The specification confirms that the term database is used in its plain, broad sense, and is not restricted to a relational database or to a database organized and searchable by "records and fields." For instance, a relational database **12** is only one type of database described in the specification. In describing the operation of the exemplary preferred embodiment of the invention, the specification discloses various databases that would be excluded by Defendant's construction as neither are described as having "records" and "fields". A text file **10**, for example, is edited to create a "linked text database" that is further used to build a "wordified database **20**." The wordified database **20** in turn is parsed and an index (lookup table) is created that links parsed words and phrases to reference materials. *See, e.g.*, '731 Patent at 5:5-28; *see also*, 6:46-7:39. Thus, neither the linked text database nor the wordified database are described in the specification as having records or fields.

In contrast, Plaintiff's proposed construction is consistent with the open-ended use of the term in the specification and the plain meaning of the term, and expressly contemplates that a database may be a relational database but also may be any file, including a text file. *Id.* and '731 Patent, claims 50-52 (further clarifying that the database may be a "relational database," an "electronic file," or an "electronic text"). Whereas both parties here agree that a database is an "organized collection of data" consistent will all dictionaries cited by either side, Defendants can

---

[3] *MySpace*, 756 F. Supp. 2d at 1227.

SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF                    Case No. C-13-0825-PSG

point to no reason to restrict the general term "database" to only a database that includes fields and records or requires "complete entries."  The '731 Patent does not even discuss "records" at all and refers to "fields" only in the context of data entry and display fields, not database fields.

**B.     "Link"/"Linking"**

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| a **link** to the at least one of the plurality of external reference materials/**links** to the external reference materials<br><br>('731/'633) | electronic connection to one or more external reference materials/ electronic connections to the external reference materials | a pointer to data or information or the location of data or information in a record that is different than the originating record / pointers to data or information or the location of data or information in a record that is different than the originating record |

Sentius's proposed construction of the term link captures its plain meaning, without any improper limitations.  Plaintiff's proposed construction is also substantively identical to the construction that Flyswat and Sentius agreed to and the court adopted in the *Flyswat* litigation, without limitations that neither party here proposes.[4]  The term "link" has also been similarly construed in at least one previous case in the Northern District of California.[5]  Moreover, the *Flyswat* Court already rejected a definition of link, like Defendant's, that would exclude hyperlinks.[6]

---

[4] *See* Ex. 6 (*Flyswat* Order) at 16 (accepting uncontested construction of link as "electronic connection").  The *Flyswat* Court imposed two limitations on the term 'link' – that it be 'tagless' and 'media independent' – but neither party in this action propose those limitations.

[5] *See Informatica Corp. v. Business Objects Data Integration, Inc*., 2005 WL 6220492 *12 (N.D. Cal. 2005) (There is no need to go beyond the plain and ordinary meaning here. The Court . . . construes the term "link" to mean: **connection**.").

[6] *See* Ex. 6, *Flyswat* Order at 19 ("Based on all of the intrinsic and extrinsic evidence, there is no support for Flyswat's proposed definition of 'linking' which excludes 'hyperlinks.'  The Court finds that 'linking' in the preamble does not exclude 'hyperlinks.'").  Defendant's construction would exclude hyperlinks because hyperlinks do not need to link to anything in a "record."

Sentius and Microsoft part company in two fundamental ways.  First, Microsoft proposes limiting the term "link" to a "pointer" rather than leaving it open-ended as "an electronic connection" as proposed by Sentius.[7]  At best, Microsoft's only justification for limiting the term to a pointer would be to narrow improperly this open-ended claim term to an exemplary type of link shown in a preferred embodiment.  However, in the absence of any compelling reason to do so, such as a clear disclaimer in the prosecution history, it is incorrect to limit a term to an example given in the preferred embodiment.[8]  More fundamentally, the specification describes that the link may be of various types and resolved dynamically, which would also negate limiting the link to a specific address in memory, because as the specification teaches the link may be to an entire dictionary.  *See* '731 Patent at 7:16-19 ("In the case of language learning, the component words and phrases are linked to a foreign language dictionary."); *see also id.* at 7:35-50 (describing a dynamic link to a dictionary wherein the associated references from the dictionary for a given word are resolved and displayed alongside the word only after the user right clicks on it).

