1  Frank E. Scherkenbach (SBN 142549)
   scherkenbach@fr.com
2  Kurt L. Glitzenstein (pro hac vice)
   glitzenstein@fr.com
3  FISH & RICHARDSON P.C.
   One Marina Park Drive
4  Boston, MA 02210
   Telephone: (617) 542-5070
5  Facsimile: (617) 542-8906

6  Attorneys for Defendant
   MICROSOFT CORPORATION

7  *Additional counsel listed on signature page*

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 (SAN JOSE DIVISION)

12

13 SENTIUS INTERNATIONAL, LLC,          Case No. 5:13-cv-00825 PSG

14            Plaintiff,                **DEFENDANT MICROSOFT
                                        CORPORATION'S RESPONSIVE CLAIM
15       v.                             CONSTRUCTION BRIEF**

16 MICROSOFT CORPORATION,

17            Defendant.

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page(s)

3

I.      INTRODUCTION ................................................................................................. 1

4

II.     BACKGROUND ................................................................................................... 2

5

        A.      The Reissue Patents.................................................................................. 2

6

        B.      The '985 and '349 Patents........................................................................ 4

7

        C.      The Accused Products ............................................................................... 5

8

III.    Statement of Law .................................................................................................. 6

9

IV.     Argument .............................................................................................................. 7

10

        A.      "Database" (The Reissue Patents)............................................................. 7

11

        B.      "Database" (The '985 & '349 Patents) ................................................... 10

12

        C.      "Link" / "Linking" (The Reissue Patents) ............................................. 11

13

        D.      "Link" / "Linking" (The '985 & '349 Patents) ..................................... 13

14

        E.      "Syndicating" / "Syndicated" ('985 patent)......................................... 13

15

                1.      "Syndication" Need Not Be Automatic ...................................... 14

16

17

                2.      Syndication Need Not Occur "Over the Internet to One or More Remote Subscribed Computers"..................................... 16

18

        F.      "Receiving" / "Received" ('349 Patent) ................................................. 17

19

        G.      "Parsing" (The '985 & '349 Patents) ..................................................... 18

20

        H.      The "Module" and "Processor" Limitations (The '985 & '349 Patents)..................................................................................................... 18

21

22

                1.      The "Module" and "Processor" Limitations are Subject to § 112(6) ...................................................................................... 18

23

                2.      There is No Corresponding Structure for the "Parsing" Limitations ................................................................................. 21

24

25

                3.      There is No Corresponding Structure for the "Identifying" Limitations ................................................................................. 22

26

        I.      Order of Method Steps (The Reissue Patents) ...................................... 23

V.      Conclusion ......................................................................................................... 26

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>Cases</u>

4

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003)...............................................................................................23

5

6

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003)...............................................................................................20

7

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (*)...........................................................................................................19, 20

8

9

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
    632 F.3d 1246 (Fed. Cir. 2011).........................................................................................14, 15

10

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)...............................................................................................21

11

12

*C.f. Informatica Corp. v. Business Objects Data Integration, Inc.*,
    2005 WL 6220492 (N.D. Cal. 2005)........................................................................................12

13

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)...............................................................................................23

14

15

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012).........................................................................................21, 23

16

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008).....................................................................................8, 19, 20

17

18

*Function Media, L.L.C. v. Google Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013)...............................................................................................21

19

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009)...............................................................................................15

20

21

*Kozam v. Phase Forward Inc.*,
    2005 WL 6218037 (D. Md. Aug. 29, 2005).............................................................................19

22

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004)...............................................................................................20

23

24

*Mas-Hamilton Grp. v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)...............................................................................................18

25

*Mass. Inst. of Tech. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006).........................................................................................18, 20

26

27

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
    2012 WL 1857161 (N.D. Cal., 2012)......................................................................................23

28

ii

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)................................................................20

*Nystrom v. Trex Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)..................................................................9

*Pers. Audio, LLC v. Apple, Inc.*,
    2011 U.S. Dist. LEXIS 157778 (E.D. Tex. January 31, 2011)..........................19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................6

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)................................................................15

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)................................................................20

*Ranpak Corp. v. Storopack, Inc.*,
    1998 U.S. App. LEXIS 16348 (Fed. Cir. July 15, 1998)................................19

*Resonate Inc. v. Alteon Websystems, Inc.*,
    338 F.3d 1360 (Fed. Cir. 2003)................................................................14

*Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*,
    2010 WL 2292316 (N.D. Cal. June 7, 2010)................................................19

*TecSec, Inc. v. International Business Machines Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013)................................................................20

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)................................................................17

*Williamson v. Citrix Online LLC*,
    2012 U.S. Dist. LEXIS 189496 (C.D. Cal. September 4, 2012)........................19

**Statutes**

35 U.S.C. § 101 ..........................................................................................1

35 U.S.C. § 112 ........................................................................1, 10, 18, 19, 22

35 U.S.C. § 251 ......................................................................................3, 25

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

1    **I.      INTRODUCTION**

2            This is the second time that Sentius has asserted its patents in litigation.  Back in 2000,

3    Sentius sued an entity called Flyswat Inc. in this District alleging infringement of U.S. Pat.

4    No. 5,822,720 ("the '720 patent").  After construing the disputed claims, Judge Armstrong granted

5    summary judgment of invalidity under 35 U.S.C. §§ 101 and 112.  The case settled pending

6    appeal.

7            Sentius attempted to fix the '720 patent by placing it into reissue.  The two resulting

8    reissue patents (the asserted '731 and '633 patents) have claims that are long and narrow,

9    prompting Sentius to seek broad and expansive constructions for infringement purposes.  For

10   example, Sentius seeks to have this Court adopt a construction for the term "database" that would

11   encompass a PowerPoint slide, an Outlook e-mail, or a Word document.  Such a broad

12   construction is unsupported by the intrinsic and extrinsic record, and no person of ordinary skill in

13   1994 would have called a Word document a "database."

14           Sentius has also asserted a second patent family against Microsoft, the '985 and '349

15   patents.  These patents were filed very late – the earliest alleged priority date is August 16, 2001.

16   By that time, Microsoft had already released multiple versions of its Office software that included

17   the same features Sentius now accuses of infringing.  Specifically, the accused background spell

18   check feature was first offered in Word 95, the accused background grammar check feature was

19   first offered in Word 97, and the accused Synonyms feature was offered in Word 2000.  All of

20   these products predate the two asserted patents.  For these patents, Sentius is primarily concerned

21   with invalidity.  Consequently, Sentius proposes narrowing constructions that import limitations

22   not found in the claims themselves.  For example, Sentius takes the straightforward term

23   "receiving" and changes it to "obtaining and storing automatically."  Nothing in the patent or

24   prosecution history supports such a narrowing construction.

25           Because Sentius' proposed constructions are inconsistent with the intrinsic and extrinsic

26   record, they should be rejected.  The Court should instead adopt Microsoft's proposed

27   constructions for the disputed claim terms.

