1 | Frank E. Scherkenbach (SBN 142549)
scherkenbach@fr.com
2 | Kurt L. Glitzenstein (pro hac vice)
glitzenstein@fr.com
3 | FISH & RICHARDSON P.C.
One Marina Park Drive
4 | Boston, MA 02210
Telephone: (617) 542-5070
5 | Facsimile: (617) 542-8906

6 | Attorneys for Defendant
MICROSOFT CORPORATION
7
*Additional counsel listed on signature page*
8

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | (SAN JOSE DIVISION)

12

13 | SENTIUS INTERNATIONAL, LLC, | Case No. 5:13-cv-00825 PSG

14 | Plaintiff, | **DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY (U.S. PATENT NO. 7,672,985)**
   | v.
15 |
   | MICROSOFT CORPORATION,
16 |
   | Defendant.
17 | | DATE: May 6, 2014
   | | TIME: 10:00 a.m.
18 | | JUDGE: Hon. Paul S. Grewal

19 | AND RELATED COUNTERCLAIMS

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS .......................................................................................... 2

    A. Microsoft Office 1995 ..................................................................................... 2

    B. Microsoft Office 1997 ..................................................................................... 2

    C. Microsoft Systems Management Server Version 1.2 ...................................... 2

    D. The Asserted Patent ......................................................................................... 4

III. STATEMENT OF LAW .............................................................................................. 5

    A. Summary Judgment ......................................................................................... 5

    B. Anticipation ...................................................................................................... 5

    C. Obviousness ..................................................................................................... 5

IV. ARGUMENT ............................................................................................................... 6

    A. There is No Genuine Dispute that Microsoft Office 1995, Microsoft Office 1997, and Microsoft Systems Management Server 1.2 are Prior Art to the '985 Patent ............................................... 6

    B. There is No Genuine Dispute Concerning the Level of Ordinary Skill at the Relevant Time ..................................................................... 6

    C. There is No Genuine Dispute that Microsoft Office 1995 and 1997 by Themselves Anticipate All of the Limitations of the Asserted Claims of the '985 Patent Except for "Syndication" ............................. 7

    D. There is No Genuine Dispute That the Use of SMS to Distribute Office 1995 and 1997 Anticipates the "Syndication" Limitation ........................ 8

    E. The Asserted Claims Were Publicly Used and Known Prior to August 16, 2001, Rendering the Claims Invalid as Anticipated ......................... 12

        1. The Asserted Claims Were Publicly Used Prior to August 16, 2001 .................................................................................................. 13

        2. The Asserted Claims Were Publicly Known Prior to August 16, 2001 .................................................................................................. 14

    F. The Asserted Claims of the '985 Patent Are Obvious ....................................... 15

V. CONCLUSION ............................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab. v. Geneva Pharms., Inc.*,
    182 F.3d 1315 (Fed. Cir. 1999) ................................................................................................14

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*,
    731 F.2d 831 (Fed. Cir. 1984) ....................................................................................................5

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010) ..................................................................................................5

*Evans Cooling Systems, Inc. v. General Motors Corp.*,
    125 F.3d 1448 (Fed. Cir. 1997) .............................................................................................7, 8

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) .......................................................................................................................6

*In re Ackenbach*,
    45 F.2d 437 (C.C.P.A. 1930) ...................................................................................................14

*In re Baxter Travenol Labs.*,
    952 F.2d 388 (Fed. Cir. 1991) ..................................................................................................14

*In re Borst*,
    52 C.C.P.A. 1398 (C.C.P.A. 1965) ..........................................................................................14

*In re King*,
    801 F.2d 1324 (Fed. Cir. 1986) ................................................................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ..................................................................................................5

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................................................................5, 6

*Leggett & Platt, Inc. v. VUTEk, Inc.*,
    537 F.3d 1349 (Fed. Cir. 2008) ..................................................................................................5

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ................................................................................................15

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001) ................................................................................................15

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003) ................................................................................................14

*Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*,
    522 F.3d 1348 (Fed. Cir. 2008) ................................................................................................13

**Statutes**

35 U.S.C. § 102 ................................................................................................................5, 6, 13

35 U.S.C. § 103 .........................................................................................................................5

Fed. R. Civ. P. 56 ......................................................................................................................5

PLEASE TAKE NOTICE that on May 6th, 2014 at 10:00 a.m., Defendant Microsoft Corporation ("Microsoft") will and hereby does move the Court for summary judgment that the asserted claims of Plaintiff Sentius Corporation's ("Sentius") U.S. Patent No. 7,672,985 ("the '985 patent") are invalid.

