1  Frank E. Scherkenbach (SBN 142549)
   scherkenbach@fr.com
2  Kurt L. Glitzenstein (pro hac vice)
   glitzenstein@fr.com
3  FISH & RICHARDSON P.C.
   One Marina Park Drive
4  Boston, MA 02210
   Telephone: (617) 542-5070
5  Facsimile: (617) 542-8906

6  Attorneys for Defendant
   MICROSOFT CORPORATION

7
   *Additional counsel listed on signature page*
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  (SAN JOSE DIVISION)

12

13  SENTIUS INTERNATIONAL, LLC,        Case No.  5:13-cv-00825 PSG

14              Plaintiff,             **DEFENDANT MICROSOFT
                                       CORPORATION'S MOTION FOR
15      v.                             SUMMARY JUDGMENT OF NO
                                       INFRINGEMENT (DIRECT, INDIRECT,
16  MICROSOFT CORPORATION,             OR WILLFUL)**

17              Defendant.

18  ─────────────────────────────
    AND RELATED COUNTERCLAIMS         DATE:      January 13, 2015
19                                     TIME:      10:00 a.m.
                                       JUDGE:     Hon. Paul S. Grewal
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................... 3

    A.     The Reissue Patents.................................................................................. 3

    B.     The Court's Claim Construction Order.................................................... 5

    C.     The Accused Products............................................................................... 6

    D.     The Prior Contacts between Sentius and Microsoft ................................ 7

III.   STATEMENT OF LAW...................................................................................... 8

    A.     Summary Judgment ................................................................................. 8

    B.     Infringement............................................................................................ 8

        1.     Literal Infringement .................................................................... 8

        2.     Infringement under the Doctrine of Equivalents.......................... 9

        3.     Direct Versus Indirect Infringement ............................................ 9

    C.     Willful Infringement .............................................................................. 10

IV.    ARGUMENT ...................................................................................................... 11

    A.     The Accused Background Spell and Grammar Check Functionalities Do Not Infringe Because They Do Not Use the Claimed Look-Up Table ............................................................................ 11

    B.     Sentius Relied Upon Non-Operable Code in Office 2010 and 2013 as Allegedly Infringing the Asserted Method Claims .............................. 14

    C.     Sentius Cannot Meet Its Burden to Prove Direct Infringement ........................ 15

    D.     Sentius Cannot Meet Its Burden to Prove Pre-Suit Indirect Infringement ............................................................................................ 16

    E.     Sentius Cannot Meet Its Burden to Prove Willful Infringement........................ 17

        1.     Sentius' Purported Pre-Suit Contacts With Microsoft Do Not Support a Claim of Willful Infringement As a Matter of Law ............................................................................................... 17

        2.     Microsoft's Good-Faith Defenses Preclude a Finding of Willful Infringement as a Matter of Law ................................... 18

V.     CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AquaTex Indus. v. Techniche Solutions*,
  419 F.3d 1374 (Fed. Cir. 2005)..........................................................................9

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013)..........................................................................9

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964)...........................................................................................10

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
  682 F.3d 1003 (Fed. Cir. 2012)..........................................................................19

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*,
  731 F.2d 831 (Fed. Cir. 1984)............................................................................8

*Bayer AG v. Elan Pharma. Res. Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)......................................................................8, 9

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3d 1556 (Fed. Cir. 1994)............................................................................11

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)..........................................................................9

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006)..........................................................................10

*Emblaze Ltd. v. Apple Inc.*,
  2014 U.S. Dist. LEXIS 57893 (N.D. Cal. April 24, 2014) ..........................18, 19

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) ..................................................................................10, 17

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007)..........................................................................10

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)..........................................................................8

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
  249 F.3d 1314 (Fed. Cir. 2001)..........................................................................9

*Mas-Hamilton Group v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998)..........................................................................8

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998)..........................................................................13

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ...................................................................................9, 10

*Pause Tech. LLC v. TiVo Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) ..........................................................................................8

*Plumley v. Mockett*,
    836 F. Supp. 2d 1053 (C.D. Cal. 2010) ............................................................................18

*Robocast, Inc. v. Microsoft Corp.*,
    2014 U.S. Dist. LEXIS 22331 (D. Del. Feb. 21, 2014) ....................................................19

*Tarkus Imaging, Inc. v. Adobe Sys.*,
    867 F. Supp. 2d 534 (D. Del. 20120) ...............................................................................18

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ..............................................................................................................9

**<u>Statutes</u>**

35 U.S.C. § 271 ...............................................................................................................................9, 10

Fed. R. Civ. P. 56 ...................................................................................................................................8

1    PLEASE TAKE NOTICE that on January 13, 2015, at 10:00 a.m., Defendant Microsoft

2 Corporation ("Microsoft") will and hereby does move the Court for summary judgment that it

3 does not infringe the asserted claims of the Sentius reissue patents.

4 **I.    INTRODUCTION**

5    The two Sentius reissue patents claim a very specific data structure: a "look-up table" that

6 includes, among other things, "a pointer to data or information or the location of data or

7 information that is external to the source material."  One purported advantage of this "look-up

8 table" is that it avoids the need to search for the desired external content upon each click of a word

9 in a document by a user.  For example, if a user wants to know the translation for a particular

10 Japanese character in a document, the "look-up table" claimed in the Sentius reissue patents points

11 to the translation for that specific character, eliminating the need to search through the entire

12 Japanese-English dictionary for the translation.

13    The accused background spell check and background grammar check features do not use

14 the claimed "look-up table."  Before a user right-clicks on a word or phrase that is flagged as

15 potentially incorrect, the accused products (Microsoft Word, PowerPoint, Outlook, OneNote, and

16 Publisher) have no idea whether any potential corrections even exist, let alone what they are.  Each

17 time a user right-clicks on a word or phrase, the accused products must perform a new search of

18 the entire spelling dictionary or complete set of grammatical rules to identify potential corrections.

