Frank E. Scherkenbach (SBN 142549)
scherkenbach@fr.com
Kurt L. Glitzenstein (pro hac vice)
glitzenstein@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Attorneys for Defendant
MICROSOFT CORPORATION

*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN JOSE DIVISION)

| | |
|---|---|
| SENTIUS INTERNATIONAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No.  5:13-cv-00825 PSG<br><br>**DEFENDANT MICROSOFT CORPORATION'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER** |
| AND RELATED COUNTERCLAIMS | DATE:      January 13, 2015<br>TIME:      10:00 a.m.<br>JUDGE:   Hon. Paul S. Grewal |

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ..................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................ 2

III.   STATEMENT OF LAW........................................................................... 5

IV.   ARGUMENT ........................................................................................... 7

    A.   The Wecker Survey Should Be Excluded Because the Questions
        It Posed Are Not Tied to the Claimed Subject Matter ........................... 7

    B.   The Wecker Survey Should Be Excluded Because It Is Not Based
        on Reliable Methodologies ................................................................... 12

        1.   The Wecker Survey Should be Excluded Because It
               Employs a Hypothetical Framework That Is
               Fundamentally Flawed in the Context of Products Having
               Thousands of Features................................................................. 12

        2.   The Wecker Survey Should Be Excluded Because It Was
               Part of an Omnibus Survey, And No Attempt Was Made
               to Account for the Influence of Other Questions ..................................... 14

        3.   The Wecker Survey Should be Excluded Because it
               Lacked Any Quality Control Measures................................... 15

    C.   The Willingness-To-Pay (WTP) Results from the Wecker Survey
        Should Be Excluded Because There is No Basis for Using the
        Selected Calibration Factor or Any Other Calibration Factor ........................... 16

V.   CONCLUSION........................................................................................ 19

i            MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                                  SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                                         Case No. 5:13-cv-00825 PSG

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Apple, Inc. v. Samsung Elects. Co., Ltd.*,
    2014 WL 794328 (N.D. Cal. Feb. 25, 2014)................................................9, 10, 13

4

5

*Arche, Inc. v. Azaleia, U.S.A., Inc.*,
    882 F. Supp. 334 (S.D.N.Y. 1995).......................................................................10

6

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
    2003 WL 24010950 (W.D. Pa. Apr. 23, 2003) ...................................................10

7

8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001).................................................................................6

9

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................... passim

10

11

*Fractus, S.A. v. Samsung*,
    2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) .....................................................6, 8

12

*Georgia-Pacific Consumer Prods. LP v. Kimberly Clark Corp.*,
    2010 WL 1334714 (N.D. Ill. March, 31 2010) .....................................................11

13

14

*Icon Enters. Int'l, Inc. v. American Products Co.*,
    2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ...............................................6, 9, 10

15

*Lucent Tech. v. Gateway*,
    580 F.3d 1301 (Fed. Cir. 2009)........................................................................7, 12

16

17

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003)...............................................................................6

18

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013)....................................................................9

19

20

*ResQNet.com, Inc. v. Lansa*,
    594 F.3d 860 (Fed. Cir. 2010).......................................................................6, 7, 8

21

*Scott Fetzer Co. v. House of Vacuums Inc.*,
    381 F.3d 477 (5th Cir. 2004)....................................................................................9

22

23

*Southland Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997)..................................................................................6

24

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...............................................................................7

25

<u>Statutes</u>

26

Fed. R. Evid. 403 ...............................................................................10, 13, 15

27

Fed. R. Evid. 702 ......................................................................................9, 13

28

1         PLEASE TAKE NOTICE that on January 13, 2015, 10:00 a.m., Defendant Microsoft

2    Corporation ("Microsoft") will and hereby does move the Court to exclude the testimony of

3    Sentius International, LLC's ("Sentius") survey expert Dr. William Wecker.

4    **I.        INTRODUCTION**

5         In support of its damages theory, Plaintiff Sentius International, LLC ("Sentius") relies

6    heavily on an on-line survey conducted at the direction of one of its experts, Dr. William Wecker.

7    Dr. Wecker concludes from his survey results that a sizable percentage of Microsoft's customers

8    would not have purchased the Office suite of products if the applications in that suite lacked the

9    background spell- and grammar-checking features that are accused of infringement in this case.

10   For those who would nonetheless have bought Office, Dr. Wecker concludes that they would have

11   paid a sizable amount to have those features included.  Sentius' damages expert, Mr. Robert Mills,

12   relies on these results as mathematical certainties, concluding from the first set of figures that

13   Microsoft would have lost a billion dollars in profit had it not included the accused features in

14   Office, and so would have gladly paid about a quarter of that to Sentius.

15        In short, Mr. Mills premises a commercial analysis on Dr. Wecker's survey data, one that

16   ostensibly tracks a commercial decision-making process that would supposedly have led from

17   those survey results to Microsoft cutting a check to Sentius for well over one hundred million

18   dollars.

19        Dr. Wecker's survey cannot bear this weight.  Dr. Wecker cannot recall ever designing a

20   survey to evaluate individuals' preferences or opinions, in a commercial, non-litigation setting,

21   and it shows in his survey for this case.  Among the problems with the survey detailed below,

22   Dr. Wecker failed to ask any questions that would probe the extent to which respondents care

23   about the specific aspects of the spell- and grammar-check features that Sentius alleges infringes

24   its claims (such as the purported use of a "look-up table" with "links").  The Sentius reissue

25   patents are directed to a very specific implementation that facilitates the retrieval of reference

26   information, not to spell- or grammar-checking generally.  Notably, Sentius' own technical expert

27   has acknowledged that there is at least one non-infringing way to implement the accused spell-

28   and grammar-checking features.  For the questions he did ask, Dr. Wecker employed a

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
Case No. 5:13-cv-00825 PSG

hypothetical approach that singled out the accused features to the exclusion of the thousands of others in Office.  With the deck thus stacked, it is little wonder that respondents expressed a preference for those features.  That is a well-known phenomenon called "hypothetical bias," a common-sense phenomenon wherein people asked to focus on one particular feature in a product will naturally overstate the importance of that feature.  To reduce this bias, multi-feature products are conventionally surveyed using conjoint techniques—and even those techniques have severe limitations when the products at issue have the thousands of features that Microsoft Office products have.

