# EXHIBIT P

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | | |
|---|---|---|
| SENTIUS INTERNATIONAL, LLC, | ) | CASE NO. 5:13-CV-825-PSG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | HIGHLY CONFIDENTIAL |
| | ) | INFORMATION – |
| MICROSOFT CORPORATION, | ) | OUTSIDE COUNSEL ONLY |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

# EXPERT REPORT OF ROBERT MILLS

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

22.     The named inventors of the '985 patent are Marc Bookman, David Kurtz, and Niket Patwardhan.  The '985 patent was assigned upon issuance to Sentius, and I understand that Sentius continues to hold all rights and interest in the '985 patent.[51]  The abstract of the '985 patent states:

> A method and apparatus are disclosed which automatically build a database by automatically identifying a term of interest and building a term database with supplemental content from an assigned source for that term. A term can be selected by applying various rules. An advertiser can sponsor the term, for example, by having an advertisement window automatically pop-up on a keyword search. Content windows can be attached to the term, the content window containing information such as definitions, related products or services, sponsorship information, information from content syndicators, translations and reference works. Data objects that represent the contents of the database and templates are syndicated to remote servers running a processing engine. The processing engine uses these data objects to execute linking rules without requiring a connection to the database.[52]

### C.     Technology of the Patents-In-Suit

#### i.     The '731 Patent and the '633 Patent

23.     It is my understanding that the inventions described in the '731 patent and the '633 patent are directed to an automated method of identifying words and phrases in a parsed document and respectively linking them to external source materials that can be retrieved and displayed in a pop-up window in response to a user selecting that word or phrase.  I understand that prior to the inventions disclosed in the '731 patent and the '633 patent, links to other portions of a document or to other reference materials were inserted into the text stream of a document.  This complicated the original document and made dense linking very difficult.

---

the '985 patent is extended under 35 U.S.C. 154(b) by 450 days.  Hence, I understand that the '985 patent will expire on November 8, 2023, which is 450 days after August 15, 2022.

51.   U.S. Patent No. 7,672,985.

52.   U.S. Patent No. 7,672,985.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

Additionally, edits to the document required the movement of linking information in the text stream, which complicated subsequent parsing of the document, and made editing the document much more complicated.[53]

24.      It is my understanding that the '731 patent and '633 patent provide a solution to this problem.  In particular, a linking scheme is implemented using linking rules to identify specific words and phrases in the document for linking and to record the relative positions of the identified words or phrases along with the linking information in a separate look-up table.  This information is used to identify where in the document terms of interest for which associated external reference materials exist and to retrieve external reference materials for display in a pop-up window.  In the context of a spell checker, for example, the linking rule might consider whether a word matches or does not match any known word in a word lexicon.  In this example, a parsed word is compared to a list of the lexicon words to determine whether it matches a word in the lexicon.  If the parsed word does not match a word in the lexicon (indicating that it might be misspelled), a reference may be recorded in the table structure to an external resource, such as a dictionary, that can be used to determine associated content for that word (such as the correct spelling of the misspelled word) that can be retrieved for display in a pop-up window.  I understand that linking rules may also be used for grammar, specialized terms, and foreign languages.[54]

---

53.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section III (Technology Background).

Sentius Technology Tutorial.

54.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section III (Technology Background).

Sentius Technology Tutorial.

Sentius's Opening Claim Construction Brief, November 26, 2013.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

**Table 3: Accused Functionalities Available in Outlook**

| Accused Functionality | First Accused Version | Year of Release |
|---|---|---|
| 1. Accused spell checker | Outlook 2007 | 2007 |
| 2. Accused grammar checker | Outlook 2007 | 2007 |
| 3. Smart tags | Outlook 2007 | 2007 |
| 4. Automatic dictionary updates | Outlook 2010 | 2010 |

### C.      PowerPoint

38.      On July 31, 1987, Microsoft announced its acquisition of Forethought Inc. ("Forethought") for $14 million.[98]  Forethought developed PowerPoint and FileMaker Plus, the top-selling Macintosh database program.[99]  At the time of the acquisition, PowerPoint was only available for Apple Macintosh computers.[100]  Microsoft introduced the first Windows version of PowerPoint, PowerPoint 2.0, on May 18, 1990.[101]  PowerPoint is a presentation application that enables users to create professional-looking presentations.[102]  PowerPoint provides a variety of features to design unique and compelling slides and presentations, as well as the ability to collaborate online to create presentations.[103]  The latest version of PowerPoint, PowerPoint 2013,

---

"Microsoft Office 2010 Now Available for Consumers Worldwide," Microsoft Press Release, June 15, 2010.

98.  "COMPANY NEWS; Microsoft Buys Software Unit," *The New York Times*, July 31, 1987.

99.  "COMPANY NEWS; Microsoft Buys Software Unit," *The New York Times*, July 31, 1987.

"$14-Million Deal: Microsoft Buys Software Competitor," *Los Angeles Times*, July 31, 1987.

100.  "COMPANY NEWS; Microsoft Buys Software Unit," *The New York Times*, July 31, 1987.

101.  Gaskins, Robert, *Sweating Bullets: Notes About Inventing PowerPoint*, San Francisco, Vinland Books, 2012, p. 322.

102.  Microsoft website – All Office Apps (http://www.microsoftstore.com/store/msusa/en_US/list/categoryID.62686200?Icid=OfficeCat_PopularApps_ SeeAllAppsLink_052013).

103.  Microsoft website – PowerPoint 2013 (http://office.microsoft.com/en-us/powerpoint/).

---

Expert Report of Robert Mills                                                                                            21

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

was introduced on January 9, 2013.[104]  PowerPoint is currently sold as a standalone product and as part of Office and Office 365.[105]  Microsoft currently offers the standalone version of PowerPoint for $109.99.[106]

39.    The years in which accused versions of PowerPoint with the accused spell checker, smart tags, and dictionary updates were first released are identified in the following table.[107]

**Table 4: Accused Functionalities Available in PowerPoint**

| Accused Functionality | First Accused Version | Year of Release |
|---|---|---|
| 1. Accused spell checker | PowerPoint 2007 | 2007 |
| 2. Accused grammar checker | N/A | N/A |
| 3. Smart tags | PowerPoint 2007 | 2007 |
| 4. Automatic dictionary updates | PowerPoint 2010 | 2010 |

**D.    OneNote**

40.    OneNote is a digital notebook that allows users to capture, share, and save information.  It is available on Windows 7, Windows 8, Windows Phone, Mac, iPad, iPhone, and

---

104.  Microsoft PowerPoint Product Lifecycle, Microsoft website (http://support.microsoft.com/lifecycle/search/default.aspx?sort=PN&alpha=powerpoint&Filter=FilterNO).

105.  Microsoft website – Office (http://www.microsoftstore.com/store/msusa/en_US/cat/Office/categoryID.62684700).

106.  Microsoft website – All Office Apps (http://www.microsoftstore.com/store/msusa/en_US/list/categoryID.62686200?Icid=OfficeCat_PopularApps_SeeAllAppsLink_052013).

107.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section VIII (Microsoft's Accused Products).

"Microsoft Launches Windows Vista and Microsoft Office 2007 to Consumers Worldwide," Microsoft Press Release, January 29, 2007.

Deposition testimony of Tristan Davis (Microsoft), May 16, 2014, pp. 135-136.

Sentius International, LLC's Disclosure of Asserted Claims and Preliminary Infringement Contentions Pursuant to Patent Local Rules 3-1 and 3-2, June 11, 2013, Chart for U.S. Patent No. 7,672,985.

"Microsoft Office 2010 Now Available for Consumers Worldwide," Microsoft Press Release, June 15, 2010.

---

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

---

141. Deposition testimony of Marc Bookman (Sentius), May 29, 2014, pp. 38-40.

142. For ease of exposition, I have elected to address the valuation under *Georgia-Pacific* No. 1 rather than discussing it elsewhere in my report.  By doing so, I am not suggesting that this valuation serves to "prove an established royalty."

