# EXHIBIT AF

# Public Version of Exhibit Previously Sought to be Sealed

1                          DRAFT TRANSCRIPT

2     - - - - - - - - - - - - - - - - - - - - - - - - -

3                          IMPORTANT NOTICE:

4                         AGREEMENT OF PARTIES

5          WE, THE PARTY WORKING WITH REALTIME AND ROUGH

6     DRAFT TRANSCRIPTS, UNDERSTAND THAT IF WE CHOOSE TO USE

7     THE REALTIME ROUGH DRAFT SCREEN OR THE PRINTOUT, THAT

8     WE ARE DOING SO WITH THE UNDERSTANDING THAT THE ROUGH

9     DRAFT IS AN UNCERTIFIED COPY.

10         WE FURTHER AGREE NOT TO SHARE, GIVE, COPY, SCAN,

11    FAX OR IN ANY WAY DISTRIBUTE THIS ROUGH DRAFT IN ANY

12    FORM (WRITTEN OR COMPUTERIZED) TO ANY PARTY.  HOWEVER,

13    OUR OWN EXPERTS, CO-COUNSEL, AND STAFF MAY HAVE

14    LIMITED INTERNAL USE OF SAME WITH THE UNDERSTANDING

15    THAT WE AGREE TO DESTROY OUR ROUGH DRAFT AND/OR ANY

16    COMPUTERIZED FORM, IF ANY, AND REPLACE IT WITH THE

17    FINAL TRANSCRIPT UPON ITS COMPLETION.

18

19    WITNESS:  ROBERT MILLS

20    DATE:   NOVEMBER 18, 2014

21

22

23

24

25

1   sit here.

2   BY MR. GLITZENSTEIN:

3        Q.   Other than what you've already explained, did

4   Mr. Stabil play any other role in assisting you with

5   the preparation of your work in this case?

6        A.   Not that comes to mind, no.

7        Q.   You mentioned also Ms. Stephanie Yea, I think

8   her name was.

9        A.   Yes.

10       Q.   What role did she play?

11       A.   Primarily, checking certain exhibits for

12   accuracy.

13       Q.   These are the exhibits to your report?

14       A.   Yes.

15       Q.   In this matter, Mr. Mills, you've identified

16   several Microsoft settlement agreements as being

17   allegedly probative to the damages issues in this

18   matter; right?

19       A.   I have identified settlement agreements that

20   I think provide insight into reasonable royalty, yes.

21       Q.   So, for example, you've identified the

22   Microsoft settlement agreement with Lucent as being

23   something that you consider to be relevant to the

24   damages analysis in this case; right?

25       A.   Yes.

1    Q.  The same is true with Microsoft settlement

2  agreement with Arendi; right?

3    A.  It is.

4    Q.  What was the process that you followed to

5  come up with the Microsoft settlement agreements that

6  you considered to be probative on the issues of

7  damages in this case?

8    A.  Well, the process involves first identifying

9  information about comparability, technical

10  comparability of the underlying patents and the

11  underlying technology.  And that's something that I

12  relied on the technical expert in the case for.  But

13  beyond that, it is a matter of comparing the facts and

14  circumstances, as I understand them, concerning the

15  relevant agreements to the situation, the hypothetical

16  negotiation to determine whether the agreements are --

17  provide economic comparable -- or are economically

18  comparable, whether they provide an indication of

19  value, in my view.

20    Q.  Let me break that down.  So were you provided

21  with the complete set of Microsoft settlement

22  agreements and other agreements that Microsoft

23  produced in this litigation?

24    A.  Well, I had access to the documents that

25  Microsoft has produced in the case.  So I'd say yes.

1      Q.  Okay.  So you know that much about the Lucent

2   case; right?

3      A.  Oh, certainly, yes.

4      Q.  And the date picker is the little calendar

5   that pops up when you want to enter something into a

6   date field; right?

7      A.  Yes.

8      Q.  So you know that much about the Lucent case;

9   right?

