1   Steven G. Sklaver (SBN 237612)            Max L. Tribble (*Pro Hac Vice*)
2   Meng Xi (SBN 280099)                      Vineet Bhatia (*Pro Hac Vice*)
    Krysta Kauble Pachman (SBN 280951)        SUSMAN GODFREY L.L.P.
3   SUSMAN GODFREY L.L.P.                      1000 Louisiana, Suite 5100
    1901 Avenue of the Stars, Suite 950        Houston, TX 77002
4   Los Angeles, CA 90067                      Telephone:  (713) 651-9366
    Telephone:  (310) 789-3100                 Email: mtribble@susmangodfrey.com
5   Email:  ssklaver@susmangodfrey.com         Email: vbhatia@susmangodfrey.com
    Email:  mxi@susmangodfrey.com
6   Email:  kpachman@susmangodfrey.com         Sandeep Seth (SBN 195914)
                                               SETH LAW OFFICES
7                                              Two Allen Center
    Seth Ard (*Pro Hac Vice*)                  1200 Smith St., Suite 1600
8   SUSMAN GODFREY L.L.P.                      Houston, TX 77002
    560 Lexington Avenue, 15th Floor           Telephone: 713-353-8847
9   New York, NY 10022                         Email: ss@sethlaw.com
    Telephone:  (212) 336-8330
10  Email: sard@susmangodfrey.com

11  *Attorneys for Sentius International, LLC*

12

13                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
14                         SAN JOSE DIVISION

15  SENTIUS INTERNATIONAL, LLC,              Case No. C-13-0825-PSG

16                  Plaintiff,              **PLAINTIFF SENTIUS' MEMORANDUM
                                            OF LAW IN OPPOSITION TO
17           vs.                            DEFENDANT'S *DAUBERT* MOTION TO
                                            EXCLUDE TESTIMONY OF SENTIUS'
18  MICROSOFT CORPORATION,                  SURVEY EXPERT DR. WILLIAM
                                            WECKER**
19                  Defendant.
                                            **DATE**:       January 13, 2015
20                                          **TIME**:       10:00 a.m.
                                            **JUDGE**:      Hon. Paul S. Grewal
21

22

23          ***FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER ***

24

25          **CONTAINS INFORMATION DESIGNATED AS "HIGHLY CONFIDENTIAL -

            ATTORNEYS' EYES ONLY" AND "HIGHLY CONFIDENTIAL SOURCE CODE"**
26

27

28

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

I.     BACKGROUND ........................................................................................... 2

       A.   Dr. Wecker ......................................................................................... 2

       B.   The Survey .......................................................................................... 3

            1.   Survey Design and Controls ....................................................... 3

            2.   Survey Results............................................................................. 5

       C.   Mr. Mills' Use of the Wecker Survey ............................................... 7

II.    LEGAL STANDARD ................................................................................... 8

III.   ARGUMENT ................................................................................................ 8

       A.   Dr. Wecker's Survey Was Tied To the Claimed Subject Matter ........... 8

       B.   Dr. Wecker's Survey Is Based on Reliable Methodologies ................. 13

            1.   Dr. Wecker's Use of a Direct Method Survey is Generally Accepted ............. 13

            2.   Dr. Wecker's Use of Omnibus Surveys is Appropriate .................... 17

            3.   Dr. Wecker's Survey Had Adequate Quality Control Measures ...................... 18

       C.   Dr. Wecker's Used an Appropriate Calibration Factor ....................................... 20

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). ..........................................8

*Apple, Inc. v. Samsung Electronics Co.*, No. 12-CV-00630-LHK, 2014 WL
794328, at *18 (N.D. Cal. Feb. 25, 2014)...................................................9, 13, 14

*Bloom v. J.P. Morgan Chase & Co.*, No. C 09-03418 WHA, 2010 WL 4939951, at
*1 (N.D. Cal. Nov. 30, 2010)................................................................24

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ......................4

*Emblaze Ltd. v. Apple Inc.*, No. 5:11-CV-01079-PSG, 2014 WL 2889764, at *3
(N.D. Cal. June 25, 2014) ...................................................................8

*Golden Bridge Tech. v. Apple Inc.*, Case No. 5:12-cv-04882-PSG, slip op. at 7
(N.D. Cal. May 18, 2014). ...................................................................8

*Hartle v. FirstEnergy Generation Corp.*, No. CIV.A. 08-1019, 2014 WL 1317702,
at *6 (W.D. Pa. Mar. 31, 2014) *reconsideration denied sub nom Patrick v.
FirstEnergy Generation Corp.*, No. CIV.A. 08-1025, 2014 WL 5463885 (W.D.
Pa. Oct. 27, 2014)............................................................................16

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) .........................3, 8, 20

*Lucent Technologies, Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1113 (S.D.
Cal. 2011) ..................................................................................10, 15

*MobileMedia Ideas, LLC v. Apple, Inc.*, 907 F. Supp. 2d 570, 626 (D. Del. 2012) ....................9

*O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088
(N.D. Cal. 2006).............................................................................10

*Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *10
(N.D. Cal. Mar. 13, 2012). ................................................................15, 17

*Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 8:12-CV-01479-T-27, 2014 WL
2625297, at *3 (M.D. Fla. June 12, 2014) .............................................18

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir. 1997)..................4

*TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006 (N.D. Cal. 2013) ............12, 16

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, No. C 12-3856 PJH, 2014 WL
4312021, at *3 (N.D. Cal. Aug. 28, 2014)...............................................18, 19

1   Plaintiff Sentius International, LLC ("Sentius") respectfully submits the following

2   memorandum in opposition to Defendant Microsoft Corporation's ("Microsoft") Daubert Motion

3   to Exclude Testimony of Sentius' Survey Expert Dr. William Wecker.

4                                    **<u>INTRODUCTION</u>**

5   Dr. Wecker is a highly regarded survey expert who conducted a survey directed to

6   purchasers of Microsoft Office and its components to assess their use two accused features

7   (background spell- and grammar-check), their willingness to pay for the accused features, and

8   whether they would have purchased the accused products had the accused features been replaced

9   with the best non-infringing alternatives.

10  Microsoft seeks to exclude Dr. Wecker's testimony on the grounds that he asked the

11  wrong questions, he should have used a different type of survey approach, he lacked proper

12  controls, and he used an improper calibration factor for his willingness to pay results.  None of

13  these arguments have merit.

14  Microsoft contends that Dr. Wecker did not identify the best non-infringing alternative in

15  his survey.  But Dr. Wecker relied on Dr. Madisetti's determination of what the accused features

16  and best non-infringing alternatives were.  Any attack on this score should be directed to Dr.