Indeed, the only time the term "pointer" is used in the specification in describing the operation of the preferred embodiment is in the context of a user's pointing device such as a mouse.  *Id*. at 7:40-42.  "Pointer" is used in the context of links at 6:22-36; however, this is in the context of distinguishing prior art and broadens the use of the term to something beyond an address, rather than narrowing it.  To the contrary, the patent here specifically envisions that links are not limited to static links.

---

[7] Microsoft has not defined the term "pointer".  To the extent that they mean "an address in memory," that inappropriately narrows the meaning of the claim language.

[8] *See Kara Tech*, 582 F.3d at 1348 ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment . . .").

9

Thus, it would be wrong to limit the term "link" to a "pointer" to a specific address or location based on these citations, as proposed by Defendant. Not only is such a construction inconsistent with the breadth of the specification, but the dependent claims themselves make even clearer that the term "link" is used broadly and may include an address, a hyperlink or any other reference information used in retrieving selected reference materials for display. *See* '731 Patent at claims 22-24. Defendant's proposed construction would exclude hyperlinks, which can be dynamic and do not always point to an end address. To the contrary, dependent claim 22 (which depends from asserted claim 8) specifically requires that the link is a hyperlink, showing both that the term "link" is broader than and contemplated to specifically include a hyperlink.[9] Moreover, dependent claim 23, also stemming from claim 8, specifically calls for the link being an address, to which Defendant's proposed construction appears to be limited. Most importantly, dependent claim 24 contemplates that the link may be any reference information for retrieving the selected reference material. All of these dependent claims are squarely inconsistent with Defendant's narrow proposed construction.

In addition to the broad use of the term 'link' in the specification, the extrinsic evidence shows that the term "link" encompassed various and unlimited electronic connections. For example, in PCT International Application WO 95/04974 at page 1 (pdf page 3), a patent cited in the '985 Patent's prosecution, the term "link" was expressly contemplated to encompass "an instance of a relationship between two or more components" where a component is a "discrete unit of information." Ex. 11. Similarly, the IBM Dictionary of Computing (1994) defines a link as an "association between two information nodes." Ex. 7 at p. 386. Moreover, consistent with

---

[9] "Hyperlink", as used at the time of the '731 patent, was understood to be a broad term covering a variety of possible implementations, from the "simple pointers" disclosed in the specification, to the dynamic links described in PCT International Application WO 95/04974 at 1 and elsewhere. *See, e.g.*, Ex. 9 Viewing Dexter with Open Eyes, John J. Leggett and John L. Schnase (1994); Ex. 10, Light Hypermedia Link Services: A Study of Third Party Application Integration. Hugh C. Davis, Simon Knight, and Wendy Hall. (1994)).

the disclosure in the '985 Patent that the link can be dynamic, the reference captures the knowledge of one of ordinary skill in the art that a "dynamic link" can be computed "at the time that the result of the computation is needed." Ex. 11.  Moreover, the '349 patent specification, which also uses the term link, broadly describes that tags used for linking may be "a hyperlink that leads to additional annotational content; however additional tag structures can be used." '349 at 9:9-11.  Similarly, the '985 patent expressly contemplates that the '731 technology can be used by the RichLink processor to tag the document, see '985 at 7:34-44, and also that the specific content for display in the pop-up window may be selected after user clicks on the term (i.e the word or phrase), *see* '985 at 12:6-15, which further demonstrates that link in the look-up tables need not be a specific location of the final content to be displayed, as Defendant appears to suggest.

Second, Defendant seeks to limit the term "link" to denote a relationship only between two "records."  Nothing in the specification requires that the reference material be a "record," whatever that term means.  Given Defendant's construction of "database", this would appear to bootstrap into the broad term 'link' a limitation that the link can only be between two relational databases.  This proposal would directly contradict the specification, which shows a link between text in a structured text file (wordified database 20) to a dictionary, as explained in the "database" section of this brief.  For that additional reason, Defendant's proposed construction should be rejected.