28

II.     **BACKGROUND**

    A.     **The Reissue Patents**

The two reissue patents-in-suit (RE40,731 ("the '731 patent") and RE43,633 ("the '633 patent")), both reissues[1] of the '720 patent asserted in the *Flyswat* litigation, purport to describe "a novel indexing scheme that is useful in such applications as learning a foreign language, for example a language based upon an ideographic alphabet, such as Japanese."  (D.I. 52, Ex. 2 ('731 Patent) at 1:15-20).  The patents state that, "the study of Japanese language is plagued by the burdens of learning Kanji, the ideographic alphabet in which Japanese is written." (*Id*. at 1:58-60).  The patents provide a two-step solution in order to provide "a more effective way for people to read and improve their command of the foreign language, while at the same time communicating insightful and relevant cultural, social, and economic information about the country." (*Id*. at 3:58-63).  First, the patents describe "building links in a computer environment between particular segments of [the] source material and reference materials related to those segments." (Ex. A at 6).  Second, the patents recite "accessing the reference materials when a segment of source material is selected by a user." (*Id*.)

The reissue patents teach that each word in the source material is identified by its offset within the source document.  (D.I. 52, Ex. 2 ('731 Patent) at 5:5-6:45 & 7:1-10).  For example, the word "fox" in the following sentence has a starting position of 16 and an ending position of 18:

```
0           10          20          30          40
The  quick brown  fox jumps  over  the  lazy dog.
```

The patents use a "look-up table" to store the offsets for each word in the file, along with "links" to external content associated with that word. (*Id*. at 5:5-6:45, 7:11-20, Fig. 2).  For example, the look-up table can store the starting and ending address for the word "fox," with a link to a picture of a fox, as illustrated below:

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

| Start | End | Link |
|-------|-----|------|
| 16 | 18 | <c:\fox.gif> |



Whenever a user selects that same portion of the document, the system can display the linked content.  For example, if a user clicks their mouse at offset 17 within the file, the patented system determines that the user selected the word "fox" and uses the look-up table to identify the linked content, displaying it to the user.

The patents provide an example in the context of translating a Japanese language document.  Specifically, the patents describe a user clicking on Japanese characters at offset 25.  (*Id*. at 6:46-65)  The patented system uses the look-up table to identify the external content associated with that term (in this case, the translation "Japanese economy"), and display that linked content to the user via a pop-up:

*202*

| START | END | LINK |
|-------|-----|------|
| 10 | 15 | TEXT ,0 |
| 17 | 19 | PICT ,100 |
| 20 | 27 | TEXT ,200 |
| 29 | 31 | TEXT ,300 |
| 32 | 35 | SND ,400 |

| Address | Content |
|---------|---------|
| 200 | Japanese Economy |

Claim 8 of the '731 patent recites:[2]

---

[1]  Reissue allows a patentee to correct a patent that has been deemed "wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent."  35 U.S.C. § 251.

[2]  A reissue patent shows additions to the original claim in italics and deletions surrounded by boldface brackets.  Only the currently-operative claim language is shown here, not any additions or deletions.

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

8. A method for linking source material to external reference materials for display, the method comprising the steps of:

determining a beginning position address of a **source material stored in an electronic database**;

cutting the source material into a plurality of discrete pieces;

determining a starting point address and an ending point address of at least one of the plurality of discrete pieces based upon the beginning position address;

recording in a look up table the starting and ending point addresses;

**linking at least one of the plurality of discrete pieces to at least one of a plurality of external reference materials by recording in the look-up table, along with the starting and ending point addresses of the at least one of the plurality of discrete pieces, a link to the at least one of the plurality of external reference materials**, the plurality of external reference materials comprising any of textual, audio, video, and picture information; displaying an image of the source material;

selecting a discrete portion of the displayed source material image;

determining a display address of the selected discrete portion;

converting the display address of the selected discrete portion to an offset value from the  beginning position address;

comparing the offset value with the starting and ending point addresses recorded in the look-up table to identify one of the plurality of discrete pieces;

selecting one of the plurality of external reference materials corresponding to the identified one of the plurality of discrete pieces;

retrieving the selected one of the plurality of external reference materials using a recorded link to the selected one of the plurality of external, reference materials; and

displaying the retrieved external reference material.

**B.      The '985 and '349 Patents**

The '985 and '349 patents are similar to the reissue patents in that they generally recite systems and methods for building a "term database" that identifies "supplemental content" for various terms in a document.  In these two patents, terms of interest are identified by "crawling and parsing [a] corpus of documents to select terms through application of rules." (D.I. 52, Ex. 4 ('985 patent) at 2:21-30).  Once terms are identified, they are assigned to "experts" in the field, who can "enter supplemental information for that term, including definitions, explanations, specifications, links, related products or services, … translations, and reference works…" (*Id*. at 2:7-14).  These databases of content are distributed (the '985 patent uses the term "syndicated") to

4

remote computers, which can use the term database to create "enhanced page[s] that contain[]

links to the additional content." (*Id*. at 8:35-50). Claim 1 of the '985 patent recites:

> 1. A computer implemented method for processing database content, the method comprising the steps of:
>> **syndicating** one or more data objects associated with a term database to one or more remote computers, wherein the one or more data objects contain data associated with one or more terms;
>> parsing one or more documents to identify at least one term based on at least one rule;
>> identifying content for the at least one term; and
>> associating the at least one term with the identified content;
>> wherein the one or more data objects associated with the term **database** provide a representation of at least a portion of the term **database** at the one or more remote computers and are used to **link** the identified content with the at least one term.

## C.    The Accused Products

Sentius has accused various software products within the Microsoft Office suite of

infringing its four asserted patents. With respect to the reissue patents, Sentius has accused three

features as allegedly infringing: background spell check, background grammar check, and

"Additional Actions."

The background spell check feature identifies portions of a document (such as a Word

document, an e-mail, or a Power Point presentation) that are potentially misspelled by underlining

those portions with a red squiggle mark. When a user right-clicks on a potentially misspelled

word, the spell check engine can retrieve and display a list of possible correct spellings. The

grammar check functionality works similarly – a green squiggle mark is placed under a possible

grammatical error and, when a user right clicks on that word or phrase, a list of potential

replacements may be provided.

The "Additional Actions" functionality (also referred to as "Actions" or "Smart Tags"), as

its name suggests, allows a user to take additional actions for particular types of text. For

example, Microsoft Word can identify that certain specific terms (such as "MSFT") represent

stock symbols. If a user right clicks on the term "MSFT" in a document, and if the appropriate

actions are enabled, the user is given various options under the "Additional Actions" menu item,

including "Stock quote on MSN MoneyCentral," "Company report on MSN MoneyCentral," and

1  "Recent news on MSN MoneyCentral."  Clicking one of these options will open a separate web

2  browser window and direct the user to an external web page.

3         With respect to the '985 and '349 patents, Sentius accuses these same three functionalities.

4  Additionally, Sentius accuses the "Synonyms" functionality as allegedly infringing these patents.

5  The Synonyms functionality provides a thesaurus; when a user right clicks on a term, the accused

6  software can display suggestions from a thesaurus corresponding to that term.

7  **III.    STATEMENT OF LAW**

8         Microsoft presents the authority for specific points of law in the individual sections that

9  follow.  As a general proposition, claim terms should be given the ordinary and customary

10  meaning "that the term would have to a person of ordinary skill in the art in question at the time of

11  the invention. … [t]he inquiry into how a person of ordinary skill in the art understands a claim

12  term provides an objective baseline from which to begin claim interpretation." *Phillips v. AWH*

13  *Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  "Importantly, the person of ordinary skill

14  in the art is deemed to read the claim term not only in the context of the particular claim in which

15  the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

16  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is

17  dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315.  "Like the

18  specification, the prosecution history [also] provides evidence of how the PTO and the inventor

19  understood the patent," and is a part of the intrinsic record.  *Id.* at 1317.