## I. INTRODUCTION

The asserted claims of the '985 patent are invalid. Sentius accuses features that have been in Microsoft Office since 1995, yet it did not file the '985 patent application until August of 2001, over six years later.[1] There is no genuine dispute that Office 1995 and Office 1997 are prior art. There is also no genuine dispute that these prior art versions of Office included the same background spell check and background grammar check features that Sentius now accuses of infringing the '985 patent.

Sentius' may argue that Office 1995 and Office 1997 by themselves do not satisfy the "syndication" limitation, which the Court construed to mean "making content available for automatic download over a network to one or more remote subscribed computers." (Docket No. 66). Sentius claims that "automatic" distribution capabilities were not added to Microsoft Office until 2007. Yet Sentius was not the first to conceive of making software available for automatic distribution over a network. In that regard as well, Microsoft long predated Sentius. As described below, Microsoft sold another product called Systems Management Server ("SMS") since well before August of 2001, and a primary purpose of SMS was to allow information technology ("IT") administrators to distribute software – including Microsoft Office 1995 and 1997 – automatically over a network to multiple remote subscribed computers. There is no genuine dispute about this functionality, which is described in multiple contemporaneous books and manuals, all of which predate the asserted patent by several years. There are even explicit instructions in these documents regarding how to distribute Microsoft Office 1995 and 1997 automatically over a network using SMS, and Microsoft's declarant in support of this motion,

---

[1] For purposes of this motion only, Microsoft will not dispute that Sentius is entitled to claim priority to the filing of its provisional application on August 16, 2001. Sentius has not alleged an earlier conception date. (*See* Docket No. 71, Ex. B).

Rusty A. Slaten, confirms that he personally assisted customers in doing just that years before Sentius filed its '985 patent application.

Put simply, there is nothing inventive about the '985 patent claims. All of the asserted claims are anticipated by and obvious in light of Microsoft's own software, which was released years earlier. Because there are no disputed facts, the Court should grant summary judgment and find the asserted claims of the '985 patent invalid.

## II.   STATEMENT OF FACTS

### A.   Microsoft Office 1995

Microsoft Office 1995 was first released on or around August 24, 1995. (Ex. A).[2] One new feature in this release of Microsoft Office was the "background spell check" capability, which checked the spelling of a document as a user typed, and which also marked potentially misspelled words with a red squiggle underline. (Ex. B, p.14, MS_SENTIUS011163; *id.*, p.66, MS_SENTIUS011215). When a user right clicked on a potentially misspelled word, a list of possible correct spellings would generally be displayed. (*Id.*).

### B.   Microsoft Office 1997

Microsoft Office 1997 was first released on or around January 16, 1997. (Ex. C). Microsoft Office 1997 retained the "background spell check" capability of Microsoft Office 1995, and one new feature was the "background grammar check" capability, which checked the grammar of a document as a user typed and marked potential errors with a green squiggle underline. (Ex. D, p.2, MS0203034; *id.*, p.10, MS0203065). When a user right clicked on a potentially incorrect term or phrase, a list of possible corrections would generally be displayed. (*Id.*).

### C.   Microsoft Systems Management Server Version 1.2

Microsoft Systems Management Server ("SMS") version 1.2 was first released on or around August 19, 1996. (Ex. E). A primary purpose of SMS was to make it easier for IT administrators to "centrally manage, support, and maintain a distributed network of computers."

---

[2] All exhibits cited herein are attached to the Declaration of Jonathan J. Lamberson, filed herewith. All emphasis is added unless otherwise noted.

(Ex. F, p.ix, MS_SENTIUS017229). Multiple contemporaneous sources state that one of the "most common" tasks using SMS was to automate the installation of software. (*See id*. at p.91, MS_SENTIUS017320 ("One of the most common management tasks that needs to be **automated** is the **installation and upgrading of software**."); Ex. G, p.3, MS_SENTIUS021418 ("Scheduled virus scans and **unattended software installations** are common uses for this SMS feature.")).

Using SMS, an IT administrator could "schedule and distribute individual software files or complete software applications to specific computers, at specified times. SMS even allows you to initiate **automated, unattended distribution** of software to selected computers. This can be done off hours, when the majority of users have gone home." (Ex. F, p.2, MS_SENTIUS017233).