19 This is by design.  It makes little sense to maintain a "pointer" to a particular potential spelling or

20 grammatical correction because there are often many potential corrections that the user might

21 choose from.  Conversely, just because a word or phrase is not recognized by the spelling or

22 grammar engine, it may nevertheless be correct, leading to the familiar situation where the user

23 simply ignores the indication that there might be an error in the text.  Indeed, some words or

24 phrases may have no suggested corrections.  That is why, rather than maintaining a "look-up

25 table" with pointers to the specific potential corrections, Microsoft simply notes which portions of

26 the text are potentially incorrect, without wasting system resources to immediately determine what

27 the potential corrections are.  Potentially incorrect words or phrases are simply marked with an

28 error flag, *i.e.,* a binary zero (0) or one (1) indicating that a range of text may contain an error.  It

is not until after a user right-clicks on a particular word or phrase that the accused products conduct a search to determine what the potential corrections may be. Because there is no genuine dispute that the accused spell and grammar check features do not use the claimed "look-up table," the Court should grant summary judgment that those accused features do not infringe the Sentius reissue patents.[1]

Additionally, Sentius has not met its burden to prove that Microsoft directly infringed the reissue patents, or that Microsoft indirectly infringed prior to the filing of this lawsuit. The two asserted reissue patents contain only method claims. That means in order to show direct infringement, Sentius must show that someone within Microsoft actually carried out each and every step of the claimed methods in the United States during the period when the patents were in force. Sentius has no such evidence. With respect to indirect infringement, Sentius must show that Microsoft had knowledge of the asserted patents. Sentius did not notify Microsoft of the asserted patents before the filing of this lawsuit.

Finally, with respect to willfulness, Sentius has raised an allegation that relies upon two pre-suit contacts between Sentius and Microsoft that occurred in 1998 and 2003. Yet the first of the asserted patents did not issue until 2009. One cannot "willfully" infringe a patent that does not exist. Also, Sentius acknowledged (through its 30(b)(6) witness and named inventor Marc Bookman) that it never gave Microsoft any confidential technical information during any of those meetings. Even assuming, contrary to the chronological facts, that Microsoft was told about the asserted patents during those meetings, Microsoft's good faith defenses of non-infringement and invalidity in this suit are more than sufficient to overcome Sentius' willful infringement allegation as a matter of law.

For these reasons, and for the reasons discussed below, the Court should grant Microsoft's motion.

---

[1]   As discussed below, the accused "actions" functionality in Office 2010 and 2013 also does not use the claimed "look-up table." In those two versions of Office, no table is created prior to the "selection" of a particular word by a user, and thus there can be no infringement of any asserted claims.

## II. STATEMENT OF FACTS

On February 22, 2013, Plaintiff Sentius International, LLC ("Sentius") filed this patent infringement lawsuit against Defendant Microsoft Corp. ("Microsoft").  [Docket No. 1.]  Sentius asserted four patents in its complaint: U.S. Pat. No. RE40,731 (the "'731 patent"), U.S. Pat. No. RE43,633 (the "'633 patent"), U.S. Pat. No. 7,672,985 (the "'985 patent"), and U.S. Pat. No. 8,214,349 (the "'349 patent").  [*Id.*]  Sentius withdrew the '349 patent on April 28, 2014.  [Docket No. 88.]  Sentius withdrew the '985 patent on November 25, 2014.  [Docket No. 127.][2]

### A. The Reissue Patents

The Sentius reissue patents purport to describe "a novel indexing scheme that is useful in such applications as learning a foreign language, for example a language based upon an ideographic alphabet, such as Japanese."  ['731 patent at 1:15-20.]  The patents offer a two-step solution in order to provide "a more effective way for people to read and improve their command of the foreign language, while at the same time communicating insightful and relevant cultural, social, and economic information about the country."  [*Id.* at 3:58-63.]  First, the patents describe creating an "index" or "look-up table" that "allows word-by-word access to any of several external multi-media references."  [*Id.* at 4:28-30.]  Second, the patents recite using the "index" or "look-up table" to locate the desired external reference material in response to a user's selection of a specific word in the original document.  [*Id.* at 7:40-50.]

The reissue patents state that each word in the source material is identified by its offset within the source document.  [*Id.* at 5:5-6:45 & 7:1-10.]  For example, the word "fox" in the following sentence has a starting position of 16 and an ending position of 18:

```
0          10          20          30          40
The quick brown fox jumps over the lazy dog.
```

The patents describe the process for creating a "look-up table," which stores the offset for the start and end of each word, along with "links" to external content associated with the word.  [*Id.* at 5:5-

---

[2]  The '731 and '633 patents will be referred to collectively as the "reissue patents" or as the "patents-in-suit."  Copies of the patents were attached to Sentius' complaint.  [Docket No. 1.]

6:45, 7:11-20, Figure 2.]  For example, the look-up table could store the starting and ending address for the word "fox" in the sentence shown above, with a link to a picture of a fox, as illustrated below:

| Start | End | Link |
|-------|-----|------|
| 16 | 18 | <c:\fox.gif> |



Whenever a user selects that same portion of the document, the system can display the linked content.  For example, if a user clicks their mouse at offset 17 within the file (corresponding to the letter "o" in "fox"), the patented system recognizes that the location falls within the range in the look-up table for the word "fox," and uses the "link" field in the look-up table to retrieve the linked content, displaying it to the user.