In addition to those problems, Dr. Wecker did not even conduct a dedicated survey.  His survey was instead included amongst an unknown number of others, in what is known in the field as an "omnibus" survey.  It is a well-known shortcoming of omnibus surveys that questions asked in one survey can materially influence responses given in others.  This too fails to follow generally accepted survey methodology, which calls for a dedicated survey where there is any material commercial decision hinging on the survey results.  Compounding the omnibus survey problem, Dr. Wecker failed to utilize any quality control measures.  This too is the standard in survey methodology.  There are well-established techniques to determine if respondents are "racing" through the survey, not reading the questions carefully (if at all), or otherwise failing to engage in the survey in a meaningful and thoughtful manner.  Dr. Wecker employed none of these techniques, and he consequently has no way to determine if any of the respondents took any of the questions in his survey seriously.

In sum, Dr. Wecker's survey failed to ask the right questions, and failed to apply acceptable survey methodology.  No meaningful use can be made of his survey results for any purpose germane to this case, and certainly no conclusions can be drawn from those results that carry one hundred million dollar, real-world commercial consequences, as Sentius contends.  The survey and Dr. Wecker's testimony should be excluded in their entirety.

## II.   STATEMENT OF FACTS

Dr. Wecker submitted an expert report on behalf of Sentius concerning a survey that ostensibly reveals the extent to which Microsoft's customers would not have purchased Microsoft

1  Office if the accused spell- and grammar-check features were absent, and if they would have

2  nonetheless still purchased the product, how much extra they would have paid for those features

3  (the "Wecker Report").[1]  The opinions offered in the Wecker Report in turn serve a critical

4  predicate role for the damages analysis offered by Sentius' damages expert, Mr. Mills.

5      Dr. Wecker has never before conducted a commercial survey to assess what, if anything, a

6  consumer would be willing to pay for a good, service, or feature.[2]   His survey for this case

7  ("Wecker Survey") was an on-line survey conducted by a third party at Dr. Wecker's request.[3]

8  The Wecker Survey was a part of an omnibus survey, meaning that the same panel of respondents

9  were asked questions from multiple different surveys, both before and after the Wecker Survey.[4]

10  When Dr. Wecker formed his opinions, he did not know what questions were asked before his

11  survey (he obtained that information the day before his deposition), and to this day does not know

12  how many other surveys made up the omnibus survey.[5]

13      Dr. Wecker states that his survey was "aimed at users and purchasers of Microsoft Office

14  computer software" and asked such users "about their use of Microsoft's spelling and grammar

15  check methods available in components of Microsoft's Office and the value they placed on those

16  capabilities."[6]  The Wecker Survey directly asked the survey participants open-ended questions

17  about their willingness-to-pay ("WTP") extra for what Dr. Wecker described as Microsoft's

18  "check spelling as you type" and "check grammar errors as you type" features.[7]  Dr. Wecker

19  acknowledged that responses to such WTP questions tend to "overstate consumers' 'true'

20  willingness to pay" "thus requiring a calibration factor to adjust for the overestimation."[8]

21      The Wecker Survey described the "check spelling as you type" feature as follows,

22  referencing a series of included screenshots: "As you type text, the software identifies words that

23  _____

24  [1] Ex. J, Expert Report of William E. Wecker, September 8, 2014.  All references to "Ex." are to
exhibits attached to the Declaration of Jonathan J. Lamberson.

25  [2] Ex. K, Wecker Depo Tr. (ROUGH) at 35:14-19.
[3] Ex. J at paras. 7-11.

26  [4] Ex. L, 9/16/2014 Sentius Email.
[5] Ex. K at 90:14-22.

27  [6] Ex. J at para. 8.
[7] *Id*. at para. 13.

28  [8] *Id*. at para. 14.

may not be spelled correctly and marks them with a red-squiggly underline. When you 'right click' ('control-click' on some Apple Macintosh computers) on a marked word, a drop down menu is displayed with a list of alternative words and other options to choose from, as shown below."[9]  As an additional feature of Microsoft Office, the Wecker Survey described a "user-initiated" spell checker option: "The user-initiated spell checker option does not mark misspelled words as you type with a red-squiggly underline, but instead identifies words that may not be spelled correctly when, for example, you select Spelling & Grammar from the Review menu in Word (or select Spelling and Grammar from the Tools menu on an Apple Macintosh computer), as shown below."[10]

Similarly, with respect to grammar checking, the Wecker Survey described "check grammar errors as you type" as follows: "As you type text, the software identifies words or phrases that may contain grammar errors (or inconsistent formatting) and marks them with a green or blue squiggly underline. When you 'right click' ('control click' on some Apple Macintosh computers) on a marked word or phrase, a drop down menu is displayed with a list of alternatives and other options to choose from, as shown below."[11]  The Wecker Survey described an additional Microsoft Office feature, a "user-initiated grammar check," as an "option [that] does not mark grammar errors (or inconsistent formatting) as you type with a green or blue squiggly underline, but instead identifies words or phrases that may contain grammar errors (or inconsistent formatting) when, for example, you select Spelling & Grammar from the Review menu in Word (or select Spelling and Grammar from the Tools menu on an Apple Macintosh computer), as shown below."[12]

The two reissue patents (U.S. Pat. Nos. RE40,731 and RE43,633) asserted by Sentius in this case relate to "indexing displayed elements. More particularly, the present invention relates to a novel indexing scheme that is useful in such applications as learning a foreign language, for