143.

Expert Report of Robert Mills                                                          33

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY



HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

███████████████████████████████████████████████████

████████████████████████████████████     ███████████

███████████████████████████████████████████████████

████████████████   █████████████████████████████████

████████████████   ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

*Georgia-Pacific* No. 2:    **The rates paid by the licensee for the use of other patents comparable to the patents-in-suit**

62.      Microsoft has produced a number of agreements under which it has received rights to patents owned by third parties.  These agreements are summarized at Exhibit 4.  I am aware of several agreements that pertain to features of Office and related software applications.[153]  These agreements are discussed in greater detail below.

     *i.*    ██████████████████

     63.    ████   ██████   █████  ██   ████████   █████   ████████   ██

███████████████████████████████████████████████████

---

153.  I note that at his deposition, John Mulgrew, Assistant General Counsel at Microsoft, was unable to identify any agreements under which Microsoft licensed technology comparable to the patents-in-suit.  *See* deposition testimony of John Mulgrew (Microsoft), May 30, 2014, pp. 66-67.

Expert Report of Robert Mills                                                                                                35

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

compensation under the '356 patent, which had expired on December 11, 2006.[177] ▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

      72.     I am aware that Dr. Madisetti has reviewed the patent that is the subject of the agreement between Alcatel-Lucent and Microsoft and compared it to the functionality and benefits provided by the '731 patent and the '633 patent.[178]  It is my understanding that the technology of the Alcatel-Lucent patent is comparable to the technology of the '731 patent and the '633 patent as they are used for the accused spell checker and the accused grammar checker.[179]  These patents are all generally directed to improving productivity in word processing through use of links to external content.[180]  According to Dr. Madisetti, the Alcatel-Lucent patent provides the display and substitution of pre-defined data into cells within a form.  The '731 patent and the '633 patent as they are used for the accused spell checker and the accused grammar checker are similar to the Alcatel-Lucent patent because they also relate to linked content and serve to increase efficiency.[181]

      73.     While the technology of the Alcatel-Lucent patent is comparable to the technology of the '731 patent and the '633 patent as they are used for the accused spell checker and the accused grammar checker, I understand that Dr. Madisetti has concluded that the '731

---

177.  U.S. Patent No. 4,763,356.

178.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

179.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

180.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

181.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

HIGHLY CONFIDENTIAL INFORMATION--OUTSIDE COUNSEL ONLY

patent and the '633 patent provide additional benefits.[182]  In particular, as opposed to improving productivity by filling in forms with frequently used information, the '731 patent and the '633 patent are directed at linking content to any useful information in an efficient manner, including the ability to link content over a network.[183]

### iv. *HyperPhrase Technologies LLC and HyperPhrase Inc.*

74.    On November 27, 2002, HyperPhrase Technologies LLC and HyperPhrase Inc. (collectively "HyperPhrase") filed a complaint against Microsoft alleging that Microsoft's smart tags feature infringed U.S. Patent No. 6,308,171 ("the 171 patent"); U.S. Patent No. 5,895,461 ("the '461 patent"); U.S. Patent No. 6,272,505 ("the '505 patent"); and U.S. Patent No. 6,516,321 ("the '321 patent").[184]  On September 24, 2003, the Court granted Microsoft's Motion for Summary Judgment and dismissed the case after determining that HyperPhrase failed to show that smart tags incorporated certain elements of the asserted patents.[185]  HyperPhrase appealed the decision in October 2003, and the parties agreed to settle their dispute in January 2004.[186]

---

182.   Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

183.   Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

184.   Docket Report, *HyperPhrase Technologies, LLC, at al. v. Microsoft Corporation*, Case No. 02-C-0647.

Settlement, Release, and License Agreement between HyperPhrase Technologies LLC and HyperPhrase Inc. and Microsoft Corporation, January 14, 2004 (MS_SENTIUS1691628-647 at 628).

Expert Report of Laurits R. Christensen, *HyperPhrase Technologies, LLC, at al. v. Microsoft Corporation*, Case No. 02-C-0647, July 3, 2003 (MS130570-629 at 572 and 575).

185.   Docket Report, *HyperPhrase Technologies, LLC, at al. v. Microsoft Corporation*, Case No. 02-C-0647.

"Federal Court Dismisses HyperPhrase Patent Infringement Case Against Microsoft," *Center for Internet and Society*, October 7, 2003 (http://cyberlaw.stanford.edu/packets001564.shtml).

186.   Docket Report, *HyperPhrase Technologies, LLC, at al. v. Microsoft Corporation*, Case No. 02-C-0647.

Settlement, Release, and License Agreement between HyperPhrase Technologies LLC and HyperPhrase Inc. and Microsoft Corporation, January 14, 2004 (MS_SENTIUS1691628-647).

---

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

to the accused functionalities and to the success of the accused Microsoft products beyond the accused functionalities.  The at-risk revenue calculations discussed above, however, include only those revenues that Microsoft would stand to lose if it removed the background spell checker and the background grammar checker from the accused Microsoft products.

*Georgia-Pacific* **No. 14:   The opinion testimony of experts**

149.    My opinions are reflected in this report.  I also rely upon the opinions of Dr. Madisetti and Dr. Wecker.  I anticipate reviewing the reports and testimony of experts retained on behalf of Microsoft as this information becomes available.

*Georgia-Pacific* **No. 15:   The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement**

150.    In order to determine a reasonable royalty adequate to compensate Sentius for Microsoft's infringement of the patents-in-suit, I have analyzed the *Georgia-Pacific* factors in the context of hypothetical negotiations between Sentius, as the hypothetical licensor, and Microsoft as the hypothetical licensee.  The date of the hypothetical negotiation between Sentius and Microsoft is in or around June 2009 for a license to the '731 patent and the '633 patent, and in or around June 2010 for a license to the '985 patent.

i.    *Reasonable Royalty for Accused Spell Checker and Grammar Checker*

a)    Guidance from Microsoft Agreement with Lucent

151.    As discussed under *Georgia-Pacific* No. 2, it is my understanding that the patent that is the subject of the agreement between Microsoft and Lucent involves technology that is comparable to the technology of the '731 patent and the '633 patent as these patents have been used by Microsoft in connection with the accused spell checker and the accused grammar checker.  In the sections that follow, I explain how my analysis of the *Georgia-Pacific* factors

Expert Report of Robert Mills                                                                                                      89

and other information can be used to adjust the ███████ fee paid by Microsoft to Lucent to account for differences between the agreement executed by Microsoft and Lucent and the agreement that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius.  This analysis provides insight into a reasonable royalty for Microsoft's use of the '731 patent and the '633 patent for the accused spell checker and the accused grammar checker.

### (1)     Context of the Agreement

152.    As discussed under *Georgia-Pacific* No. 2, parties to settlement agreements often dispute whether the subject patents are valid and whether the licensee infringes the patents.  Parties often agree to settle litigation because litigation outcomes are uncertain. Other things being equal, resolving uncertainty over validity and infringement in favor of the licensor—as required for purposes of determining patent infringement damages—points to a higher royalty as compared to license agreements where uncertainty exists.  No such adjustment is necessary in the present context, however, because Microsoft entered into the agreement with Lucent after a finding that the '356 patent was not invalid and was infringed by Microsoft.  A jury verdict in the United States District Court for the Southern District of California that the '356 patent was not invalid and that Microsoft indirectly infringed the '356 patent was affirmed on appeal to the United States Court of Appeals for the Federal Circuit in September 2009.[366] This occurred two years before Microsoft entered into a settlement agreement with Lucent concerning the '356 patent.  It is therefore reasonable to conclude that when Microsoft entered into the settlement agreement with Lucent, there was little uncertainty concerning Microsoft's infringement of a valid U.S. patent.  This is similar to the June 2009 hypothetical negotiation

---

366. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

between Sentius and Microsoft, which is premised on acknowledgment by both parties that the patents-in-suit are valid and will be infringed by Microsoft without a license from Sentius.