10      A.  I do, yes.

11      Q.  All right.  And that feature was found in

12   Microsoft Outlook and Money; right?

13      A.  Yes.

14      Q.  And it wasn't accused of being in Microsoft

15   Word, for example; right?

16      A.  It was not.  Well, not that I know of anyway.

17   It certainly wasn't tried.

18      Q.  All right.  I'm trying to understand, then,

19   how you can say that the patent at issue in the Lucent

20   case is generally directed to improving productivity

21   in word processing when the feature that was at issue

22   in that lawsuit had nothing to do with word

23   processing.  Can you explain that, sir?

24      A.  I can't from a technical standpoint.  I'm not

25   certain.  Again, I cite to Dr. Madisetti for that, and

1    I would refer you to him.

2         Q.  So you consider the question of whether a

3    feature is found in a word processing program versus

4    an E-mail program to be a technical question that

5    you're unable to answer?

6         A.  This statement is referring to what the

7    patents are generally directed to, and I can't speak

8    about what patents are generally directed to from a

9    technical standpoint.

10        Q.  So again, my question, though, was you cannot

11   distinguish between Word as a word processing program

12   and Outlook as an E-mail program?  That's a technical

13   question that you can't address; right?

14        A.  I think it depends on what you mean by the

15   distinction.  I certainly can tell the difference on

16   my computer when I click on the icon to launch Word

17   versus whether I click on an icon to launch Outlook.

18   But from a technical standpoint, I can't tell you how

19   those programs are -- if they are separate, how

20   they're -- if they share code.  I can't tell you

21   anything about the technical aspects of those

22   programs.  I use them.  So I'm familiar with them as a

23   user.

24        Q.  All right.  Let's start with that, then.

25   From your perspective as a user, explain to me how the

1   date picker feature that was at issue in the Lucent

2   litigation is in any way directed to improving

3   productivity in word processing?

4        A.   I'm not certain that it is, and I haven't

5   said that it is in my report.

6        Q.   Because now you're talking both the patents

7   are directed to.  Is that your --

8        A.   Well, that's what the sentence says.  It

9   says, "These patents are all generally directed to

10  improving productivity in word processing through the

11  use of links to external content," and I cite to Dr.

12  Madisetti for that.

13       Q.   So that's your understanding in this case

14  even though the feature at issue in that lawsuit was

15  not found in a word processing program?

16       A.   That's my understanding of Dr. Madisetti's

17  view of the patents, yes, and that's who I cite to for

18  that proposition.  I'm not here to offer my own

19  technical opinions about what the patents do or do not

20  relate to.

21       Q.   Okay.  Can you reconcile for us how it can

22  possibly be that the patents -- that the patent in the

23  Lucent litigation was generally directed to improving

24  productivity in word processing when the feature at

25  issue there was not present in a word processing

1    program?

2         A.   I'm not certain.   I would have to talk to

3    Dr. Madisetti.   I don't see that sentence is limiting

4    to say that the patents are only directed to that, but

5    I would defer to Dr. Madisetti on that.   I'm not

6    certain.

7         Q.   Well, keep that sentence in mind from

8    Paragraph 72, and I want to return you to Paragraph 67

9    of your report.   In Paragraph 67 of your report, about

10   a third of the way down that paragraph, for that, you

11   say, "These patents are all generally directed to

12   improving productivity in word processing through use

13   of links to external content"; right?

14        A.   I do see that statement.   I cited

15   Dr. Madisetti.

16        Q.   Right.   And so you characterized the Arendi

17   patents and the Lucent patent and the reissued patents

18   in identical ways; right?

19        A.   Well, I'm just providing my understanding

20   based on Dr. Madisetti's report, and I suspect that

21   the reason that I've done that is because he has

22   referred to them that way.

23        Q.   Did you ever ask Dr. Madisetti why it is that

24   he draws this distinction between Arendi as only

25   having technical comparability to smart tags and

1        Q.  Well, but before we get to that conclusion, I

2    guess my question for you is as a matter of the

3    analytical process that you employed here, you did not

4    attempt to quantify or value the fact that Microsoft,

5    as part of the Arendi settlement, was receiving rights

6    to patents other than the ones asserted in that

7    action?