17  Madisetti, not Dr. Wecker.  And Microsoft fails to address Dr. Madisetti's expert opinions, which

18  are more than sufficient to defeat Microsoft's proposed non-infringing alternative.

19  Microsoft next argues that Dr. Wecker should not have asked consumers direct questions

20  about the accused features, but should have employed a different type of survey, called a

21  "conjoint" analysis, which measures the relative preferences of various features.  But the direct

22  method is commonly used in these circumstances and Microsoft cites no authority saying that

23  conjoint analyses alone are proper (indeed, Microsoft seems to concede that a conjoint analysis

24  would not be proper here because too many features are at issue).

25  Microsoft's arguments regarding the alleged lack of adequate quality control and the use

26

27

28

of the wrong type of survey panel miss the mark.[1]  Like most of the other arguments Microsoft makes, they plainly go to the weight, not the admissibility of the testimony.

Finally, Dr. Wecker used an appropriate calibration factor to mitigate the alleged "hypothetical bias" of which Microsoft complains.  Microsoft says that Dr. Wecker did not use the correct calibration factor, but does not say what the proper calibration factor is. Dr. Wecker's calibration factor is well-supported by the literature.

All of Microsoft's points can be made on cross-examination, and Dr. Wecker can respond to Microsoft's arguments.  Not only are they mistaken, but they all go to weight not admissibility. For these reasons, Sentius respectfully requests that the motion be denied.

## I.  BACKGROUND

### A.  Dr. Wecker

Dr. Wecker has served as a survey expert in over 14 matters in which he testified at a deposition or trial about surveys, and he designed a survey in all but two of those.  *See* Declaration of Seth Ard ("Ard Decl."), Ex. A (Wecker Report, Attachment B), Ex. B (Wecker Depo. at 9:16-10:1 & 11:20-12:12).  He holds a PhD in Statistics and Management science from the University of Michigan. Ard Decl., Ex. A (Wecker Report, Attachment B). Between 1973-1998, he was a professor at University of Chicago, UC Davis, and Stanford University.  *Id.*  At all those schools, he taught classes covering the design of surveys to elicit consumer preferences.  Ard Decl., Ex. B (Wecker Depo. at 50:23-51:16).  He has been the associate editor of leading statistics journals, including Journal of the American Statistical Association and Journal of Business and Statistics. He has published 35 articles in scholarly journals, many of which concern "fundamentals which are critical to survey design and analysis."  *Id.* (Wecker Depo. at 61:22-62:4).  He now runs a consulting firm.   As a litigation expert, he has designed at least nine willingness-to-pay surveys for use in litigation. Declaration of Dr. William E. Wecker, ¶ 2.  He has also served as an expert critiquing several willingness-to-pay studies conducted by other litigants.   Ard Decl., Ex. B

---

[1] Further, because the survey integrated proper quality control measures, described in detail at pp. 3-4, *infra*, the survey comported with the standards set forth in Dkts. 135-12, 135-14, 136-1.

(Wecker Depo. at 19:1-20:24 & 36:21-37:25).

In a case that reached the Federal Circuit, Microsoft vigorously challenged a survey designed by Dr. Wecker and his testimony.  The Federal Circuit affirmed the jury verdict that was based partly on his testimony, noting that "[t]he testimony of Wecker, the expert who helped design the survey, sufficed to show that the survey was compiled in accordance with acceptable survey methods."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010).

**B.    The Survey**

**1.    Survey Design and Controls**

Dr. Wecker was asked to consider questions regarding the use and value of Microsoft's "check spelling as you type" and "check grammar errors as you type" capabilities.  Ard Decl., Ex. A (Wecker Report at 3-4).  He determined that a representative sample of U.S. adults would provide unbiased, reasonably accurate, approximate answers that have a known degree of potential error.  *Id.*  He designed a survey aimed at users and purchasers of Microsoft Office computer software in which participants were asked about their use of Microsoft's spelling and grammar check methods available in components of Microsoft Office and the value they place on those capabilities.  *Id.*

Dr. Wecker retained ORC International ("ORC") to conduct the survey.  According to Dr. Wecker, ORC is a large market research firm with extensive experience and expertise in the design and implementation of sample surveys, including online surveys. ORC maintains panels of millions of computer users who are available for survey research via the Internet. At his request, ORC recruited a representative sample of U.S. adults via the Internet.

Dr. Wecker and ORC International implement several quality control measures to ensure accurate survey results.  First, ORC maintains a high quality survey panel that they use for surveys and they constantly and routinely prune that group of panelists to eliminate people who they identify as "racers" – *i.e.*, people who rush through the survey in order to receive an award rather than spend an appropriate amount of time reading and answering questions – or people who give gibberish answers.  Ard Decl., Ex. B (Wecker Depo. at 89:22-90:13; 91:20-92:3).  Second,

1    ORC tracks and excludes racers from individual panels by eliminating all respondents who finish

2    the survey in the thirtieth percent below the median.  *Id.* at 189:14-190:7.  They also monitor the

3    overall average for respondents to a survey and if that is too fast in their experience, it triggers a

4    warning to managerial level, which did not occur here.  *Id.* at 190:8-15.  Dr. Wecker believes that

5    ORC's methods are a satisfactory way of excluding racers.  *Id.* at 190:16-25.  Third, Dr. Wecker

6    tested the questions on employees of his firm not involved in the project in order to learn if any

7    question posed confusion and to tweak the questions.  *Id.* at 72:10-73:19.  The employees went

8    through the questions around six or seven times before finalizing the survey, a process they use in

9    every case.  *Id.*  The best approach to quality control, in his professional view, is to have a well-

10   designed and not very long survey, while using a high quality panel that weeds out racers and

11   other suspect respondents.  *Id.* at 124:13-20.

12           The survey also had an external validation, which Dr. Wecker emphasized is an important

13   indicator of the reliability of the survey.  *Id.* at 107:18-109:10. In particular, respondents' answers

14   to opening questions about demographics were compared to known demographic figures.

15   Comparing these results, Dr. Wecker found that the "statistics estimated from [his] survey sample

16   closely approximate the official U.S. data," for example with respect to the percentage of males,

17   age, geographic region, and other demographic statistics.  Ard. Decl, Ex. A (Wecker Report at 6

18   & Attachment I).      Dr. Wecker explained that this is "a validation check of the entire

19   undertaking."  Ard Decl., Ex. B (Wecker Depo. at 107:18-109:10).  As Dr. Wecker explained, if

20   the survey is able to "estimate something where we know the right answer," then that

21   demonstrates to survey experts that "I have not [just] validated some aspect. I've validated that

22   this device works as advertised." *Id.*  Furthermore, even if Microsoft's critiques of Dr. Wecker's

23   survey were accurate – which they are not – all such critiques go to weight, not admissibility, of

24   the survey.  The Ninth Circuit has stated that "[u]nlike novel scientific theories, a jury should be

25   able to determine whether asserted technical deficiencies undermine a survey's probative value."