### C.  "Syndicating/Syndicated"

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| **Syndicating / syndicated** ('985 Claims 1,11) | making content available for automatic download over the internet to one or more remote subscribed computers | Distributing/ Distributed |

11

Contrary to Defendant's construction, the specification and the context of the use of term 'syndicating/syndicated' in the claim language makes clear that it does not refer to just any type of network distribution but rather specifically refers to the publication of content to computers that can automatically download and subsequently maintain synchronicity with the content.

The '985/'633 Patents of the second patent family are succinctly titled "Automated Creation and Delivery of Database Content."  The '985 specification calls the automated delivery of the database content "syndication."  *See, e.g.*, '985 Patent at 2:14-16 ("Information from the database needed to create links and the rules for linking to database content are syndicated to remote servers.").

As described in the specification, "a content publisher wishing to provide links from words and phrases in a document to the supplemental information in the database installs an automated tagging engine (the RichLink Processor) within its network.  The RichLink processor automatically downloads, from the central database, the data structures necessary to perform the high-speed tagging of the text and to execute tagging rules without requiring a connection to the database at the time of tagging…"  '985 at 2:44-52.  As the specification explains, the system maintains synchronization between new database content:  "[t]he RichLink Processor performs routine synchronization of its data structures with the database to insure that changes to content within the database, tagging rules, or presentation rules are reflected locally."  *Id.* at 2:52-55.[10]

---

[10] The RichLink Processor performs several operations on the text of a file that it processes.  The text may be parsed and tagged when matches are identified between the parsed terms and terms occurring in the Lexicon Object for specified dictionaries. '985 Patent at 9:1-14. The RichLink Processor module enables the automatic linking of external information by using processing rules and syndicated content to determine whether or where a particular document page should be processed to identify what terms should be cross-referenced to supplemental content based upon the syndicated lexicon object data and template object data. '985 Patent at 8:35-67.  ("The RichLink Processor interacts with the Template Object 930 to identify the rules that should be used in processing and the Lexicon Object 920 to identify what terms should be tagged in the source text.").  As the specification explains, "[t]he Lexicon Object provides a local representation of the Term Database for use by the RichLink Processor 910 so a direct connection to the Term Database is not required…" and  "[t]he Template Object provides a local representation of the Template that contains the rules for processing and linking a file so a direct connection to the Template Database is not required…"  '985 Patent at 9:30-35 and 9:37-52.

12

As the specification further explains, the Lexicon and Template Manager modules automatically access the Term and Template Databases to obtain the latest versions of the Lexicon and Template Objects and further perform periodic refreshes of the Lexicon and Template objects to maintain synchronization between the central databases and the information they maintain locally.   Further, the specification explains that the Lexicon and Template Manager modules must log into the databases "so that the server only obtains lexicons and templates for which they have privileges."   '985 Patent at 9:59-10:14.   Further supporting that the term "syndicating" as used in the patent refers to the automatic delivery of the authorized content, each independent claim is directed to a computer implemented method/system.   *See* '985 patent at claims 1, 11, 20, 21 and 36; *see also* '349 patent at claims 1, 15, 28, 31, 45.   Thus each claim specifically requires that the computer (acting through modules) perform the steps of sending or receiving the syndicated content.

Thus, the terms "syndicating" and "syndicated" do not merely refer to "distributing" content over the internet, as suggested by Defendant.   Merely "distributing" content over the internet would encompass sending the database objects via emails or via an FTP link, where the user would have to install the files.   No such user involvement is contemplated in the syndicating system of the present invention.   Indeed, such type of prior art was expressly distinguished during the prosecution of the '985 patent.   Specifically, in April 1, 2009 Office Action, the USPTO rejected pending claims 49, 58-59 and 68 under 35 U.S.C. §102(e) as anticipated by the U.S. Patent Publications No. 2003/0033290 ("Garner"), in part on the basis that this reference also taught syndicating one or more data objects representing data associated with a term database to remote servers for linking content to terms.   In its September 14, 2009 response, Applicant pointed out that Garner provided a "tabulation function" that would allow a "data

table" to be "exported" to the remote computers and argued that this did not "syndicate" the data table to remote servers. Ex. 12 at p. 11. The rejection was subsequently withdrawn.