20         "In some cases, the ordinary meaning of claim language as understood by a person of skill

21  in the art may be readily apparent even to lay judges, and claim construction in such cases

22  involves little more than the application of the widely accepted meaning of commonly understood

23  words." *Id.* at 1314.  "In such circumstances, general purpose dictionaries may be helpful." *Id.*

24  Extrinsic evidence such as dictionaries can also "help educate the court regarding the field of the

25  invention and can help the court determine what a person of ordinary skill in the art would

26  understand claim terms to mean," and therefore "it is permissible for the district court in its sound

27  discretion to admit and use such evidence."  *Id.* at 1319.

28

6

IV.     ARGUMENT

A.  "Database" (The Reissue Patents)

| Claim Term | Sentius' Construction | Microsoft's Construction |
|---|---|---|
| Database ('731 Patent, all claims; '633 Patent, all claims) | A collection of data with a given structure for accepting, storing and providing, on demand, data for at least one user | A collection of data organized and searchable via records and fields.  A record is one complete entry in a database, *e.g.*, Gerry Friesen, 12 West 21 Street, new York, NY 10010, 212-691-8215.  A field would be the street address field, namely 12 West 21 Street. |

The independent claims of the reissue patents all require "source material stored in an electronic database."  Specifically, the patents describe taking an input file, such as an "electronic book," and "cutting" that file into its constituent parts, such as individual words or phrases, to create a "wordified database."  (D.I. 52, Ex. 2 ('731 Patent) at 5:5-18, 7:1-10).  In its claim construction briefing in the *Flyswat* case, Sentius highlighted this "database driven approach" of its claimed invention.  (*See* Ex. A at 3 ("In contrast to prior art linking technology, the invention described in Claim 8 of the '720 Patent specifies a new system for the automatic addition of hyperlinks to a document using a **database driven approach**")).[3]

In its infringement contentions, however, Sentius does not point to any database within Microsoft Office (for example, Microsoft Access) as allegedly infringing its patents.  Instead, Sentius alleges that features such as an Outlook e-mail, a Power Point slide, or a Word document in memory can satisfy the "database" limitation.

> "When any of the accused products opens a document or file, the document/file is loaded into random access memory and displayed on a computer screen. … **The textual content in the document/file is 'source material' and is stored in a structured manner within the document/file ('database')**."

(Ex. B at 6).

---

[3]     All emphasis in this brief is added unless otherwise noted.

1    This application of the claims is far too broad.  The case of *Finisar Corp. v. DirecTV*

2  *Group, Inc*., 523 F.3d 1323 (Fed. Cir. 2008), is instructive.  In that case, the district court

3  construed the term "information database" to mean, "a collection of computerized information

4  which can be accessed."  *Id*. at 1330.  The Federal Circuit rejected this construction as

5  "unjustifiably broad."  *Id*.  It noted that the claim language and specification required various

6  hallmarks of a database, such as an index and the ability to search (i.e., query) the data.  *Id*. at

7  1331.

8    Similarly, here the claim language itself, as well as the specification, describe a traditional

9  database that uses a "table" structure to store data in records and fields.  The patents recite that,

10  "[i]n the new format of the **present system**, every word or sound, for example, can be linked to

11  information not contained within the text using an indexing method that maps a single word or

12  phrase to a **table** that contains external reference numeral." (D.I. 52, Ex. B ('731 Patent) at 6:37-

13  45).  The claims of the reissue patents refer to this as a "look up table," which stores a record for

14  each word in the document containing individual fields including "the starting and ending point

15  addresses of the at least one of the plurality of discrete pieces" and "a link to the at least one of the

16  plurality of external reference materials."  (*Id*., claim 8).  Figure 2 of the '731 patent shows a

17  representation of this claimed look-up table, depicting it as a table with records (*i.e.*, the individual

18  rows) and fields (*i.e.*, the columns within a row).  (*Id*., Fig. 2).

19    The patents distinguish this "database" structure from the structure of the input data, which

20  can be in the form of a "text file," an "ASCII" file, or a "word processor file."  For example, the

21  patents state, "[t]he original text [to be placed in the database] is provided by a publisher in

22  electronic form in a raw binary text format (*e.g.* **an ASCII text file or other word processor file**).

23  This text is then divided up into the component word or phrases in preparation for the next step,"

24  *i.e.*, the creation of the database.  (*Id*. at 7:1-10).  The patents further describe the process by which

25  an "input text file" is turned into an "indexed database."  (*Id*. at 5:19-23).  Figure 1 shows both

26  files (such as the "text file 10" and the "file 33") as separate and distinct from the "wordified

27  database 20" and the "relational database 15."  (*Id*., Fig. 1; *see also* Ex. C at SENTIUS0001060-

28  61).

8

1    This "database" structure was critical in securing the allowance of the original '720 patent.

2    Specifically, the claims of the '720 patent as originally filed did not recite that the source material

3    must be stored in an electronic database; this limitation was added in order to overcome a rejection

4    based on an IBM patent (U.S. Pat. No. 5,146,552, to Cassorla *et al.*), which disclosed adding

5    content to documents using tags within the document.  (*See* Ex. D; Ex. E).  Sentius added the

6    limitation "said source material image stored in an electronic database," and distinguished

7    Cassorla's use of "tags" within the document as different from its database-driven approach,

8    which instead uses an "electronic database…for the source material image" with links to the

9    external content.  (Ex. D at 7).  The claims were allowed after this amendment.

10    In addition to being consistent with the intrinsic record, Microsoft's proposed construction

11    is also consistent with extrinsic definitions cited by both parties.  The portion of Microsoft's

12    construction reciting "records and fields" is taken from Newton's Telecom Dictionary from 1994.

13    (*See* Ex. F).  The Microsoft Press Computer Dictionary from 1994, which Sentius cited in the

14    parties' joint claim construction chart, similarly describes a "database" as made up of "records (or

15    tables), each of which is constructed of fields (columns) of a particular type, together with a

16    collection of operations that facilitate searching, sorting, recombination and similar activities."

17    (*See* D.I. 51, Ex. A at 2).  While Sentius was also able to locate broader definitions, "it is improper

18    to read [a] term to encompass a broader definition simply because it may be found in a dictionary,

19    treatise, or other extrinsic source."  *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1145 (Fed. Cir.

20    2005).  The proper focus should be on what the intrinsic evidence reveals and, while the extrinsic

21    evidence is informative, as discussed above the intrinsic evidence is consistent with those

22    definitions requiring records and fields.[4]  Sentius' proposed construction, by contrast – "a

23    collection of data with a given structure for accepting, storing and providing, on demand, data for

24

25

26    [4]   Sentius cites opinions of other courts that have construed the term "database," yet it
      acknowledges that none are binding.  (D.I. 52, fn.1).  Importantly, none of these courts were
27    faced with the intrinsic record here, nor were they presented with a patentee attempting to read
      the term "database" so broadly that it could encompass an Outlook e-mail, a Power Point
28    presentation, or a Word document.  Flyswat, for example, may well have used a database in its
      accused product, which would explain why it did not dispute Sentius' proposed construction.