SMS could automate the distribution of software in two different ways. First, an IT administrator could create a "package" of software to install on remote client machines and set that package for "mandatory" installation at a specific time, which meant "when the deadline is reached, the program will run automatically." (*Id*. at p.49, MS_SENTIUS017279). This "automated installation" could be performed "in background mode" which meant the software "can be installed without the user having to log on." (*Id*. at p.50, MS_SENTIUS017280; *Id*. at p.91, MS_SENTIUS017320 ("if the job was configured for unattended, mandatory installation, the software can be installed when the computer is unattended--overnight, for example"); *Id*. at p.103, MS_SENTIUS017332 ("If the software application package was configured for unattended installation, the installation will not require any user input"); Ex. G, p.13, MS_SENTIUS021428 ("the package might become mandatory (and **automatically execute** on the client)")). Microsoft Office 1995 and 1997 provided flags for a "quiet mode" installation, which required no user interaction. (Ex. H, pp.654-55, MS_SENTIUS018938-39; Ex. G, p.289, MS_SENTIUS021703).

In a second and distinct mode of operation, SMS allowed for software such as Microsoft Office 1995 and 1997 to be configured as a "shared application," in which case the software would be "stored on a distribution server for multiple users to run. When it is started by a user, it is loaded over the network into the local computer's RAM and is run at the local computer." (Ex. H, p.498, MS_SENTIUS018787).

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY (USP 7,672,985)
Case No. 5:13-cv-00825 PSG

1   Books were written on how to use SMS to automatically distribute Microsoft Office using
2   these two different distribution methods.  (*See, e.g., id.*, pp.652-56, MS SENTIUS018936-40;
3   Ex. G, pp.288-301, MS_SENTIUS021702-15).
4   Microsoft's declarant, Rusty A. Slaten, worked for Microsoft starting in 1997, and in 1998
5   and 1999 his job was to provide customer support for SMS version 1.2.  (Slaten Decl., ¶¶ 1-2).
6   Mr. Slaten confirms that he personally supported customers automatically installing Microsoft
7   Office 1995 and 1997 during that timeframe using SMS.  (*Id.*, ¶ 2).  These installations used the
8   "quiet mode" flags so that they would not require any user involvement.  (*Id.*, ¶ 3).

### D.    The Asserted Patent

Sentius filed the patent application that issued as the '985 patent on October 30, 2006. (Docket No. 52, Ex. 4).  The '985 patent claims priority to a provisional patent application filed on August 16, 2001.  (*Id.*).  By that time, all of the software discussed above had been developed, sold, and publicly known and used for several years.

Sentius filed this lawsuit against Microsoft on February 22, 2013.  (Docket No. 1).  Sentius served supplemental infringement contentions for the '985 patent on February 12, 2014.  (Ex. O; *see also* Docket No. 71, Ex. B).  These contentions accuse, among other things, the background spell check and background grammar check features of Microsoft Office 2007 of allegedly infringing the '985 patent.  (*Id.*).  As discussed below, and specifically with respect to the '985 patent, the implementation of the background spell check feature in Microsoft Office 2007 is materially identical to the implementation of the background spell check feature in Microsoft Office 1995, and the implementation of the background spell check and background grammar check feature in Microsoft Office 2007 is materially identical to the implementation of the background spell check and background grammar check features in Microsoft Office 1997.

/ / /

/ / /

/ / /

## III. STATEMENT OF LAW

### A. Summary Judgment

Summary judgment should be granted when no reasonable jury could return a verdict for the non-moving party. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). "Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). To defeat summary judgment, "[t]he party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." *Id.* at 835-36.

### B. Anticipation

A patent claim is invalid if it was "in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." *See* 35 U.S.C. § 102(a)(1). Determining if a claim is anticipated involves two steps: first, the court must construe the claims, and second the construed claims must be compared against the prior art. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010). "While anticipation is a question of fact, 'it may be decided on summary judgment if the record reveals no genuine dispute of material fact.'" *Id.* at 1331 (citing *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008)).

### C. Obviousness

A patent claim is invalid as obvious under § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *See* 35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-407 (2007). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the

level of ordinary skill in the pertinent art resolved.  Against this background, the obviousness or nonobviousness of the subject matter is determined.  Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *KSR*, 550 U.S. at 406 (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). Obviousness is a question of law that may be decided on summary judgment.  *Id*.