The patents provide an example in the context of translating a Japanese language document.  Specifically, the patents describe a user clicking on the Japanese character at offset 25.  [*Id*. at 6:46-65.]  The patented system uses the look-up table to identify the external content associated with that term (in this embodiment, the English translation of the Japanese character, "Japanese economy"), and displays that linked content to the user via a pop-up window:

*202*

| START | END | LINK |
|-------|-----|------|
| 10 | 15 | TEXT,0 |
| 17 | 19 | PICT,100 |
| 20 | 27 | TEXT,200 |
| 29 | 31 | TEXT,300 |
| 32 | 35 | SND,400 |

| Address | Content |
|---------|---------|
| 200 | Japanese Economy |

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF NO INFRINGEMENT
Case No. 5:13-cv-00825 PSG

Claim 96 of the '731 patent recites:[3]

96. A method for linking textual source material to external reference materials for display, the method comprising the steps of:

    determining a beginning position address of textual source material stored in an electronic database;

    cutting the textual source material into a plurality of discrete pieces;

    determining a starting point address and an ending point address of at least one of the plurality of discrete pieces based upon the beginning position address;

    recording in a look up table the starting and ending point addresses;

    **linking at least one of the plurality of discrete pieces to at least one of a plurality of external reference materials by recording in the look-up table, along with the starting and ending point addresses of the at least one of the plurality of discrete pieces, a link to the at least one of the plurality of external reference materials**, the plurality of external reference materials comprising any of textual, audio, video, and picture information;

    displaying an image of the textual source material;

    selecting a discrete portion of the displayed source material image;

    determining a display address of the selected discrete portion;

    converting the display address of the selected discrete portion to an offset value from the beginning position address;

    comparing the offset value with the starting and ending point addresses recorded in the look-up table to identify one of the plurality of discrete pieces;

    selecting one of the plurality of external reference materials corresponding to the identified one of the plurality of discrete pieces;

    retrieving the selected one of the plurality of external reference materials using a recorded link to the selected one of the plurality of external reference materials; and

    displaying the retrieved external reference material.

**B.  The Court's Claim Construction Order**

The Court issued an order construing the disputed limitations of the patents-in-suit on January 9, 2014.  [Docket No. 66.]  The Court specifically construed the "linking" limitations of the patents-in-suit to require "a **pointer** to data or information or the location of data or information that is external to the source material."  [*Id.* (emphasis added).]  During the claim construction hearing, the Court noted that merely indicating that a translation for a particular Japanese character exists is "not sufficient."  [Docket No. 69 (Hearing Tr.) at 65:13-15.]  The

---

[3]   A reissue patent shows additions to the original claim in italics and deletions surrounded by boldface brackets.  Only the currently-operative claim language is shown here, not any additions or deletions.

1  Court's construction required a specific "pointer" to the external content (*e.g.*, to the English

2  translation of the Japanese-language word), rather than a vague "reference" to the fact that

3  external content might exist, as Sentius had proposed.  [*See id.* at 69:13-14.]

4            **C.  The Accused Products**

5          On September 8, 2014, Sentius served an infringement report by its technical expert, Dr.

6  Vijay K. Madisetti.  [Ex.[4] A.]  The asserted claims of the reissue patents were as follows:

7           •  For the '731 patent: claim 96

8           •  For the '633 patent: claims 62, 64, 70, 146, 148, 149, 154, 164

9  [*Id.*, ¶ 1.]  The accused products were "the 2013, 2010, and 2007 versions of Microsoft Word,

10  Outlook, PowerPoint, OneNote and Publisher for Windows, and the 2011 versions of Microsoft

11  Word, Outlook, and PowerPoint for Macintosh."  [*Id.*, ¶ 101.]  The specific accused functionalities

12  were the background spell check, background grammar check, and "Actions" or "Smart Tags"

13  technologies.  [*Id.*, ¶ 103.]

14          The background spell check feature identifies portions of text that are potentially

15  misspelled by underlining those portions with a red squiggle mark.  When a user right-clicks on a

16  potentially misspelled word, the spell check engine searches for and displays a list of possible

17  correct spellings, if any are located.

18          The grammar check functionality works similarly—a green or blue squiggle mark is placed

19  under a possible grammatical error and, when a user right clicks on that word or phrase, the

20  grammar check engine searches for a list of potential replacements, and displays them if any are

21  located.

22          The "Additional Actions" functionality (also referred to herein as "Actions" or "Smart

23  Tags"), as its name suggests, allows a user to take additional actions for particular types of text.

24  For example, Microsoft Word can identify that certain specific terms (such as "MSFT") represent

25  stock symbols.  If a user right clicks on the term "MSFT" in a document, and if the appropriate

26  actions are enabled, the user is given various options under the "Additional Actions" menu item,

27  including "Stock quote on MSN MoneyCentral," "Company report on MSN MoneyCentral," and

28

1    "Recent news on MSN MoneyCentral."  Clicking one of these options will open a separate web

2    browser window and direct the user to an external web page.

### D.  The Prior Contacts between Sentius and Microsoft

4    With respect to willfulness, Sentius has described its contention as follows: "Sentius

5    representatives met with Microsoft representatives in 1998 to discuss the RichLink technology.