---

[9] *Id*. at Attachment E at page E.2.
[10] *Id*. at Attachment E at page E.4.
[11] *Id*. at Attachment E at page E.9.
[12] *Id*. at Attachment E at page E.11.

example a language based upon an ideographic alphabet, such as Japanese."[13]  Sentius in its tutorial stated that the "starting and end point addresses for [linked] words and phrases [in a document] and their associated links are recorded in *a look-up table* and executed to retrieve additional materials for display in a pop-up window in response to a user input."[14]

Neither reissue patent mentions spell checking or grammar checking.[15]  Marc Bookman, a named inventor on both reissue patents, acknowledged that spell checking and grammar checking have been around for a long time,[16] and Sentius has not alleged that all spell or grammar checking infringe.  The other named inventor on the reissue patents, Brian Yamanaka, acknowledged that there are multiple ways to implement a spell checking system, *e.g.*, one implementation using a look-up "table that … had a link, a pointer, to the correct spelling" and another where "you wouldn't maintain links to the correct spelling."[17]  Sentius' technical expert, Dr. Vijay Madisetti, acknowledged that there is at least one non-infringing way to implement the accused spell- and grammar-checking functionalities in Microsoft Office.[18]  None of the questions posed in the Wecker Survey sought to probe respondents for the supposed criticality of, or value of, the specific aspects of the spell and grammar check features that are alleged to infringe Sentius' patents—a "look-up table" with "links" to external content.

### III.   STATEMENT OF LAW

Federal Rule of Evidence 702 allows expert testimony only if it is based on "scientific, technical, or other specialized knowledge" by a qualified expert and if it "will help the trier of fact to understand the evidence or determine a fact in issue."  Fed. R. Evid. 702.  The Supreme Court has assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

---

[13] US. Pat. No RE40,731 at 1:15-20; U.S. Pat. No. RE43,633 at 1:27-31.
[14] Ex. M, Sentius Tutorial at page 22 (emphasis added).
[15] *See* US. Pat. Nos. RE40,731 and RE43,633.
[16] Ex. E, 5/30/2014 Bookman Depo. Tr. at 328:24-329:5.
[17] Ex. F, 6/20/2014 Yamanaka Depo. Tr. at 104:20-106:22.
[18] Ex. I, 11/24/2014 Madisetti Depo. Tr. at 142:16-143:7.

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
Case No. 5:13-cv-00825 PSG

A party proffering expert testimony has the burden to establish by a preponderance of the evidence that such testimony is sufficiently reliable.  *See id*. at 592 n.10.  Expert testimony is sufficiently reliable only if it (1) is based on sufficient facts or data; (2) is the product of reliable principles and methods; and (3) applies the principles and methods reliably to the facts.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591-592.  As "gatekeeper," the court must exclude expert testimony that "is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case."  *Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1391 (Fed. Cir. 2003).

The admissibility of survey evidence is governed by *Daubert*.  *Southland Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 n.8 (9th Cir. 1997).  Serious flaws in a survey will make reliance on that survey unreasonable.  *See Icon Enters. Int'l, Inc. v. American Products Co*., 2004 WL 5644805, at *22 (C.D. Cal. Oct. 7, 2004).  To be admissible, evidence, including survey evidence, considered in a reasonable royalty analysis must be tied to the patented invention.  *See Fractus, S.A. v. Samsung*, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011) (quoting *ResQNet.com, Inc. v. Lansa,* 594 F.3d 860, 869 (Fed. Cir. 2010) ("Survey evidence purportedly demonstrating the value of [a product feature] not tied directly to Plaintiff's technology confuses the issues and must be excluded.  Allowing the jury to hear such evidence not tied to the claimed invention risks 'compensation for infringement [that] punishes beyond the reach of the statute.' Indeed, admissible expert testimony must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'")).

"Treatment of surveys is a two-step process.  First, is the survey admissible?  That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?  This threshold question may be determined by the judge.  Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir. 2001) (internal citations omitted).

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
Case No. 5:13-cv-00825 PSG

1    Further, even if expert testimony or survey evidence is relevant, Federal Rule of Evidence

2    403 requires the court to exclude such relevant evidence "if its probative value is substantially

3    outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

4    misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

5    Patent damages must be based on sound economic principles and reliable data.  *Uniloc*

6    *USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011); *ResQNet.com Inc. v. Lansa, Inc.*

7    594 F.3d 860 (Fed. Cir. 2010); *Lucent Tech. v. Gateway,* 580 F.3d 1301 (Fed. Cir. 2009).  The

8    hypothetical negotiation must account for factors that would have affected a real-world

9    negotiation, including potential alternatives to the patent.  *Uniloc,* 632 F.3d at 1313.

10   **IV.    ARGUMENT**

11           **A.  The Wecker Survey Should Be Excluded Because the Questions It Posed Are
12               Not Tied to the Claimed Subject Matter**

13           As noted above, the Wecker Survey asked respondents about their willingness to purchase

14   products that lacked, and their willingness to pay extra for, Microsoft's "check spelling as you

15   type" and "check grammar errors as you type" features.[19]  These are simply the wrong questions to

16   ask.  Sentius did not invent background spell or grammar checking.  Indeed, the inventors of the

17   patents-in-suit acknowledge that there are multiple ways to link or look-up content,[20] and multiple

18   ways to implement a spell checking system.[21]  Additionally, Microsoft has identified several

19   alternative approaches for implementing background spell and grammar checking that are well

20   outside what Sentius contends its claims cover.[22]  One such alternative has already been

21   implemented for background spell-check, and Microsoft currently anticipates releasing it to some

22   Office customers in the next one-to-two months.[23]  Sentius' technical expert, Dr. Madisetti,

23   acknowledged in his deposition that he was not alleging this alternative infringed the Sentius

24
25

[19] Ex. J at para. 13.
26   [20] *See* Ex. D, 5/29/2014 Bookman Depo. Tr. at 126:17-130:25.
[21] *See* Ex. F at 104:20-106:22.
27   [22] Ex. N, Expert Report of Daniel A. Menasce Regarding Non-Infringement, at paras. 656-665.
28   [23] *Id.* at para. 660.