### (2)   *Licensed Technology*

153.    Pursuant to the terms of the settlement agreement between Microsoft and Lucent, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ ████████████████████████

████████████████████████████████████████████ ██████

████████████████████████████████ ██████████████████████

███████████████████████████████████████████████████████

██████████████████████     Similarly, under the agreement emerging from the June 2009 hypothetical negotiation, Microsoft would not receive development assistance from Sentius, nor would it receive know-how, trade secrets, or rights to any intellectual property other than the '731 patent and the '633 patent.  Thus, no adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is necessary for this factor.

---

367.  Settlement Agreement between Alcatel-Lucent USA Inc. and Microsoft Corporation, December 29, 2011 (MS_SENTIUS156552-562 at 554-555).

368.  Settlement Agreement between Alcatel-Lucent USA Inc. and Microsoft Corporation, December 29, 2011 (MS_SENTIUS156552-562 at 554).

369.  Settlement Agreement between Alcatel-Lucent USA Inc. and Microsoft Corporation, December 29, 2011 (MS_SENTIUS156552-562).

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

*(3)      Nature and Scope of the Agreement*

154. 

This is consistent with the nature of the agreement that would emerge from the June 2009 hypothetical negotiation between Sentius and Microsoft; Sentius would not receive a cross-license to any Microsoft patents.

155.   As discussed under *Georgia-Pacific* No. 3, the scope of the hypothetical license would be non-exclusive.  All else equal, non-exclusive licenses typically command lower royalties than exclusive licenses.   The license that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius would be unrestricted in terms of territory or customers served. Other things being equal, unrestricted licenses typically are more valuable than licenses with territorial or customer restrictions.  No adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is necessary for this factor given that (i) ████████████████████████████████████████████████████t, and (ii) ████████████████████████████████████████████████████████████████ ████████████████████████[371]

*(4)      Licensor's Licensing Policy*

156.   As discussed under *Georgia-Pacific* No. 4, a higher royalty is sometimes justified when a patent owner has an established policy of not licensing its patents or other intellectual property.  ████████████████████████████████████████████████

---

370.  Settlement Agreement between Alcatel-Lucent USA Inc. and Microsoft Corporation, December 29, 2011 (MS_SENTIUS156552-562).

371.  Settlement Agreement between Alcatel-Lucent USA Inc. and Microsoft Corporation, December 29, 2011 (MS_SENTIUS156552-562).

I understand that AT&T, the predecessor to Lucent, entered into a broad portfolio cross license agreement with IBM that includes the '356 patent, and Lucent maintained that IBM used the '356 patent for its Lotus Notes product.  *See* trial testimony of Raymond Sims, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 8-9 and "AT&T Spinoff Lucent Makes Historic IPO," *Los Angeles Times*, April 4, 1996.

---

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

███████████████████ [372]  I further understand that Lucent does not have an established policy of not licensing the '356 patent.[373]  No adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is necessary for this factor given that Sentius, like Lucent, is willing to grant licenses under its patents.

*(5)      Commercial Relationship*

157.   As discussed under *Georgia-Pacific* No. 5, a higher royalty is often warranted when a licensor and licensee compete in the same line of business.  I am not aware of any evidence that Sentius competed with Microsoft at the time of the June 2009 hypothetical negotiation, nor am I aware of any evidence that licensing the patents-in-suit to Microsoft would amount to licensing away a competitive advantage.  Lucent was similarly situated given that it did not compete with Microsoft for sales of the software products that were found to infringe the '356 patent.[374]  Accordingly, no adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is necessary for this factor.

*(6)      Effect on Sales of Other Products*

158.   As discussed under *Georgia-Pacific* No. 6, other things being equal, the potential to generate significant convoyed or derivative sales from the use of a patent will make a license to that patent more valuable.  I am unable to quantify the extent, if any, to which Microsoft has generated convoyed or derivative sales from its use of the patents-in-suit, and as a result, I consider this factor to be neutral.  I am not aware of any evidence that the potential for

---

372. Deposition testimony of Marc Bookman (Sentius), May 29, 2014, p. 22.

373. Trial testimony of Raymond Sims, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, p. 80 ["…in many cases in litigation, the licensor, the patent owner doesn't want to license its technology.  It wants to keep it and use it for itself to provide a competitive advantage for its products.  Now, in this case, that's not what Lucent does.  Lucent has a policy and a practice of licensing its technology to others."].

374. Trial testimony of Raymond Sims, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, p. 81 ["In this case, Microsoft and Lucent don't compete for Outlook and Money and Pocket PC, so there's no risk to Lucent of losing sales."].

convoyed or derivative sales influenced the financial terms of the settlement agreement between Microsoft and Lucent.   Indeed, Lucent's damages expert testified at trial that this factor is neutral.[375]   Thus, no adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is necessary for this factor.

*(7)     Duration of Use*

159.   Lucent was awarded $26.3 million in damages for Microsoft's infringement of the '356 patent.[376]   Of this amount, $24.6 million is attributable to Outlook.[377] The damages awarded for Outlook effectively amount to $0.22 per copy of Outlook sold in the United States during the damages period for the action brought by Lucent (which extended through the life of the '356 patent).[378] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.[379]   Thus, $0.22

---

375. Trial testimony of Raymond Sims, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, p. 82.

376. Order Granting In Part and Denying In Part Microsoft's Motion For Judgment as a Matter of Law and in the Alternative, a New Trial With a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, p. 26.

377. The jury returned a verdict of $70.0 million in damages consistent with the amount sought by Lucent, which included $1.8 for Money and $68.2 million for Outlook.   The Court reduced the total damages award to $26.3 million, finding that the valuation of Outlook within Office was not supported by substantial evidence.   This indicates that $1.8 million of the $26.3 is attributable to Money and the remaining $24.6 million is attributable to Outlook.

Order Granting In Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, a New Trial With a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, pp. 1 and 14-19.

Trial testimony of Raymond Sims, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 24 and 93-96.

378. $0.22 = $24.6 million / 109.5 million copies of Outlook.

Order Granting In Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, a New Trial With a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, p. 2.

379. The Court awarded Lucent $40,995,486.67 including prejudgment interest and taxed costs.   The amount paid by Microsoft to settle its dispute with Lucent exceeds the total award by approximately $4 million.   *See* Order Granting in Part and Denying in Part Microsoft's Motion for Judgment as a Matter of Law and in the

---

Expert Report of Robert Mills                                                                                            94

is a reasonable, albeit somewhat conservative indication of the consideration paid by Microsoft per copy of Outlook sold in the United States over the duration of Microsoft's use of the '356 patent. An adjustment to the per-copy rate is not necessary for this factor; differences in duration of use (and sales made during the period of use) are captured in the base of sales to which a per-copy rate is applied.

*(8)      Established Profitability of Product Made Under Patents*

160.    Accused Microsoft products with the accused spell checker and/or the accused grammar checker—including Word, Outlook, PowerPoint, OneNote, and Publisher—are components of Office. In the case brought by Lucent against Microsoft, Outlook accounted for the vast majority of accused sales.[380]   I conclude that an adjustment to the financial terms of the settlement agreement between Microsoft and Lucent is not necessary for this factor given the similar (in that they largely are components of Office) and overlapping nature of the Microsoft products accused under the patents-in-suit and the Microsoft products found to infringe the '356 patent.

*(9)      Benefits and Advantages of the Patent Property*

161.    Jensen Harris, the Director of Program Management for the Microsoft Windows User Interface, has testified that about half of Office users have historically used Outlook and approximately 40 percent of Outlook users use the Calendar module.[381]   This

---

Alternative, a New Trial with a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, p. 27.