8        A.  I considered that in reaching my conclusions,

9    but I did not assign a specific value to those

10   patents.  I wasn't aware of any information that would

11   suggest that Microsoft would need or require a license

12   to those patents.  But having said that, I think that

13   if you consider the differences between the agreements

14   in this respect, that that suggests that there would

15   be some downward influence on the royalty rate that

16   Microsoft would pay Sentius relative Arendi.

17       Q.  Did you ask -- well, withdrawn.

18           But you don't know what the extent of that

19   downward influence might be?

20       A.  I can't tell you precisely, but I can say

21   that in my view, it warrants a royalty that's lower

22   than the upper end of the range and that I've

23   identified.  In fact, my royalty is lower than the bid

24   point.

25       Q.  Did you ask Dr. Madisetti to help you

1    understand the technological benefits of the

2    additional rights that Microsoft received under the

3    Arendi agreement?

4         A.   No.

5         Q.   Did you make any inquiry of anybody to try to

6    figure out what the potential value of those

7    additional rights are or is?

8         A.   I don't recall doing that aside from my own

9    research into the products and the patents that were

10   at issue in the case, and I don't recall whether

11   Mr. Mulgrew spoke to that in his deposition or not.  I

12   don't recall.  But I would have looked there as well.

13        Q.   You made reference in that answer to your own

14   research into the products and the patent.  But it's

15   true, is it not, that you're not here to offer any

16   technical opinions about the scope or potential

17   benefit of the additional patents that Microsoft

18   received as a consequence of that license; right?

19        A.   I'm not here to speak to the scope of any

20   patents.  That much is true, yes.

21        Q.   And again, you're not aware of Dr. Madisetti

22   offering any opinion in that regard?

23        A.   I don't recall such an opinion, but I would

24   defer to him.

25        Q.   Let me return to the first factor in your

1    Table 17, which is the context of the agreement.  Am I

2    correct, sir, that you did not make any attempt to

3    quantify or place a value on the amount of that upward

4    adjustment for the -- what you have identified as the

5    alleged uncertainty that surrounded the settlement

6    negotiations?

7         A.  Well, I discuss some information under that

8    section of my report, but it's illustrative in nature

9    as opposed to specific to this case.  So I think

10   that's true.  I haven't actually assessed how much of

11   an upward adjustment might be warranted.  I've just

12   noted that that would tend to have an upward pressure

13   on the negotiation if they were negotiating under the

14   assumption that the patents are, in fact, valid and

15   infringed.

16        Q.  So am I correct, sir, that what you did was

17   you concluded that the -- those first and second

18   factors in Table 17, they were basically a wash;

19   right?

20        A.  No, I don't think so.  As I said, I haven't

21   specifically factored in the context of the agreement.

22   What I've done is I've looked at that range.  I've

23   looked at the midpoint of that range, and I've

24   adjusted that downward for the license technology.

25        Q.   You've adjusted it downward by .8 cents;

1    right?

2         A.  Yes.   .8 cents, which is a significant

3    downward adjustment, yes, relative to the 3.8 cents

4    that we start with.

5         Q.  Right.  So you start with the midpoint of

6    3.8 cents, as you say; right?

7         A.  Yes.

8         Q.  And you arrive at your opinion, which is

9    3 cents even; right?

10        A.  Yes, that's my opinion.

11        Q.  So what is the -- what is the reason or

12   principal basis for decreasing the midpoint by

13   .8 cents?

14        A.  Recognizing that there should be some

15   downward adjustment for the license technology, and I

16   don't think it would be a significant downward

17   adjustment because there's no evidence that I'm aware

18   of that Microsoft required rights to any of those

19   patents.  I think it's very reasonable to presume that

20   the patents that were actually asserted against

21   Microsoft were the driving force behind the

22   settlement.  That's what -- certainly what motivated

23   the settlement I would think.

24             And, you know, so I recognize that there

25   would be some need to perhaps make a downward

1   adjustment, but it wouldn't be a downward adjustment

2   that would bring you to the lower end of the range,

3   for example.

4        Q.  Did you ask Dr. Madisetti to attempt to place

5   a value on the -- withdrawn.

6            Did you ask Dr. Madisetti to place any

7   probabilities on the infringement and validity

8   defenses in the Arendi case?

9        A.  No.

10       Q.  Do you know if Dr. Madisetti performed any

11  analysis that would try to quantify the extent to

12  which Microsoft would have been successful with those

13  defenses in that lawsuit?