26   *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 n. 8 (9th Cir. 1997). *See*

27   *also Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir. 2001) ("[I]ssues of

28

methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.").

### 2. Survey Results

[redacted][2]   The accused spell-checker and accused grammar-checker differ from user-initiated spell and grammar checkers because they link a given misspelled word or grammatically incorrect word to its corresponding spelling or grammar correction without a prompt from the user.  Specifically, the spell-check and grammar-check features use a pointer to point the system to information that is external to the source material. For example, for the spell check functionality, the fError flag identifies the character string of the misspelled word and its language, and then identifies and retrieves the specific corrections for that misspelled word from the appropriate language spell check library. Dr. Wecker also asked questions regarding consumers' use of the accused products and features, and consumers' willingness to pay more for the accused features.

According to Dr. Wecker, nearly 62 percent of people who have used Word, PowerPoint, Outlook, OneNote, or Publisher have purchased one or more of these applications (as part of Office or on a standalone basis), and nearly 94 percent of those purchasers have used the background spell checker or Microsoft's user-initiated spell checker.  Ard Decl., Ex. A (Wecker Report, Attachment D, Table 1, Q2, Q3).  Survey participants who have used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) and who have used the background spell checker and/or Microsoft's user-initiated spell checker were asked to "[s]uppose the components of Microsoft Office included the user-initiated spell

---

[2] Ard Decl., Ex. C (Infringement Expert Report of Dr. Vijay K. Madisetti ("Madisetti Report"), September 8, 2014, Section XIII (Non-Infringing Alternatives)).

checker option (select Spelling and Grammar menu option), but did not include Microsoft's 'check spelling as you type' option (display a red squiggly line as you type) [emphasis omitted]." Ard Decl., Ex. A (Wecker Report, Attachment D, Table 1, Q4). These participants were then asked: "Would you still have purchased Microsoft Office or any of its components (Word, PowerPoint, Outlook, OneNote, and Publisher)?" *Id.*  According to Dr. Wecker, approximately 14.7 percent of this segment of the population would not have purchased Office (or any of its relevant component applications) without the background spell checker. *Id.*  This amounts to approximately 8.5 percent of the segment of the population that has used Word, PowerPoint, Outlook, OneNote, or Publisher. *Id.*

According to Dr. Wecker, 87 percent of people who have used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) have used the background grammar checker or Microsoft's user initiated grammar checker. Ard Decl., Ex. A (Wecker Report, Attachment D, Table 1, Q1).  Survey participants who have used and purchased Word, PowerPoint, Outlook, OneNote, or Publisher (as part of Office or on a standalone basis) and who have used the background grammar checker and/or Microsoft's user initiated grammar checker were asked to "[s]uppose the components of Microsoft Office included the user-initiated grammar checker option (select Spelling and Grammar menu option), but did not include Microsoft's 'check grammar errors as you type' option (display green or blue squiggly line as you type) [emphasis omitted]."  Ard Decl., Ex. A (Wecker Report, Attachment D, Table 1, Q4).  These participants were then asked: "Would you still have purchased Microsoft Office or any of its components (Word, PowerPoint, Outlook, OneNote, and Publisher)?" *Id.*  According to Dr. Wecker, approximately 14.8 percent of this segment of the population would not have purchased Office (or any of its relevant component applications) without the background grammar checker.  *Id.*  This amounts to approximately 8.0 percent of the segment of the population that has used Word, PowerPoint, Outlook, OneNote, or Publisher.  Ard Decl., Ex. A (Wecker Report, Attachment D, Table 3).  Dr. Wecker found that approximately 11.2 percent of the population that has used Word, PowerPoint, Outlook, OneNote, or Publisher would not have

1   purchased Office (or any of its relevant component applications) if both the background spell

2   checker and the background grammar checker were removed.  *Id.*

3       **C.     Mr. Mills' Use of the Wecker Survey**

17      Mr. Mills uses the "willingness-to-pay" results for limited purpose. Mr. Mills opines that

18   the average willingness to pay for a feature conveys information concerning the value that

19   consumers place on that feature. One of Mr. Mills damages' theories relates to the relative value

20   of the Lucent and Sentius patents and technology.

1

2

3

## II.    LEGAL STANDARD

In evaluating expert testimony in response to a *Daubert* motion, the critical prerequisite is that "the methodology . . . [be] sound." *Golden Bridge Tech. v. Apple Inc*., Case No. 5:12-cv-04882-PSG, slip op. at 7 (N.D. Cal. May 18, 2014). "The inquiry into admissibility of expert opinion is a 'flexible one,' where shaky 'but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *Emblaze Ltd. v. Apple Inc.*, No. 5:11-CV-01079-PSG, 2014 WL 2889764, at *3 (N.D. Cal. June 25, 2014) (quoting *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010)). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* (quoting *Primiano*, 598 F.3d at 564).

"That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014).  The Federal Circuit "has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *Id.* (quotations omitted); *see also i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility").

## III.    ARGUMENT

### A.    Dr. Wecker's Survey Was Tied To the Claimed Subject Matter

Microsoft's principal complaint is that Dr. Wecker asked the wrong questions:  instead of asking questions about background spell-check and grammar-check, he should have asked questions about "Microsoft's alleged use of a look-up table, and its performance of certain steps

in the order required by the claims." Motion at 8. That is incorrect. Dr. Wecker asked the only questions that mattered in light of the use that Mr. Mills made of the survey: questions about the accused features and the best non-infringing alternatives. At best, Microsoft's complaints about the description of the alternatives go to weight, not admissibility. *See Apple, Inc. v. Samsung Electronics Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *18 (N.D. Cal. Feb. 25, 2014) ("Samsung's dissatisfaction with the description of the patented features in the survey ... goes to weight, not admissibility." (quotation marks omitted)). Under Microsoft's logic, surveys would have to test whether consumers cared about the sequencing of source code or look up tables, things that are neither important nor apparent to the average consumer. Rather, what consumers care about, and what is relevant for purposes of an expert's damages analysis, is the performance of the relevant software and its features. *See id.*, at *6 (denying motion to exclude expert's survey that tested demand for patented features of smartphones and tablets); *MobileMedia Ideas, LLC v. Apple, Inc.*, 907 F. Supp. 2d 570, 626 (D. Del. 2012) (accepting survey evidence for purposes of motion for summary judgment that users had created and modified a playlist, even though the survey did not establish that anyone actually performed each and every step of the asserted claims). Here, too, Dr. Wecker's survey tested the degree of Microsoft's customers' dissatisfaction if the Office products did not contain the patented features, background-spelling and background grammar-checking.