Another reason that syndicating is not merely distributing the content over the network in any manner as suggested by Defendants is that without the ability for the remote computer to automatically download the available content, the system, which must be computer implemented, could not synchronize content as expressly contemplated by the specification as well as dependent claims 9 and 19 of the '985 patent and dependent claims 9 and 23 of the '349 patent.

For all of the reasons above, the Court should reject Defendant's position that syndication refers to any arbitrary form of distribution over a network, such as would be satisfied by sending the content via an email attachment for installation onto the remote computer by the email recipient, or likewise via an FTP link for a manual installation. The context of the term in the claim language and the specification makes clear that it does not refer to just any type of network distribution but rather specifically refers to the publication of content to authorized computers who can automatically download and subsequently maintain synchronicity with the content.

D.   "Receiving"/"Received"

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| **Receiving / received** ('349 patent) | obtaining and storing automatically | Plain and ordinary meaning, which does not require or exclude "obtaining and storing automatically" |

The specification of the '349 Patent is identical to the '985 patent and each of its independent claims similarly requires a computer implemented method/system. See '349 Patent at claims 1, 15, 28, 31 and 45. Just as the '985 patent requires the computers acting through software modules to perform the steps of syndicating the lexicon objects, so does the '349 Patent require that a computer obtain and store the lexicon objects. The conditions are the same, only

14

the perspective of which computer is engaged in the action is different. Plaintiff's construction is consistent with the specification and claims language, and its ordinary meaning, [11] whereas Defendant's construction is exactly the opposite of the specification's teachings and the express claim language, since it would allow for a human implemented method of obtaining and storing the lexicon objects, rather than a computer implemented method as required by the claims.

### E.    "Parsing"

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| **parsing** one or more documents to identify at least one term based on at least one rule ('985 claim 1, '349 claim 1)<br><br>**parsing** one or more source documents to identify at least one term based on one or more predetermined rules ('349 claim 31) | breaking at least one document into segments to identify at least one term based on at least one rule<br><br>breaking at least one source document into segments to identify at least one term based on at least one predetermined rule | breaking at least one entire document into sentences, words and/or phrases to identify at least one term based on at least one pre-established criteria |

The parties dispute one basic issue with respect to the meaning of parsing. Defendants' proposed construction would require an entire document to be broken into "sentences, words and/or phrases," before a term is identified, which is a limitation nowhere found in the claim. The claim language makes it plain that the purpose of the parsing is to identify at least one term based on a predetermined rule. Nowhere does the claim recite, nor does the specification or prosecution history require, that the parsing of any given document must be done by first breaking the "entire" document into "sentences, words and/or phrases." Such a construction is also inconsistent with Microsoft's own dictionary definition of parsing, which defines parsing as

---

[11] *See* Ex. 7, IBM Dictionary of Computing (1994), p. 559 (receive (1) To obtain and store data.).

"break[ing] input into smaller **chunks** so that a program can act upon the information."[12] Caselaw confirms that parsing simply means breaking data into components whose content or format can be analyzed, rather than breaking data into "sentences, words and/or phrases."[13]

The '985 patent describes that the RichLink Processor uses the parsing function to identify the portions of a document that should be processed to identify a term: "The RichLink Processor interacts with the Template Object **930** to identify the rules that should be used in processing and the Lexicon Object **920** to identify what terms should be tagged in the source text. Tags in the page identify whether a page should be processed by the RichLink Processor or not, *denote sections of a page to be processed*, and indicate the template that should be used in processing that page/section." '985 Patent at 8:51-58 (emphasis supplied).