9

1    at least one user" – renders the term "database" meaningless, since all computerized data must

2    have some "structure."[5]

3         Sentius objects that Microsoft's proposed construction is limited to "relational" databases.

4    This is simply not correct.  A relational database, as its name suggests, contemplates the creation

5    of "relationships" between multiple tables.  Nothing in Microsoft's proposed construction requires

6    the creation of relationships, nor does Microsoft require more than a single table.  Consequently,

7    Sentius' discussion of claim differentiation misses the point.  (*See* D.I. 52 at 7).

8         Sentius also objects that Microsoft's construction excludes the concept that a text file can

9    in some instances be a database.  Once again, this is incorrect: a text file can be a "database" under

10   Microsoft's proposed construction, so long as it is organized using records and fields.[6]

11        **B.    "Database" (The '985 & '349 Patents)**

12        The parties appear to agree that the term "database" should be construed consistently

13   between the two asserted patent families.  The '985 and '349 patents, like the reissue patents,

14   expressly distinguish between a "database" and other types of files.  For example, the patents state

15   that input files can be in any "common file types such as XML, HTML, RTF, **Word documents**,

16   and Adobe Acrobat."  (D.I. 52, Ex. 4 ('985 Patent) at 8:47-50).  By using a capital "W," the

17   patents are clearly referring to the accused Microsoft Word file format, which is also referenced

18   elsewhere in the patents.  (*See Id*. at 11:3).  The patents never refer to these source documents as a

19   "database," and instead state that words from these sources "may be inserted into the Term

20   Database," which is shown as a separate element.  (*See Id*. at 9:1-13; Fig. 1; Fig. 7).  When the

21   patents do refer to "databases," they refer to "commercially-used database formats, such as Oracle,

22   MS SQL, Informix, Sybase, and IBM DB2," which the patents state contain "fields." (*Id*. at 12:46-

23   49).  It is notable that, although the patent expressly refers to Microsoft Word in other locations, it

24   is not listed here.

25   _____

26   [5]  Sentius' proposed construction is so broad it would raise invalidity issues pursuant to 35
     U.S.C. § 112, which is another reason it should be rejected.

27   [6]  One extrinsic source produced by Sentius states, "[a] flat file is the simplest possible database.
     It consists of a single, unformatted text file in which **each line corresponds to a record**. k-1

28   occurrences of a separator character divide each record into k variable length **fields**."  (*See* Ex.
     G).

                                                10

1    For these reasons and the reasons noted above, the Court should adopt Microsoft's

2  proposed definition for the term "database."

3    **C.    "Link" / "Linking" (The Reissue Patents)**

| Claim Term | Sentius' Construction | Microsoft's Construction |
|---|---|---|
| A **link** to the at least one of the plurality of external reference materials / links to the external reference materials<br><br>('731 Patent, all claims; '633 Patent, all claims) | Electronic connection to one or more external reference materials / electronic connections to the external reference materials | A pointer to data or information or the location of data or information ~~in a record that is different than the originating record~~ that is external to the source material /<br>Pointers to data or information or the location of data or information ~~in a record that is different than the originating record~~ that is external to the source material |

13    The term "link," like "database," is a term of art whose meaning is straightforward.  As

14  Sentius argued in the prior *Flyswat* litigation, a "link" is a reference to "data or information or the

15  location of data or information in a record that is different than the originating record."  (Ex. A at

16  6).  In other words, a "link" is a "pointer" to something not found in the source material itself.  (*Id.*

17  at 7).  The Court in *Flyswat* agreed with Sentius on this point.  (*See* D.I. 52, Ex. 6 at 10 ("This use

18  of 'linking' [in the patent] falls squarely within Sentius' suggested meaning of a **pointer from**

19  **information in one record to information in another**.")).  Microsoft's proposed construction is

20  nearly identical to the construction Sentius proposed back in 2002, with the only change being to

21  replace the imprecise term "referring to" with the more specific term "pointer to."

22    In addition to tracking Sentius' prior construction of the term, Microsoft's proposed

23  construction is also consistent with the intrinsic record.  For example, the reissue patents describe

24  "hyperlinks" as "simple pointers[7] that directly link text with other text, graphics, or sound within

25  the text file itself."  (D.I. 52, Ex. 2 ('731 Patent) at 6:24-26).  The patents state that, "[i]n the new

26  format of the **present system**, every word or sound, for example, can be **linked** to information not

_____

[7]    Sentius incorrectly suggests that this term never appears in the reissue patents other than to
     describe a mouse pointer.  (D.I. 52 at 9).

11

1   contained within the text using an indexing method that maps a single word or phrase to a table

2   that contains **external reference numeral**." (*Id*. at 6:37-42). In the patents, this "external

3   reference numeral" is a number pointing to the location of "text, graphics, images, movies, and/or

4   sound" stored in a separate table within the database. (*Id*. at 6:37-64 & Fig. 2).

5          Microsoft's proposed construction is also consistent with extrinsic evidence. For example,

6   the IEEE Standard Dictionary of Electrical and Electronics Terms from 1996 defines the term

7   "link" as "a pointer." (*See* Ex. H). First named inventor Mark Bookman previously testified that,

8   "[a] link is a **pointer** embedded within a record that refers to data or the location of data in another

9   record…" (Ex. I at SENTIUS0000896-897). Second named inventor Brian Yamanaka  similarly

10  agreed that a "link" is "a **pointer** embedded within a record that refers to data or the location of

11  data in another record." (Ex. C at SENTIUS0001295-96).

12         Sentius argues that Microsoft's use of the word "pointer" is limited to "a specific address

13  in memory" and that it excludes hyperlinks. (D.I. 52 at 9-10). This is incorrect – as noted above,

14  the patent itself explicitly refers to a hyperlink as a "pointer." (D.I. 52, Ex. 2 ('731 Patent) at 6:24-

15  26). The term "pointer" simply refers to anything that provides the location of something else,

16  and it could include a memory address, a hyperlink, or a "reference numeral" referring to an entry

17  in a database table. A "pointer" can be static (*i.e.*, always pointing to the same thing) or dynamic

18  (*i.e.*, pointing to different things at different times). None of these are excluded by Microsoft's

19  proposed construction. Indeed, Microsoft respectfully believes that its use of the term "pointer" is

20  in fact broader than Sentius' chosen term, "electronic connection."[8] A "connection" connotes

21  some physical linkage between two things – for example, a bridge "connects" two banks of a river

22  by physically attaching to each side. An individual standing on one bank of a river and "pointing"

23  to the opposite side, however, need not actually connect the two sides. Because Microsoft's

24  proposed construction is in fact broader than what Sentius argues in its opening brief, its

25  discussion regarding reading in preferred embodiments (*i.e.*, the "reference numeral"

26  _____

27  [8]   It is certainly possible that in some contexts a "link" could require an actual physical

28  "connection," such as a "link" in a chain, but as discussed above in the context of the reissue
    patents-in-suit the term is not so limited. *C.f. Informatica Corp. v. Business Objects Data
    Integration, Inc.*, 2005 WL 6220492 *12 (N.D. Cal. 2005).

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

1   embodiment), violating the doctrine of claim differentiation, and purported inconsistencies with

2   various extrinsic sources are straw man arguments that have no relevance to the present dispute.