## IV. ARGUMENT

### A. There is No Genuine Dispute that Microsoft Office 1995, Microsoft Office 1997, and Microsoft Systems Management Server 1.2 are Prior Art to the '985 Patent

Microsoft Office 1995 was released on or about August 24, 1995.  (Ex. A).  Microsoft Office 1997 was released on or about January 16, 1997.  (Ex. C).  Microsoft Systems Management Server version 1.2 was released on or about August 19, 1996.  (Ex. E).  Microsoft produced multiple books and other contemporaneous documents that describe these products, all of which were publicly available over a year before the claimed priority date for the '985 patent.  (*See* Exs. B, D, F-H, M-N).  There is no genuine dispute that these products, as well as the documents describing them, are all within the scope and content of the prior art under at least 35 U.S.C. § 102(a)(1).

### B. There is No Genuine Dispute Concerning the Level of Ordinary Skill at the Relevant Time

For purposes of this motion only, the parties have agreed that the Court can consider invalidity from the perspective of a person having a bachelor's degree in computer science, computer engineering, or a related discipline, or alternatively four (4) years of computer software design experience.

/ / /

/ / /

/ / /

     **C.**     **There is No Genuine Dispute that Microsoft Office 1995 and 1997 by Themselves Anticipate All of the Limitations of the Asserted Claims of the '985 Patent Except for "Syndication"**

Sentius' infringement contentions accuse, among other things, the background spell check (red squiggle) and background grammar check (green squiggle) features of Microsoft Office of infringing the '985 patent. (*See* Ex. O). As shown in Microsoft's invalidity contentions, the background spell check feature was first included in Office 1995, and for the purposes of this case has not changed in any material respect since that time. (*See* Exs. I-J). The background grammar check feature was first included in Office 1997, and again for purposes of this case there are no material differences in the operation of this feature since that time. (*See* Exs. K-L). In fact, Microsoft filed patent applications on these features in 1995 and 1996, respectively, and the patents that issued from those applications describe all of the same features that Sentius now accuses of infringing, including most notably the background parsing of documents to create "tables" with "codes to identify checked, unchecked, or edited ranges of characters." (*See* Exs. M, N).

This case is thus analogous to *Evans Cooling Systems, Inc. v. General Motors Corp*., 125 F.3d 1448 (Fed. Cir. 1997). In *Evans*, the patentee accused General Motors of stealing his patented invention and incorporating it into GM's "LT1" and "L99" Corvette engines. *Id*. at 1450. General Motors introduced evidence that it sold the LT1 engine over a year before Evans filed for his patent. *Id*. Evans responded that GM's non-infringement contentions precluded summary judgment of invalidity based on prior use, but the Federal Circuit disagreed, noting, "[t]his is not the typical case where the patentee has placed some device on sale prior to the critical date and the accused infringer must demonstrate that this device actually embodied or rendered obvious the patented invention. Here, the entire basis of the lawsuit is Evans' – the patentee's – contention that the LT1 engine – the device that was put on sale – contains a cooling system that infringes. … Although GM bore the burden of proving that the LT1 engine embodied the patented invention or rendered it obvious for purposes of the summary judgment motion, this burden is met by Evans' allegation, forming the sole basis for the complaint, that the LT1 engine infringes." *Id*. at 1451.

Here, as in *Evans*, Sentius' own infringement contentions demonstrate that nearly all of the limitations of the asserted claims are anticipated by the prior art versions of Office, given that those contentions accuse the same features that were introduced years before in prior versions of the accused Office software.

### D. There is No Genuine Dispute That the Use of SMS to Distribute Office 1995 and 1997 Anticipates the "Syndication" Limitation

Sentius' only possible argument that Microsoft Office 1995 and Microsoft Office 1997 by themselves do not anticipate the asserted claims is that they did not allow for dictionaries to be "syndicated" – *i.e.*, automatically distributed over a network. Yet this feature was also present in the prior art. Indeed, a primary purpose of Microsoft SMS was to do just that – allow for the automated distribution and installation of software over a network without user involvement:

- "One of the **most common** management tasks that needs to be automated is the installation and upgrading of software." (Ex. F, p.91, MS_SENTIUS017320).