6    This meeting was with at least with [sic] Don Bradford.  Subsequently, Sentius at the request of

7    Microsoft sent to Microsoft Sentius literature regarding its RichLink technology and Mikan and

8    RichLink Author products to be shared with the Microsoft Office team, the MS research lab, the

9    Internet Explorer for Windows team, and the Help team.  In July, 2003, Sentius representatives

10   again met with Microsoft representatives to discuss RichLink technology including RichLink

11   Automate.  This meeting was with Alay Desai.  At least two Microsoft employees downloaded

12   and registered the RichLink Author tool off the web."  [*See* Ex. B at 6-7.]

13   At the time of these purported contacts with Microsoft in 1998 and 2003, neither of the

14   reissue patents existed; the '731 patent issued on June 9, 2009, and the '633 patent issued on

15   September 4, 2012.  [*See* Docket No. 1, Exs. C & D.]  Sentius did not give Microsoft pre-suit

16   notice of the reissue patents.  [*See* Ex. C at 6.]

17   Mr. Bookman testified as Sentius' 30(b)(6) witness about these prior contacts with

18   Microsoft, and confirmed the following two facts:

19       1.   Any information Mr. Bookman gave to Microsoft during these meetings was

20            public, was given voluntarily, and was not subject to any confidentiality obligations

21            [Ex. D at 200:24-201:9; Ex. E at 230:24-231:5, 238:5-13, 249:25-250:13, 250:23-

22            251:10, 252:18-25]; and

23       2.   Nothing Mr. Bookman gave to Microsoft ever mentioned any implementation

24            details, such as the claimed look-up table [Ex. D at 194:5-12; Ex. E at 255:12-17].

25   Also, by the time of the purported contact in 1998, Microsoft had already released the

26   accused background spell check and grammar check features.  [*See* Docket No. 78, Exs. A-D.]  By

27

28

---

[4] Exhibits are attached to the declaration of Jonathan J. Lamberson, filed herewith.

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF NO INFRINGEMENT
Case No. 5:13-cv-00825 PSG

the time of the purported contact in 2003, Microsoft had already released the initial version of the accused smart tags feature.  [*See* Ex. E at 253:5-7.]

### III.   STATEMENT OF LAW

#### A.   Summary Judgment

Summary judgment should be granted when no reasonable jury could return a verdict for the non-moving party.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004).  "Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources."  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd*., 731 F.2d 831, 835 (Fed. Cir. 1984).  To defeat summary judgment, "[t]he party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant.  Mere denials or conclusory statements are insufficient."  *Id*. at 835-36.

#### B.   Infringement

"A determination of infringement is a two-step process.  The court must first construe the asserted claims and then compare the properly construed claims to the allegedly infringing devices."  *Pause Tech. LLC v. TiVo Inc*., 419 F.3d 1326, 1335 (Fed. Cir. 2005).  "The patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents."  *Id*.  Sentius bears the burden of proving infringement by a preponderance of the evidence.  *See Bayer AG v. Elan Pharma. Res. Corp*., 212 F.3d 1241, 1247 (Fed. Cir. 2000).

##### 1.   Literal Infringement

"Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s).  If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Id*. (citing *Mas-Hamilton Group v. LaGard, Inc*., 156 F.3d 1206, 1211 (Fed. Cir. 1998)).

### 2.    Infringement under the Doctrine of Equivalents

"If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product."  *Bayer*, 212 F.3d 1250 (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17 (1997)).

Infringement under the doctrine of equivalents is a question of fact.  *See Lockheed Martin Corp. v. Space Systems/Loral, Inc*., 249 F.3d 1314, 1323 (Fed. Cir. 2001).  However, its application is limited by various legal doctrines.  *Id*.  One legal limitation on the doctrine of equivalents is the "all-elements rule," which "bars a patentee from asserting a theory of equivalence that would entirely vitiate a particular claim element."  *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1323 (Fed. Cir. 2009).

### 3.    Direct Versus Indirect Infringement

"To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed."  *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech*., 709 F.3d 1348, 1362 (Fed. Cir. 2013).  "For method claims—such as those at issue here—a patent holder must establish that an accused infringer performs 'all the steps of the claimed method, either personally or through another acting under his direction or control.  Direct infringement has not been extended to cases in which multiple independent parties perform the steps of the method claim.'"  *Id*., citing *Muniauction, Inc. v. Thomson Corp*., 532 F.3d 1318, 1330 (Fed. Cir. 2008).

"Although not directly infringing, a party may still be liable for inducement or contributory infringement of a method claim if it sells infringing devices to customers who use them in a way that directly infringes the method claim.  Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement."  *See AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1379-80 (Fed. Cir. 2005) (citations omitted).

To establish liability for induced infringement, "a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct

1   infringement.  … The mere knowledge of possible infringement by others does not amount to

2   inducement; specific intent and action to induce infringement must be proven."  *See DSU Med.*

3   *Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc); *see also Global-Tech*

4   *Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011) ("induced infringement under § 271(b)

5   requires knowledge that the induced acts constitute patent infringement").

6          Contributory infringement is defined as follows: "[w]hoever offers to sell or sells within

7   the United States or imports into the United States a component of a patented machine,

8   manufacture, combination or composition, or a material or apparatus for use in practicing a

9   patented process, constituting a material part of the invention, knowing the same to be especially

10  made or especially adapted for use in an infringement of such patent, and not a staple article or

11  commodity of commerce suitable for substantial noninfringing use, shall be liable as a

12  contributory infringer."  35 U.S.C. § 271(c).  "[A] violator of § 271(c) must know 'that the

13  combination for which his component was especially designed was both patented and infringing.'"