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                Case No. 5:13-cv-00825 PSG

1    reissue patents.[24]  His opinion was that this alternative would allegedly not have been "acceptable"

2    for a variety of reasons.[25]  Notably, nothing in the Wecker survey asks any questions about the

3    "acceptability" of this or any other alternative design for implementing background spell- or

4    grammar-checking.

5              The central defect of the Wecker Survey is thus its failure to pose questions that probe

6    respondents for their preference for, and perceived value of, the specific aspects of Microsoft's

7    background spell- and grammar-check features that are alleged to infringe the patents-in-suit.

8    Sentius contends that only Microsoft's alleged use of a look-up table, and its performance of

9    certain steps in the order required by the claims, infringes.  A proper survey would have explored

10   whether respondents have any preference for spell and grammar check features implemented in

11   this specific way, not the features in general.[26]

12             "[T]he trial court must carefully tie proof of damages to the claimed invention's footprint

13   in the market place."  *ResQNet.com* at 869.  "Survey evidence purportedly demonstrating the

14   value of [a product feature] not tied directly to Plaintiff's technology confuses the issues and must

15   be excluded."  *Fractus*, 2011 WL 7563820 at *1 (excluding survey evidence where the subject

16   questions of the survey where directed to the value of internal antennas and not directed tied to the

17   patented technology of one type of internal antenna that purportedly provides advantages such as

18   multiband functionality and reduced size).  "Allowing the jury to hear such evidence not tied to

19   the claimed invention risks 'compensation for infringement [that] punishes beyond the reach of the

20   statute.'"  *Id.* (quoting *ResQNet.com,* 594 F.3d at 869).  "Indeed, admissible expert testimony must

21   'carefully tie proof of damages to the claimed invention's footprint in the market place.'"  *Id.*

22   Here, in accord with the Federal Circuit in *ResQNet.com* and similar to *Fractus*, "the surveys are

23   not tied to the alleged advantageous technical characteristics of the patents-in-suit … .  Put another

24   way, the surveys do not measure how consumers value the purported advantages provided by

25   Plaintiff's technology."  *Fractus*, 2011 WL 7563820, at *1.

26   _____

27   [24] Ex. I, 11/24/2014 Madisetti Depo. Tr. at 142:16-143:7.
     [25] *Id.*

28   [26] D.I. 66, Court's Claim Construction Order, requiring that the steps of the reissue patent method
     claims, the only remaining asserted claims, "must be performed in the orders written."

1        Judge Koh confronted a similar issue in a challenge to Apple's survey in *Apple, Inc. v.*

2  *Samsung Elects. Co., Ltd*., 2014 WL 794328 (N.D. Cal. Feb. 25, 2014).  While ultimately

3  rejecting the defendant's *Daubert* challenge, that was because the survey questions in that case

4  ***were*** directly tied to the particular claim feature at issue, which concerned a particular background

5  synchronization component.  *Id*. at *19.  While the claims required two additional background

6  synchronization components that were not probed in the survey, *id*. at *18, the unrebutted

7  evidence there showed that the defendant "could not have implemented a single-component non-

8  infringing alternative." *Id*. at *19.  "Accordingly, Apple can argue that, for Samsung consumers,

9  the technical limitations of Samsung's devices rendered the relevant choice to be between a device

10  with background synchronization and a device without background synchronization (not a choice

11  between three-component background synchronization and one-component background

12  synchronization).  Given the apparent limitations of Samsung's devices, the Court concludes that

13  Dr. Hauser's [Apple's survey expert] description of claim 20 of the '414 Patent was not

14  improper." *Id*.

15        In so holding, Judge Koh cautioned against survey questions that stray too far from the

16  particulars of the claims alleged to be infringed:  "At some point, a description of a patent in a

17  survey may vary so much from what is claimed that the survey no longer 'relate[s] to any issue in

18  the case' and is 'not relevant and, ergo, non-helpful.'" *Id*. at *18 (quoting *Daubert*, 509 U.S. at

19  591); *see Icon Enterprises Int'l, Inc.*, 2004 WL 5644805, at *22 ("However, 'serious flaws in a

20  survey will make any reliance on that survey unreasonable.'") (citing *Scott Fetzer Co. v. House of*

21  *Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d

22  866, 878 (C.D. Cal. 2013) (excluding a survey).

23        Given that Sentius did not invent background spell- or grammar-checking, and that the

24  record here amply demonstrates that those features can be implemented using techniques that fall

25  outside of what Sentius contends its claims cover, the methodology of the Wecker Survey is

26  fatally flawed and unsound as a consequence of posing questions that are not sufficiently tied to

27  the claimed subject matter.  The Wecker Survey is thus meaningless on the issues of whether

28  respondents would still have purchased Microsoft's products absent the specific implementation

details required for infringement (the claimed "look-up table"), and if so how much extra they would have paid for spell- and grammar-check features that were implemented in that particular way.  The Wecker Survey and its results, the Wecker Report, and all testimony from Dr. Wecker should therefore be excluded as inadmissible under *Daubert* and Federal Rule of Evidence 702.