380. Order Granting In Part and Denying In Part Microsoft's Motion For Judgment as a Matter of Law and in the Alternative, a New Trial With a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, pp. 2-3 ["Additionally, Microsoft Money and Windows Mobile infringe the ['356] patent, but the vast majority of the claimed damages relate to the 109.3 million Office licenses."].

381. Trial testimony of Jensen Harris, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 237-243.

---

suggests that only about 20 percent of Office users use the Calendar module of Outlook.[382]   The percentage of Office users that employ the date picker of the Calendar module of Outlook that was found to infringe the '356 patent is likely considerably lower than 20 percent because not all Outlook users who use the Calendar module actually enter dates using the date picker.[383]   Mr. Harris has characterized the date picker as a fairly trivial thing, and he testified that removing it would be a "very very minor" distraction.[384]   William Kennedy, the Corporate Vice President for the Office Communications and Mobile Experiences team, similarly testified that the date picker is a "very small feature."[385]

162.   In contrast to date picker—which Microsoft views as a minor feature that is not widely used—Microsoft testimony and documents confirm that spell checker and grammar checker capabilities are extremely important and widely employed by users. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████         ██ ████████████████████████████

---

According to Mr. Harris, "the big dogs of Office were always Word, Excel, PowerPoint, in that order…Outlook is a sort of distant fourth."  *See* Trial testimony of Jensen Harris, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 241-242.

382.   20 percent = 50 percent x 40 percent.

383.   Indeed, according to Mr. Harris, more people use other ways of entering a date in an appointment than using the date picker.  *See* Trial testimony of Jensen Harris, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 256-257.

   *See, also,* trial testimony of Jensen Harris, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 220-221.

384.   Trial testimony of Jensen Harris, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 26, 2011, pp. 266-267.

385.   Trial testimony of William Kennedy, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 27, 2011, p. 36.

   Mr. Kennedy also testified that Microsoft has "received no feedback, positive, negative or neutral, that [he has] seen about the Date Picker itself during all of [his] 12 years working on the Outlook product."  *See* Trial testimony of William Kennedy, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, July 27, 2011, pp. 29-30.

386.   "H2 FY12 Office PSAT Program Word – Full Report," June 29, 2012 (MS_SENTIUS104083-118 at 104).

   *See, also,* deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, pp. 144 and 198.

---

Expert Report of Robert Mills                                                                                  96

HIGHLY CONFIDENTIAL INFORMATION—OUTSIDE COUNSEL ONLY



163.    According to Mr. Mogilevsky, removing background spell check from Office is unimaginable:

> Q.  Can you imagine Microsoft removing that feature from Office?
> A.  No.
> Q.  Have you ever heard of any—any discussion of every removing that feature from Office?
> A.  No.
> Q.  Would it surprise you if you ever did hear any discussion of removing that features?
> A.  It would.[391]

Mr. Crowley confirmed through his testimony that Microsoft would not decide to remove the background spell checker.[392]   In fact, he testified that even if Microsoft were to write a completely new word processor it would almost certainly decide to include the background spell checker because it is a functionality that people have become accustomed to.[393]

164.    Microsoft further testified that the "user interface of actually displaying misspelled words with red squiggly underline…proved to be a preferred way to check spelling

---

387.  "Word Satisfaction," February 2005 (MS_SENTIUS023378-435 at 381).

388.  "Word Satisfaction," February 2005 (MS_SENTIUS023378-435 at 390).

389.  Microsoft presentation (MS_SENTIUS000634-644 at 634 and 642).
       Email from Krista Bendig to Tristan Davis, December 21, 2007 (MS_SENTIUS098309-310 at 309).

390.  Deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, p. 100.

391.  Deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, p. 21.

392.  Deposition testimony of Terrence Crowley (Microsoft), May 12, 2014, pp.17-18.

393.  Deposition testimony of Terrence Crowley (Microsoft), May 12, 2014, p.18.

---

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

over having to invoke [a] special user interface and having a dialogue pop up for every word."[394] The background spell checker made checking for misspelled words easier as well as faster.[395] Mr. Mogilevsky testified that he has never met anyone who refuses to use the background spell checker and he cannot remember anyone ever expressing a desire to go back to the old way of checking for misspelled words.[396]

165.    I am aware of survey evidence that supports the view that the accused spell checker (and background spell checker) and the accused grammar checker (and background grammar checker) are far more important and widely used than the date picker.  The Sentius survey addresses the extent to which people use Microsoft's background and foreground spell checker and background and foreground grammar checker as well as the amount that people are willing to pay for background spell checker and background grammar checker capabilities.  In the course of its litigation with Microsoft, Lucent conducted a survey (the "Lucent survey") that addresses similar topics for the date picker.

166.    The results of the Lucent survey show that "approximately half (51%) of survey respondents who used Microsoft Outlook, said they had used the calendar feature in Microsoft Outlook to enter appointments."[397]  Among the respondents in the Lucent survey who use the calendar feature in Microsoft Outlook, 58 percent reported using the date picker either exclusively or most of the time to enter the dates of appointments.[398]  In other words, less than 30

---

394.  Deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, pp. 29-30.

395.  Deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, p. 30.

396.  Deposition testimony of Alex Mogilevsky (Microsoft), May 8, 2014, p. 30.

397.  "Software Survey Report," *Field Research Corporation*, October 2010, p. 25.

398.  "Software Survey Report," *Field Research Corporation*, October 2010, pp. 26-27.

percent of the Lucent survey participants who use Outlook have used the calendar feature and use the date picker either exclusively or most of the time to enter the dates of appointments.[399]

167.    According to Dr. Wecker, the Sentius survey shows that more than 93 percent of the segment of the population that has used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) has used the background spell checker or foreground spell checker, and nearly 80 percent of the segment of the population that uses one or both of these methods uses the background spell checker as frequently or more frequently than the foreground spell checker.[400]   The Sentius survey further shows that more than 87 percent of the segment of the population that has used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) has used the background grammar checker or foreground grammar checker, and more than 76 percent of the segment of the population that uses one or both of these methods uses the background grammar checker as frequently or more frequently than the foreground grammar checker.[401]

168.    The results of the Sentius survey and the Lucent survey confirm that the accused spell checker and the accused grammar checker are more widely used than the date picker.   I further note that the results of these surveys are directionally consistent with Microsoft's testimony concerning the extent to which the date picker is used and the extent to which the accused spell checker is used.

169.    In the Lucent survey, purchase decision makers who use the date picker to enter the dates of appointments were asked to assume that Outlook did not have this

---

399. 29.6% = 51% x 58%.

400. Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 1.

401. Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 3.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

capability.[402]   These participants were then asked whether they would or would not have been willing to pay something extra for Outlook to include this capability.[403]   Approximately 13 percent answered that they would have been willing to pay something extra for Microsoft Outlook to include this capability.[404]   Purchase decision makers participating in the Lucent survey who said they would have been willing to pay something extra for Outlook to include the date picker were asked how much extra they would have been willing to pay for Outlook to include this capability.[405]   The average willingness to pay among those participants who answered the question is approximately $6.00.[406]   The average willingness to pay across all purchase decision makers who use the date picker to enter the date of an appointment is approximately $0.78.[407]

170.   In the Sentius survey, participants who would have purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) without the background spell checker were asked to "suppose the components of Microsoft Office included the user-initiated spell checker option (select Spelling and Grammar menu option), but did not include Microsoft's 'check spelling as you type' option (display a red-squiggly line as you type) [emphasis omitted]."[408]   These participants were then asked: "Would you have been willing to pay an extra amount to have Microsoft's 'check spelling as you type' option included in Microsoft Office or any of its components (Word, PowerPoint, Outlook, OneNote, and

---

402.  "Software Survey Report," *Field Research Corporation*, October 2010, p. 28.

403.  "Software Survey Report," *Field Research Corporation*, October 2010, p. 28.

404.  "Software Survey Report," *Field Research Corporation*, October 2010, pp. 28-29.