14       A.  I don't know.

15       Q.  How about yourself, sir?  What attempts did

16  you make to quantify the potential damages range in

17  the Arendi litigation?

18       A.  I didn't try to quantify damages for the

19  Arendi litigation.  I wasn't asked to calculate

20  damages, and I didn't have -- I wouldn't have

21  information to all the facts that one would probably

22  want to take into consideration in calculating the

23  damages for that case.

24       Q.  Is that right?  What facts didn't you have?

25       A.  Well, I don't believe that I had access to

1  all the documents that Arendi produced in its

2  litigation with Microsoft.  At least I don't recall

3  seeing documents like that.

4        Q.  What are the facts you say you didn't have?

5        A.  I haven't really thought about it, but that's

6  the first place that comes to mind is the documents

7  that were produced in that case, to the extent that

8  they were produced.  I don't view it as my role to try

9  to calculate damages in another case.  I have the

10 settlement agreement and the consideration of the

11 settlement agreement that I'm relying upon.

12       Q.  And just that, just the four corners of that

13 document?

14       A.  Well, clearly not.  I mean if you look at my

15 report, I've identified other information about the

16 case.

17       Q.  Did you make any effort to learn more about

18 how -- what the damages range -- withdrawn.

19            Did you make any attempt, such as by making

20 inquiry of counsel, to try to determine whatever

21 information you say would be necessary to figure out

22 what the damages range might be in that case?

23       A.  No, I didn't set out to determine what the

24 damages range might be in that case.  So I didn't make

25 those inquiries.

1      Q.  I note in Paragraph 190 of your report, you

2  do state that there was -- that the Arendi settlement

3  also resolved a European patent on an action filed in

4  the Netherlands; right?

5      A.  Yes.

6      Q.  Do you know whether Arendi in that action was

7  seeking to enjoin Microsoft for -- from selling any

8  products in the Netherlands or anywhere else in

9  Europe?

10         (The witness reviewed the document.)

11         THE WITNESS:  That sounds right, but I can't

12  be certain as I sit here.

13  BY MR. GLITZENSTEIN:

14      Q.  Did you attempt, as part of your analysis in

15  the Arendi settlement, to place any value on that type

16  of injunctive relief?

17      A.  No, not specifically.

18      Q.  So is it your view, Mr. Mills, that as part

19  of the consideration of some settlement agreement from

20  some other litigation that in order to account for the

21  settlement posture of another litigation, that the

22  parties in some later case where that's been

23  identified as an allegedly comparable license # you

24  litigating the merits of that other case?

25         MR. ARD:  Objection.

 1          THE WITNESS:  I think I'm going to have that

 2    either again or perhaps broken down.

 3    BY MR. GLITZENSTEIN:

 4        Q.  The question I want to ask you about is you

 5    identified all these uncertainties that can bear on

 6    the amount of a settlement; right?

 7        A.  Yes.  Just like any license agreement, there

 8    are uncertainties.  Whether it's litigation or not

 9    litigation, there are uncertainties.

10        Q.  And to what extent, in your experience, is

11    there an effort made to try to identify those

12    uncertainties and, you know, place some -- and

13    quantify the impact that those uncertainties have on

14    the underlying amount that the settlement agreement

15    provides?