Dr. Madisetti concluded that user-initiated spell and grammar checking are the best non-infringing alternatives to the accused background-spelling and background grammar-checking features.[3] Microsoft does not seek to exclude Dr. Madisetti's testimony on this topic.

Dr. Wecker's survey asked users about the accused features and the non-infringing alternatives discussed in Dr. Madisetti's report. Mr. Mills used Dr. Wecker's survey primarily in order to opine on the amount of profits that Microsoft risked losing if it removed the accused features and instead relied upon the best non-infringing alternatives (as determined by Dr.

---

[3] Ard Decl., Ex. C, (Madisetti Report (Section XIII (Non-Infringing Alternatives))).

Madisetti).[4]  That is the "income approach" to damages discussed in the motion to exclude Mr. Mills. Critically, while Microsoft seeks to exclude the income approach on other grounds, it does not argue that the basic methodology of the income approach (i.e., evaluating the profits that Microsoft risked losing if the accused features were replaced with the best non-infringing alternatives) is unsound, nor could it given the caselaw.  *See, e.g.*, *Lucent Technologies, Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1113 (S.D. Cal. 2011) (approving use of income approach where "risk of loss" was based on the Lucent survey).

Given the purpose for which Dr. Wecker's survey is used by Mr. Mills in the income approach, there can be no doubt that Dr. Wecker asked the right questions.  Mr. Mills needed to know information about consumer preferences regarding the accused features and the best non-infringing alternative. That is exactly the question that Dr. Wecker asked, using the accused features and best non-infringing alternatives outlined in Dr. Madisetti's report.  If Microsoft has any complaint about Dr. Wecker asking the wrong question, that complaint should be directed to Dr. Madisetti, not Dr. Wecker.  *See O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006) (denying motion for new trial where defendant argued that the court improperly permitted one expert to rely on another expert's test results, in part because defendant never met its burden of challenging the other expert's methodology in its rebuttal case). Tellingly and critically, Microsoft does not seek to exclude Dr. Madisetti's opinions regarding the best non-infringing alternatives, nor does it even critique his conclusions (with one exception).

The one exception is that Microsoft claims that Dr. Madisetti acknowledged that one of Microsoft's non-infringing alternatives outlined in its rebuttal report on non-infringement is non-infringing.  This argument fails for three reasons.

First, Dr. Madisetti submitted a supplemental report giving detailed reasons why Microsoft's supposed non-infringing alternatives were not available, acceptable, or potentially

---

[4]

even non-infringing for various reasons.[5]   Microsoft focuses on the first non-infringing

alternative that its rebuttal expert discussed. Motion at 7, n. 22. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████[8]   Microsoft completely ignores these arguments, all of which would

establish, if believed by the jury, that Microsoft's proposed alternatives are not best non-

infringing alternatives.  While Microsoft criticizes Dr. Wecker for not testing the acceptability of

these alternatives, it fails to note that its expert described them long after Dr. Wecker's survey

and report were completed.  Further, the critiques made by Dr. Madisetti are not susceptible to

survey analysis.

Second, Microsoft relies on an alleged alternative that allegedly has already been written

and will ship with the next version of Office.   Incredibly, **Microsoft mentioned that it**

**completed the alleged design-around for the first time in Microsoft's rebuttal report**,[9] many

months after the close of discovery.  Despite a request a month ago, Microsoft produced this code

for the first time on December 17, 2014, far too late for Sentius to review the code and pursue

discovery related to it. Ard Decl., Ex. E.  Microsoft's late disclosure and production of this

alleged design-around should preclude it from being mentioned at trial. Sentius will file a motion

---

[5] Ard Decl., Ex. M (Madisetti Supplemental Report).

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

[9] Dkt. 131-10 at ¶ 660.

1  in limine on that topic.[10]

2         Third, Microsoft relies on code that presumably was written recently.[11]  The hypothetical

3  negotiation date is in June 2009.  Microsoft has not offered any evidence that this code could

4  have been written in June 2009.  For that reason alone, Dr. Wecker's survey cannot be excluded

5  for failure to ask about this alleged non-infringing alternative.  This Court declined to exclude a

6  survey expert on nearly identical grounds. *See TV Interactive Data Corp. v. Sony Corp.*, 929 F.

7  Supp. 2d 1006, 1026-27 (N.D. Cal. 2013) ("Sony contends that [patentee's] surveys should be

8  excluded for failure to compare … what Sony considers to be the two best noninfringing

9  alternatives. [One alternative was previously excluded]   [B]ecause Sony's other proposed

10  noninfringing alternative . . . was not in existence at the time the hypothetical negotiation would

11  have taken place, Sony bears the burden of proving before the jury that this alternative was

12  'available.'  . . .  The Court will not exclude an expert report based on Sony's assumption which

13  may be disproven at trial.").

14         The cases Microsoft relies upon are not to the contrary.  They simply stand for the

15  unremarkable proposition that a survey must ask about issues that are relevant to the case.  That

16  standard is plainly met here given that the disputed questions related to the accused features and

17  the best available non-infringing alternatives. For example, in the *Apple v. Samsung* case that

18  Microsoft discusses at length, Judge Koh rejected a similar challenge to Apple's survey.  There,

19  Samsung argued that the survey posed the wrong choice to consumers by asking them to choose

20  between a device with a single-component synchronization feature in Samsung products and no

21  background synchronization feature, even though Apple recognized that the asserted claim

22  required three background synchronization components. No. 12-CV-00630-LHK, 2014 WL

23  794328, at *18-19 (N.D. Cal. Feb. 25, 2014).  The Court rejected this argument because "Apple

24

25  [10] Microsoft may argue that the code was only written in the last few months. If so, that is no excuse. Microsoft claims that it took 2 days to write the code. If that is true, and Microsoft wanted to rely on the design-around for this litigation, then Microsoft has no excuse for not spending the 2 days far earlier in the litigation.

26

27  [11] Because of Sentius's inability to pursue discovery on this topic, Sentius does not know when it was written. If it was written a long time ago, that would make Microsoft's failure to disclose it in a timely fashion all the more inexcusable.

28

can argue that, for Samsung consumers, the technical limitations of Samsung's devices rendered the relevant choice to be between a device with background synchronization and a device without background synchronization (not a choice between three-component background synchronization and one-component background synchronization)."  2014 WL 794328, at *19.  The same is true here: based on Dr. Madisetti's testimony, Sentius will argue at trial that the relevant choice for Microsoft is between background spell-check and user-initiated spell check.  As in the *Samsung* case, Microsoft's "dissatisfaction with the description of the patented features in the survey ... goes to weight, not admissibility." *Id.* at *18 (quotation marks omitted).