Microsoft also proposes to construe the word "rule" as "criteria", but offers no support for this construction. "Rule" is a commonly understood term that does not require construction; Microsoft does not explain what it means by "criteria," which, if anything, is more in need of construction than the term "rule." Moreover, the use of the term "criteria" is confusing because the '985 specification uses the term "criteria" in a completely different context from its use of the term "rule." The term "criteria" is used in the specification in the context of applying business judgment in determining how to split terms and associated content into the various dictionaries ('985 at 4:14-17), whereas "rules" is used in the specification in the context of executing the linking rules from which terms of interest are identified and content associated therewith displayed based upon the information contained in the lexicon objections (*i.e.* the local

---

[12] Ex. 13, Microsoft Press Computer Dictionary. The Comprehensive Standard For Business, School, Library, and Home (1994), page 292 (emphasis added). Plaintiffs understand this definition of parsing to be synonymous with plaintiffs' proposed construction, but prefer the term "segment" rather than the synonymous word "chunk" because the former word is more clearly understood to a lay audience.

[13] *See SimpleAir, Inc. v. AWS Convergence Technologies, Inc., et. al.*, 2011 WL 3880525 at *12-*13 (E.D. Tex. 2011) (construing "parsing said data with parsers" to mean "using computer software to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon").

representation of the term dictionary).  It is not clear why Microsoft seeks to construe the term "rule", but nothing indicates its use in other than a plain and ordinary way that requires no further construction.

### F.  MPF: "Term Module," "Processing Module," "Processor," and "Module"

#### 1.  The "Module"/ "Processor" Limitations Are Not MPF

The parties first dispute whether the module and processor limitations found in claim 11 of the '985 patent and claim 15 of the '349 patent should be treated as "means plus function" limitations subject to 35 U.S.C. § 112, ¶ 6.  They should not.  The claims do not use the word "means," and a claim limitation that does not use the word "means" triggers a strong presumption that § 112, ¶ 6 does not apply.  *See Inventio AG v. ThyssenKrupp Elevator Americas Corp.,* 649 F.3d 1350, 1360 (Fed. Cir. 2011) ("In this case, the inventor did not draft the claims in "means for" format, and his decision to avoid the term "means" raises a strong presumption that the claimed "computing unit" connotes sufficiently definite structure to those skilled in the art.");   *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1369 (Fed. Cir. 2002).   This presumption may be rebutted only by demonstrating that the disputed claim term fails to "recite sufficiently definite structure" or else recites "function without sufficient structure for performing that function."  *See CCS Fitness*, 288 F.3d at 1369 (quotations omitted); *Inventio*, 649 F.3d at 1360 (defendant had "the burden to show that the 'computing unit' terms are so structurally devoid that we should rewrite them in means-plus-function format").   "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of the structure and is simply a substitute for the term 'means for.'" *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1360 (Fed. Cir. 2004).

The Federal Circuit has held that when "the structure-connoting term [ ] is coupled with a description of the [term's] operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art...."  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004).  The Federal Circuit has specifically observed:

> In considering whether a claim term recites sufficient structure to avoid application of § 112, ¶ 6, we have not required the claim term to denote a specific structure.  Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.

*Inventio AG,* 649 F.3d at 1359–60.

Here, the term "module" connotes sufficient structure in the mind of one of ordinary skill in the art because it refers to a part of a program that contains instructions relating to a specific function or related functions.  *See* IBM Dictionary of Computing (1994), Ex. 7, at 439 ([4] "a part of a program that usually performs a particular function or related functions;" [7] "[s]ynonymous with program unit.").

Courts regularly construe module claims to avoid section 112, ¶6.  In *TecSec, Inc. v. International Business Machines Corp.*, 731 F.3d 1336, 1348 (Fed. Cir. 2013), the Federal Circuit, reversing a district court, rejected the court's holding that a ""digital logic means" is a means-plus-function limitation because the "**modules**," "systems," and "means" recited in the claim are generic structures."  *Id.* at 1347 (emphasis added.)  The claim recited an "encryption algorithm module" and a "decryption algorithm module."  *Id.* at 1339.  The Federal Circuit emphasized that:

> The claim also recites that the digital logic means is comprised of structural elements, including a system memory and **specific modules** and subsystems. While the defendants assert that those elements are purely generic, we see no reason to hold that those elements are so devoid of structure as to implicate § 112, ¶ 6.