3   As noted above, the term "pointer" is one that neither Sentius nor the Court in *Flyswat* had any

4   trouble understanding and adopting to describe this term.

5       Sentius also argues that Microsoft errs by including the word "record" in its proposed

6   construction.  (D.I. 52 at 11 ("Nothing in the specification requires that the reference material be a

7   'record,' whatever that term means.")).  As noted above, the term "record" is taken directly from

8   Sentius' own prior construction for this term.  (*See* Ex. A at 6).  Nevertheless, Microsoft agrees

9   that the term "record" has the potential to cause juror confusion given that it also could refer to a

10  "record" in a database.  Microsoft has therefore modified its proposed construction to read, "a

11  pointer to data or information or the location of data or information **that is external to the source**

12  **material**."  This is the same construction for "external reference" proposed by Sentius and

13  adopted by the Court in the *Flyswat* litigation.  (*See* Ex. A at 15; D.I. 52, Ex. 6 at 38).

14      **D.**   **"Link" / "Linking" (The '985 & '349 Patents)**

15      The parties appear to agree that the identical terms "link" and "linking" in the '985 and

16  '349 patents should be given the same construction as the reissue patents.  The only minor

17  modification Microsoft proposes for these patents is that, to track the grammatical structure of the

18  patent claims, the constructions should read either "create" (for claims that use the term "link,"

19  *i.e.*, '985 Patent claim 1 and '349 Patent claim 1) or "creating" (for claims that use the term

20  "linking," *i.e.*, '985 Patent claims 11 & 16 and '349 Patent claims 6, 15 & 31) a pointer to data or

21  information or the location of data or information in a location that is different than the originating

22  location.  For the reasons discussed above, the Court should adopt Microsoft's proposed

23  construction for these terms.

24      **E.**   **"Syndicating" / "Syndicated" ('985 patent)**

25

| Claim Term | Sentius' Construction | Microsoft's Construction |
|---|---|---|
| Syndicating / Syndicated ('985 Patent, all claims) | Making content available for automatic download over the internet to one or more remote subscribed computers | Distributing / Distributed |

28

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

1    The term "syndicate" has a plain meaning, though not one often used in the computer
2    science context.  With respect to the publishing industry, an article or comic strip may be
3    "syndicated" by mailing it to a newspaper to print.  A non-technical dictionary from the relevant
4    time period defines the verb "syndicate" as "publish (material) through a syndicate."  (Ex. J).  In
5    the '985 patent, the term refers to the distribution of databases of content created by "experts" in a
6    particular field.  (D.I. 52, Ex. 4 ('985 Patent) at 3:35-40).
7    Both parties appear to agree that this term refers to "distributing" or "making content
8    available."  Sentius, however, claims that this distribution must be (1) automatic (*i.e.*, without user
9    involvement), and (2) over the internet to one or more remote subscribed computers.  Both of
10   these additional limitations are inappropriate.

### 1.    "Syndication" Need Not Be Automatic

12   With respect to the word "automatic," this is a phrase that the patentee was apparently well
13   familiar with – it appears at least 22 times throughout the patent.  The patent refers to
14   "automatically" building a database, "automatically" identifying terms of interest in a document,
15   "automatically" assigning terms to an expert, and "automatically" synchronizing databases.  (*Id.* at
16   Abstract, 11:14-24, 12:36-45).  Some claims specifically recite "automatically associating the at
17   least one term in the one or more source documents with at least one link."  (*See, e.g., Id.* at
18   Claims 21, 36).  The fact that the patentee did not use the word "automatic" in the asserted claims
19   to modify "syndication" is highly instructive.  S*ee Arlington Indus. v. Bridgeport Fittings, Inc.*,
20   632 F.3d 1246, 1254-55 (Fed. Cir. 2011) (refusing to read the word "split" into the claims when
21   other claims explicitly recited this limitation); *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d
22   1360, 1365 (Fed. Cir. 2003) ("Courts may not rewrite claim language based on what has been
23   omitted from a claim").
24   As Sentius notes, the specification does state in one instance that, "[t]he RichLink
25   processor automatically downloads, from the central database, the data structures necessary to
26   perform the high-speed tagging of the text and to execute tagging rules…" (D.I. 52, Ex. 4 ('985
27   Patent) at 2:44-52).  First, this passage does not use the word "syndicate."  Second, the
28   specification elsewhere expressly uses the modifier "automatically" before the word syndicate to

14

1    describe a preferred embodiment: "FIG. 7 is a diagram illustrating the steps performed to

2    **automatically create, syndicate, and link** to database content, according to the present

3    invention."  (*Id.* at 3:12-14).  This modifier would have been unnecessary if "syndicate" by itself

4    required automatic distribution.  These two statements at most describe preferred operations of the

5    claimed system, but that does not mean the concept of "automatic" syndication must be read into

6    every single claim.  *See Arlington*, 632 F.3d at 1254 ("even where a patent describes only a single

7    embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear

8    intention to limit the claim scope using words of expressions of manifest exclusion or

9    restriction"); *Kara Tech. Inc. v. Stamps.com Inc*., 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The

10   claims, not specification embodiments, define the scope of patent protection. The patentee is

11   entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or

12   import a limitation from the specification into the claims").[9]

13           Sentius also points to passages in the '985 specification that refer to "synchronization,"

14   but this concept has nothing to do with the term in dispute.  The synchronization of databases

15   occurs *after* those databases are "syndicated," and separate claims explicitly recite this

16   synchronization functionality.  (*See* D.I. 52, Ex. 4 ('985 Patent) at Claims 9 & 19).  Even with

17   synchronization, it is not at all clear that this must occur "automatically" – instead, the patents

18   state that, "[s]ynchronization of data **can be scheduled** so transfers between the two databases

19   occur automatically…"  (*Id.* at 12:36-45).

20           Sentius also argues that the patentee disclaimed coverage of non-automatic distribution

21   systems during the prosecution of the '985 patent, yet the prosecution history does not support this

22   argument.  Specifically, Sentius points to a portion of the file history where the patentee argued

23   that Garner (U.S. Pat. Pub. No. 2003/0033290) only discloses "exporting" a database table to a

24   format such as Microsoft Excel or Access, and not "syndicating" the table to a "remote server."

25   ───────────────────

26   [9]   The fact that the title of the patent refers to "automated" delivery of database content is of even
          less importance.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co*., 182 F.3d 1298, 1312, 51
27        U.S.P.Q.2D (BNA) 1161, 1171 (Fed. Cir. 1999) ("If we do not read limitations into the claims
          from the specification that are not found in the claims themselves, then we certainly will not
28        read limitations into the claims from the patent title.").

(D.I. 52, Ex. 12 at 11; Ex. K).  This portion of the prosecution history is irrelevant for at least two reasons.  First, to the extent the cited portions of the Garner reference only disclose exporting database content to the same machine running the database, Sentius was entirely correct to point out that this is not "syndicating" to a "remote server," as the pending claim required.  The argument focused on the lack of *any* transmission, not on whether or not that transmission was performed automatically.  Second, the Patent Office expressly rejected this purported distinction: in an interview summary dated December 1, 2009, the examiner stated, "[e]xaminer thought the proposed amended claims do not overcome the cited prior art."  (Ex. L).  It was not until after an examiner's amendment was entered adding a number of ***additional*** claim limitations that the claims were ultimately allowed.  (Ex. M).  This exchange is simply not informative, and it certainly does not rise to the level of a clear and unambiguous disclaimer or disavowal.  *See Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 833-34 (Fed. Cir. 2003) (noting that prosecution disclaimer requires "clear and unambiguous disavowal of claim scope").