- "It is **very common** to use the software distribution feature to install applications at **unattended clients or without user intervention**." (Ex. G, p.326, MS_SENTIUS 021740).

- "Using SMS, you can install, upgrade and configure each computer, from a single, central location. You can schedule and distribute individual software files or complete software applications to specific computers, at specified times. SMS even allows you to initiate **automated, unattended distribution** of software to selected computers. This can be done off hours, when the majority of users have gone home." (Ex. F, p.2, MS_SENTIUS017233).

- "From the perspective of the user at the client, SMS provides the following benefits: Faster, **automated software installation** (no disks to shuffle); Attended or **unattended software installation**…" (*Id.*, p.49, MS_SENTIUS017279).

- "On Windows NT-based computers, if a package has been configured for **automated installation in background mode**, the user does not have to use the

Package Command Manager.  **Software can be installed without the user having to log on**." (*Id*., p.50, MS_SENTIUS017280).

- "If the software application package was configured for unattended installation, the installation **will not require any user input**." (*Id*., p.103, MS_SENTIUS017332).

- "the package might become mandatory (and **automatically execute on the client**)" (Ex. G, p.13, MS_SENTIUS021428).

As noted above, this automated installation could take place in two different ways.  First, an IT administrator could configure a software "package" for automated installation, for example by using the "quiet mode" flags available in Microsoft Office 1995 and 1997:

- "The /q1 option directs Setup to run with **no user interaction**; the /b1 option directs Setup to use the Typical installation type.  When this command is run from this SMS package, Setup **automatically installs** Office for Windows 95 using the predefined options for the Typical installation type." (Ex. H, p.654, MS_SENTIUS018938).

- "/q1 or /qt - Quiet mode, q1 **does not request any user input**; qt **hides the setup display,** including the blue background and the percent done bar.  The qt switch prevents users from canceling the installation." (*Id*., p.655, MS_SENTIUS018939; *see also* Ex. G, p.289, MS_SENTIUS021703).

Alternatively, an administrator could make Microsoft Office 1995 or 1997 available as a "shared application," in which case it was only installed on a server (and not any remote client machines).  When a client wished to execute Microsoft Office 1995 or 1997, the necessary files were automatically downloaded from the server and stored in random access memory ("RAM") on the users' computer:

- "A shared application is one that is stored on a distribution server for multiple users to run.  When it is started by a user, **it is loaded over the network into the local computer's RAM and is run at the local computer**." (Ex. H, p.498, MS_SENTIUS018787).

- "The shared versions of Microsoft Office and Works applications use the ACME Setup program to install.  SMS provides some utilities to **automate the installation**, along with a proxy application for each of the shared applications for OLE compatibility.  Whenever an OLE object is activated, the proxy application is called, and **SMS connects to a distribution server to run the shared application**."  (*Id*., p.505, MS_SENTIUS018794).
- A shared application is one that is stored on a distribution server for multiuser access.  **When a shared application is started by a user, the program is loaded over the network into the local client's RAM to be run at the local client**." (Ex. G, p.395, MS_SENTIUS021809).

In either mode of operation, SMS automatically downloaded the necessary files for Microsoft Office, including the spell check and grammar check dictionary files, from a server to a client without any user interaction.

Indeed, not only do the cited prior art documents discuss the automated distribution capabilities of SMS, they also explain that those capabilities could be employed to automatically distribute Microsoft Office.  For example, two of the books attached hereto regarding SMS have sections dedicated to the automated installation of Microsoft Office 1995:

- "SMS now provides package definition files (PDFs) that help **automate the distribution of Microsoft Office for Windows 95** Standard and Professional editions." (Ex. F, p.6, MS_SENTIUS017237).
- "SMS now includes Package Definition files for **automated distribution** of both the standard and professional versions of **Microsoft Office 95**.  This includes versions 7.0, 7.0a, and 7.0b and the mini applications that go with Office. Chapter 11, 'Software Distribution,' shows you how to use PDF files to distribute applications."  (Ex. H, p.28, MS_SENTIUS018332).

/ / /

/ / /

/ / /

1    The third book includes screenshots showing how to configure Microsoft Office 1997 for a
2  "quiet" installation using the "/Q1" flag:



Figure 7-3. Navigating the Workstations Package creation screens.