14  *See Global-Tech*, 131 S. Ct. at 2067, citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377

15  U.S. 476, 488 (1964).

16          **C.  Willful Infringement**

17          "[T]o establish willful infringement, a patentee must show by clear and convincing

18  evidence that the infringer acted despite an objectively high likelihood that its actions constituted

19  infringement of a valid patent.  The state of mind of the accused infringer is not relevant to this

20  objective inquiry.  If this threshold objective standard is satisfied, the patentee must also

21  demonstrate that this objectively-defined risk (determined by the record developed in the

22  infringement proceeding) was either known or so obvious that it should have been known to the

23  accused infringer."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) (en banc)

24  (internal citations omitted).  The *Seagate* decision raised the standard for proving willful

25  infringement "from one akin to negligence to that of objective recklessness."  *See Muniauction,*

26  532 F.3d at 1323.  Reasonable defenses of non-infringement and invalidity presented during

27  litigation can preclude a finding of willful infringement.  *See Advanced Fiber Techs. Trust v. J&L*

28  *Fiber Servs.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012).

10

1    In *American Original Corp. v. Jenkins Food Corp*., 774 F.2d 459, 465 (Fed. Cir. 1985), the

2 Federal Circuit held that "to willfully infringe a patent, the patent must exist."  The Federal Circuit

3 upheld the district court's decision that knowledge of a pending patent application, with nothing

4 more, was insufficient to show willful infringement.  *Id.; see also Conopco, Inc. v. May Dep't*

5 *Stores Co*., 46 F.3d 1556, 1562 (Fed. Cir. 1994) ("In resolving the willfulness, enhanced damages,

6 exceptional case, and attorney fees issues, the court is cautioned not to place undue reliance on

7 defendants' activities prior to the issuance of the patent.  Although these activities may have been

8 undertaken with knowledge that a patent application covering the [accused technology] was

9 pending … that is insufficient to support a finding of willfulness").

10 **IV.    ARGUMENT**

11    **A.    The Accused Background Spell and Grammar Check Functionalities Do Not
            Infringe Because They Do Not Use the Claimed Look-Up Table**

12

13    All of the asserted claims from the reissue patents require a "look-up table" with a "link"

14 between a word in the document and some external content.  The Court construed these "linking"

15 limitations to require, "a pointer to data or information or the location of data or information that

16 is external to the source material."  [Docket No. 66.]

17    The accused background spell check and grammar check features do not employ any

18 "pointer" stored in a "look-up table."  There is no dispute that the accused "look-up table" for

19 these two features (referred to internally by Microsoft as a "PLC" data structure) instead stores an

20 "error flag" – a binary value (a zero (0) or a one (1)) that indicates whether a particular location in

21 the document is marked as potentially misspelled or potentially grammatically incorrect.  In the

22 code, this is referred to as an "fError" flag.  [*See* Ex. A at 75 ("The error flag in cell 84 indicates

23 that there is a potential spelling error starting with character position 112.").]  There is no dispute

24 that the error flag, by itself, does not identify what the potential corrections are (if there even are

25 any), or where to find them—the identification of potential corrections does not occur until after

26 the user right-clicks on the marked word or phrase, at which point the accused products call the

27 spelling or grammar engine, passing it the selected word or phrase.  [*Id.* at 244, ¶ 326.]  In the case

28 of the spelling engine, the software then searches one or more dictionaries and uses rules to

determine what potential suggestions to return, if any.  [*Id*. at 246, ¶ 333.]  In the case of the grammar engine, the software uses grammar rules to determine potential grammatical suggestions, if any exist.  [*Id*. at 248, ¶¶ 341-342.]  In short, there is no "pointer" to the potential corrections—they are determined (if they exist at all) only after a user clicks on a word or phrase marked with a colored squiggle, and each time a user clicks on a potentially incorrect word the same search of the dictionaries or grammar rules must be run again.

There is no *genuine* dispute that a flag is not literally a "pointer."  A flag simply identifies whether something is true or false, it does not "point" to anything.  One of the named inventors on the Sentius reissue patents, Brian Yamanaka, confirmed this in his deposition:

> Q. Okay.  Well, let's say the flag is just a binary zero or a one, true or false.
>
> A. Well, then **I wouldn't consider that pointing to something**.  It's just telling me the state. …
>
> Q. If all the flag is doing is telling you the state of something and nothing else, is that a pointer?  Is it pointing to something?
>
> A. **No, it's not a pointer**. …
>
> Q. I'm saying no link.  I'm just saying that we have – we know a word is misspelled or not.  We know it's bolded or not.  We know it's italics or not.  Each of these are pieces of state information.  Just based on that, **would you call that state information a link?**
>
> A. **No, I wouldn't**. …
>
> Q. I'm saying would you need to know how – the details of the programming and how the flag is used in order to have an opinion as to whether or not the flag is pointing to something?
>
> A. **If it's a binary flag, I find it difficult to believe it can be used as a pointer.**  It would just be an indication that I need to do something else to find out what is wrong or why it's in that state, I should say.

[Ex. F at 17:19-23, 18:6-11, 107:10-16, 117:7-15 (emphasis added).]

There is also no *genuine* dispute that a "flag" is not equivalent to a pointer. A "flag" indicates a state: true or false. It does not provide location. It thus performs a materially different function than a pointer (merely indicating the state of some text in the document, instead of the location of something external to the document), in a materially different way (using a binary value that is the same for every potential spelling or grammatical error, rather than, for example, a memory address, file path, or other location information), to achieve a materially different result (indicating that there may be an error, versus pointing to a potential correction for that error). Indeed, Sentius' own inventors both confirmed that the two are not interchangeable, [*Id.*; *see also* Ex. D at 173:2-174:12], another test for equivalency. *See Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("Interchangeability is a significant factor in determination of equivalency").