These materials should also be excluded under Fed. R. Evid. 403.  *Apple,* 2014 WL 794328, at *18.  Rule 403 requires the court to exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, *confusing the issues, misleading the jury*, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403 (emphasis added).  "[A]t some point, discrepancies between the scope of the patent claims and the survey questions may be so confusing to the jury as to substantially outweigh the survey's probative value, thus requiring the Court to exclude such material under Rule 403."  *Apple, Inc.,* 2014 WL 794328, at *18; *see Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 2003 WL 24010950, at *5 (W.D. Pa. Apr. 23, 2003) (excluding a survey under Rule 403); *Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F. Supp. 334, 336 (S.D.N.Y. 1995) (excluding consumer survey under Rule 403); *Icon Enterprises Intern., Inc.*, 2004 WL 5644805, at *22 (("Likewise, [i]f the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial."  (internal quotations and citation omitted)).

Sentius will likely argue that whether there were any available and acceptable non-infringing alternatives is a fact dispute that the jury must resolve.  Such an argument misses the point.  As discussed above, there is no dispute that there is at least one possible alternative implementation of the accused features that does not infringe the asserted claims.[27]  Even assuming there is a fact dispute about whether this alternative implementation would have been *acceptable* to customers (and if so, Microsoft contends there is no genuine dispute on acceptability, given that it has already been successfully implemented), the Wecker Survey is not addressed to that dispute, and thus is not probative on the issue of acceptability.  The Wecker Survey simply assumes that there are no possible alternative implementations for background

1  spell- or grammar-checking.  As discussed above, that factual predicate is unfounded and

2  incorrect.

3       Because the Wecker Survey framed its questions in terms of "check spelling as you type"

4  and "check grammar errors as you type" without tethering those questions to the claimed subject

5  matter (a "look-up table" with "links"), not only does it have no probative value for the issues

6  germane to this case, but it is highly likely to confuse and mislead the jury as to the alleged

7  criticality and value of the patented technology.

8       Not only did Dr. Wecker fail to ask the right questions, but the "check spelling as you

9  type" characterization that he used is materially overbroad and confusing in another respect as

10  well.  Some Microsoft Office products, such as Microsoft Word for Windows, include an

11  "Autocorrect" function."  Autocorrect can "correct typos and misspelled words as well as to insert

12  symbols and other pieces of text."   "AutoCorrect can also correct a misspelled word if the word is

13  similar to a word in the main spelling checker dictionary."  The classic example is Autocorrect

14  automatically correcting "teh" to "the."  Autocorrect can function in tandem with "check spelling

15  as you type" and "check grammar errors as you type."

16       Even though Autocorrect is not accused, the "check spelling as you type" phrasing used in

17  the Wecker Survey is broad enough to encompass Autocorrect, and thus respondents when

18  indicating whether they would have purchased the accused products if it lacked the "check

19  spelling as you type" feature, and if so how much extra they would have been willing to pay for

20  this feature, may have had the unaccused Autocorrect feature in mind.  Plainly, best-practices in

21  administering a survey requires unambiguous questions.[28]   Courts likewise have recognized that

22  "[a] reliable survey should avoid the use of confusing or ambiguous questions."  *Georgia-Pacific*

23  *Consumer Prods. LP v. Kimberly Clark Corp.*, 2010 WL 1334714, at *5 (N.D. Ill. March, 31

24  2010).

25

26  ───────────────────────
   [27] Ex. I, 11/24/2014 Madisetti Depo. Tr. at 142:16-143:7.

27  [28] Ex. O, *Basic Survey Design*, available at
   http://www.nss.gov.au/nss/home.nsf/NSS/4354A8928428F834CA2571AB002479CE?opendocum

28  ent (last visited December 1, 2014) ("Questions should not be loaded, double-barreled, misleading
   or ambiguous, and should be directly relevant to the objectives of the survey.").

1    Accordingly, the Wecker Survey and its results, the Wecker Report, and all testimony from

2    Dr. Wecker should also be excluded as inadmissible under Federal Rule of Evidence 403.

3

4    **B.    The Wecker Survey Should Be Excluded Because It Is Not Based on Reliable Methodologies**

5        **1.   The Wecker Survey Should be Excluded Because It Employs a Hypothetical Framework That Is Fundamentally Flawed in the Context of Products Having Thousands of Features**

6

7    The accused Microsoft Office applications have, collectively, thousands of features.  The

8    Wecker Survey elevates two of those to preeminence, and asks only about those, to the exclusion

9    of all others.  Given how the deck was stacked, it is not surprising that a sizable percentage of

10   respondents said that they would not purchase Office without the accused features—8.4% in the

11   case of background spell check, and 7.9% in the case of background grammar check—and that

12   respondents on average valued these features at $2.36 and $2.12, respectively.  Mr. Mills then

13   accepts these figures at face value, and applies the first set of figures to conclude that Microsoft

14   would have lost $1.5 billion in revenue if it omitted the features[29], and then applies the second to

15   justify relying on the wholly unrelated *Lucent* JMOL decision to support an alleged $0.22/unit

16   running royalty.[30]

17   Neither Mr. Mills nor Dr. Wecker identifies any authority—legal, academic, or

18   otherwise—showing that any real world commercial decisions, let alone billion-dollar commercial

19   decisions, have ever turned on this type of hypothetical survey that asks about two features to the

20   exclusion of thousands of others.  The generally accepted practice—and even it has serious

21   limitations when applied to multi-thousand feature products of the type at issue here—is instead to

22   employ a conjoint analysis:

23           Conjoint (trade-off) analysis is one of the most widely-used quantitative methods in Marketing Research. It is used to measure preferences for product features, to learn how changes to price affect demand for products or service, and to forecast the likely acceptance of a product if brought to market.

24

25

26           Rather than directly ask survey respondents what they prefer in a product, or what attributes they find most important, conjoint

27

---

28   [29] Ex. P, Expert Report of Robert Mills, Sept. 8, 2014, at para. 177.
     [30] *Id*. at paras. 174-175.