405.  "Software Survey Report," *Field Research Corporation*, October 2010, p. 29.

406.  "Software Survey Report," *Field Research Corporation*, October 2010, p. 29.

407.  $0.78 = $6.00 x 13\% + $0.00 x 87\%$.

408.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.

---

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

Publisher) you have purchased?"[409]   According to Dr. Wecker, approximately 34.5 percent of this segment of the population would have been willing to pay an extra amount.[410]   Participants in the Sentius survey who said they would have been willing to pay something extra for Microsoft's "check spelling as you type" capability were asked how much extra they would have been willing to pay to include this capability.[411]   According to Dr. Wecker, the average willingness to pay among the segment of the population that would be willing to pay something extra is $16.23.[412]   The average willingness to pay among the segment of the population that has used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) is $3.82.[413]

171.   Participants in the Sentius survey who would have purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) without the background grammar checker were asked to "suppose the components of Microsoft Office included the user-initiated grammar checker option (select Spelling and Grammar menu option), but did not include Microsoft's 'check grammar errors as you type' option (display green or blue squiggly line as you type) [emphasis omitted]."[414]   These participants were then asked: "Would you have been willing to pay an extra amount to have Microsoft's 'check grammar errors as you type' option included in Microsoft Office or any of its components (Word, PowerPoint, Outlook, OneNote, and Publisher) you have purchased?"[415]   According to Dr. Wecker, approximately 33.5

---

409.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.
410.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 1.
411.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.
412.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 2.
413.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 2.
414.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.
415.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.

percent of this segment of the population would have been willing to pay an extra amount.[416] Participants in the Sentius survey who said they would have been willing to pay something extra for Microsoft's "check grammar as you type" capability were asked how much extra they would have been willing to pay to include this capability.[417]   According to Dr. Wecker, the average willingness to pay among the segment of the population that would be willing to pay something extra is $15.90.[418]   The average willingness to pay among the segment of the population that has used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) is $3.42.[419]

172.   The average willingness to pay for a feature conveys information concerning the value that consumers place on that feature.   Taken together, the Sentius survey and the Lucent survey demonstrate that the value that consumers place on the background spell checker and the background grammar checker is considerably greater than the value that consumers place on the date picker.   These results are not surprising given the Microsoft testimony noted above.

173.   The Microsoft documents and testimony discussed above along with the results of the Lucent survey and the Sentius survey demonstrate that a significant upward adjustment to the per-copy amount effectively paid by Microsoft for Outlook is necessary to account for the greater importance of the accused spell checker and accused grammar checker capabilities that embody the '731 patent and the '633 patent as compared to the date picker.   I conclude that increasing the per-copy amount effectively paid by Microsoft by a factor of two is

---

416.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 3.
417.  Expert Report of William E. Wecker, September 8, 2014, Attachment E.
418.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 4.
419.  Expert Report of William E. Wecker, September 8, 2014, Attachment D, Table 4.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

a reasonable, albeit conservative, adjustment for accused Microsoft products that include both the accused spell checker and the accused grammar checker.

*(10)    Conclusion*

174.    The following table summarizes my conclusions regarding the adjustments that are necessary in the context of the accused spell checker and accused grammar checker to account for differences between the Microsoft agreement with Lucent and the agreement that would emerge from a hypothetical negotiation between Microsoft and Sentius for a license to the '731 patent and the '633 patent.

**Table 15: Adjustments to the Amount Effectively Paid Per Copy to Lucent**

| Amount effectively paid per copy for Outlook | $0.22 |
|---|---|

| Factor | Adjustment |
|---|---|
| Context of the agreement | No adjustment |
| Licensed technology | No adjustment |
| Nature and scope of the agreement | No adjustment |
| Licensor's licensing policy | No adjustment |
| Commercial relationship | No adjustment |
| Effect on sales of other products | No adjustment |
| Duration of use | Adjustment captured in sales base |
| Established profitability of accused product | No adjustment |
| Benefits and advantages of patent property | Upward adjustment (factor of two) |

| **Adjusted effective payment per copy** | **$0.44** |
|---|---|

175.    Based on the foregoing, adjusting the financial terms of the settlement agreement between Microsoft and Lucent for differences between that agreement and the agreement that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius, indicates that an effective per-copy royalty of not less than $0.44 is reasonable for

Expert Report of Robert Mills                                                                                          103

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

Microsoft's use of the '731 patent and the '633 patent for the accused spell checker and the accused grammar checker. For products that include the accused spell checker but not the accused grammar checker, an effective per-copy royalty of not less than $0.22 is reasonable.

b)   Guidance Based on Income Approach to Valuation

176.   The income approach to intellectual property valuation focuses on the income-producing capability of intellectual property. In the context of patent infringement damages, the income approach involves estimating the anticipated economic income attributable to the use of the patent property. Depending upon the nature of the patents and the circumstances surrounding their use, the relevant economic income may include incremental economic profit that would not be realized without the patents, cost savings resulting from use of the patents, or some combination thereof. In the present context, I quantify the incremental profits that Microsoft would stand to lose if it were to remove the accused spell checker and accused grammar checker from the accused Microsoft products and implement the best non-infringing alternative that was available to Microsoft at the time of the June 2009 hypothetical negotiation.

177.   As discussed under *Georgia-Pacific* No. 13, I estimate that Microsoft would stand to lose approximately $1.5 billion in revenue through December 31, 2013, if, at the time of the June 2009 hypothetical negotiation, it had elected to remove the background spell checker and the background grammar checker and instead relied upon user-initiated spell and grammar checkers. ███████████████████████████████████████

████████████████████████.[420]   Dividing at-risk profit by the number of copies of accused Microsoft products with the accused spell checker and/or the accused grammar checker

---

420. ██████████████████████████████████████

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

that were sold in the United States during the damages period yields estimated at-risk profit per copy. As discussed under *Georgia-Pacific* No. 11, ▮▮▮▮▮▮▮ copies of accused Microsoft products with the accused spell checker and/or the accused grammar checker were sold in the United States from June 9, 2009 through December 31, 2013. Thus, the average at-risk profit per copy is $1.99.[421]

178.    In the context of the hypothetical negotiation framework, Microsoft should be indifferent between (a) forgoing use of the '731 patent and the '633 patent and (b) paying Sentius a royalty equal to the profit it would lose by forgoing its use of the '731 patent and the '633 patent. In other words, Microsoft should be indifferent between removing the accused spell checker and the accused grammar checker from the accused Microsoft products (relying instead upon non-infringing user-initiated spell and grammar checkers) and paying a per-copy royalty of $1.99 to avoid removing these capabilities. Microsoft would, of course, seek to pay as little as possible for a license to the '731 patent and the '633 patent in a hypothetical negotiation, and Sentius would seek a license fee that is as close to the full value realized from using the patents as possible. Sentius could not reasonably expect to receive a royalty equal to the entire value realized by Microsoft, however, because such a royalty would leave Microsoft with little or no incentive to take a license.

179.    Microsoft and Sentius would recognize that they both could benefit greatly by reaching an agreement and that neither would receive any of the gains to trade if negotiations failed. The hypothetical negotiation framework is premised on the assumption that both parties would have access to all relevant information. Principal factors that would impact the relative bargaining power of Microsoft and Sentius in the hypothetical negotiation framework include:

---

421. $▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

- Microsoft would acknowledge that the '731 patent and the '633 patent are valid, enforceable, and will be infringed without a license from Sentius. Accordingly, the options available to Microsoft would be limited in the sense that it could not realize the incremental benefit over its best non-infringing alternative without a license from Sentius.

- Sentius is a willing licensor that does not manufacture or sell products and therefore largely relies upon the efforts of others in order to monetize its technology.

- Microsoft would receive only a non-exclusive, bare license to practice the patents-in-suit; it would not receive know-how, technical support, or rights to any other technology.