16        A.  It's been my experience that that's not often

17    something that's achievable.  Sometimes it is, but

18    oftentimes, it's not.  And the same is true for a

19    license agreement that's entered outside the context

20    of litigation.  There are -- it's not always

21    possible -- in fact, it's often not possible to

22    understand with clarity what the parties were thinking

23    precisely at the time they entered into that deal.  So

24    that kind of information isn't always available for

25    consideration.  But that's not to say that the

```
 1   agreements don't provide useful information

 2   nonetheless.

 3           MR. GLITZENSTEIN:  I'll ask the court

 4   reporter to mark as Mills Exhibit 5, it's a document

 5   with Production No. MSSENTIUS 1696160 through -178,

 6   and it's an agreement between Microsoft and *Timeline

 7   dated October 16, 2007.

 8           (Deposition Exhibit 5 was marked for

 9            identification.)

10   BY MR. GLITZENSTEIN:

11      Q.  Mr. Mills, have you seen this agreement

12   before?

13           (The witness reviewed Exhibit 5.)

14           THE WITNESS:  May I have just one moment?

15           MR. GLITZENSTEIN:  Certainly.

16           (The witness further reviewed Exhibit 5.)

17           THE WITNESS:  I'm not certain.  I've

18   certainly seen a patent license agreement between

19   Microsoft and Timeline, but I'm not certain that it's

20   this agreement.  And the reason I say that is the

21   Bates numbers are different, and it looks like the

22   license patent might be different.

23   BY MR. GLITZENSTEIN:

24      Q.  Do you recall giving consideration to whether

25   any agreement between Microsoft and Timeline should be
```

1      Q.  All right.  So I'm going to just call it "the

2   income approach."  Will you understand that?

3      A.  I think I will, yes.

4      Q.  Thank you.  So what role does the income

5   approach play in your analysis in this matter?

6          MR. ARD:  I'm sorry.  I just have to jump in.

7   He said there's a difference between income approach

8   and at-risk profit calculation, and you said, "Is it

9   okay if I call it the income approach."  Which one are

10  you calling "the income approach"?  I just want to

11  make sure the record is clear.  But it's a little

12  muddled.

13         MR. GLITZENSTEIN:  Sorry.

14     Q.  I want to ask about the overall approach.  I

15  believe you said that the at-risk profit is one

16  component of the income approach.  Do I have that

17  correct?

18     A.  Yes.

19     Q.  All right.  So I'll just call it -- I'll call

20  the overall approach "the income approach."  Is that

21  clear?

22     A.  Yes.  And if it's not for a particular

23  question, I will try to make that clear.

24     Q.  All right.  So with regard to the income

25  approach, what role does that play in -- or what role

1    did that play in your overall analysis in this case?

2        A.  It's an alternative way of looking at the

3    damages in this case for the background -- or for the

4    accused spell checker and the accused grammar checker.

5        Q.  You call it -- in your report you call it a

6    "benchmark."  Do you recall that?  Withdrawn.  I'm

7    sorry.  I actually misread your report.

8             So do you consider this to be a check on what

9    you consider to be your primary theory in this case,

10   or do you consider it to be an alternative approach of

11   sort of equal weight or significance.

12       A.  I consider it to be both a check on my other

13   analysis, because I think it confirms that the other

14   analysis is very reasonable, but also, it could be

15   used on a stand-alone basis to determine a reasonable

16   royalty.

17       Q.  Now, one of the -- one of the assumptions of

18   your income approach in this case is that Microsoft

19   has no design alternatives other than reverting back

20   to a foreground spell or grammar check technology;

21   right?

22       A.  I wouldn't characterize it that way, no.

23       Q.  All right.  So help me understand this.

24   What -- if Microsoft indeed has other alternatives

25   available to it to implement the background and

1    grammar check -- background spelling and grammar check

2    features, then your calculation of at-risk profits

3    under this income approach is no longer valid; right?

4         A.  Well, that's a different question, and I

5    think it would depend upon the alternative that you

6    have in mind.

7         Q.  Well, it's not a matter of what I have in

8    mind.  My question for you is if the jury disagree

9    with you or disagree with Dr. Madisetti that --

10   withdrawn.

11        If the jury in this case concludes that

12   Microsoft had alternative technologies for

13   implementing background spell check and background

14   grammar check to the ones that are accused in this

15   case, then there would be no basis to conclude that

16   there was any profit at risk and your calculation is

17   not valid; correct?

18        A.  No, I disagree.

19        Q.  Why?

20        A.  Well, to say that an alternative exists to

21   incorporate background spell checking into Word

22   doesn't indicate anything about the acceptability of

23   that alternative or the cost associated with that

24   alternative or the risks associated with implementing

25   that alternative.  I mean you could imagine a

1          Q.  Well, the profit numbers that you cite in

2     Paragraph 107.  How is any of that information

3     relevant to any issue in this case?

4          A.  Well, those numbers in and of themselves are

5     not as key to me as the fact that Microsoft generates

6     a significant portion of its total operating profit,

7     as I report in Paragraph 108, from these products that

8     are at issue, or at least the division that contains

9     these products.