Microsoft argues finally that the survey question was not clear because the phrasing Dr. Wecker used is allegedly "broad enough to encompass Autocorrect," which is not an accused feature. Motion at 11.  This argument fails for several reasons.  First, the wording is not broad enough to encompass Autocorrect: the wording describes a "*check* spelling as you type" – checking spelling as you type is not the same as *correcting* spelling as you type, which is what Autocorrect does.  Second, the screenshots in the survey show that Autocorrect is an available "Tool" for both "check spelling as you type" and "user-initiated spell checker" (see Ard Decl., Ex. A (Wecker Report, Attachment E pages E.2 and E.4)), so users could not have thought that disabling the "check spelling as you type" option would also disable Autocorrect.  Third, any criticisms Microsoft has on this score can be raised to the jury during cross-examination.

### B.   Dr. Wecker's Survey Is Based on Reliable Methodologies

#### 1.   Dr. Wecker's Use of a Direct Method Survey is Generally Accepted

Microsoft next criticizes Dr. Wecker's decision to use a direct survey rather than a conjoint analysis to assess willingness to pay, but Microsoft ignores the articles cited by Dr. Wecker that establish that direct surveys' are commonly used to assess willingness to pay and Microsoft cites no trustworthy authority stating that conjoint analyses are preferred to direct analyses for assessing willingness to pay.

Dr. Wecker notes that the "direct approach has numerous precedents in peer-reviewed, scholarly literature and pronouncements by government agencies."  Ard Decl., Ex. A (Wecker

Report at 5).  He cites a 2011 article by Miller in the *Journal of Marketing Research* that evaluates "the relative performance of four <u>commonly used approaches</u> to measure WTP."  Ard Decl., Ex. F (Miller paper at 173).  The first approach, which he says "some marketing researchers favor," is "the direct approach, asking consumers directly to state their WTP for a specific product through, for example, an open-ended question format." *Id.*[12]  That is the approach Dr. Wecker uses.[13] Microsoft's survey expert did not cite any authority suggesting that the direct method is not a commonly accepted practice for measuring willingness to pay, nor does Microsoft's motion.

Microsoft claims that "the generally accepted practice" (which it admits has "serious limitations" here) is to use "conjoint analysis." Motion at 12.  The only authority it cites for this proposition, however, is a website advertisement for a company that describes itself as "the consensus leading provider of conjoint analysis software"[14] and that is "best known for a marketing research technique called Conjoint Analysis."[15]  The website only says (without citation to authority) that conjoint analysis is "<u>one of the</u> most widely-used quantitative methods in Marketing Research." It does not say that the direct approach is not also a widely-used quantitative method, or say anything about the direct approach at all.  The unsigned web advertisement, which does not say anything about Dr. Wecker's approach, cannot be a ground to exclude Dr. Wecker's testimony.[16]

While some courts have approved the use of conjoint analyses, that is a far cry from <u>excluding</u> the use of direct-method surveys on the ground that conjoint analyses are better, which no court cited by Microsoft has done.  And at least one court has disallowed the use of conjoint

---

[12] The Miller paper also confirms the continued validity of the direct approach. *Id.* at 180 (concluding that the analysis "affirms the usefulness of [the direct approach] and [conjoint approach], despite some concerns about the hypothetical nature of these approaches.").

[13] Dr. Wecker also cites a EPA document, Ard Decl., Ex. G, that states that regulatory agencies use the direct method to measure damages at cites contaminated by hazardous substances by asking people how much they would be willing to pay to preserve the natural resources (http://www.epa.gov/superfund/programs/nrd/faqs.htm).

[14] Ard Decl., Ex. H (http://www.sawtoothsoftware.com/products/conjoint-choice-analysis/conjoint-analysis-software).

[15] Ard Decl., Ex. I (http://www.sawtoothsoftware.com/about-us/our-story).

[16] Judge Koh cited a publication by the same software company in *Apple v. Samsung*, but only for a description of what conjoint analysis is.  *See* 2014 WL 794328, at *16.

1   surveys when there were too many features "that would have played an important role in real-

2   world consumers' preference" for the survey to capture.  *Oracle Am., Inc. v. Google Inc.*, No. C

3   10-03561 WHA, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012).  Microsoft seems to agree

4   that this same concern may pose "serious limitations" on using a conjoint analysis in this case

5   given the "multi-thousand feature products of the type at issue here." Motion at 12.   Given

6   Microsoft's frank admission that there are "serious limitations" with using a conjoint analysis

7   here, it is puzzling that Microsoft tries to exclude Dr. Wecker on the ground he did not use a

8   conjoint analysis.[17]

9        Moreover, Microsoft submitted an expert survey report criticizing Dr. Wecker's report,

10   which did not once criticize Dr. Wecker for failing to use a conjoint analysis or claim that

11   conjoint analyses are the only commonly accepted practice in these circumstances.  If there were

12   a consensus in the field that a conjoint analysis, rather than a direct approach, is the "generally

13   accepted practice" in these circumstances, one would expect Microsoft's survey expert to say

14   that. He does not because there is no such generally accepted practice.

15        Microsoft also faults Dr. Wecker for failing to cite any real world decisions that have ever

16   turned on the type of survey used by Dr. Wecker, but Dr. Wecker cites articles that attest to the

17   generally accepted practice of using direct surveys to assess willingness to pay in a variety of

18   contexts.  Ard Decl. Ex. A (Wecker Report at nn. 8, 9).  Furthermore, Microsoft ignores at least

19   one *judicial* decision that allowed a reasonable royalty analysis to be based on this type of survey.

20   In *Lucent v. Microsoft*, the Federal Circuit noted that surveys can be used to support a reasonable

21   royalty calculation derived from a hypothetical negotiation.  On remand, the court permitted the

22   use of a survey by Lucent after rigorous attack from Microsoft both pre- and post-trial. Dr. Jay

23   was subject to vigorous cross-examination about her questions, methods, and conclusions. *See*

24   *Lucent Technologies, Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1123-24 (S.D. Cal. 2011)

25

26   _____

[17]As that *Oracle* decision explains and Microsoft acknowledges, conjoint analyses are less useful when there are thousands of features that could drive demand. The reason is simple: conjoint analyses ask respondents to compare the value of various features, so the analysis works only if you know what features are relevant to start with.   The type of survey that Dr. Wecker used, by contrast, does not require respondents to compare the accused feature to some other set of features.