*Id.* at 1348 (emphasis added); *see also, e.g.*, *Wi-Lan USA, Inc. v. Alcatel-Lucent USA, Inc.*, 2013 WL 4811233 (S.D. Fla. 2013) (finding 'module' provided sufficient structure to avoid

SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF

Case No. C-13-0825-PSG

section 112, ¶ 6).  Indeed, in numerous Northern District of California cases the term "module" was either left undefined or was defined as a discrete hardware or software component.  *See, e.g.* *Jajah Inc v. Stanacard LLC*, 2010 WL 1838970 *17 (N.D. Cal. 2010) (construing "a telephone number detection module for detecting an assigned telephone number dialed by the caller" as "a discrete component of hardware or software or both that performs the function of detecting an assigned telephone number dialed by the caller."); Ex. 14, *Friskit, Inc. v. Realnetworks, Inc.*, 3-03-cv-0585 (N.D. Cal. May 20, 2005) (construing "network server module" as "a software module located on the serverside in a client-server network, capable of performing a stated task or function").

The same is true for processor.  *See, e.g.*, *Wi-Lan*, 2013 WL 4811233 (holding that the "'processor' claims," like the module claims, are "not means-plus-functions limitations"). Further, because the claim language does not use the term "means," "[i]n the absence of any compelling evidence of the understanding of one of ordinary skill in the art, the presumption that Section 112(f) does not apply is determinative." *Id.* at *42.  *See, e.g.*, *Apple v. Samsung Electronics Co., Ltd.*, 2013 WL 1502181 at *10-*11 (N.D. Cal. 2013) (construing "action processor" as "program routine(s) that perform the selected action on the detected structure.")

### 2.      Alternative Means-Plus-Function Construction

Alternatively, if the module and processor terms are interpreted to be means-plus-function limitations (which they are not), there is no basis for Microsoft's position that there is no corresponding structure.  Courts have regularly found that a "module" is the actual structure described in the specification which corresponds to the function claimed by means language. *See, e.g.*, *On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1340–41 (Fed. Cir. 2006) (affirming claim construction that found "computer module" to be the structure for "means for a customer to visually review said sales information"); *Foundry Networks v. Lucent Techs., Inc.,* 2005 WL 6217420, at *7-*9 (E.D. Tex. May 24, 2005) (finding "voice communication module" to be the structure for "means for forwarding an incoming call" limitations); *Roche*

19

*Diagnostics Corp. v. Apex Biotechnology Corp.,* 455 F. Supp. 2d 840, 868 (S.D. Ind. 2005) (finding "a removable and/or reinsertable read-only-memory ("ROM") chip and/or module" to be the structure for "pluggable memory key means" limitation); *Alcatel USA Sourcing, Inc. v. Microsoft Corp.,* 2008 WL 3914889, at *18, 20, 21 (E.D. Tex. 2008) (finding a processor using a "locator module" to be structure for "means for determining" and "means for identifying" and "device module" and the software executing it to be structure for "means for manipulating each received data or message"); *Visto Corp. v. Good Tech, Inc.,* No. 2:06–CV–039, 2008 WL 163576, at *11–12, 13 (E.D. Tex. Jan. 16, 2008) (finding "general synchronization module" to be the structure for "first [/second] means for generating first[/second] examination results from first [/second] version information" and "means for generating;" "synchronization start module" to be the structure for "means for initiating;" and communications module" to be the structure for "means for downloading data"), *constructions adopted by Visto Corp. v. Research in Motion, Ltd.,* 623 F. Supp. 2d 756 (E.D. Tex. 2008); *Autobytel, Inc. v. Dealix Corp.,* 2006 WL 155683, at *8–9 (E.D. Tex. Jan. 18, 2006) (finding "process purchase request module," "database access module," "buyer-dealer association module," and "network access module" to be structures for "means for identifying," "means for creating," and "means for communicating").