### 2.   Syndication Need Not Occur "Over the Internet to One or More Remote Subscribed Computers"

Sentius also includes in its proposed construction the concept that "syndication" requires distribution "over the internet to one or more remote subscribed computers."  It is unclear whether by "internet" Sentius excludes distribution over private networks.  It is also unclear what Sentius means by "subscribed computers."  Regardless, the limitation is inappropriate.

The '985 patent never states that distribution must occur over a network (whether the Internet or otherwise).  The asserted claims contain no such limitation.  The only portion of the patent that Sentius cites to support its argument is the preamble, which states, "[a] computer implemented method for processing database content."  Sentius suggests that other method steps (such as "synchronizing") cannot occur without the ability for the remote computer to "automatically download" the available content over a network.  (D.I. 52 at 14).  Yet this is factually incorrect – it would be possible to implement a "computer implemented method for processing database content" by distributing databases, for example, on a CD-ROM executable by a computer.

16

1    Sentius also relies on the prosecution history, but once again, the prosecution history does

2    not support its argument.  As noted above, Sentius' arguments distinguishing the Garner reference

3    pointed out the lack of *any* distribution to a remote machine whatsoever.  (D.I. 52, Ex. 12 at 11).

4    Sentius never argued, for example, that Garner distributed content, for example, using a CD-

5    ROM, but not via the internet.

6    Because Sentius' proposed construction imports at least two limitations that are not

7    required by the intrinsic record, the Court should instead adopt Microsoft's proposed construction

8    for this term.

9    **F.    "Receiving" / "Received" ('349 Patent)**

| Claim Term | Sentius' Construction | Microsoft's Construction |
|---|---|---|
| Receiving / received<br><br>('349 Patent, all claims) | Obtaining and storing automatically | Plain and ordinary meaning, which does not require or exclude "obtaining and storing automatically" |

13   The term "receive" has a plain meaning.  It means "to get" or "obtain."  Even Sentius' own

14   dictionary definition confirms this.  (*See* D.I. 52, Ex. 7 at 559).

15   Sentius' sole argument appears to be that the term "receiving" should be construed

16   consistently with the term "syndicating."  For all of the reasons discussed above, Sentius is

17   incorrect that anything in these two patents requires "automatically" obtaining and storing

18   dictionaries.  Moreover, even assuming that the Court were to find that there was overwhelming

19   evidence to construe the term "syndicating" to require either "automatic" or "internet"

20   distribution, that says nothing about the separate term "receiving," which is not used in the patents

21   anywhere other than in the claims.

22   "To act as its own lexicographer, a patentee must clearly set forth a definition of the

23   disputed claim term other than its plain and ordinary meaning."  *Thorner v. Sony Computer Entm't*

24   *Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotations and citations omitted).

25   Sentius did nothing here to change the common and straightforward definition of "receive."  It

26   should be given its plain and ordinary meaning, with the clarification that Sentius cannot argue

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

1    manual distribution (for example by a user clicking a link or installing a CD) are excluded by this

2    limitation.

3        **G.       "Parsing" (The '985 & '349 Patents)**

4        Microsoft can agree to Sentius' proposed construction for this term.

5        **H.       The "Module" and "Processor" Limitations (The '985 & '349 Patents)**

6            **1.       The "Module" and "Processor" Limitations are Subject to § 112(6)**

7        Microsoft respectfully believes that the following four limitations, while not using the

8    word "means," nevertheless invoke 35 U.S.C. § 112(6):[10]

9        • "a term module for parsing one or more documents to identify at least one term

10           based on at least one rule" ('985 Patent, Claim 11)

11       • "a processing module for identifying content for the at least one term" ('985 Patent,

12          Claim 11)

13       • "a processor for parsing one or more documents to identify at least one term based

14          on at least one rule" ('349 Patent, Claim 15)

15       • "a module for identifying content for the at least one term" ('349 Patent, Claim 15)

16       Section 112, Paragraph 6, permits a patentee to express a claimed element as a "means . . .

17   for performing a specified function without the recital of structure, material, or acts in support

18   thereof." 35 U.S.C. § 112(6). The specific words "means for" are not required to trigger the

19   statute's applicability. *See Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir.

20   1998). Rather, absence of the words "means for" raises a rebuttable presumption that § 112, ¶ 6

21   does not apply, but the presumption may be overcome where the claim limitation at issue does not

22   "recite sufficiently definite structure or else recites function without reciting sufficient structure

23   for performing that function." *See Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1353

24   (Fed. Cir. 2006) (internal citations omitted).

25       The word "module" in particular is one that has been singled out as a generic term that

26   does not connote any meaningful structure. *See Ranpak Corp. v. Storopack, Inc.*, 1998 U.S. App.

27   _____

28   [10]   Do to recodification, this section is now referred to as 35 U.S.C. § 112(f). Microsoft will use
         the older terminology in its briefing to remain consistent with the case law cited herein.

18

1   LEXIS 16348, 1998 WL 513598, at *2 (Fed. Cir. July 15, 1998) (non-precedential) (finding

2   "settable control module" subject to 112(6)); *Williamson v. Citrix Online LLC*, 2012 U.S. Dist.

3   LEXIS 189496 at *41-43 (C.D. Cal. September 4, 2012) (finding "streaming data module" and

4   "distributed learning control module" subject to 112(6)); *Kozam v. Phase Forward Inc*., 2005 WL

5   6218037, 2005 U.S. Dist. LEXIS 46850 at *17 (D. Md. Aug. 29, 2005) (finding "data verification

6   module" subject to 112(6)).  The U.S. Patent Office lists "module for" as a "non-structural term[]

7   that may invoke § 112, ¶ 6."  (Ex. N).

8         Similarly, a generic usage of the term "processor" or "computer," with nothing more, has

9   been held to require means-plus-function treatment because it does not recite a specific structure

10  for carrying out a claimed function.  *See Pers. Audio, LLC v. Apple, Inc*., 2011 U.S. Dist. LEXIS

11  157778 at *68-72 (E.D. Tex. January 31, 2011) (finding several "processor for" limitations subject

12  to 112(6)); *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc*., 2010 WL 2292316, 2010 U.S. Dist.

13  LEXIS 60501 at *38 (N.D. Cal. June 7, 2010) ("if 'computer' is insufficient structure for a

14  'means' limitation, the naked term 'computer' cannot describe sufficient structure when recited

15  directly in the claim limitation").

16        Here, all of the claims are written as a "module" or a "processor" for performing a recited

17  function (*i.e.*, "a term module for parsing…"; "a processing module for identifying…"; "a

18  processor for parsing…"; "a module for identifying…").  There are no specific algorithms recited

19  in the claims that describe how these "parsing" or "identifying" functions are carried out.  The

20  terms "module" and "processor" by themselves do not add structure – they at best refer to general

21  purpose hardware running some unspecified algorithm.  As the *Soque Holdings* case noted, if a

22  reference to a general purpose computer or processor is insufficient to provide corresponding

23  structure in the specification, then logically it cannot provide sufficient structure when placed in

24  the claims.  *See* 2010 U.S. Dist. LEXIS 60501 at *36-38, citing *Aristocrat Techs. Austl. PTY Ltd.