17  (Ex. G, p.289, MS_SENTIUS021703).  It also show how to schedule Microsoft Office 1997 for a
18  "mandatory" installation, which would automatically install the software at a designated time:

19  After this time and date, the command will be forced to run on the client. If the **Not Mandatory Over Slow Link** check box is selected, the command is not forced to run over a slow link.

22  (*Id.*, p.297, MS_SENTIUS021711).
23  / / /
24  / / /
25  / / /

Finally, multiple references show specifically how to configure Microsoft Office 1995 and 1997 as a shared application:

Figure 8-1 shows how to create a Sharing package through the SMS Administrator.



Figure 8-1. Configuring a Sharing package in the SMS Administrator.

(*Id*., p.396, MS_SENTIUS021810; *see also id*., p.4, MS_SENTIUS021419; Ex. F, pp.109-123, MS_SENTIUS017337-51).  One reference sums up this functionality as follows:

> "Although it's easy to manually copy files or entire programs to a small number of computers on a network, this can be an ominous task on medium to large networks.  In this type of environment, an **automated distribution mechanism** allows the IS staff to effectively respond to a user's data and software requirements.  SMS provides a built-in facility to distribute files and configure programs on network-attached clients."

(Ex. G, p.283, MS_SENTIUS021697).  This is exactly the "syndication" functionality that Sentius' claims it invented.

### E.    The Asserted Claims Were Publicly Used and Known Prior to August 16, 2001, Rendering the Claims Invalid as Anticipated

As described above, the use of SMS to distribute Microsoft Office 1995 and Microsoft Office 1997 prior to August 16, 2001, anticipated all of the limitations of the asserted claims of the '985 patent.  Because the limitations of the asserted claims were publicly known and used prior to August 16, 2001, those claims must be found invalid as anticipated.

### 1. The Asserted Claims Were Publicly Used Prior to August 16, 2001

An invention is anticipated if it was "in public use" prior to the claimed date of invention. *See* 35 U.S.C. § 102(a)(1). Here, public use is confirmed by the declaration of Rusty A. Slaten. Mr. Slaten worked for Microsoft starting in 1997, and in 1998 and 1999 his job was to provide customer support for SMS version 1.2. (Slaten Decl., ¶¶ 1-2). Mr. Slaten confirms that he personally supported customers automatically installing Microsoft Office 1995 and 1997 during that timeframe using SMS. (*Id.*, ¶ 2). These installations used the "quiet mode" flags so that they would not require any user involvement. (*Id.*, ¶ 3). The multiple books cited above, all dated prior to August 16, 2001, and all of which instruct users on how to perform an automatic installation of Microsoft Office, confirm that this was a common usage scenario. (*See* Exs. F-H).

To the extent that Sentius responds that summary judgment of anticipation is inappropriate because SMS version 1.2 and Microsoft Office are "multiple" systems, whereas anticipation must rely upon a single reference, that would be in error. Microsoft is asserting that the prior public use of these two software products *together*, as described in Mr. Slaten's declaration, are anticipatory events. The case of *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348 (Fed. Cir. 2008), is instructive. In that case, the claim at issue recited "[a] method of operating a television receiver wired to a remote housing including a speaker and a multi function control signal encoder." *Id.* at 1353. The district court found that this claim was anticipated by the prior public use of a prior art television (model number "J20525") when used in combination with a prior art digital pillow speaker (model number "205-E"). *Id.* at 1354. The Federal Circuit affirmed, finding no genuine dispute that the two items were "being publicly used together…well before the December 27, 1993 critical date." *Id.* at 1356-57. Similarly, here there is no genuine dispute that both these software products were sold by Microsoft intending that they be used together, and in fact were used together prior to August 16, 2001.

Because there are no genuine disputes of fact, the Court should find the asserted claims invalid as anticipated by the prior public use of SMS to automatically install Microsoft Office 1995 and 1997.