The only arguments that Sentius makes to attempt to support its infringement theory are improper and must be rejected.

First, Sentius argues that the "link" in the accused products encompasses not only the flag itself, but also the starting address of the range of text in the document, shown below as a red box:

| Starting Address | fError Flag |
|---|---|
| 0 | 0 |
| 10 | 1 |
| 15 | 0 |

This argument is flawed, for at least two reasons. First, it improperly conflates the "link" limitation and the "starting position address" limitations. Second, and more importantly, the Court has said that the "link" must point to "data or information that is **external** to the source material." [Docket No. 66 (emphasis added).] The starting position address in the PLC data structure at most indicates a location within the document; it does not "point" to anything external to the document.

Sentius also argues that the fError flag "points" to the spell or grammar checking dictionary because it is part of a chain of logic that ultimately calls those dictionaries. Again, as

noted above, the error flag does not "point" to anything.  It indicates whether a word is potentially incorrect, but does not provide any location information.  Notably, Sentius' expert acknowledges that the accused products call the spelling and grammar engine *before* the error flag value is even set in order to determine what value to give that error flag.  [Ex. I at 85:23-86:12.]  In other words, the accused products are able to locate the dictionaries irrespective of any flag value.  Indeed, Sentius' expert admitted in his deposition that multiple dictionaries may be called for a given word depending on the language specified for that particular word.[5]  [*Id*. at 112:18-115:10.]  It is nonsensical to say that the same binary flag value (the number "1," indicating the presence of an error) "points" to two completely different dictionaries.  This argument also contradicts the alleged benefit of using the claimed "look-up table," which is to avoid the need to search through potentially multiple dictionaries each time a user wishes to retrieve a particular piece of external content associated with a word in the document.  [*See* Ex. D at 130:3-11; Ex. F at 33:22-34:22, 35:10-36:7.]

The Court adopted a very clear and specific construction for the "linking" limitations.  It did so because of the clear teachings in the patents, as well as the statements Sentius made to distinguish the prior art.  The Court held that a "link" is "a **pointer** to data or information or the location of data or information that is **external** to the source material."  [Docket No. 66 (emphasis added).]  There is no dispute that the accused products do not maintain a "pointer" in the accused "look-up table" to anything external to the document.  They use a flag indicating the state of the text, not a pointer to any possible corrections.  Thus there can be no infringement of any of the asserted claims as a matter of law.

### B. Sentius Relied Upon Non-Operable Code in Office 2010 and 2013 as Allegedly Infringing the Asserted Method Claims

Sentius has accused Microsoft Office versions 2007, 2010 and 2013 as allegedly infringing the reissue patents.  Sentius apparently believed at the time it prepared its expert reports that all three versions operated in the same manner.  Yet with respect to the accused "actions"

---

[5]   For example, Spanish language text results in calling a Spanish language dictionary, whereas English language text results in calling an English language dictionary.

functionality, there is a fundamental difference between versions 2007 and versions 2010 and 2013.  Specifically, Microsoft removed the capability for Microsoft Office to look for "actions" words or phrases in the background.  [*See* Little Decl., ¶ 3.]  Background processing for actions can only occur in the later versions of Office by calling a separate dynamic link library ("DLL") file—a file that Microsoft never shipped.  [*Id.*, ¶ 4.]

This disabled code is central to Sentius' infringement theory.  Specifically, all of the asserted claims require background processing in order to identify words in the document that should be "linked" to external content, and to build the claimed "look-up table."  [*See, e.g.*, '731 patent, claim 96 ("cutting…", "determining…", "recording…", "linking…").]  Then, after the "selection" of a specific word by a user, the claims require using the "link" in the "look-up table" to locate the external content.  [*See id.* ("selecting…", "comparing…", "retrieving…", "displaying…").]  The Court explicitly said that all of these limitations must be performed in order.  [Docket No. 66.]  In the 2010 and 2013 versions of Office, however, because there is no background processing for actions, there can be no table creation prior to the user selecting a word.  Sentius' expert acknowledged this in his deposition, confirming that based on his new-found understanding of how this feature worked, he was no longer accusing the actions functionality in Office 2010 or 2013 of infringing.  [*See* Ex. I at 187:11-19.]  The Court should therefore grant summary judgment that the 2010 and 2013 versions of the accused products cannot infringe the asserted claims of the reissue patents with respect to the accused "actions" functionality.

## C.  Sentius Cannot Meet Its Burden to Prove Direct Infringement

As noted above, all of the asserted claims of the Sentius reissue patents are method claims. [*See* Ex. A at 41.]  For each of these claims, Sentius has alleged that Microsoft itself directly infringes by "using the accused spell check, grammar check and actions features in the accused products in the United States."  [*Id.* at 41-42, ¶ 88.]

Sentius has no evidence regarding Microsoft's internal testing or usage of its accused software in the United States.  Sentius' expert cited two pieces of evidence regarding this purported usage, but neither supports his claims.

1    First, Sentius cited a job posting from the website LinkedIn that advertises a job testing

2  Microsoft Office.  [*Id.*, citing Ex. G.]  The posting, however, does not state that any testing has in

3  fact taken place, or that any similar jobs exist and have in fact been filled.  It is simply a job

4  posting.  Even assuming that a similar job had been filled by someone running tests, the posting

5  does not state what that testing was.  The posting does not mention any of the accused

6  functionalities, much less whether or how they were tested.[6]  The posting does not state what

7  versions of Office would be tested, or what programs within Office (*i.e.*, Word, PowerPoint,

8  Excel, Access, etc.).  As noted above, only certain products, versions of products, and features are

9  actually accused in this case.  Again, even assuming the relevant features and versions had all been

10  tested (a point on which the record is silent), the job posting does not state what actual steps were

11  carried out in any such testing, or in what order.