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
Case No. 5:13-cv-00825 PSG

analysis employs the more realistic context of respondents evaluating potential product profiles.[31]

That was the type of survey at issue in *Apple v. Samsung*, 2014 WL 794328 at *13:

> First, Dr. Hauser presented survey respondents, who all owned an accused Samsung device, with four profiles at a time. Each profile consisted of a hypothetical smartphone, and the survey asked respondents to choose which of the four profiles they preferred. See Expert Report of John Hauser (ECF No. 1182) ¶ 85 ("Hauser Rep.").FN6  These profiles varied the price, camera features, call initiation and screening features, input assistance features, screen size, and data accessibility features of hypothetical smartphones. *Id.* ¶ 45. The surveyed features included the patented features and "distraction features," which were chosen because they were featured in Samsung guides and manuals. For any feature not listed (e.g., battery life), respondents were asked to assume that each profile offered the same level of functionality as their current smartphones. *Id.* ¶ 83. Each respondent chose sixteen hypothetical smartphones from sixteen sets of four profiles. *Id.* ¶ 77[32]

Dr. Wecker's failure to employ a survey technique that properly frames the two accused features in the context of the overall feature set of the software applications in which they appear, coupled with Mr. Mills' use of the results of that survey to posit "at risk" revenues to Microsoft of over a billion dollars, fails to apply generally accepted methodology, and inevitably results in figures that are unreliably biased to favor Sentius.[33]  The Wecker Survey and its results, the Wecker Report, and all testimony from Dr. Wecker should also be excluded on this basis as well.

---

[31] *See* Ex. Q, *What is a Conjoint Analysis?*, available at http://www.sawtoothsoftware.com/products/conjoint-choice-analysis/conjoint-analysis-software (last visited on December 1, 2014).

[32] The distorting effects from surveys that elevate particular features above others was also recognized by Judge Koh in *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 976898, at *15 (N.D. Cal. 2014) ("The survey also appears to have inflated the relative value of the patented features by giving much more information to respondents about the patented features than consumers in the marketplace have about those features. *See* Wind Decl. ¶ 56. Research has shown that 'attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace.' Joel Huber, 'What We Have Learned from 20 Years of Conjoint Research: When to Use Self–Explicated, Graded Pairs, Full Profiles or Choice Experiments,' *Sawtooth Software Conference Proceedings* 2 (1997), *available at* http://www.sawtoothsoftware.com/download/techpap/whatlrnd.pdf. 'Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choice.'").

[33] *See* Ex. R, Joel Steckel et al., *Is It Worth Anything? Using Surveys in Intellectual Property Cases*, at pages 4-6 (Conjoint analysis techniques were developed to address the limitations of direct questioning, including the artificial feature importance direct questioning can cause); Ex. S, Shankar Iyer, *Consumer Surveys and Other Market-Based Methodologies in Patent Damages*, http://apps.americanbar.org/litigation/committees/intellectual/articles/fall2014-0914-consumer-

1      **2.  The Wecker Survey Should Be Excluded Because It Was Part of an**
          **Omnibus Survey, And No Attempt Was Made to Account for the**
2          **Influence of Other Questions**

3          Although Dr. Wecker did not disclose the fact in his report, Microsoft after receiving that

4    report suspected that the questions that make up the Wecker Survey were part of an omnibus

5    survey that included numerous questions from researchers other than Dr. Wecker.[34]  Sentius later

6    acknowledged that this was the case.

7          It is well known in the survey field literature that an innate flaw of an omnibus survey is

8    the tendency of one question set to influence another question set.[35]  Omnibus surveys have their

9    role in marketing research, but they are "not a substitute for custom-design market research," as is

10   required here.[36]  Dr. Wecker made no effort to account for the influence of the other questions in

11   the omnibus survey.  Indeed, he did not even know what those questions were until the day before

12   his deposition.  Here too, neither Dr. Wecker nor Mr. Mills has identified any authority to suggest

13   that billion dollar commercial decisions have ever turned on survey data collected from a portion

14   of an omnibus survey.  Given this, and given Dr. Wecker's failure to account for the effect of the

15   other questions in the omnibus survey on the answers to his survey, the survey and Dr. Wecker's

16   testimony regarding it should be excluded.[37]

17

18

19

20

21   surveys.html (last visited Nov. 30, 2014) (Conjoint analysis techniques were developed to
     minimize direct question surveys that "may improperly elevate the relevance or importance of a
22   particular feature by focusing the respondent on that feature.").
     [34] *See* Ex. L.
23   [35] *See* Ex. T, Nigel Bradley, Marketing Research: Tools and Techniques 281, 3d ed. ("The
     disadvantage [of omnibus surveys] is the risk that one set of questions might be affected by other
24   sets"); Ex. U, Good Small Business Guide 2013: How to Start and Grow Your Own Business 242,
     7th ed. ("Before participating in the [omnibus] survey, you should check that the other topics in the
25   survey are compatible"); Ex. V, Scottish Governmental Social Research Group: Social Science
     Method Series, http://www.scotland.gov.uk/resource/doc/175356/0091407.pdf (last visited Nov.
26   10, 2014) ("it is difficult to assess the impact of other questions").
     [36] *See* Ex. T at page 281.
27   [37] This failing of the Wecker Survey could have been avoided by commissioning a solo survey
     that only included the questions from the Wecker Survey, as explained by Dr. Colby (*see* Ex. W,
28   Expert Report of Charles L. Colby at page 20).