- The parties would recognize that the at-risk profit estimate is conservatively low in the sense that it is based on Microsoft's operating margin and not its incremental margin. The software industry is characterized by a cost structure whereby development usually accounts for a significant portion of the costs. After software is developed, the marginal cost of selling an additional unit generally is quite low. Incremental costs typically are limited to marketing, distribution, royalties, and physical reproduction.

- Sentius would recognize that Microsoft wrote the code for the accused spell checker and the accused grammar checker, Microsoft has been granted patents related to these capabilities, and Microsoft has contributed greatly to the success of the accused Microsoft products.

---

Expert Report of Robert Mills                                                                 106

- Microsoft has used the '731 patent and the '633 patent extensively; the accused spell checker and/or the accused grammar checker have been widely deployed in Microsoft's office productivity software offerings.

180.    Acknowledgement by Microsoft that the '731 patent and the '633 patent are valid and would be infringed without a license from Sentius would serve to increase Sentius's bargaining power relative to Microsoft.  The fact that Sentius does not manufacture or sell products and instead relies upon others to monetize its technology would serve to increase Microsoft's bargaining power relative to Sentius.  The importance of the accused spell checker and the accused grammar checker and the extent to which they are deployed would favor Sentius in the hypothetical negotiation for a license to the '731 patent and the '633 patent as would the conservative nature of the at-risk profit estimate.  The scope of the license and contributions that Microsoft has made to the development of the accused spell checker and accused grammar checker would favor Microsoft in the hypothetical negotiation.

181.    The effective per-copy royalty of $0.44 discussed above for Microsoft's use of the '731 patent and the '633 patent for the accused spell checker and the accused grammar checker amounts to approximately 22 percent of the at-risk profit per copy for accused Microsoft products.  Given the relative bargaining strengths discussed above, I have concluded that this is a conservative outcome.  If Microsoft and Sentius were negotiating over the at-risk profit, Sentius would be in a position to negotiate for more than 22 percent and perhaps as much as 50 percent of the at-risk profit.  It is noteworthy that the jury in the patent infringement case brought against Microsoft by Lucent awarded damages that are consistent with Microsoft and Lucent having roughly equal bargaining power when it comes to negotiating over the estimated Microsoft profit

at risk in that case.[422]  While the Court later reduced the jury's damages verdict, it left intact the conclusion that Lucent and Microsoft would share equally the benefits derived from Microsoft's use of Lucent's patent.[423]  Given similar circumstances with respect to the context of the agreements, the licensed technology, the nature and scope of the agreements, the willingness to grant licenses, the commercial relationship between the licensors and Microsoft, the effect of the licensed patents in securing sales of non-patented products, and the established profitability of the products made under the patents, the jury's verdict reflecting a 50/50 split of at-risk profits in the Lucent litigation provides another useful benchmark here.

c) <u>Conclusion Regarding Per-Unit Royalty for the Accused Spell Checker and the Accused Grammar Checker</u>

182. In light of the guidance provided by the agreement between Microsoft and Lucent and the guidance provided by the income approach to valuation, I have concluded that an effective per-copy royalty of not less than $0.44 is reasonable for Microsoft's use of the '731 patent and the '633 patent for the accused spell checker and the accused grammar checker.  For accused Microsoft products that include the accused spell checker but not the accused grammar checker, an effective per-copy royalty of not less than $0.22 is reasonable.

ii. *Reasonable Royalty for Smart Tags*

a) <u>Guidance from Microsoft Agreement with Arendi</u>

183. As discussed under *Georgia-Pacific* No. 2, it is my understanding that the patents that are the subject of the agreement between Microsoft and Arendi involve technology

---

422.  Order Granting In Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, a New Trial with a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, pp. 10-11.

423.  Order Granting In Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, a New Trial with a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, November 10, 2011, p. 19.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

that is comparable to the technology of the '731 patent and the '633 patent as these patents have been used by Microsoft in connection with its smart tags functionality.[424]   In the sections that follow, I explain how my analysis of the *Georgia-Pacific* factors and other information can be used to adjust the ████████ fee paid by Microsoft to Arendi to account for differences between the agreement executed by Microsoft and Arendi and the agreement that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius.   This analysis provides insight into a reasonable royalty for Microsoft's use of the '731 patent and the '633 patent for smart tags.

### *(1)   Context of the Agreement*

184.   The license agreement between Microsoft and Arendi was negotiated at a time when Microsoft denied that it infringed the patents asserted by Arendi and Microsoft maintained that the patents asserted by Arendi were invalid.   This differs from the hypothetical negotiation framework, where both Microsoft and Sentius would agree that the patents-in-suit are valid and will be infringed by Microsoft unless Microsoft obtains a license from Sentius.

185.   Studies have shown that plaintiffs in patent infringement matters prevail at the trial court level in less than 50 percent of the matters that are resolved by pretrial motions or by a trial verdict.[425]   The success rate for patent owners reportedly falls to about 25 percent after appeals are taken into account.[426]   These data demonstrate that litigation involves significant risk. It has been my experience that parties to settlement agreements often take this uncertainty into account when negotiating terms.   In particular, license fees that emerge from settlement

---

424. Deposition testimony of John Mulgrew (Microsoft), May 30, 2014, p. 78.

425. *See, for example,* Sherry, Edward F. and David J. Teece, "Royalties, evolving patent rights, and the value of innovation," *Research Policy*, 2004, pp. 179-191.

426. *See, for example,* Janicke, Paul M. and LiLan Ren, "Who Wins Patent Infringement Cases?," *AIPLA Quarterly Journal*, Winter 2006, p. 8.

---

Expert Report of Robert Mills

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

agreements that are entered before validity and infringement are established typically reflect a "discount" to deal with this uncertainty.

186.     To take a numerical example, assume that a patent owner and an alleged infringer were to agree that a reasonable license fee for a patent is $120 million assuming that the patent is valid and the alleged infringer actually infringes.  Further assume for purposes of this numerical example, that both the patent owner and the alleged infringer recognize based on historical patent infringement trial outcomes that there is only about a 50 percent chance that the patent owner will prevail on validity and infringement issues at trial.  Under these circumstances, a rational alleged infringer would not likely pay $120 million to settle the dispute and a rational patent owner would not likely expect to receive the full $120 million.  Negotiating parties that face a known (or agreed upon) level of uncertainty—a 50 percent chance of success in this numerical example—might agree to settle the matter based on a discount that reflects the likelihood that the patent will be found valid and infringed.  That is, the parties in this numerical example might be expected to settle for $60 million (50 percent of $120 million) assuming that there is no opportunity to appeal.  Historical data indicates that patent owners are successful only about 25 percent of the time when appeals are considered.  Assuming for purposes of this numerical example that both the patent owner and the alleged infringer recognize that there is only about a 25 percent chance that the patent owner will prevail through appeals, the parties may be expected to settle for $30 million (25 percent of $120 million).

187.     Although quantifying the precise uncertainty discount for a particular settlement agreement may not be possible, the concept of a settlement discount is based on sound economics.  The relatively low plaintiff success rates discussed above suggest that settlement discounts of 50 percent to 75 percent (or even higher in some cases) may be reasonable.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

188.   Other things being equal, resolving uncertainty over validity and infringement in favor of the licensor—as required for purposes of determining patent infringement damages—points to a higher royalty as compared to license agreements where uncertainty exists.

*(2)   Licensed Technology*

189.   The agreement that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius would provide license rights to only the '731 patent and the '633 patent.  Microsoft would not receive development assistance, know-how, trade secrets, or any other intellectual property from Sentius. ███████████████████

███████████████████████

190.   Unlike the license that would emerge from the hypothetical negotiation, which would be limited to U.S. patent rights, █████████████████████████

███████████████████████[427]████████████████

███████████████████████████████████[428]

███████████████████████████████████

███████████████████████████ My effective royalty rate calculations for the Arendi agreement are conservatively based on worldwide sales of relevant Microsoft products.[429]  Thus, no further adjustment is necessary to account for this issue.