10         Q.  So this is all to the point that Microsoft

11    Office is a big part of Microsoft?

12         A.  That Microsoft Office is of vital importance

13    to Microsoft, yes.

14         Q.  Okay.

15         A.  It's not a trivial product.  It's of vital

16    importance to Microsoft.

17         Q.  So it's that qualitative factor that is

18    relevant to you, not the quantitative data that stands

19    behind it; is that correct?

20         A.  Well, the quantitative data, I think, is

21    relevant as well.

22         Q.  How?

23         A.  Because the quantitative data is what yields

24    the qualitative conclusion; right?  It's microsoft's

25    client on the products at issue here for a substantial

1   portion of its operating income.  And that means that

2   it's of vital importance to Microsoft, and Microsoft

3   acknowledges that.

4        Q.  I'm not asking about the world as a whole.

5   I'm asking about the issues in this case on which you

6   offer opinions.  I mean how does it -- what -- in what

7   ways do the numeric calendar figures that you discuss

8   in Paragraphs 106, -7, and -8 -- sorry.  106 and 107

9   impact any of the opinions that you offer in this

10  case?

11       A.  Well, as I mentioned earlier, the revenue

12  figures are relevant under the income approach because

13  that's an input into that analysis.  This is -- also

14  speaks to the success that Microsoft has had with

15  Office.

16       Q.  You're talking about revenue or profit now?

17       A.  I think both.

18       Q.  Okay.  So you keep coming back to terms like

19  "success" and the importance of Microsoft Office

20  division relative to Microsoft as a whole, but what

21  impact, if any, do those have on your analysis in this

22  case?

23       A.  Well, aside from the income approach, they

24  don't enter into my analysis in a formulaic way, but

25  they do speak to the importance of this product to

1    Microsoft.

2        Q.  Let me ask you to turn back in your report to

3    Paragraph 16, please.

4        A.  Yes.

5        Q.  Paragraph 16 you cite to Microsoft's net

6    revenue operating profits for a time frame indicated

7    here.  What are these figures relevant to?

8        A.  These figures are intended to provide just

9    background information on Microsoft.  They're not

10   specifically inputs into my damages analysis.

11       Q.  Let me ask you to turn to Paragraph 38,

12   please.  38 you make reference to the fact that

13   Microsoft announced acquisition of Forethought for

14   $14 million in 1987.  What's the relevance of that to

15   any of your analysis in this matter?

16       A.  It's just explaining the lineage of

17   PowerPoint and that Microsoft acquired that product

18   from Forethought.

19       Q.  Does that $14 million number have any bearing

20   one way or the other on the opinions that you offer in

21   this case?

22       A.  No, that has no specific impact on my

23   opinions.

24       Q.  All right.  Let me ask you to turn, please,

25   to Paragraph 60.  You have a discussion beginning in

 1   Paragraph 60 of a valuation that was performed by an

 2   entity called "VRC."  Why was that valuation

 3   performed?

 4        A.  I don't recall why that valuation was

 5   performed.

 6             MR. GLITZENSTEIN:  Let me hand you a copy of

 7   the ##.  I'd like to have this marked as Exhibit 12.

 8             (Deposition Exhibit 12 was marked for

 9             identification.)

10             MR. GLITZENSTEIN:  It's got Production Nos.

11   SENTIUS120724 through -54.

12        Q.  So having handed you the agreement, why was

13   the VRC valuation performed?

14        A.  It appears it was performed for tax purposes.

15        Q.  What tax purposes?

16        A.  I'm not certain.  I can review the document

17   to see if it provides any further guidance or further

18   information on that, but I don't know offhand.

19        Q.  In Paragraph 61 of your report you note --

20   and I'm looking at the portion of the paragraph that

21   appears on Page 35.  You say, "It's noteworthy,

22   however, that VRC estimated that royalties would

23   amount to approximately $230 million through the lives

24   of the '731 patent and the '633 patent assuming

25   Sentius is successful in patent litigation against

1    Microsoft."

2            Then you go on to say, "This is consistent

3    with a conclusion that the technology at issue here is

4    valuable and would warrant more than a de minimis

5    royalty for license to the patents-in-suit"; right?