27

28

(Lucent's survey expert "was subject to vigorous cross-examination about her questions, methods, and conclusion . . . The jury found her reasoning to be persuasive.").  The Lucent survey was a direct, non-conjoint survey very similar to the survey conducted here;[18] the Lucent survey was used by the Lucent damages expert in a manner similar to here; and the Lucent survey, as used by the Lucent damages expert, served as the basis for the jury's award.  *Id.*

Finally, Microsoft complains that direct surveys are beset by "hypothetical bias," which Microsoft defines as a phenomenon where "people asked to focus on one particular feature in a product will naturally overstate the importance of that feature." Motion at 2.[19]  But it cites no Court that has excluded a survey because of hypothetical bias.   Nor can Microsoft consistently argue that this is a ground for exclusion because the conjoint surveys that Microsoft lauds are also "hypothetical" and equally present "hypothetical bias."[20] Indeed, any survey that is used to assess a purchasers willingness to pay for a feature in the event it were absent is necessarily hypothetical, which is the heart of the approach approved in *Lucent*.  *See, e.g., TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006 (N.D. Cal. 2013) (denying motion to exclude expert's survey where defendant argued that "the exclusion of the majority of product attributes . . . led respondents to overvalue each of the product attributes that were tested" for a market willingness to pay survey); *Hartle v. FirstEnergy Generation Corp*., No. CIV.A. 08-1019, 2014 WL 1317702, at *6 (W.D. Pa. Mar. 31, 2014) *reconsideration denied sub nom Patrick v. FirstEnergy Generation Corp*., No. CIV.A. 08-1025, 2014 WL 5463885 (W.D. Pa. Oct. 27, 2014) (finding that defendants' arguments regarding, *inter alia*, hypothetical bias and error rate, went only to the weight, and not the admissibility of a willingness-to-pay survey used to quantify harm

---

[18]

[19] At some points, Microsoft seems to be criticizing the use of "hypothetical" surveys generally,

[20] Miller (2011) at 173 ( both the direct approach and the "choice based conjoint analysis . . . measure consumers' hypothetical, rather than actual, WTP and thus can generate hypothetical bias, which the economics literature defines as the bias induced by the hypothetical nature of a task.").

1   from air pollution).[21]

2         In any event, as discussed below, Wecker uses a "calibration factor" from the Murphy

3   paper, which is designed to account for the very hypothetical bias that Microsoft identifies.

4              **2.      Dr. Wecker's Use of Omnibus Surveys is Appropriate**

5         Dr. Wecker explained in his deposition why he normally uses omnibus survey (where the

6   questions in the survey are asked as part of a larger set of survey questions), which afford

7   additional safeguards that ensure the panel is qualified, and offer no disadvantages when

8   administered by a company of the quality of ORC International.  Ard Decl., Ex. B (Wecker Depo.

9   at 112:18-114:10).  Microsoft does not claim that using omnibus surveys is inconsistent with

10  generally accepted practice.

11        The only authorities cited by Microsoft critical of omnibus surveys note that the

12  "disadvantage [of omnibus surveys] is the risk that one set of questions might be affected by other

13  sets."  Motion at 14 n. 35.  And another authority cited by Microsoft acknowledges that omnibus

14  surveys are acceptable provided the other topics in the survey do not affect the respondents'

15  answers.  *Id.* (citing authority saying: "Before participating in the [omnibus] survey, you should

16  check that the other topics in the survey are compatible"). The risk occurs when a survey is

17  preceded by questions on a related topic, which might affect respondents' answers to subsequent

18  questions.  There is no question that the topics in the omnibus survey preceding Dr. Wecker's

19  survey did not relate to or affect the Wecker survey.  In response to an inquiry from Microsoft,

20  Sentius informed Microsoft that only one survey set, with seven questions, preceded the Wecker

21  survey: there were four questions that "asked for respondents' awareness of brands and types of

22  beans" and three questions that "asked about their experience with airline flights over the last 12

23  months." Ard Decl., Ex. J (10/2/14 email).  Those  questions did not relate to or affect the Wecker

24

25  _____
    [21] Further, to the extent Microsoft attempts to argue, via Exs. R-S that the failure to use conjoint analysis constitutes a
    failure to apply "generally accepted methodology," while the use of a conjoint survey *can* be generally accepted

26  methodology, other courts have acknowledged that conjoint surveys can produce unreliably biased results where test
    non-patented features to force participants to focus on the patented functionalities, "warping what would have been

27  their real-world considerations."  *Oracle America, Inc. v. Google, Inc.*, No. 10-03561 WHA, 2012 WL 850705, at
    *10 (N.D. Cal. March 13, 2012) (granting in part and denying in part Daubert motion).

28

1    survey and Microsoft has not argued otherwise.

2          Microsoft's attacks on the manner in which the survey was taken (as part of an omnibus

3    rather than stand-alone panel), and the order of the questions, are proper subjects of cross-

4    examination, not *Daubert*.[22]  *See, e.g.*, *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, No. C

5    12-3856 PJH, 2014 WL 4312021, at *3 (N.D. Cal. Aug. 28, 2014) ("[T]he Ninth Circuit has held,

6    on multiple occasions, that "[c]hallenges to survey methodology," including "the format of the

7    questions or the manner in which it was taken, bear on the weight of the evidence, not its

8    admissibility") (citing *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt, Inc.,* 618

9    F.3d 1025, 1036 (9th Cir. 2010); *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 814 (9th Cir. 1997)).

10          **3.      Dr. Wecker's Survey Had Adequate Quality Control Measures**

11          Microsoft incorrectly claims that Dr. Wecker's survey included "no quality control"

12   measures.  This is simply incorrect: Dr. Wecker outlined a series of quality control measures,

13   which is the type he relies upon in all his work.  These include using ORC International, a

14   renowned survey firm used by CNN and other national agencies, which ensures that people who

15   race through surveys are excluded from the results and ensures that people who give nonsensical

16   or suspect answers are removed from future ORC panels; testing his questions on other

17   professionals to ensure that they are clear to an average consumer; and cross-checking any

18   verifiable answer to ensure that survey result conforms to reality.   Further, Microsoft's attacks on

19   quality controls are proper subjects of cross-examination, not a *Daubert* motion. *See, e.g.*, *Pods*

20   *Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 8:12-CV-01479-T-27, 2014 WL 2625297, at *3 (M.D.

21   Fla. June 12, 2014) ("PEI also argues that Dr. Wood improperly weighted the data, included

22   improper questions, and failed to employ proper quality controls.  These criticisms likewise go to

23   the weight of her opinions, not their admissibility. Vigorous cross-examination will allow PEI to

24   address the deficiencies of Dr. Wood's report, a process that should not be supplanted by

25   *Daubert*'s gatekeeper role." (emphasis added and citation omitted)); *accord Wells Fargo*, 2014

26

27   [22] Similarly, Microsoft's articles regarding the viability of omnibus surveys are appropriate topics of cross-examination.  *See* Dkts. 135-8, 135-10.

28

WL 4312021 at *3 ("Challenges to survey methodology . . . bear on the weight of the evidence, not its admissibility" (quotation marks omitted and alteration removed)).