Nor can Microsoft argue that there is a lack of algorithmic support for how the module is implemented. "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005). "The usage 'algorithm' in computer systems has broad meaning, for it encompasses in essence a series of instructions for the computer to follow." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011) (internal quotation omitted). The algorithm required to be disclosed by the specification can be expressed "in any

20

understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). "For computer-implemented procedures, the computer code is not required to be included in the patent specification," but the disclosure only need be sufficient "for a person of skill in the field to provide an operative software program for the specified function." *Typhoon Touch*, 659 F.3d at 1385. Thus, Courts have regularly found that even broadly described steps provide sufficient algorithmic support.

### G. "Term Module" and "Processor"

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| **term module** ('985 claim 11)[14] | **a computer processor in conjunction with executable code for instructing the computer processor to parse one or more documents to identify at least one term based on at least one rule**<br><br>Alternatively (if Court considers term to be MPF),<br><br>Function: parsing one or more documents to identify at least one term based on at least one rule<br><br>Structure: a computer processor in conjunction with executable code for instructing the computer processor to parse one or more documents to identify at least one term based on at least one rule, as described in the specification and equivalents thereof | Means Plus Function<br><br>Function: "breaking at least one entire document into sentences, words and/or phrases to identify at least one term based on at least one pre-established criteria"<br><br>Corresponding Structure: none |

---

[14] The parties agree that the same construction applies to 'processor' ('349 claim 15).

SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF                    Case No. C-13-0825-PSG

The claim element "term module" denotes the executable code that instructs the processor to parse one or more documents to identify at least one term using at least one rule. Therefore there is no real reason for the Court to construe the term.  If the Court determines any construction is needed, the Court should accept Plaintiff's proposed construction which follows the claim language.

Should the Court determine that the claim element "term module" requires means-function treatment, it should find the structure to be a computer processor in conjunction with executable code for instructing the computer processor to parse one or more documents to identify at least one term based on at least one rule, as described in the specification and equivalents thereof.

Here, the specification describes the exemplary steps of using natural language parsing for the parsing and using a compare function between a parsed word and the lexicon object data to see if the term is or is not within the lexicon (*i.e.* apply a rule) in order to determine whether or not the term needs to be flagged for linking to additional content.  The specification's description provides the algorithmic support, including the exemplary steps of using natural language parsing for the parsing and using a compare function between a parsed word and the dictionary lexicon to see whether the term is or is not within the lexicon (*i.e.* apply a rule) in order to determine whether or not the term needs to be flagged for linking to additional content. Moreover, the '985 patent is clear that the RichLink Processor may use the automated methods disclosed in the '720 patent (which is the predecessor to the '731 patent and shares the same specification therewith, and which discloses using the natural language parsing as well as tagging using look-up tables rather than in-document tagging).  *See e.g.*, '985 at 7:35-52; 8:35-9:21. Thus, the Defendant's assertion that no structure for this module should be rejected.

**H.      "Processing Module" and "Module"**

| Claim Term | Sentius' Construction | Defendant's Construction |
|---|---|---|
| processing module ('985 claim 11)[15] | **a computer processor in conjunction with executable code for instructing the computer processor to identify content for the at least one term**<br><br>Alternatively (if Court considers term to be MPF),<br><br>Function:  identifying content for the least one term<br><br>Structure:  a computer processor in conjunction with executable code for instructing the computer processor to identify content for the at least one term, as described in the specification and equivalents thereof | Means Plus Function<br><br>Function: "identifying content for the at least one term"<br><br>Corresponding Structure: none |

For all of the same reasons as above for the claim element 'term module", the claim element "processing module" does not need to be construed because the term "module" connotes sufficient structure as a hardware/software component that performs the recited function (here of identifying content for the at least one term.)  If the Court determines that any construction is needed, it should adopt the Plaintiff's construction, which is consistent with the specification and with the plain and ordinary meaning "module."