25  v. Int'l Game Tech*., 521 F.3d 1328,1333 (Fed. Cir. 2008) ("In cases involving a computer-

26  implemented invention in which the inventor has invoked means-plus-function claiming, this court

27  has consistently required that the structure disclosed in the specification be more than simply a

28  general purpose computer or microprocessor"), *Finisar Corp.*, 523 F.3d at 1340-41 ("Simply

19

1   reciting 'software' without providing some detail about the means to accomplish the function is

2   not enough"), and *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1367 (Fed. Cir. 2008) ("a

3   means-plus-function claim element for which the only disclosed structure is a general purpose

4   computer is invalid if the specification fails to disclose an algorithm for performing the claimed

5   function").

6        Sentius relies on *Linear Tech. Corp. v. Impala Linear Corp*., 379 F.3d 1311, 1320 (Fed.

7   Cir. 2004), but that case (and others like it) deal with claims that recite hardware "circuits," not

8   general purpose computer software.  *See Id*. at 1319 (construing "circuit" and "circuitry"); *see also*

9   *MIT*, 462 F.3d at 1354-55 ("aesthetic correction circuitry"); *Apex Inc. v. Raritan Computer, Inc*.,

10  325 F.3d 1364, 1373-74 (Fed. Cir. 2003) ("first interface circuit" and "second interface circuit");

11  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 711 F.3d 1348, 1363 (Fed. Cir.

12  2013) ("soft start circuit").  In these cases, the use of the term "circuit" along with a description of

13  what that circuit does was sufficient to tell one of ordinary skill in the art how to construct that

14  specific circuit.  As noted above, the same is not true in cases involving software, where a

15  recitation of some algorithm is required in order to provide the necessary structure.  *See*

16  *Aristocrat*, 521 F.3d at 1333; *Finisar*, 523 F.3d at 1340-41; *Net MoneyIn*, 545 F.3d at 1367.

17       Sentius also relies on the Federal Circuit's recent decision in *TecSec, Inc. v. International*

18  *Business Machines Corp*., 731 F.3d 1336, 1348 (Fed. Cir. 2013), but that decision sheds little light

19  on the dispute here.  The first portion of the Federal Circuit's opinion dealt with the term "a

20  system memory," which was found to be "sufficient structure to perform the general function of

21  'storing data.'"  *Id*.  Here, the claims at issue recite specific functions ("parsing" and

22  "identifying"), not general functions that can be carried out by a general purpose computer, and

23  thus algorithmic specificity is required.  For the second limitation at issue in *TecSec*, "digital logic

24  means," the Federal Circuit noted that the claims at issue "do not recite a function for the digital

25  logic means to perform," and instead were written using purely structural language.  *Id*.  Here, by

26  contrast, the claims at issue only recite the functions that the "modules" or "processors" must

27  perform.  Because these disputed terms are written in purely functional language, they should be

28  construed as means-plus-function limitations.

20

2.      **There is No Corresponding Structure for the "Parsing" Limitations**

Claim 11 of the '985 patent recites, "a term module for parsing one or more documents to identify at least one term based on at least one rule."  Similarly, claim 15 of the '349 patent recites, "a processor for parsing one or more documents to identify at least one term based on at least one rule." The function in both claims is "parsing one or more documents to identify at least one term based on at least one rule.  As noted above, Microsoft no longer disputes Sentius' proposed construction for this functional claim language.

The next step in construing a means-plus-function limitation is to identify the corresponding structure that is "clearly linked or associated with the claimed function."  *Ergo Licensing, LLC v. CareFusion 303, Inc.,* 673 F.3d 1361, 1363 (Fed. Cir. 2012) (citation omitted). As noted above, in the case of computer-implemented means-plus-function limitations, "the structure disclosed in the specification [must] be more than simply a general purpose computer or microprocessor."  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009). Likewise, "simply disclosing software . . . without providing some detail about the means to accomplish the function, is not enough."  *Function Media, L.L.C. v. Google Inc.,* 708 F.3d 1310, 1318 (Fed. Cir. 2013) (internal quotations and citations omitted).  Rather, the specification must disclose a specific algorithm for performing the claimed function.  *Id.*  An algorithm is "a step-by-step procedure for accomplishing a given result" – *i.e.*, performance of the function.  *Ergo Licensing*, 673 F.3d at 1365.  Absent such a disclosure, the term is indefinite, and the claims that recite it invalid.  *See id.*

Here, the patents disclose no actual algorithm for carrying out the claimed "parsing" function.  The portion of the patents that describe the operation of the RichLink Processor only use functional language to describe the parsing process.  (D.I. 52, Ex. 4 ('985 Patent) at 9:1-13 ("The text may be parsed…").  The patents provide some additional detail on how terms may be identified, for example by comparing them to terms found in the "Lexicon Object" (*id.* at 9:5-11), but that says nothing about how the initial "parsing" to identify those terms is carried out.  There is no flowchart or other algorithm describing how to break a document into smaller sentences, words, and/or phrases.

21

1  Sentius points to portions of the specification that describe "natural language processing to

2  tokenize the text into significant objects such as words and phrases." (D.I. 52 at 22, citing D.I. 52,

3  Ex. 4 ('985 Patent) at 6:57-60). Once again, this says nothing about how this "natural language

4  processing" is carried out. The patents do not describe, for example, how to "tokenize the text into

5  significant objects." Nor do they provide any criteria for determining when an object (such as a

6  word or phrase) is "significant."

7  Sentius notes that the '985 and '349 patents make reference to the '720 patent, but the '720

8  patent is only referenced for its discussion of "tagging" source documents, not for any disclosure

9  of "parsing." (*Id*. at 7:35-44). Even if one were to turn to the '720 patent to understand how the

10  claimed parsing is performed, the '720 patent discloses that its "grammar parser 720" as a black

11  box, without any recitation of the structures that actually perform this functionality. (*See* Ex. O at

12  5:9-10, 7:9-11 and Fig. 1). The Court in the *Flyswat* litigation expressly held that the '720 patent

13  does not disclose the algorithm for "auto-cutting" (*i.e.*, automatically parsing) the source material.

14  (Ex. P at 17).[11] Further, the '720 patent states that source documents can take the form of "text

15  based material, or audio, video, or graphic based information." (Ex. O at 4:50-52). As the Court

16  in *Flyswat* held, there is no disclosure in the '720 patent for how to implement parsing for non-

17  textual sources. (Ex. P at 17-18). Sentius did not appeal this finding.

18  Because these patents do not disclose any algorithm for parsing documents, claim 11 of the

19  '985 patent and claim 15 of the '349 patent are invalid as indefinite. *See Ergo Licensing*, 673 F.3d

20  at 1365.

21  **3.       There is No Corresponding Structure for the "Identifying" Limitations**

22  Claim 11 of the '985 patent recites, "a processing module for identifying content for the at

23  least one term." Claim 15 of the '349 patent recites, "a module for identifying content for the at

24  least one term." Both parties agree that the function should be given its plain and ordinary

25

26

27  [11] While the Court held that one of skill in the art may be able to implement "auto-cutting" textual source material, for the purpose of corresponding structure under 35 U.S.C. § 112(6) the recitation of the structure for doing so must be explicit – it is not sufficient that one of ordinary skill may be able to implement such a structure. *See Noah Sys.*, 675 F.3d at 1318.