13

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY (USP 7,672,985)
Case No. 5:13-cv-00825 PSG

### 2. The Asserted Claims Were Publicly Known Prior to August 16, 2001

Separate and apart from actual usage, where, as here, a patented method claims nothing more than the "normal and usual" operation of a prior art system, then the claims are anticipated even in the absence of actual use of that prior system. *See In re King*, 801 F.2d 1324, 1326-27 (Fed. Cir. 1986) ("the law is, and long has been, that 'if a previously patented device, in its normal and usual operation, will perform the function which an appellant claims in a subsequent application for process patent, then such application for process patent will be considered to have been anticipated by the former patented device.'"); citing *In re Ackenbach*, 45 F.2d 437, 439 (C.C.P.A. 1930) ("if the appellant has merely taken one device known to the art, and another device likewise so known, and has combined them and has produced no results other than were produced by the original devices in their individual operation, he has invented nothing.").[3]

There is no genuine dispute that all of the elements of all of the asserted claims were known and therefore "available to the public" prior to August 16, 2001. The test for whether claims were known or "available to the public" prior to the purported date of invention does not require actual use of the claimed system or performance of the claimed method. Rather, the test is whether there was a disclosure "sufficient to enable one skilled in the art to reduce the disclosed invention to practice. In other words, the disclosure must be such as will give possession of the invention to the person of ordinary skill." *See In re Borst*, 52 C.C.P.A. 1398, 1403 (C.C.P.A. 1965); *see also Schering*, 339 F.3d at 1380 ("Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; an anticipation requires only an enabling disclosure"); *In re Baxter Travenol Labs*., 952 F.2d 388, 390 (Fed. Cir. 1991) (holding that "the dispositive question" for anticipation is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the elements of the claimed

---

[3] The same result could also be reached based on principles of inherency – in other words, the use of the prior art Microsoft software inherently anticipates the use of any particular features of that software, since those features were "necessarily present" in the software itself. *See Abbott Lab. v. Geneva Pharms., Inc*., 182 F.3d 1315, 1319 (Fed. Cir. 1999) ("If a product that is offered for sale inherently possesses each of the limitations of the claims, then the invention is on sale, whether or not the parties to the transaction recognize that the product possesses the claimed characteristics"); *see also Schering Corp. v. Geneva Pharms., Inc*., 339 F.3d 1373, 1377 (Fed. Cir. 2003) (finding anticipation where features were "necessarily present").

1 invention).  Here, each of the software itself and the publications describing that software (Exs. F-
2 H) demonstrates that the elements of the asserted claims were known prior to August 16, 2001.
3 For this additional reason, the Court should find the asserted claims invalid as anticipated.

### F. The Asserted Claims of the '985 Patent Are Obvious

There was nothing new about distributing software automatically over a network to remotely subscribed client computers in 2001.  Indeed, there was nothing new about doing so with Microsoft Office 1995 and 1997.  IT administrators were not relegated to visiting each end user machine with a disk, installing the Office software manually.  This could be done, and was in fact done, automatically using SMS version 1.2.

As discussed above, all of the elements of the claims were known and used prior to the claimed date of invention, and those claim elements are described in multiple prior art patents, books, manuals, and pieces of software.  (*See* Exs. B, D, F-N).  There is thus no genuine dispute about the scope and content of the prior art or the level of ordinary skill in the art, and there are no genuine disputes about purported material differences between the prior art and the patent claims because there are no such differences.  Microsoft is also not aware of any secondary indicia of non-obviousness, but to the extent that Sentius argues such evidence exists, it cannot possibly overcome the strong *prima facie* showing in this case.  *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp*., 264 F.3d 1344, 1355 (Fed. Cir. 2001) ("We see no error in the district court's conclusion in this case that the secondary considerations cannot overcome the strong evidence of obviousness presented.").[4]

Because the use of SMS 1.2 to automatically distribute Microsoft Office renders obvious all of the asserted claims of the '985 patent, the Court should find the asserted claims of the '985 patent invalid on this separate and independent basis.

/ / /

/ / /

---

[4] Also, Sentius would have to meet the rigorous "nexus" requirement by demonstrating that the patent claims were responsible for the claimed secondary consideration evidence.  *See Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) ("Evidence of commercial

## V. CONCLUSION

For the reasons discussed above, Microsoft respectfully requests that the Court grant its motion and find the asserted claims of U.S. Patent No. 7,672,985 invalid.

Dated:  March 25, 2014                                                   FISH & RICHARDSON P.C.


By:  */s/ Jonathan J. Lamberson*
     Jonathan J. Lamberson

Attorneys for Defendant
MICROSOFT CORPORATION

*Additional Counsel*

Jonathan J. Lamberson (SBN 239107)
lamberson@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Isabella Fu (SBN 154677)
Isabella.fu@microsoft.com
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
Telephone: (425) 882-8080
Facsimile:  (425) 936-7329

50942652.doc

---

success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success").