12    The second piece of evidence that Sentius cites to support its claim of direct infringement

13  is a document entitled "Proofing Tools Integration."  [Ex. H.]  Sentius did not ask any witnesses

14  about this document, and it is entirely unclear what it relates to.  Importantly, the document is

15  dated November 16, 2006, which is three years before any of the Sentius patents even issued.

16  Sentius has no evidence about whether or when this document was ever in effect, or whether

17  anyone ever used this document or did anything described in it.  It does not show that anyone

18  within Microsoft practiced the asserted method claims.

19    Because Sentius has no evidence that anyone within Microsoft performed the method

20  claims of the patents-in-suit in the United States during the period of time when the patents were

21  in force, the Court should grant summary judgment that Microsoft does not directly infringe any

22  claims of the Sentius reissue patents.

23    **D.    Sentius Cannot Meet Its Burden to Prove Pre-Suit Indirect Infringement**

24    In addition to alleging direct infringement, Sentius has also alleged that Microsoft induces

25  and/or contributes to the infringement of its customers.  [*See* Ex. A at 42-44, ¶¶ 89-91.]  It is well

26  settled, however, that for both induced and contributory infringement, the accused infringer must

27

28  [6]    All of the accused functionalities were originally developed, and presumably tested, years ago, before the Sentius patents-in-suit even existed, and long before this job posting was ever made.

1   have had actual knowledge of the asserted patents.  S*ee Global-Tech*, 131 S. Ct. at 2068 ("we

2   proceed on the premise that § 271(c) requires knowledge of the existence of the patent that is

3   infringed.  Based on this premise, it follows that the same knowledge is needed for induced

4   infringement under § 271(b)."). Here, Sentius has acknowledged that it did not give Microsoft

5   notice of the asserted patents before the filing of this lawsuit.  [*See* Ex. C at 6.][7]  Because

6   Microsoft did not have actual knowledge of the patents-in-suit prior to the filing of this lawsuit,

7   the Court should grant summary judgment that Microsoft did not induce or contribute to the

8   infringement of anyone prior to February 22, 2013.

9       While this may seem like a relatively minor issue, it has a significant impact on the

10  damages in this case.  Specifically, as noted above, all of the asserted claims of the reissue patents

11  are method claims.  If Microsoft did not induce or contribute to the infringement of its customers

12  prior to the filing of this lawsuit, then Sentius' damages claims must be reduced by approximately

13  $125 million, or approximately 70% of its total demand.

14      **E.      Sentius Cannot Meet Its Burden to Prove Willful Infringement**

15      Sentius has alleged that Microsoft's infringement is "willful."  This allegation is an

16  unnecessary distraction, with only one purpose: to attempt to prejudice the jury against Microsoft.

17  Sentius' willfulness claim fails as a matter of law, for at least two reasons.  First, with respect to

18  the purported pre-suit contacts, there is no dispute that the asserted patents did not even exist at

19  that time.  One cannot "willfully" infringe a patent that does not exist.  Second, Microsoft's good-

20  faith defenses of non-infringement and invalidity preclude a finding of willfulness as a matter of

21  law.

22      **1.      Sentius' Purported Pre-Suit Contacts With Microsoft Do Not Support a
              Claim of Willful Infringement As a Matter of Law**

23

24      Sentius willfulness contention rests on two purported pre-suit contacts with Microsoft

25  occurring in 1998 and 2003, discussed above.  [*See* Ex. B at 6.]  Yet in order to willfully infringe,

26  Microsoft must have acted knowing that there was an objectively high likelihood that its actions

27

28  [7]      While its interrogatory response states that notice was given "no later than" the filing of the
         lawsuit, Sentius never supplemented its response to identify any earlier date.

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF NO INFRINGEMENT
Case No. 5:13-cv-00825 PSG

infringed a valid patent. *Seagate*, 497 F.3d 1374.  Microsoft could not have had the requisite

knowledge given that the asserted patents did not exist at the time of these purported pre-suit

contacts. *See American Original*, 774 F.2d at 465.  Here, the first of the asserted patents to issue

was the '731 patent in 2009—six years after the purported contacts with Microsoft.  Because

Microsoft could not have known of the asserted patents during its pre-suit discussions with

Sentius, it could not have acted knowing it was infringing any Sentius intellectual property rights.

To the extent Sentius advances some new or novel theory of willful infringement that does

not require knowledge of the asserted patents, there is also no dispute that there was nothing of

substance discussed in either meeting between Sentius and Microsoft, insofar as willfulness is

concerned.  Specifically, Mr. Bookman acknowledged that he never told Microsoft anything

confidential about the operation of his systems, such as whether or not they use a "look-up table."

[Ex. D at 194:5-12; Ex. E at 255:12-17.]  He also confirmed that anything he sent to Microsoft

was public, was given voluntarily, and was not subject to any confidentiality obligations [Ex. D at

200:24-201:9; Ex. E at 230:24-231:5, 238:5-13, 249:25-250:13, 250:23-251:10, 252:18-25.]

Microsoft did not know about the asserted patents until this lawsuit was filed.  Because

nothing in the pre-suit contacts provides any basis for claiming that Microsoft willfully infringed

the Sentius reissue patents, the Court should grant summary judgment of no willful infringement.