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                              SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                              Case No. 5:13-cv-00825 PSG

**3.  The Wecker Survey Should be Excluded Because it Lacked Any Quality Control Measures**

The Wecker Survey was conducted on-line.  There was thus no direct interaction between the survey administrator and the respondents, and therefore no direct way to determine if the respondents were engaging in the substance of the survey questions.  It is a well-known problem in the survey field that "it is *very difficult—if not impossible*—to get respondents to carefully read instructions and other information online … .  This makes it difficult to perform research that depends on the respondent's reading of a situation or product description."[38]  It is therefore essential that such surveys include quality control measures.  "A researcher's desire should be to remove all the [data-quality] culprits from the data set … .  The solution is to use multiple quality-control measurements that are efficient and remove participants who fail one or more of these measurements."[39]  "In addition to the recruitment and panel management techniques discussed above, researchers should incorporate survey-specific practices to flag potential 'cheater' data to determine whether or not the panelist's data should be removed. … In addition, trap questions are included within surveys to identify respondents who are not reading the questions before selecting responses, or who are using automated response methods."[40]

Despite this well-known shortcoming of on-line surveys, the Wecker Survey included no quality control measures.  For instance, one of the most basic quality control measures is to time how long it takes the respondent to complete the survey, in order to identify potential "racers" who are simply trying to complete the survey without regard to what it asks.[41]  Yet because the Wecker Survey was part of an omnibus survey, there was no attempt by either Dr. Wecker or the survey

---

[38] Ex. X, Lars Perner, Ph.D., Consumer Research Methods, http://www.consumerpsychologist.com/cb_Research_Methods.html (last visited November 10, 2014) (emphasis added), *see also* Ex. Y, AAPOR Report on Online Panels, 32, https://www.aapor.org/AM/Template.cfm?Section=AAPOR_Committee_and_Task_Force_Reports&Template=/CM/ContentDisplay.cfm&ContentID=2223 (last visited November 10, 2014).
[39] Ex. Z, Keith Phillips, *Data Use: An evaluation of quality-control questions*, http://www.quirks.com/articles/2013/20131205.aspx  (last visited Nov. 30, 2014).
[40] Ex. AA, Michael Richarme and Felicia Rogers, *The Honesty of Online Survey Respondents: Lessons Learned and Prescriptive Remedies*.
[41] *Id*. at 4.  Respondents were paid for taking the Wecker Survey.  *See* Ex. L.  This financial incentive coupled with the long length of the Survey only encourages to respondents to rush through the Wecker Survey.

1    administrator to identify potential "racers" for the Wecker Survey.  All that the survey

2    administrator tracked was the total time that respondents took to complete the entire omnibus

3    survey.  But Dr. Wecker does not even know how many other surveys were involved in the

4    omnibus survey,[42] and it is impossible to determine if any respondent raced through his survey.

5         Another type of quality control measure is to ask about either fictitious products, or to

6    include "Harvard questions."  Harvard questions are designed to test whether respondents are

7    actually reading and paying attention to the survey questions.[43]  Dr. Wecker did neither of these

8    things.  When asked at deposition whether his survey included any quality control questions,

9    Dr. Wecker identified only his question asking respondents whether they had used the Microsoft

10   products in question.[44]   But when pressed on this, and in particular whether there was any way to

11   determine from the answer to that question whether the respondent was lying, Dr. Wecker

12   conceded that there was not.[45]  At minimum, this betrays a serious lack of understanding by

13   Dr. Wecker as to what a quality control question even is.  In any event, his failure to include any

14   quality control measures in his survey is a clear departure from standard survey methodology, and

15   for this reason as well the Wecker survey and Dr. Wecker's testimony about it should be excluded.

16        **C.    The Willingness-To-Pay (WTP) Results from the Wecker Survey Should Be
             Excluded Because There is No Basis for Using the Selected Calibration Factor
17           or Any Other Calibration Factor**

18        The Wecker Survey asked open-ended willingness-to-pay (WTP) questions.[46]  Dr. Wecker

19   acknowledges that the average responses to such questions will overestimate the true willingness-

20   to-pay of the average consumer.[47]  He purports to address this defect by applying a "calibration

21   factor," which Dr. Wecker says is equal to 1.46 ("Wecker Calibration Factor").  He then divides

22

23   _____

     [42] Ex. K at 90:14-22.
24   [43] *See* Ex. W at page 20.  Dr. Colby provides the following example Harvard question in his
     report: People vary in the amount they pay attention to these kinds of surveys. Some take them
25   seriously and read each question, while others go very quickly and barely read the questions at all.
     If you have read this question carefully, please write the word "Yes" in the blank "Other, please
26   specify" box below. (1) Strongly agree; (2) Agree; (3) Somewhat agree, somewhat disagree; (4)
     Disagree; (5) Strongly disagree; 6 Other, please specify.
27   [44] Ex. K at 92:11-93-3.
     [45] Ex. K at 81:3-8.
28   [46] Ex. J at para. 13.
     [47] Ex. J at para. 14.

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                                         SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                                         Case No. 5:13-cv-00825 PSG

1    the average WTP survey results by the Wecker Calibration Factor, ostensibly to correct for this

2    defect in the data.[48]

3            Dr. Wecker did not conduct a study to ascertain the Wecker Calibration Factor.  For

4    example, he did not compare the stated willingness to pay by the respondents in his survey with

5    any actual data showing a true willingness to pay for the features in question, dividing the two

6    come up with the Wecker Calibration Factor.  He instead derived his calibration factor from a

7    2003 paper that in turn corrects manifest errors in a 2001 paper.  Neither of these papers has

8    anything to do with computer software, let alone commercial productivity products such as those

9    found in the Office suites, let alone the use of background spell- and grammar-check features in

10   those products.  Moreover, the papers on which Dr. Wecker relies concern the willingness to pay

11   for an entire product.  None of the literature identified by Dr. Wecker says that there is any

12   validity to applying a calibration factor to respondents' stated willingness to pay for a single

13   feature of a product.