---

427.  Settlement and License Agreement between Arendi S.A.R,L, and Microsoft Corporation, November 28, 2011 (MS_SENTIUS156546-551 at 547).

428.  Settlement and License Agreement between Arendi S.A.R,L, and Microsoft Corporation, November 28, 2011 (MS_SENTIUS156546-551 at 546).

429.  This approach likely produces conservatively low effective royalty rates because it is based on the implicit assumption that Arendi has worldwide patent rights. ████████████████████████████████
███████████████████

---

Expert Report of Robert Mills                                                                                      111

HIGHLY CONFIDENTIAL INFORMATION−OUTSIDE COUNSEL ONLY

191. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████.[430]  At the June 2009 hypothetical negotiation, Microsoft and Sentius would only negotiate a license to the '731 patent and the '633 patent.  Microsoft would not receive a license to all of Sentius's patents. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

### (3)    Nature and Scope of the Agreement

192. ████████████████████████████████

████████████████████████████  This is consistent with the nature of the agreement that would emerge from the June 2009 hypothetical negotiation between Sentius and Microsoft; Sentius would not receive a cross-license to any Microsoft patents.

193.    As discussed under *Georgia-Pacific* No. 3, the scope of the hypothetical license would be non-exclusive.  All else equal, non-exclusive licenses typically command lower royalties than exclusive licenses.   The license that would emerge from the hypothetical negotiation between Microsoft and Sentius for the '731 patent and the '633 patent would be unrestricted in terms of territory or customers served. Other things being equal, unrestricted licenses typically are more valuable than licenses with territorial or customer restrictions.  The

---

430. Settlement and License Agreement between Arendi S.A.R,L, and Microsoft Corporation, November 28, 2011 (MS_SENTIUS156546-551).

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY



#### (4)    *Licensor's Licensing Policy*

194.    As discussed under *Georgia-Pacific* No. 4, a higher royalty is sometimes justified when a patent owner has an established policy of not licensing its patents or other intellectual property. ███████████████████████████████████████ ███████████████████████ [431] ███████████████████████████████████████ ███████████████████████████████████ [432] No adjustment to the financial terms of the agreement between Microsoft and Arendi is necessary for this factor ██████████████ ████████████████████████████████

#### (5)    *Commercial Relationship*

195.    As discussed under *Georgia-Pacific* No. 5, a higher royalty is often warranted when a licensor and licensee compete in the same line of business.  I am not aware of any evidence that Sentius competed with Microsoft at the time of the June 2009 hypothetical negotiation, nor am I aware of any evidence that licensing the patents-in-suit to Microsoft would amount to licensing away a competitive advantage.  Arendi was similarly situated given that Arendi does not sell products that compete with the Microsoft products that Arendi had accused

---

431.  Deposition testimony of Marc Bookman (Sentius), May 29, 2014, p. 22.

432.  █████████████████████████████████████████████████████
██████████████████████████████████████████████
(*see* Expert Report of Laurits R. Christensen, *Arendi USA, Inc., et al. v. Microsoft Corporation*, Case No. 1:02-CV-00343 (MS0128201-279 at 236).

Expert Report of Robert Mills                                                              113

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

under its patents.[433]   Accordingly, no adjustment to the financial terms of the agreement between Microsoft and Arendi is necessary for this factor.

(6)      <em>Effect on Sales of Other Products</em>

196.    As discussed under *Georgia-Pacific* No. 6, other things being equal, the potential to generate significant convoyed or derivative sales from the use of a patent will make a license to that patent more valuable.   I am unable to quantify the extent, if any, to which Microsoft has generated convoyed or derivative sales from its use of the patents-in-suit, and as a result, I consider this factor to be neutral.   I am not aware of any evidence that the potential for convoyed or derivative sales influenced the financial terms of the settlement agreement between Microsoft and Arendi.[434]   Thus, I make no adjustment to the financial terms of the agreement between Microsoft and Arendi for this factor.

(7)      <em>Duration of Use</em>

197.    Microsoft has sold ▮▮▮▮▮▮ copies of accused Microsoft products with smart tags capability from June 9, 2009 through December 31, 2013 (see Exhibit 26).   As discussed under *Georgia-Pacific* No. 2 and summarized in the following table, I have calculated effective royalty rates for the agreement between Microsoft and Arendi under two scenarios. The midpoint of the range of effective royalty rates I have calculated for the Arendi agreement is $0.038 per copy.

---

433.  Expert Report of Laurits R. Christensen, *Arendi U.S.A., Inc., et al. v. Microsoft Corporation*, Case No. 1:02-CV-00343 (MS 128201-279 at 236-237).

434.  Expert Report of Laurits R. Christensen, *Arendi U.S.A., Inc., et al. v. Microsoft Corporation*, Case No. 1:02-CV-00343 (MS 128201-279 at 238-240).

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

**Table 16: Summary of Arendi Effective Royalty Rates**

| Scenario | Date Range | Effective Rate |
|---|---|---|
| 1. Through life of Arendi asserted patents | 02/24/09 – 12/09/19 | $0.016 per copy |
| 2. Through date of Arendi settlement | 02/24/09 – 11/28/11 | $0.060 per copy |
| Midpoint | | $0.038 per copy |

An adjustment to the effective per-copy rate paid by Microsoft to Arendi is not necessary for this factor; differences in duration of use (and sales made during the period of use) are captured in the base of sales to which a per-copy rate is applied.

> (8)    *Established Profitability of Product Made Under Patents*

198.    The Microsoft products that Arendi accused of infringing its patents include Office and certain standalone software applications (i.e., Word and Excel).[435]  I conclude that an adjustment to the financial terms of the agreement between Microsoft and Arendi is not necessary for this factor given the largely overlapping nature of the Microsoft products accused under the patents-in-suit and the Microsoft products accused under Arendi's patents.

> (9)    *Benefits and Advantages of the Patent Property*

199.    As discussed under *Georgia-Pacific* No. 2, while the technology of the Arendi patents is comparable to the technology of the '731 patent and the '633 patent as they are used for smart tags, I understand that Dr. Madisetti has concluded that the technology of the Arendi patents is not as valuable in the current context given that the Arendi patents do not provide all of the advantages that the patents-in-suit provide to the accused Microsoft

---

435.  Expert Report of Laurits R. Christensen, *Arendi U.S.A., Inc., et al. v. Microsoft Corporation*, Case No. 1:02-CV-00343 (MS 128201-279 at 208).

Complaint, *Arendi Holding Ltd. v. Microsoft Corporation, et al.*, February 24, 2009, p. 3.

products.[436]  In particular, I understand that the Arendi patents do not provide the advantage of using a look-up table to pre-record the offset locations of terms of interest in a document and linking information to dictionary materials to be displayed for such terms of interest.[437]

200.    As discussed under *Georgia-Pacific* Nos. 9, 10, and 11, despite Microsoft's initial belief that smart tags would be widely used, by the time of the hypothetical negotiation, Microsoft realized that smart tags were not a significant feature in terms of driving Office sales and usage.[438]  According to Mr. Davis, usage of smart tags turned out to be low, and as a result, Microsoft turned off smart tags by default beginning with Office 2010.[439]  The license agreement between Arendi and Microsoft was executed in November 2011.  The fact that smart tags usage was not as great as Microsoft had initially expected was already known to Microsoft at the time that it agreed to ███████████████████████████ (and smart tags were already turned off by default at that time).  Because the terms of the Arendi agreement were negotiated with knowledge of actual smart tags usage levels, no adjustment to the financial terms of the agreement between Microsoft and Arendi is necessary for this factor.

*(10)    Conclusion*

201.    The following table summarizes my conclusions regarding the adjustments that are necessary in the context of smart tags to account for differences between the Microsoft agreement with Arendi and the agreement that would emerge from a hypothetical negotiation between Microsoft and Sentius for a license to the '731 patent and the '633 patent.