6        A.   Yes.

7        Q.   All right.   The analysis that VRC -- the

8    analysis that VRC performed that led to that

9    $230 million number is not a valid analysis; correct?

10       A.   I'm not sure I can agree with that.   I mean

11   it's -- I'm not sure even what that means, it's not a

12   valid analysis.   Presumably the author of this

13   valuation study felt that it was.

14       Q.   Right.   But have you analyzed the analysis

15   that VRC employed to get to that bottom line?

16       A.   I've reviewed this document, yes, and I'm

17   generally familiar with the analysis.

18       Q.   Do you believe that the analysis is a correct

19   approach to damages valuations in this matter?

20       A.   Well, it's clearly not the approach that I'm

21   using in the case, yes.   But this was also prepared

22   without access to the discovery in this case and

23   with -- this these kind of valuations are often done

24   with limited information.

25       Q.   This analysis is based on an application of

1    the entire market value rule; correct?

2        A.   It appears that the prism value calculation

3    value does apply a royalty rate to a base of revenue.

4        Q.   Just to be clear, the royalty rates in this

5    analysis are applied to Microsoft's entire sales of

6    Microsoft Office in the United States; right?

7        A.   To estimates of those sales, yes, it appears.

8        Q.   And so the -- this analysis applies the

9    entire market value rule; correct?

10       A.   It applies a royalty, a running royalty as a

11   percentage of revenue, yes.

12       Q.   So the royalty calculations in this analysis

13   were based on applying a percentage to the entire

14   revenue of Microsoft Office with no attempt to

15   apportion for the features that would be allegedly

16   covered by the patent; right?

17       A.   It doesn't appear that the royalty base was

18   apportioned.

19       Q.   And that was a proper methodology, in your

20   view; right?

21       A.   Well, I think it depends on the purpose.

22   This is not a damages study for a patent infringement

23   litigation.  This is a valuation analysis that was

24   conducted for a specific purpose, and for that

25   purpose, it may be appropriate.  I wouldn't use that

1    approach in this case to calculate damages for

2    Microsoft.

3         Q.  Because you would consider it to be an

4    inappropriate way to attempt to calculate damages in

5    this case; right?

6         A.  Based on the information I've reviewed, I

7    would agree that I would not use this approach to

8    calculate damages in this case.

9         Q.  Had you heard of this organization, VRC,

10   prior to this lawsuit?

11        A.  I'm not certain.  It doesn't stand out in my

12   mind, but I've looked at a lot of valuations over the

13   years.  So it's possible that I've seen their work

14   before, but it doesn't stand out.

15        Q.  And if you turn to the second page of the

16   document it identifies three people who prepared the

17   report, Justin Johnson, Jane Myung and Walter O'Haire.

18   Do you know any of those people, either personally or

19   by reputation?

20        A.  No.

21        Q.  Okay.  Thanks.  You can set that aside.  All

22   right.  You comment in Paragraph 8 of your report that

23   Sentius had developed a product called RickLink based

24   on patented technology.  Do you consider that product

25   to have been a successful product?

1      A.   I think it depends on how you measure

2    success.  It generated revenues exceeding 1.4 million

3    within two years of launch.  So that sounds like some

4    measure of success to me.

5      Q.   And Sentius never attempted to develop any

6    type of spell checking or grammar checking technology

7    using -- or feature using any of the technology in any

8    of its patents; right?

9      A.   Not that I'm aware of, but I would defer to

10   Sentius on that.

11     Q.   Okay.  So -- withdrawn.

12          MR. ARD:  Seven hours on the tape.  Is it

13   exactly seven?

14          THE VIDEOGRAPHER:  (Nods head.)

15          MR. GLITZENSTEIN:  Wow.  Good.  That's fine.

16          MR. ARD:  I'll let have you another minute.

17          MR. GLITZENSTEIN:  I appreciate that, Seth.

18   I actually have no further questions.

19          Thank you, Dr. Mills, for your time and

20   attention today.

21          I pass the witness.

22          MR. ARD:  Okay.  I'm going to just need to

23   take two minutes.

24          THE VIDEOGRAPHER:  We're off the record.  The

25   time is 6:29 p.m.