Microsoft first complains that Dr. Wecker did not adequately identify "racers" who are simply trying to complete the survey without regard to what it says.  But as Dr. Wecker explained in advance of his deposition in response to questions from Microsoft, ORC International does seek to identify racers by excluding any respondents whose response time is faster than 30 percent below the median of the median.  Ard Decl., Ex. B (Wecker Depo. at 189:10-190:7).  ORC International also tracks whether the overall average response time for the entire group responding to the omnibus is too quick, based on its expertise, which was not the case here.  *Id.* (Wecker Depo at 190:4-14).    Microsoft complains that ORC did not track the time that individuals spent answering his part of the omnibus survey, but a racer who just wants to finish quickly will race through the entire omnibus survey, not just one subset of it, so tracking racers at the level of the whole survey is adequate.

Microsoft also complains that Dr. Wecker did not use any "Harvard questions," which are designed to trick the reader in order to see if she is paying attention.  Microsoft does not cite any authority stating that Harvard questions must be used or any judicial decision touching on Harvard questions.  Dr. Wecker testified that he does not ever use Harvard questions because they destroy the rapport with the respondent.  *Id.* (Wecker Depo. at 120:7-122:11).  As he testified, the best quality control measure is to devise clear questions that readers can understand without effort.[23]  If the reader begins to suspect that the questioner is trying to trick the reader, the reader will start to read more into all the questions, ever alert to possible tricks, which undermines the "simplicity and directness" that the survey is trying to achieve and could alter respondents' answers.  *Id.*  As Dr. Wecker explained, that is contrary to the goal of having the survey respondent answer simple questions in a straightforward manner.  *Id.*  The best approach, in his

---

[23] The clear questions in Dr. Wecker's survey are unambiguous as suggested by Dkt. 135-4, *Basic Survey Design*, available at: http://www.nss.gov.au/nss/home.nsf/NSS/4354A8928428F83 4CA2571AB002479CD?opendocument (last visited December 27, 2014).  The article also notes that the two primary forms of respondent bias are sensitivity and fatigue, which are both avoided using Dr. Wecker's technique of using simple and direct questions.

professional view, is to have a well-designed an not very long survey, while using a high quality panel that weeds out racers and the like. *Id*. at 124:13-20.

Microsoft finally makes various complaints about the survey without suggesting that any are grounds for excluding the survey. For example, Microsoft seems to lament that the survey is an "online survey," but neglects to mention that the survey Microsoft commissioned on usage of Office products, which Microsoft's expert relies on, is also an online survey. *See* Dkt. 135-11 at 31. Also, Microsoft suggests that it is improper for respondents to receive some coupons for completing the survey, but this is common practice and the Federal Circuit approved a survey by Dr. Wecker that had this feature. *See i4i Ltd.*, 598 F.3d at 855 (noting that in the Wecker Survey "[a]ny company that took the survey received $35, regardless of the answers they gave").

### C.   <u>Dr. Wecker's Used an Appropriate Calibration Factor</u>

Microsoft seeks to exclude Dr. Wecker's open-ended willingness-to-pay (WTP) results because there is allegedly no basis for using the selected calibration factor. The argument is predicated on a disagreement with the articles that Dr. Wecker cites and relies upon and is best left for cross-examination.

Dr. Wecker's report recognizes that some studies on the accuracy of measuring WTP results have found that the direct method, like other methods, "tends to overestimate consumers' 'true' willingness to pay as measured by procedures that require experimental subjects to surrender real money, thus requiring a calibration factor to adjust for the overestimation." Ard. Decl., Ex. A (Wecker Report at 5). This is called hypothetical bias. Not all studies find that there is a hypothetical bias. To the extent hypothetical bias exists, it affects both the direct method and the conjoint method.

To correct for this potential hypothetical bias, Dr. Wecker relies on a frequently cited meta-analysis of 29 experimental studies of the difference between WTP estimates and participants WTP. *Id.* at 5 (citing Murphy). The Murphy paper (and the follow-up Murphy paper cited by Microsoft) discusses the growing literature on the difference between hypothetical and

actual values.[24]

The Murphy papers looked at specific variables that can affect the degree of the bias in these studies – *e.g.*, whether the study asked about public or private goods – and derived tables showing the median differences between real and actual WTP in a variety of context.[25]

| Estimated Coefficients from Murphy (2003) Table I, Revised List and Gallet (2000) Results, Regression Model 3 | | Computer User Survey WTP Questions |
|---|---|---|
| Variable (i) | Value (ßi) | (Xi) |
| [1] | [2] | [3] |
| 1 Constant | 2.21 | 1 |
| 2 Laboratory | -0.47 | 0 |
| 3 WTP | 0.38 | 1 |
| 4 Private good | -1.04 | 1 |
| 5 Within group | -0.49 | 0 |
| Type of elicitation: | | |
| 6 Open-ended | -1.17 | 1 |
| 7 First price sealed bid | -1.52 | 0 |
| 8 Provision point | -0.58 | 0 |
| 9 Random price auction | -0.2 | 0 |
| 10 BDM | -0.97 | 0 |
| 11 Dichotomous choice | -0.67 | 0 |

**Calibration Factor**    **1.46** $= e^{\sum(ßi \bullet Xi)}$

**Notes:**

1 Corrects List and Gallet (2000) data for errors listed in Murphy (2003) Table II Revision 1 and interpretation differences listed in Murphy (2003) Table IV.

2 Dependent variable is the natural log of the median calibration factor in List and Gallet (2000).

**Sources:**

• Murphy, J. J., Allen, P. G., Stevens, T. H., and Weatherhead, D. (2003), "Revisiting the Data and Estimation in List and Gallet (2000)" (accessed on September 7, 2014, at http://faculty.cbpp.uaa.alaska.edu/jmurphy/meta/LGcomment.pdf).

• Wecker electronic file "tab03/Calibration_Factor.lst".

These tables can be used to derive a Calibration Factor[26] for given set of circumstances,

---

[24] Ard Decl., Ex. L (Murphy (2005) at 314).

[25] Ard Decl., Ex. K (Murphy 2003 at Table 1) and Ard Decl., Ex. L (Murphy 2005 at Table I).

[26] *See* Ard Decl., Ex. L (Murphy (2005) often refers to the Calibration Factor as "CF").

where a calibration factor is defined as the hypothetical WTP divided by the actual WTP. A calibration factor, in turn, can be used to adjust for hypothetical bias. To give a simplified example, if hypothetical WTP estimates are regularly 1.5 higher than real WTP in a particular set of circumstances, then researchers can use hypothetical WTP estimates, divide them by 1.5 (calibration factor), and arrive at the reliable conclusions about real WTP.