If the Court determines that the term requires means plus function treatment then it should find its structure to be executable code instructing the computer processor to identify relevant content for an identified term as described in the patent, and its equivalents.  The '985

---

[15] The parties agree that the same construction applies to module ('349 claim 15).

SENTIUS'S OPENING CLAIM CONSTRUCTION BRIEF                         Case No. C-13-0825-PSG

patent describes that the RichLink processor applies linking rules contained in the syndicated lexicon and/or template object data to identify content associated with the identified term for display alongside the identified term.   '985 at 7:35-44; 8:35-59; 9:1-14; 9:19-27; 9:36-51.   The Defendant's assertion that no structure is shown for this term should be rejected.

## IV.   ORDER OF CLAIMS

Microsoft argues that all claims of '731, all claims of '633, claim 1 of '985 and claims 1 and 31 of '349 must be performed in the order written, citing only to pages 7-8 of the *Flyswat* claim construction order.   There is no merit to this argument.   "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."  *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1342 (Fed. Cir. 2001).   Courts look "to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written."  *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1369 (Fed. Cir. 2003).   If not, courts "next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction."  *Id.* (internal citations omitted).   If it does not, there is no order requirement. *See id.*

The *Flyswat* Court only held that Claim 8 of the '720 Patent must be performed in the order written, and it based this decision solely on a finding that two sequences must be performed in order (8.2 before 8.3 and 8.7 before 8.9) and because Sentius did not offer any other possible orders.   In the first place, Claim 8 of the asserted '731 patent, which is a reissue of the predecessor '720 patent, rewrites the original claim 8 steps of the '720 patent, and adds the "linking", "displaying" and "retrieving" steps, so the *Flyswat* Order does not apply.   Claim 8 does not actually recite an order, so ordinarily it should not be construed to require one.  *See Interactive Gift*, 256 at 1342.   The steps are not all required as a matter of logic or grammar to occur in order.   For example, steps 1-5 do not need to be done before steps 6-9, and could even

24

be interleaved within steps 1-5, and many orders are possible.  Even if 8.2 needs to precede 8.3 and 8.7 needs to precede 8.9, which is all the *Flyswat* Court held with respect to the prior patent, the fact that *some* steps must be performed in a specific order does not mean that the *other* steps must be performed in any particular order.  *See, e.g.*, *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) (holding that some claimed steps needing to be performed in order does not require all claimed steps be performed in order); *accord In re Cygnus Telecommunications Technology, LLC, Patent Litigation,* 481 F. Supp. 2d 1029 (N.D. Cal. 2007).

Finally, Microsoft has not pointed to anything in the specification or prosecution history that directly or implicitly requires such a narrow construction.  Thus, there is no reason to hold that claim 8 of '731 requires every step to be performed in the order written.  It is even less clear why Microsoft states that the other claims must be performed in order, which have no relationship to the *Flyswat* ruling.

Dated:  November 26, 2013

SUSMAN GODFREY L.L.P.


By:  *s/Seth Ard*_____
        Steven G. Sklaver (SBN 237612)
        SUSMAN GODFREY L.L.P.
        1901 Avenue of the Stars, Suite 950
        Los Angeles, CA 90067
        Telephone:  (310) 789-3100
        Email:  ssklaver@susmangodfrey.com

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Max L. Tribble
(Appearance *Pro Hac Vice*)
Vineet Bhatia
(Appearance *Pro Hac Vice*)
Sandeep Seth
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  (713) 651-9366
Email: mtribble@susmangodfrey.com
Email: vbhatia@susmangodfrey.com
Email: sseth@susmangodfrey.com

Seth Ard
(Appearance *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone:  (212) 336-8330
Email: sard@susmangodfrey.com

Attorneys for Plaintiff Sentius International, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 6, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ. L.R. 5-1(h)(1). A copy has been sent to the ADR Unit.

By:  *s/Seth Ard*
   Seth Ard

27