28

22

1    meaning.  The parties dispute whether there is any corresponding structure disclosed for this

2    claimed function.

3        The '985 and '349 patents do not themselves recite any algorithm for how the RichLink

4    Processor identifies content for at least one term.  The patents state that, "[t]erms from the

5    database are tagged in source documents 760 using the RichLink Processor or other automated

6    methods such as those disclosed in US. Pat. No. 5,822,720…" (D.I. 52, Ex. 4 ("'985 Patent) at

7    7:35-37).  Material found outside of the patent, however, cannot act as the corresponding structure

8    for a means-plus-function claim limitation.  *See Default Proof Credit Card Sys. v. Home Depot*

9    *U.S.A., Inc*., 412 F.3d 1291, 1301 (Fed. Cir. 2005).  Consequently, because there is no disclosure

10   of any corresponding structure in the '985 and '349 patents themselves, these means-plus-function

11   limitations are invalid as indefinite.  *See Ergo Licensing*, 673 F.3d at 1365.

12       **I.        Order of Method Steps (The Reissue Patents)**

13       All of the asserted claims of the '731 Patent and the '633 patent are method claims.

14   Sentius disputes that these method steps must be performed in the order recited in the claims, even

15   though it did not appeal a similar ruling in the *Flyswat* case.  (*See* D.I. 52, Ex. 6 at 7-8).  Here, the

16   plain language of the claims and the specifications require that the method steps must be

17   performed in the orders written.  *See, e.g.*, *Mformation Techs., Inc. v. Research in Motion Ltd*.,

18   2012 WL 1857161, at * 3 (N.D. Cal., May 10, 2012) ("if the claim explicitly or implicitly requires

19   a specific order," then the claim is limited to performance of the steps in that order. In addition,

20   the specification or prosecution history may . . . require a narrower, order-specific construction of

21   a method claim in some cases." (internal citations and quotations omitted)); *Altiris, Inc. v.*

22   *Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) (courts look to "the claim language to

23   determine if, as a matter of logic or grammar, [the method steps] must be performed in the order

24   written" and "[i]f not, we next look to the rest of the specification to determine whether it directly

25   or implicitly requires such a narrow construction." (internal citations and quotations omitted)).

26

27

28

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG

The following table demonstrates why each step of the Reissue Patents must be performed in the order recited:[12]

| Step | Claim Language | Order Requirements |
|---|---|---|
| 1 | determining a beginning position address of a source material stored in an electronic database; | |
| 2 | cutting the source material into a plurality of discrete pieces; | |
| 3 | determining a starting point address and an ending point address of at least one of the plurality of discrete pieces based upon the beginning position address; | • Determining start and end of "discrete pieces" cannot occur until after "cutting the source material" into those discrete pieces (*see* step 2).<br>• Start and end addresses cannot be computed as an offset from the "beginning position address" until the "beginning position address" is determined (*see* step 1). |
| 4 | recording in a look up table the starting and ending point addresses; | • Start and end addresses cannot be "recorded" until they are "determined" (*see* step 3) |
| 5 | linking at least one of the plurality of discrete pieces to at least one of a plurality of external reference materials by recording in the look-up table, along with the starting and ending point addresses of the at least one of the plurality of discrete pieces, a link to the at least one of the plurality of external reference materials, the plurality of external reference materials comprising any of textual, audio, video, and picture information; | • A lookup table cannot be created before the start and end addresses are recorded in that table (*see* step 4) |
| 6 | displaying an image of the source material; | |
| 7 | selecting a discrete portion of the displayed source material image; | • A user cannot "select" a portion of the source material until it is displayed (*see* step 6) |
| 8 | determining a display address of the selected discrete portion; | • The display address cannot be determined until a portion of the source material is selected (*see* step 7) |
| 9 | converting the display address of the selected discrete portion to an offset value from the | • The display address cannot be "converted" to an offset |

___

[12]  The language shown is from Claim 8 of the '731 patent, but all of the method claims from the Reissue Patents contain essentially the same steps in the same order.

| | | |
|---|---|---|
| | beginning position address; | value until the display address is "determined" (*see* step 8) |
| 10 | comparing the offset value with the starting and ending point addresses recorded in the look-up table to identify one of the plurality of discrete pieces; | • The offset value does not exist until after the display address is converted (*see* step 9)<br>• Comparison to a "look-up table" cannot occur before the look-up table is created (*see* steps 4 & 5) |
| 11 | selecting one of the plurality of external reference materials corresponding to the identified one of the plurality of discrete pieces; | • The selection of the external reference material cannot occur before the comparison with the look-up table takes place (*see* step 10) |
| 12 | retrieving the selected one of the plurality of external reference materials using a recorded link to the selected one of the plurality of external, reference materials; and | • The retrieval of the external reference material cannot occur until the external reference material is selected (*see* step 11) |
| 13 | displaying the retrieved external reference material. | • The external reference material cannot be displayed before it is retrieved (*see* step 12) |

Beyond the plain language of the claims requiring the performance of certain steps in the written order, the specification of the reissue patents is replete with instances of the patentee explicitly requiring ordered performance. For example, the patents describe that, "[t]he linking process takes the text ***after the word cut process*** and links it to an external reference." (D.I. 52, Ex. 2 ('731 patent) at 7:12-13). The patents further explain that, "***[a]fter linking***, the text and references are compiled." (*Id*. at 7:22-24). "During compilation, the cut text is reassembled to create an image of the text that the end user sees." (*Id*. at 7:22-24). For at least these reasons, the method steps of the reissue patents must be performed in the orders written.[13]

---

[13]   To the extent Sentius contends that the method steps of the '731 and '633 patents do not have to be performed in the written order because of changes made in the reissue proceedings, Microsoft submits that the '731 and '633 patents are improper broadening re-issue patents and are therefore invalid under 35 U.S.C. § 251.

25

1

**V.      CONCLUSION**

2

    For the reasons discussed above, Microsoft respectfully requests that the Court adopt its

3

proposed constructions for the disputed claim terms.

4

Dated:  December 13, 2013                          FISH & RICHARDSON P.C.

5

6

                                              By:  */s/ Jonathan J. Lamberson*

7

                                                   Jonathan J. Lamberson

8

                                              Attorneys for Defendant
                                              MICROSOFT CORPORATION

9

10

11

*Additional Counsel*

12

Jonathan J. Lamberson (SBN 239107)
lamberson@fr.com

13

FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500

14

Redwood City, CA  94063
Telephone: (650) 839-5070

15

Facsimile: (650) 839-5071

16

Isabella Fu (SBN 154677)
Isabella.fu@microsoft.com

17

MICROSOFT CORPORATION
One Microsoft Way

18

Redmond, WA 98052
Telephone: (425) 882-8080

19

Facsimile:  (425) 936-7329

20

50931437.doc

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 13, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ. L.R. 5-1(h)(1).  Any other counsel of record will be served by U.S. mail or hand delivery.

By:  <u>/s/ Jonathan J. Lamberson</u>
     Jonathan J. Lamberson

50931437.doc

MICROSOFT'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
Case No. 5:13-cv-00825 PSG