## 2.     Microsoft's Good-Faith Defenses Preclude a Finding of Willful Infringement as a Matter of Law

As discussed above, good-faith defenses of non-infringement or invalidity presented in the

litigation will also defeat a claim for willful infringement. *See Advanced Fiber*, 674 F.3d at 1377-

78.  This Court recently granted summary judgment of no willful infringement based on

reasonable non-infringement defenses, even though the Court ultimately sent those defenses to the

jury rather than granting summary judgment. *See Emblaze Ltd. v. Apple Inc*., 2014 U.S. Dist.

LEXIS 57893 at *55-56 (N.D. Cal. Apr. 24, 2014).  Other courts have similarly rejected

willfulness theories as a matter of law based on the presence of good faith litigation defenses. *See,*

*e.g., Tarkus Imaging, Inc. v. Adobe Sys*., 867 F. Supp. 2d 534 (D. Del. 20120); *Plumley v. Mockett*,

836 F. Supp. 2d 1053, 1073-76 (C.D. Cal. 2010); *Robocast, Inc. v. Microsoft Corp*., 2014 U.S.

1   Dist. LEXIS 22331 at *32-33 (D. Del. Feb. 21, 2014).  This is a separate and independent basis

2   upon which the Court should grant summary judgment of no willful infringement.

3   Here, Microsoft previously moved for summary judgment of invalidity under the doctrine

4   of broadening reissue.  [*See* Docket No. 76.]  While the Court ultimately denied that motion, it did

5   so on the basis of a reasonable dispute about whether or not Sentius corrected clerical errors in the

6   claims, deciding to send that issue to the jury for resolution.  [*See* Docket No. 119.]  That decision

7   is now the law of the case, and the presence of this good-faith dispute on what is ultimately a

8   question of law defeats a finding of objective recklessness as a matter of law.  *See Emblaze*, 2014

9   U.S. Dist. LEXIS 57893 at *55, citing *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,

10  682 F.3d 1003, 1007 (Fed. Cir. 2012) ("the objective determination of recklessness, even though

11  predicated on underlying mixed questions of law and fact, is best decided by the judge as a

12  question of law subject to de novo review"); *see also* Docket No. 119 at 9 (stating that "[w]hether

13  the claims of a reissue patent violate 35 U.S.C. § 251 is a question of law predicated on underlying

14  facts"); *id.* at 10 (noting that obviousness "is a question of law predicated on underlying questions

15  of fact").  Moreover, Microsoft has set forth a number of good faith defenses of no infringement in

16  this motion, as discussed above.  These good-faith defenses demonstrate that even after Microsoft

17  became aware of the Sentius patents with the filing of this lawsuit, Microsoft did not and does not

18  believe it is infringing or encouraging anyone else to infringe valid patents.[8]

19  Importantly, both of the reissue patents are now expired.  Thus to the extent Sentius alleges

20  willful infringement, that allegation could only cover a time period from February 22, 2013 (the

21  filing of this lawsuit) to February 16, 2014 (the patents' expiration date).  That time period ended

22  **before** the Court ruled on Microsoft's invalidity summary judgment motion.  [*See* Docket

23  No. 119.]  While that motion was pending, Sentius cannot possibly suggest that Microsoft's belief

24  in invalidity was not in good faith.  Also, Sentius did not seek a preliminary injunction, another

25  precursor to a finding post-suit willful infringement.  *See Seagate*, 497 F.3d at 1374.  Thus the

---

[8]   While not presented here, Microsoft has also raised defenses of anticipation and obviousness
for the reissue patents based upon its own prior art software.

1   Court should grant summary judgment that Microsoft has not willfully infringed the asserted

2   Sentius patents.

3   **V.      CONCLUSION**

4           For the reasons discussed above, Microsoft respectfully requests that the Court grant its

5   motion and find that (1) the accused background spell and grammar check features do not infringe

6   the Sentius reissue patents because they do not use a "look-up table" with a "pointer" as claimed;

7   (2) the accused "actions" feature in Office 2010 and 2013 does not infringe because there is no

8   creation of a "look-up table" prior to user selection of a word; (3) Sentius has not met its burden to

9   show direct infringement because it has no evidence that Microsoft itself practiced the method

10  steps of the Sentius reissue patents; (4) Sentius has not met its burden to show that Microsoft

11  indirectly infringed the reissue patents prior to the filing of this lawsuit because Microsoft had no

12  knowledge of the asserted patents prior to that date; and (5) Sentius cannot show willfulness as a

13  matter of law because it cannot show either subjective or objective recklessness.

14

15  Dated:  December 2, 2014                    FISH & RICHARDSON P.C.

16                                             By:  _s/ Jonathan J. Lamberson_____
                                                    Jonathan J. Lamberson
17
                                               Attorneys for Defendant
18                                             MICROSOFT CORPORATION

19  *Additional Counsel*

20  Jonathan J. Lamberson (SBN 239107)
    lamberson@fr.com
21  FISH & RICHARDSON P.C.
    500 Arguello Street, Suite 500
22  Redwood City, CA  94063
    Telephone: (650) 839-5070
23  Facsimile: (650) 839-5071

24  Isabella Fu (SBN 154677)
    Isabella.fu@microsoft.com
25  MICROSOFT CORPORATION
    One Microsoft Way
26  Redmond, WA 98052
    Telephone: (425) 882-8080
27  Facsimile:  (425) 936-7329

28  50968292.doc

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT OF NO INFRINGEMENT
Case No. 5:13-cv-00825 PSG