14           Moreover, the articles on which Dr. Wecker relies on their faces show that Dr. Wecker's

15   "calibration approach" is not a sound and accepted methodology in the survey field.  Specifically,

16   Dr. Wecker derives the Wecker Calibration Factor from the data in a 2003 paper by Murphy et al,

17   entitled "Revisiting the Data and Estimation in List and Gallet" ("2003 Murphy Paper").[49]  The

18   2003 Murphy Paper is a critique and revised analysis of data reported by List and Gallet in a 2001

19   paper entitled "What Experimental Protocol Influence Disparities Between Actual and

20   Hypothetical Stated Values" ("LG Paper").[50]

21           The LG Paper is a meta-survey, taking data from 29 wide-ranging studies with 174

22   observations.  Some of these 29 studies were field studies, while others were laboratory studies.

23   Some concerned private goods (*e.g.*, consumer goods), while others concerned public goods (*e.g.*,

24   public land use).  None of these studies concerned computer software, or features of computer

25   software.  Nor was there any convergence in the data reported by these surveys.  Rather, these

---

[48] *See id.*

[49] *See id.*

[50] Ex. AB, James J. Murphy et al., *Revisiting the Data and Estimation in List and Gallet (2000)* at page 1.

1   studies yielded calibration factors ranging from 0.8 to 28.2, demonstrating the significant

2   influence that the nature of the studies have on the calibration factor.  Given the small sample size

3   of studies and the wide-ranging study parameters, the paper acknowledged that "[m]ore research is

4   necessary.  Undeniably, our results should only be considered a first attempt at quantifying the

5   various experimental methods that may affect hypothetical bias."[51]  The LG Paper further offered

6   that "[a]t this early stage in the debate, we are comfortable with arguing that our results suggest

7   that experimental procedures affect reported calibration functions in meaningful ways, *and any*

8   *calibration exercise that seeks reliability will need to understand the important experimental*

9   *protocol which induce biases*."[52]  On its face, then, the LG Paper acknowledges that the results

10  and methodology reported in the paper cannot, without more, be taken as reliable.

11      The 2003 Murphy Paper likewise concluded that the LG Paper calibration results were

12  unreliable, in part, because of the small study sample size "with insufficient variation" forming the

13  basis for the LG Paper.[53]  The 2003 Murphy Paper did nothing to correct this deficiency, such as

14  by expanding on the work reported in the LG Paper or by acquiring further data to validate the

15  propositions set forth in that paper.  Rather, the 2003 Murphy Paper merely re-states and re-

16  presents the underlying data from the LG Paper.[54]

17      The authors of the 2003 Murphy Paper published another paper two years later ("2005

18  Murphy Paper"), in which they developed another model using an expanded data set.[55]  However,

19  Dr. Wecker elected not to base his opinions on this refined model with its expanded data set.  In

20  any event, even that more refined model falls far short of offering a sufficiently reliable

21  methodology to comply with *Daubert*.  That paper concludes that "there is no consensus about the

22  underlying causes of hypothetical bias or ways to calibrate survey responses for it."[56]  And

23  "[t]here is some weak evidence that bias increases when public goods are being valued, and that

---

25  [51] Ex. AC, John A. List et al., *What Experimental Protocol Influence Disparities Between Actual*
    *and Hypothetical Stated Values*, Environmental and Resource Economics 241, 251.
26  [52] *See id.* (emphasis added).
27  [53] Ex. AB at page 3.
    [54] *See id.* at page 5.
28  [55] Ex. AD, James J. Murphy et al., *A Meta-Analysis of Hypothetical Bias in Stated Preference*
    *Valuation*, Environmental and Resource Economics (2005) 313.

18                MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                 SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                 Case No. 5:13-cv-00825 PSG

1    some calibration methods may be effective at reducing bias.  However, results are quite sensitive

2    to model specification, which will remain a problem until a comprehensive theory of hypothetical

3    bias is developed."[57]  Indeed, the paper cautions that "[t]here is no theory explaining hypothetical

4    bias that could provide guidance as to the appropriate model specification" for determining

5    calibration factors.[58]  Yet Dr. Wecker nonetheless embraces the work of the 2003 Murphy Paper

6    by the same authorities as a mathematical certainty.[59]

7         In short, the Wecker Calibration Factor is not based on a reliable methodology or sufficient

8    data, and does not provide a reliable basis on which to adjust what Dr. Wecker concedes are

9    overestimates of the respondents' stated willingness-to-pay in the Wecker Survey.  That portion of

10   the Wecker Survey and Wecker Report, and Dr. Wecker's testimony on it, should therefore be

11   excluded.

12   **V.    CONCLUSION**

13        The Wecker Report and Wecker Survey should be excluded for at least the reasons

14   articulated above.

15   Dated:  December 2, 2014                    Respectfully Submitted,

16

17                                     By:  _s/ Jonathan J. Lamberson_____
                                           Jonathan J. Lamberson

18                                         Attorneys for Defendant
19                                         MICROSOFT CORP.

20

21   *Additional Counsel*

22   Jonathan J. Lamberson (SBN 239107)
     lamberson@fr.com
23   FISH & RICHARDSON P.C.
     500 Arguello Street, Suite 500
24   Redwood City, CA  94063
     Telephone: (650) 839-5070
25   Facsimile: (650) 839-5071

26   _____
     [56] Ex. AD at 313.
27   [57] *See id.*
     [58] *See id.* at page 318.
28   [59] "[R]elying on calibration methods tends to be relevant primarily in the public section context
     where it is not necessarily practical to conduct a traditional market survey."  Ex. W at page 19.

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                                                SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                                                Case No. 5:13-cv-00825 PSG

1   Isabella Fu (SBN 154677)
    isabella.fu@microsoft.com
2   MICROSOFT CORPORATION
    One Microsoft Way
3   Redmond, WA 98052
    Telephone: (425) 882-8080
4   Facsimile:  (425) 936-7329

5   Attorneys for Defendant
    MICROSOFT CORP.

6

7   50969513.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MICROSOFT'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF
                                                            SENTIUS' SURVEY EXPERT DR. WILLIAM WECKER
                                                            Case No. 5:13-cv-00825 PSG