---

436.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

437.  Infringement Expert Report of Dr. Vijay K. Madisetti, September 8, 2014, Section XII (Review of Other Licensed Patents).

438.  Deposition testimony of Terrence Crowley (Microsoft), May 12, 2014, p. 219.

439.  Deposition testimony of Tristan Davis (Microsoft), May 16, 2014, p. 98.

HIGHLY CONFIDENTIAL INFORMATION–OUTSIDE COUNSEL ONLY

**Table 17: Adjustments to the Amount Effectively Paid Per Copy to Arendi**

| Amount effectively paid per copy | $0.016 to $0.060 |
| --- | --- |

| Factor | Adjustment |
| --- | --- |
| Context of the agreement | Upward adjustment |
| Licensed technology | Downward adjustment |
| Nature and scope of the agreement | No adjustment |
| Licensor's licensing policy | No adjustment |
| Commercial relationship | No adjustment |
| Effect on sales of other products | No adjustment |
| Duration of use | Adjustment captured in sales base |
| Established profitability of accused product | No adjustment |
| Benefits and advantages of patent property | No adjustment |

| Adjusted effective payment per copy | $0.03 |
| --- | --- |

202.    A royalty that is lower than the upper end of the range of the effective royalty rates I have calculated for the Arendi agreement is reasonable given that this rate was calculated using sales through the date of the settlement agreement and Microsoft continued to offer smart tags after the effective date of the settlement agreement.  A rate that is higher than the lower end of the range of the effective royalty rates I have calculated for the Arendi agreement is reasonable given that this rate was calculated under the assumption that Microsoft will continue to offer smart tags for the duration of the Arendi patents (and place the same per-copy value on future use as past use) despite the low usage reported by Microsoft.  Based on the foregoing, I conclude that a per-copy royalty of $0.03 is reasonable for Microsoft's use of the '731 patent and the '633 patent for smart tags.  A per-copy royalty rate of $0.03 is slightly lower than the midpoint of the lower and upper ends of the range of effective royalty rates I have calculated for the Arendi agreement.  Using the midpoint of the range of effective royalty rates is conservative

**EXHIBIT 7**

**EXHIBIT 7**

**ALCATEL-LUCENT**
**EFFECTIVE ROYALTY RATE CALCULATION**
**OUTLOOK**

|   |   | Licensed Sales | Outlook Effective Rate | Outlook Imputed Royalty Payment |
|---|---|---|---|---|
|   |   | **(000s)** | **(Dollars)** | **($000s)** |
|   |   | **(1)** | **(2)** | **(3)**<br>**(1)x(2)** |
| 1. | Microsoft Outlook | 109,500.0 | $  0.22 | $  24,550 |
| **2.** | **Total** | **109,500.0** |   | **$  24,550** |

Detail may not sum to total due to rounding.

Source: Col. (1) - Total licensed Outlook sales amount are approximately 109.5 million units. *See* Order Granting in Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, a New Trial with a Remittitur, *Lucent Technologies, Inc. v. Microsoft Corporation*, Case No. 07-CV-2000, November 10, 2011, p. 7.

Col. (2) - Rate that yields a total payment of $24.6 million.

After a jury awarded Lucent $70.0 million in damages for Microsoft's infringement of the '356 patent, the Court subsequently lowered the award to $26.3 million, after making adjustments to the Outlook per-unit revenue figure. The Court otherwise left Lucent's damages calculation unchanged. Lucent sought no more than $1.8 million in damages from Microsoft's infringement of the '356 patent in Money. The portion of the award attributable to Outlook ($24.6 million) is calculated as $26.3 million minus $1.8 million. See Order Granting in Part and Denying In Part Microsoft's Motion for Judgment as a Matter of Law and in the Alternative, *a New Trial with a Remittitur, Lucent Technologies, Inc. v. Microsoft Corporation*, Case  No. 07-CV-2000, November 10, 2011, p. 19 and *Trial Transcript, Volume IV, Lucent Technologies, Inc., et al., v. Gateway, Inc., et al.*, Case No. 3:07-CV-2000, July 26, 2011, pp. 24, 31, 96, and 102-103.

Col. (3) - Column (1) times Column (2).

HIGHLY CONFIDENTIAL INFORMATION - OUTSIDE COUNSEL ONLY

Micronomics, Inc.

**EXHIBIT 27**

**EXHIBIT 27**

**RUNNING ROYALTY CALCULATION**
**ACCUSED SPELL CHECKER AND ACCUSED GRAMMAR CHECKER**
**'733 PATENT AND '631 PATENT**
**JUNE 9, 2009 - FEBRUARY 16, 2014**

| | Jun 9-30 FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | Jul-Dec FY2014 | Jan-Feb.16 FY2014 | Total |
|---|---|---|---|---|---|---|---|---|
| | (Thousands, Except Royalty Rate) | | | | | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) Sum (1)…(7) |
| *Copies Sold* | | | | | | | | |
| 1. Outlook | | | | | | | | |
| 2. PowerPoint | | | | | | | | |
| 3. Word | | | | | | | | |
| 4. Publisher | | | | | | | | |
| 5. OneNote | | | | | | | | |
| 6. Total | | | | | | | | |
| *Royalty Rates* | | | | | | | | |
| 7. Outlook | $ 0.44 | $ 0.44 | $ 0.44 | $ 0.44 | $ 0.44 | $ 0.44 | $ 0.44 | |
| 8. PowerPoint | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | |
| 9. Word | 0.44 | 0.44 | 0.44 | 0.44 | 0.44 | 0.44 | 0.44 | |
| 10. Publisher | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | |
| 11. OneNote | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | |
| *Royalty* | | | | | | | | |
| 12. Outlook | | | | | | | | |
| 13. PowerPoint | | | | | | | | |
| 14. Word | | | | | | | | |
| 15. Publisher | | | | | | | | |
| 16. OneNote | | | | | | | | |
| **17. Total** | | | | | | | | |

Note:  Copies sold per day from January 1, 2014 through February 16, 2014 estimated using average daily sales for the period July 1, 2013 through December 31, 2013.

Source:  Exhibit 22, " Copies of Accused Microsoft Products Sold in the U.S., With Accused Spell Checker, Accused Grammar Checker, and/or Smart Tags."

See Narrative for detail on royalty rates.

HIGHLY CONFIDENTIAL INFORMATION -
OUTSIDE COUNSEL ONLY

Micronomics, Inc.

**EXHIBIT 31**

**EXHIBIT 31**

**RUNNING ROYALTY CALCULATION**
**SMART TAGS**
**'731 PATENT AND '633 PATENT**
**JUNE 9, 2009 - FEBRUARY 16, 2014**

| | Jun 9-30 FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | Jul-Dec FY2014 | Jan-Feb.16 FY2014 | Total |
|---|---|---|---|---|---|---|---|---|
| | **(Thousands, Except Royalty Rate)** | | | | | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) Sum (1)…(7) |
| _Units Sold_ | | | | | | | | |
| 1.  Outlook | | | | | | | | |
| 2.  PowerPoint | | | | | | | | |
| 3.  Word | | | | | | | | |
| 4.  Total | | | | | | | | |
| 5.  Royalty Rate | $  0.03 | $  0.03 | $  0.03 | $  0.03 | $  0.03 | $  0.03 | $  0.03 | |
| _Royalty_ | | | | | | | | |
| 6.  Outlook | | | | | | | | |
| 7.  PowerPoint | | | | | | | | |
| 8.  Word | | | | | | | | |
| **9.  Total** | | | | | | | | |

Note:  Copies sold per day from January 1, 2014 through February 16, 2014 estimated using average daily sales for the period July 1, 2013 through December 31, 2013.

Source:  Exhibit 26, "Copies of Accused Microsoft Products Sold in the U.S. With Smart Tags."

See narrative for discussion of royalty rate.