Using Murphy's results, Dr. Wecker calibrated his WTP results to account for potential hypothetical bias. The calculation is set out in Attachment H to his report.

The constant 2.21 is the starting number assuming that the elicitation method was not obtained in a laboratory, not a WTP question, not a private good (i.e. a public good), not within group (e.g., individual decisions), not open-ended (with predetermined amounts), not a first price sealed bid, not a provision point, not a random price auction, not a BDM, not dichotomous choice. (These last four are just various different approaches to determining a WTP). The WTP of 0.38 increases the constant of 2.21 because the Wecker survey uses a WTP question as opposed to a WTA question. The private good -1.04 decreases the current total of (2.21+0.38) because the Wecker survey question asks about a private good as opposed to a public good. The open-ended -1.17 decreases the current total of (2.21+0.38-1.04) because the Wecker survey uses an "open-ended" direct WTP question. The result is a 1.46 calibration factor, using Murphy's analysis.

In Microsoft's rebuttal survey report, Microsoft complained that Dr. Wecker should have used the results from the Murphy (2005) paper, rather than the Murphy (2003) paper. Dr. Wecker performed that analysis and explained his method at his deposition. Microsoft curiously does not reference that discussion. Ard Decl., Ex. B (Wecker Depo. at 172:14-174:17). Dr. Wecker demonstrated that the results using the Murphy (2005) paper are nearly identical to the results in Attachment H, verifying the correctness of his approach. *Id.* at 180:13-181:6.[27]

Microsoft complains that none of the studies Dr. Wecker relies upon relate to computer

---

[27] For similar reasons, to the extent Microsoft claims Dr. Wecker's opinions are unreliable because the "LG Paper" noted that its results should only be considered a "first attempt" at quantifying the various experimental methods that may affect hypothetical bias, *see* Exs. AB-AC, Dr. Wecker's results are nearly identical when using the "refined model with its expanded data set" that mollifies Microsoft.

software, or spell- or grammar check.  But Microsoft cites no authority suggesting that calibration factors should be different for computer software.  The only relevant product category discussed in Murphy is the difference between private and public goods, for which Dr. Wecker accounts. Microsoft similarly complains that the studies relate to products, not features, but again Microsoft does not point to anything showing this distinction is meaningful for purposes of a calibration factor, and Dr. Wecker testified it is not.  *Id.* at 196:19-197:25.

Microsoft also notes that the Murphy article highlights how "experimental protocol" can induce bias, and that results can be sensitive to model specification, but it offers no argument that any of the specific protocols or specifications used by Dr. Wecker affected bias. Dr. Wecker, by contrast, notes in his report that the survey's design decreases bias because the direct method is applied "not to a hypothetical valuation of the mere *existence* of a remote, environmental public good but, rather, to the values attached by individual consumers to their experience using Microsoft's 'check spelling as you type' capability, 'check grammar errors as you type' capability and with their background knowledge of a market in which all have executed *real purchase transactions* of Microsoft Office."  Wecker Report at 5, n. 9 (second emphasis added).

Microsoft also critiques the Murphy paper because it is based on a limited data set and recognizes that there is no consensus about the causes of hypothetical bias or the ways to calibrate survey responses for it. But the paper also concludes that "the overwhelming majority of observations have relatively low CFs [calibration factors]," suggesting that hypothetical bias may not be as significant a problem in stated preference analyses as is often thought."[28]

A more recent paper cited by Dr. Wecker – which Microsoft ignores – finds that the direct method (as well as the conjoint method) can "do a good job in forecasting optimal price and quantity, even though they generate hypothetical bias." Ard Decl., Ex. F (Miller at 179).[29]  That paper found a calibration factor of 1.3 for the direct method.  *Id.* at Table 5.  The study referenced in the paper found that the direct method has a "high convergent validity in measuring

---

[28] Ard Decl., Ex. L (Murphy (2005) at 323).

[29] The paper refers to the direct method as the open-ended method.

consumers' *mean* WTP" and it did not locate any hypothetical bias for mean WTP. *Id.* at 177. Dr. Wecker's analysis shows mean WTP.  Further, because there are predictable differences between estimated WTP and real WTP, the paper concludes that "even if a particular approach generates biased mean WTPs, and even if the estimated demand curve is different from the actual demand curve, the approach may still be useful in guiding marketing researchers to good pricing decisions." *Id.* at 180.  That directly supports the notion that a calibration factor can be used to cure the predictable biases created by the direct method.  Microsoft's arguments about the calibration method are best saved for cross. *See Bloom v. J.P. Morgan Chase & Co.*, No. C 09-03418 WHA, 2010 WL 4939951, at *1 (N.D. Cal. Nov. 30, 2010) (citing *Daubert*, 509 U.S. at 596) ("Where experts reasonably differ as to the proper calculation of damages, "[v]igorous cross-examination" and "presentation of contrary evidence" are the "traditional and appropriate means" of attacking their opinions.").  Finally, as a practical matter, it would make no sense to exclude the WTP questions on the ground they didn't use a calibration factor, given the use to which these questions are put by Mr. Mills. Mr. Mills uses the WTP results from Dr. Wecker's survey only to buttress his conclusion that the background-spell and grammar-checking features are more important to Microsoft than the date-picker function in Lucent.  He reaches this conclusion by comparing the WTP results in the Lucent survey with the Wecker survey.  The Lucent survey, however, does not use a calibration factor at all.  The calibration factor is a conservative estimate that decreases the WTP feature.  Given this use of the survey's willingness to pay results, there is no reason to exclude it on the ground that it uses an improper calibration factor when the survey to which it is being compared does not use a calibration factor at all.

## CONCLUSION

Microsoft has not established that Dr. Wecker's analysis is unreliable and the questions it raises are proper subjects for cross-examination.  Its motion should be denied.

Dated:  December 30, 2014

SUSMAN GODFREY L.L.P.

By: *s/ Seth Ard*

Steven G. Sklaver (SBN 237612)
Meng Xi (SBN 280099)
Krysta Kauble Pachman (SBN 280951)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 789-3100
Email:  ssklaver@susmangodfrey.com
Email:  mxi@susmangodfrey.com
Email:  kpachman@susmangodfrey.com

Max L. Tribble (*Pro Hac Vice*)
Vineet Bhatia (*Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  (713) 651-9366
Email: mtribble@susmangodfrey.com
Email: vbhatia@susmangodfrey.com

Seth Ard (*Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Telephone:  (212) 336-8330
Email: sard@susmangodfrey.com

Sandeep Seth (SBN 195914)
SETH LAW OFFICES
Two Allen Center
1200 Smith St., Suite 1600
Houston, TX 77002
Telephone: 713-353-8847
Email: ss@sethlaw.com

Attorneys for Plaintiff Sentius International, LLC