1 | Frank E. Scherkenbach (SBN 142549)
scherkenbach@fr.com
2 | Kurt L. Glitzenstein (pro hac vice)
glitzenstein@fr.com
3 | FISH & RICHARDSON P.C.
One Marina Park Drive
4 | Boston, MA 02210
Telephone: (617) 542-5070
5 | Facsimile: (617) 542-8906

6 | Attorneys for Defendant
MICROSOFT CORPORATION
7
*Additional counsel listed on signature page*
8

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | (SAN JOSE DIVISION)

12

13 | SENTIUS INTERNATIONAL, LLC,  |  Case No. 5:13-cv-00825 PSG

14 | Plaintiff,  |  **DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF SENTIUS' DAMAGES EXPERT, ROBERT MILLS**

15 | v.

16 | MICROSOFT CORPORATION,

17 | Defendant.

18

19 | AND RELATED COUNTERCLAIMS  |  DATE:  January 13, 2015
TIME:  10:00 a.m.
JUDGE:  Hon. Paul S. Grewal

20

21

22
**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**
23

24

25

26

27

28 | DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT
OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' DAMAGES EXPERT, ROBERT MILLS
Case No. 5:13-cv-00825 PSG

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ....................................................................................................................... 1

    A. Sentius Has Not Identified Any Authority to Support the Propriety of Mr. Mills Basing His Primary Damages Theory on the *Lucent* JMOL, or Explained Why Relying On That Decision Would Not Be Unfairly Prejudicial ........................................................................ 1

    B. Mr. Mills Improperly Converts Lump Sum Values in the *Lucent* JMOL Decision and the *Arendi* Agreement into Running Royalties ............................................................................................................ 6

    C. Mr. Mills' Income Approach Theory Should Be Excluded as Unreliable ........................................................................................................ 7

        **1.** Mr. Mills' Income Approach is Wholly Derivative of His *Lucent* JMOL Theory ........................................................................ 7

        **2.** Mr. Mills' Income Approach is A Disguised, And Improper, "Entire Market Value Rule" Theory ..................................... 10

    D. Mr. Mills Did Not Account for the Fact That Damages Do Not Accrue for Method Claims Unless and Until Those Claims Are Practiced ...................................................................................................... 11

    E. Microsoft's Profits Are Not Relevant, and Would Serve Only to Distort the Jury's Damages Perspective ............................................................. 12

III. CONCLUSION ................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    418 F. Supp. 2d 1021 (S.D. Ind. 2006) ..............................................................................11

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indusies., Inc.*,
    1 Fed. Appx. 879 (Fed. Cir. 2001) ....................................................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ........................................................................................................2, 5

*Daubert*, 509 U.S. at 592 ...........................................................................................................6

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
    No. C 11-5973-PSG, 2013 WL 4537838 (N.D. Cal. Aug. 22, 2013) ..................................2

*Emblaze Ltd. v. Apple Inc.*,
    No. 5:11-CV-01079-PSG, 2014 WL 2889764 (N.D. Cal. June 25, 2014) ........................12

*Ericsson, Inc. v D-Link Sys., Inc.*,
    _ F.3d _, 2014 WL 6804864 (Fed. Cir. Dec. 4, 2014) ........................................................5

*In re MSTG, Inc.*,
    675 F.3d 1337 (Fed. Cir. 2012)............................................................................................2

*LaserDynamics Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)..........................................................................................5, 10

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)................................................................................6, 10, 11

*Lucent Techs., Inc. v. Microsoft Corp.*,
    No. 07-cv-2000 H (CAB) (S.D. Cal. Nov. 10, 2011.) .........................................................6

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).................................................................................5, 9, 12

*Virnetx, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)............................................................................................8

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012)................................................................................................5

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)............................................................................................6

## I.  INTRODUCTION

Faced with the arguments and law in Microsoft's opening brief, Sentius now seeks to retool its damages case entirely.  Sentius' original damages theory relied heavily on a JMOL decision assessing the sufficiency of the evidence presented at a trial involving a different patent owned by a different party and different accused functionality.  Sentius now asserts that Mr. Mills only relied on the *Lucent* JMOL decision for "a limited purpose," and instead relied primarily on the amount that Microsoft and Lucent subsequently agreed to in settlement of their long-running dispute.  Even if that were true, a damages theory based on the *Lucent* settlement would be excludable as entirely cursory, given the scant consideration that Mr. Mills gave to that settlement in his report, as well as for the reasons set out in Microsoft's opening brief.  But the record—including both Mr. Mills' report and his deposition—clearly belies Sentius' core contention in its opposition:  Mr. Mills' analysis started and ended with the *Lucent* JMOL decision.  The lack of any authority showing that a JMOL decision in a different case would have been considered by the parties to the hypothetical negotiation for a license of the Sentius patents, as well as the obvious prejudice to Microsoft of the jury in this case hearing about infringement and damages findings in another case, warrants exclusion of that analysis, and that damages theory.

As to Mr. Mills' "income approach," notwithstanding Sentius' insistence now to the contrary, the record also shows that that was never more than a check or derivative theory of his *Lucent*-based theory.  Even if, as Sentius now contends, that theory were truly independent of Mr. Mills' primary theory, it fails *Daubert* on numerous levels, including the arbitrariness of Mr. Mills' unfounded conclusion that Sentius and Microsoft would have agreed to a 22/78 profit split, and the fact that this theory is, at bottom, a disguised and improper entire market value rule theory.

## II.  ARGUMENT

### A.  Sentius Has Not Identified Any Authority to Support the Propriety of Mr. Mills Basing His Primary Damages Theory on the *Lucent* JMOL, or Explained Why Relying On That Decision Would Not Be Unfairly Prejudicial

The centerpiece of Mr. Mills' primary damages theory is the *Lucent* JMOL decision. Sentius in its opposition fails even to address, let alone rebut, Microsoft's argument that the use of

1   DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT
OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' DAMAGES EXPERT, ROBERT MILLS
Case No. 5:13-cv-00825 PSG

1  this decision, or the *Arendi* settlement agreement, would plainly be unfairly prejudicial to
2  Microsoft, thus warranting exclusion under Fed. R. Evid. 403.[1]
3        Sentius in its opposition also fails to identify *any* authority—legal, academic, commercial
4  best practices, or otherwise—that even suggests that a JMOL decision assessing the sufficiency of
5  the damages evidence in another case has any probative value on what the parties in a different
6  case would have accepted in the hypothetical negotiation.  As the party proffering the Mills
7  damages analysis, Sentius was obligated to show that it is reliably based on generally acceptable
8  principles.  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592 n.10. (1993).  While it is not
9  Microsoft's burden to show that Mr. Mills' reliance on that JMOL decision was inappropriate,
10 Sentius is incorrect when it asserts repeatedly that Microsoft has failed to do so. (D.I. 148 at 2, 7;
11 "Even assuming that Mr. Mills relied on Judge Hoff's [sic] decision for more than a limited
12 purpose (which he did not), Microsoft does not identify any reason why that would be
13 inappropriate.")  Judge Huff in her order was not "looking at the exact same question that Mr.
14 Mills needs to answer about the outcome of a hypothetical negotiation," as Sentius contends.  (*Id*.)
15 She did not conduct a *de novo* assessment of the hypothetical negotiation, but rather considered
16 the sufficiency of the evidence proffered by Lucent at trial to support the jury's $70 million
17 damages award in that very different case.  Those two things are far from "the exact same
18 question."

---

[1] As explained in Microsoft's opening brief, neither the *Lucent* JMOL decision (nor the Microsoft-Lucent settlement agreement to the extent Sentius now claims to rely on it) nor the Microsoft-Arendi settlement agreement, is comparable to the patents asserted in this case.  (D.I. 131-4 at pages 13-16).  At the root of Sentius' opposition is the premise that it is entitled to rely on whatever license it contends is "closest" to the patents in this case.  (D.I. 148 at page 8) ("Notably, Microsoft does not identify any other license that it claims is more reliable and in fact has consistently denied that there are <u>any</u> comparable licenses.") (emphasis in the original).  Sentius cites no authority to support that point, and the law is of course to the contrary.  *See, e.g., In re MSTG, Inc*., 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements *can be pertinent* to the issue of reasonable royalties.") (emphasis added).  The cases cited by Sentius, such as *Dynetix Design Solutions, Inc. v. Synopsys, Inc*., No. C 11-5973-PSG, 2013 WL 4537838, at *3, 7 (N.D. Cal. Aug. 22, 2013), concern a patent owner's previous settlement agreement involving the same patent, and not a settlement agreement of the accused infringer's concerning a different patent or a JMOL decision involving the accused infringer.

Tacitly acknowledging that it has built its damages castle on sand, Sentius in its opposition attempts to retool its theory in its entirety. It now insists that there has been a "misunderstanding." (D.I. 148 at 6.) In particular, Sentius posits that Mr. Mills in fact relied on the settlement agreement between Microsoft and Lucent, and "relied on Judge Huff's JMOL decision *only* to determine the portion of the ▮▮▮▮ license fee paid by Microsoft to Lucent that was attributable to the license for the Lucent patent as it was used in Microsoft Outlook ($24.6 million), as opposed to other factors such as a license for Microsoft Money or an award of costs and prejudgment interest." *Id*. (emphasis added).

There has been no such "misunderstanding." Mr. Mills was categorical in his expert report and at his deposition that he relied directly and exclusively on Judge Huff's JMOL decision to arrive at his damages figures. His report explains precisely how he used Judge Huff's figure of $26.3 million as the starting point. He then used Judge Huff's analysis to calculate the portion of that sum that was attributable to Outlook rather than Money. He then divided that figure by the number of units of Outlook reported in Judge Huff's order to come up with the ▮▮▮▮/feature/application royalty rate that he then applies across-the-board to the products at issue in this case. The ▮▮▮▮ settlement amount never once factored into this analysis:

> The Court ultimately awarded Lucent $26.3 million in damages for Microsoft's infringement of the '356 patent. No more than $1.8 million of this amount is attributable to sales of Money, indicating that no less than $24.6 million of the total damages award is attributable to Outlook. Outlook sales were approximately ▮▮▮▮ units through the life of the '356 patent. Thus Microsoft effectively paid Alcatel-Lucent no less than ▮▮▮▮ per copy of Outlook sold in the United States. See Exhibit 7 for additional details concerning this calculation.

Expert Report of Robert Mills, September 8, 2014, at para. 84.[2]

---

[2] References to Ex. AN are to the exhibit attached to the Declaration of Jonathan J. Lamberson filed concurrently herewith. The Expert Report of Robert Mills, September 8, 2014, and the transcript of the deposition of John Mulgrew ("Mulgrew Depo. Tr.") were respectively attached to the Declaration of Seth Ard in Support of Sentius' Opposition (Docket No. 147) as Exhibit A and Exhibit B.

Mr. Mills was equally unambiguous at his deposition about his methodology:

> Q. So thank you for that correction. So you took the figure that the judge in that case had chosen for the damages amount and you divided -- for Outlook and you divided it by the number of units for Outlook; right?
>
> A. Yes, that's, in effect, the calculation.

Lamberson Decl. Ex. AN, Mills Depo. Tr. at 154:20-25. Mr. Mills also expressly confirmed that his analysis was in fact not based on the settlement figure: "I've limited that calculation to the amount that was actually awarded by the Court in the *Lucent* litigation for the date picker functionality in Outlook. If I had used the entire ▇▇▇ [from the *Lucent* settlement agreement] as the basis for calculating an effective royalty rate, the rate would be considerably higher." *Id*. at 154:14-19.

Mr. Mills in his expert report mentions the ▇▇▇ settlement figure exactly twice. In the first instance, he cites the figure in explaining the overall context of the *Lucent* case, without attaching any significance to the figure, or performing any analysis of it. Expert Report of Robert Mills, September 8, 2014, at para. 71. In the second instance, he states that he will "explain how my analysis of the *Georgia-Pacific* factors and other information can be used to adjust the ▇▇▇ fee paid by Microsoft to Lucent to account for differences between the agreement executed by Microsoft and Lucent and the agreement that would emerge from the June 2009 hypothetical negotiation between Microsoft and Sentius." *Id*. at para 151. However, one can search Mr. Mills' report in vain for the promised explanation or adjustments, and Sentius, although citing to this paragraph, fails to identify any. (D.I. 148 at 6, n.1.) In fact, at paragraph 174 of his report, he summarizes his "Adjustments to the Amount Effectively Paid Per Copy to Lucent." However, all of those "adjustments" are to the ▇▇▇/unit figure derived from Judge Huff's JMOL order, not to the ▇▇▇ settlement fee. In short, at no point in his report does Mr. Mills explain how the ▇▇▇ settlement amount should be "adjusted" to account for the facts and circumstances of

1  this case.³ And of course, Mr. Mills admitted the obvious at his deposition, namely, that his
2  analysis began and ended with Judge Huff's JMOL order.
3       One final point bears mention. Sentius apparently contends that Mr. Mills' approach is
4  immune from *Daubert* scrutiny because his use of the JMOL decision results in a more
5  "conservative" figure than reliance on the settlement agreement itself. That proposition is as
6  untenable as it is unfounded. First of all, there is nothing "conservative" about Mr. Mills'
7  analysis. The *Lucent* settlement amount was ▮▮▮▮. Mr. Mills says the appropriate damages
8  figure in this case is $163.1M, which is about ▮▮▮▮▮▮▮▮▮▮, and about six
9  times the $24.6M figure in Judge Huff's JMOL order. The Federal Circuit has rejected
10 significantly smaller "multiples" of alleged comparables. *See Whitserve, LLC v. Computer*
11 *Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) ("Additionally, even if the award is meant to be a
12 lump sum, which it does not appear to be, we note the jury's verdict of $8.3 million was over 3
13 times the average of the lump sum licenses presented. As in *Lucent*, where the award was a
14 multiple of the average license amounts presented, here, there is 'little evidentiary basis under
15 Georgia–Pacific Factor 2 for awarding roughly three to four times the average amount in the
16 lump-sum agreements in evidence.'"). Second, even where a damages analysis truly results in a
17 lower number than an alleged comparable, that analysis is not *per se* immune from *Daubert*
18 scrutiny because it is more "conservative." *See Ericsson, Inc. v D-Link Sys., Inc.*, _ F.3d _, 2014
19 WL 6804864, *19 (Fed. Cir. Dec. 4, 2014) ("barring the use of too high a royalty base—even if
20 mathematically offset by a 'low enough royalty rate'—because such a base 'carries a considerable
21 risk' of misleading a jury into overcompensating, stating that such a base 'cannot help but skew
22 the damages horizon for the jury' and 'make a patentee's proffered damages amount appear
23 modest by comparison') (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed.
24 Cir. 2011) and *LaserDynamics Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)).
25 *Daubert* is not about the bottom line. It is about the methodology applied to get there, and every

---

³ Even if Mr. Mills had relied on the *Lucent* settlement as Sentius contends, his opinions in that regard warrant exclusion for the same reasons discussed in Microsoft's opening brief, including

1  step in that methodology must reliably conform to generally accepted practices and principles in
2  the relevant field.  *Daubert*, 509 U.S. at 592.  That is not the case with Mr. Mills' analysis.

### B. Mr. Mills Improperly Converts Lump Sum Values in the *Lucent* JMOL Decision and the *Arendi* Agreement into Running Royalties.

5  On this issue as well, Sentius fails to confront the substance of Microsoft's argument, and
6  fails also to address the myriad authorities Microsoft cites in support.  As explained in Microsoft's
7  opening brief, for a lump-sum license agreement to be admissible evidence in support of a
8  running-royalty damages theory (assuming all other evidentiary thresholds are satisfied), there
9  must be some foundational evidence showing that the lump-sum was in fact the product of
10 running-royalty considerations.  (D.I. 131-4 at 11-12).  *See Lucent Techs., Inc. v. Gateway, Inc.*,
11 580 F.3d 1301 (Fed. Cir. 2009) ("some basis . . . must exist" for comparing a lump-sum agreement
12 to a running royalty agreement); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609
13 F.3d 1308, 1320 (Fed. Cir. 2010) (there must be some basis for comparing one license to another,
14 such as "how the parties calculated each lump sum, the licensees' intended products, or how many
15 products each licensee expected to produce.").

16 It is not sufficient, as Sentius contends, to simply "do the math" by dividing a lump-sum
17 settlement figure by the relevant number of units.  (D.I. 148 at 12.).  As Judge Huff explained in
18 the *Lucent* JMOL decision, there are critical and fundamental differences between running-royalty
19 agreements and lump-sum agreements, and very different commercial considerations underpinning
20 each.  *Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-cv-2000 H (CAB), slip op. at 5-6 (S.D. Cal.
21 Nov. 10, 2011.)  Without showing that a lump-sum figure was in fact the product of an underlying
22 reasonable royalty analysis, there is no basis to "convert" the former to the latter, as Mr. Mills has
23 done.

24 Moreover, there is no need here to guess or speculate as to what led to the royalty structure
25 in the *Lucent* case.  Lucent only presented a lump-sum theory, and Judge Huff expressly stated
26 that the sum in the *Lucent* JMOL decision was based on a lump-sum value, not a running royalty.
27
28 the overall lack of comparability of the subject matter of that case to the subject matter of this

6

DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT
OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' DAMAGES EXPERT, ROBERT MILLS
Case No. 5:13-cv-00825 PSG

*Id.* at 5, 19 ("Here, Lucent sought a lump-sum … ." "As a result, the highest damages award supported by substantial evidence results in a lump-sum damages award of $26.3 million."). Sentius does not even address this issue, and none of the cases cited by Sentius shows the propriety of converting a lump-sum agreement into a running royalty where the evidence definitively shows that the lump-sum was *not* the result of a running royalty calculation. Any attempt to convert the *Lucent* JMOL figure to a running royalty is both unfounded and directly contrary to that decision.[4]

Mr. Mills' conversion of the lump-sum amount from the *Arendi* settlement into a running royalty is likewise unsupported, as there is no evidence that that amount was the result of a running royalty calculation either. Indeed, because the *Arendi* settlement covers both past and future Microsoft sales, Mr. Mills has no clear understanding of what the appropriate "unit count" is. That is reflected in his conclusion that the "effective per unit royalty" could range from ▇ ▇—leading him to arbitrarily split the difference at ▇. Expert Report of Robert Mills, September 8, 2014, at para. 197. Thus, even on Sentius' incorrect understanding of the law, Mr. Mills is unable to "do the math" to convert the *Arendi* lump-sum amount to a running royalty.

### C. Mr. Mills' Income Approach Theory Should Be Excluded as Unreliable

#### 1. Mr. Mills' Income Approach is Wholly Derivative of His *Lucent* JMOL Theory

It is clear from Mr. Mills' expert report that his "income approach" is in reality nothing more than a check to show the alleged reasonableness of the ▇/feature rate that he calculates

---

case.

[4] Sentius asserts that a Microsoft 30(b)(6) witness "could not identify any factual issues relevant to the Lucent or Arendi licenses or negotiations that would make them different than this case." Sentius fails to present the full story on this testimony by the witness in question, John Mulgrew. Respecting the *Arendi* settlement Mr. Mulgrew stated that "[s]o again, it's not something that I believe I'm designated to testify to, and I think it's probably more appropriate for an expert to testify to something like that than for someone like me in my role." (Mulgrew Depo. Tr at 87:22-88:6). Respecting the *Lucent* settlement, Mr. Mulgrew testified that "I don't view my testimony to be directed towards determining whether or not something is comparable. You know, I just think that's beyond what I'm here to testify to. I think it's more appropriate for, say, an expert to testify to that.") (Mulgrew Depo. Tr at 105:3-7).

1  from the *Lucent* JMOL decision.  As such, the "income approach" is wholly derivative of Mr.
2  Mills' primary theory, and if that theory is stricken, so too should this check theory.
3        In any event, there is no reliable methodology to support two of the critical steps taken by
4  Mr. Mills in his income approach, both of which concern the "profit split" that Microsoft and
5  Sentius allegedly would have agreed to.  Sentius in its opposition represents that "[a]fter analyzing
6  the relative bargaining positions of the parties, Mr. Mills determined that a 50/50 split of this
7  amount would be reasonable," citing to pages 105-08 of Mr. Mills' report.  (D.I. 148 at 19.)  Mr.
8  Mills made no such "determination."  He instead concluded that "[i]f Microsoft and Sentius were
9  negotiating over the at-risk profit, Sentius would be in a position to negotiate for more than 22
10 percent and *perhaps as much as 50 percent* of the at-risk profit." Expert Report of Robert Mills,
11 September 8, 2014, at para. 181 (emphasis added).
12       Even if Mr. Mills had "determined that a 50/50 split of this amount would be reasonable,"
13 such a "determination" was in substance nothing more than an invocation of the Nash Bargaining
14 Solution, the unprincipled use of which has been rejected by the Federal Circuit. *See, e.g.,*
15 *Virnetx, Inc. v. Cisco Systems, Inc*., 767 F.3d 1308, 1332-33 (Fed. Cir. 2014) ("For the reasons
16 that follow, we agree with the courts that have rejected invocations of the Nash theorem without
17 sufficiently establishing that the premises of the theorem actually apply to the facts of the case at
18 hand. The use here was just such an inappropriate 'rule of thumb.'" "Anyone seeking to invoke the
19 theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split
20 result is proven by the theorem only on those premises.").  As explained in Microsoft's opening
21 brief, the litany of factors recited in Mr. Mills report regarding the relative bargaining positions of
22 Microsoft and Sentius are merely generic qualitative considerations, and do not support any
23 quantitative value, let alone the conclusion that Microsoft would have agreed to pay Sentius a half-
24 billion dollars for a license—which is the consequence of a 50/50 split of the profits Microsoft

would have allegedly lost if it did not have the accused functionalities in its products. (D.I. 131-4 at 17.)[5]

Equally unsupported is Mr. Mills' conclusory assertion that a 22/78 split in favor of Microsoft is—when considered against a 50-50 split—"conservative" and thus an appropriate reflection of the parties' positions in the hypothetical negotiation. Expert Report of Robert Mills, September 8, 2014, at para. 181. It is self-evident from the analysis in Mr. Mills' report that the 22% figure—just a few percentage points away from the arbitrary 25% profit-sharing "rule-of-thumb" that the Federal Circuit rejected in *Uniloc*[6]—was not derived in any principled way from the considerations of the parties' respective bargaining positions, but rather from the results of his primary *Lucent*-based damages theory. Specifically, Mr. Mills begins paragraph 181 by repeating the ▓/feature royalty rate that he derives from the *Lucent* JMOL decision, and noting that for products such as Word that include both background spell- and grammar-check, the per-unit rate is ▓, which amounts to 22% of the per-unit lost profit that he calculates of ▓.[7] This is the *only* source of the 22% figure in Mr. Mills' report, and it plainly has nothing to do with the parties' respective bargaining positions.

---

[5] Sentius also argues that the *Lucent* jury allegedly found that Microsoft and Lucent had equal bargaining power and that a similar result should hold between Sentius and Microsoft. However, Sentius cannot meet its burden on this issue by pointing to what the jury did in another case, and in any event, as noted in Microsoft's opening brief, the situation and bargaining power of Lucent, a multi-billion corporation, as compared to Sentius is vastly different. (D.I. 131-4 at 16.)

[6] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("The 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement. The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party. Relying on the 25 percent rule of thumb in a reasonable royalty calculation is far more unreliable and irrelevant than reliance on parties' unrelated licenses, which we rejected in *ResQNet* and *Lucent Technologies*.")

[7] It is notable that Mr. Mills doubled the running royalty derived from the *Lucent* JMOL decision for accused products that included both background spell- and grammar-check. The Wecker Survey indicates that approximately (i) 8.4% would not have purchased Office without the "check spelling as you type" feature, (ii) 7.9% would not have purchased Office without the "check grammar errors as you type" feature, and (iii) 11.2 % would not have purchased Office without both the "check spelling as you type" and "check grammar errors as you type" features. Although the two features appear to have similar value to each other according to the Wecker Survey, the absence of both features does not result in a doubling of the number of respondents in (iii). There is thus no basis for Mr. Mills to double the ▓ royalty for applications that use both background spell- and grammar-check.

### 2. Mr. Mills' Income Approach is A Disguised, And Improper, "Entire Market Value Rule" Theory

In its opposition, Sentius now insists that Mr. Mills' income approach is distinct and independent of his primary *Lucent* JMOL theory. (D.I. 148 at page 5) ("That said, the comparable license and income approaches are analytically distinct … ."). Even if that were true, and as explained in the preceding section it is not, then Mr. Mills' income theory must be rejected under the Entire Market Value Rule. *Lucent Techs., Inc.,* 580 F.3d at 1336. ("For the entire market value rule to apply, the patentee must prove that 'the patent-related feature is the 'basis for customer demand.'"").

Mr. Mills begins his income approach analysis by taking the 11.2% figure from the Wecker Survey, the purported percentage of users who would not have purchased Office if both the background spell- and grammar-check features were absent, and calculating that Microsoft would have sold ▮▮▮ fewer units of Office (or relevant applications such as Word). Expert Report of Robert Mills, September 8, 2014, at para. 146. He then calculates that this works out to alleged lost revenues of ▮▮▮, *id.* at para. 147, and alleged lost profits of approximately ▮▮▮, *id.* at para. 177.

On Mr. Mills' 22/78 "profit split" theory, Microsoft and Sentius would have agreed that Sentius should be paid 22% of that ▮▮▮. That theory is clearly applying a running royalty rate to the entire revenue/profit of the fraction of the accused products that Sentius contends would not have been sold without the accused functionalities, with no demonstration that the background spell- and grammar- check features are the basis for customer demand. This violates the entire market value rule. *See LaserDynamics Inc.,* 694 F.3d at 67. (holding that because a product would not be purchased without a particular feature or functionality is not tantamount to that particular feature or functionality driving demand for the product).

Indeed, Mr. Mills at his deposition—apparently not appreciating that his income approach was in fact a disguised entire market value rule theory—readily admitted that that rule is inapplicable in this case:

> Q. In reaching your opinions in this matter, did you apply the entire market value rule, and if so, how?
>
> A. No, I did not.
>
> Q. Why not?
>
> A. Because I didn't have -- I mean it didn't even occur to me to apply the entire market value rule in this case because the products here are multi-feature products that -- and I can't -- I don't have any evidence that all of the sales of these products are driven by the patented functionality.

Lamberson Decl., Ex. AN (Mills Depo. Tr.) at 222:21-223:6. *See also* Expert Report of Robert Mills, September 8, 2014, at para. 50 ("I further note that my reasonable royalty calculations are not based on a showing that the 'entire market value' of Microsoft's products is attributable to the patents-in-suit.").

It is true that Mr. Mills masks what he is doing by "spreading" the royalty amount over the entire sales base to arrive at a per-unit royalty. But in substance, that is nothing more than seeking to collect a royalty based on the entire market value of the accused products for the 11.2% of respondents who said they would not have purchased the products without the accused functionalities, and applying a zero percent royalty rate to the remaining 88.8% of the respondents. That does not change that the bottom line royalty calculation is improperly based on the entire market value of the accused products.

### D.   Mr. Mills Did Not Account for the Fact That Damages Do Not Accrue for Method Claims Unless and Until Those Claims Are Practiced

Mr. Mills makes no effort to determine or quantify the extent to which accused features in the accused applications are ever used—he simply assumes all accused features are used in all accused application for all users. This is improper. "The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers." *Lucent*, 580 F.3d at 1334. *See also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) ("Absent proof that St. Jude's devices were programmed for and actually executed the claimed method, CPI may not recover damages for the sales of devices merely capable of infringing.").

1  To justify Mr. Mills' failure to do so, Sentius cites to *Emblaze Ltd. v. Apple Inc.*, No. 5:11-
2  CV-01079-PSG, 2014 WL 2889764 (N.D. Cal. June 25, 2014), and *Chiuminatta Concrete*
3  *Concepts, Inc. v. Cardinal Indusies., Inc.*, 1 Fed. Appx. 879, 884 (Fed. Cir. 2001).  Referring to
4  *Emblaze*, Sentius quotes "[The alleged infringer] does not cite to a single case suggesting that the
5  royalty base of a hypothetical negotiation *must be limited to units deemed to directly infringe*."
6  (D.I. 148 at page 20) (emphasis added).  This is not the issue.  Whether infringement is direct or
7  indirect, Sentius cannot collect damages for infringement of its asserted claims, all of which are
8  method claims, without showing the extent to which those methods have in fact been performed.

### E. Microsoft's Profits Are Not Relevant, and Would Serve Only to Distort the Jury's Damages Perspective

Microsoft's and Office's profitability are unnecessary for Mr. Mills' *Lucent* or *Arendi* damages theories, which are based on amounts from a JMOL decision and settlement agreement, respectively.  Nor are they relevant to his income approach theory because, as explained above, Mr. Mills has not shown or claimed that the accused features drive demand for Office sales specifically or Microsoft's sales generally.

Further, use of Microsoft's and Office's profitability and revenue would unfairly bias the jury against Microsoft, and desensitize them to the huge sums—in absolute terms—that Sentius is seeking.  *See Uniloc*, 632 F.3d at 1320 ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").  These factors alone warrant barring Mr. Mills from using Microsoft's and Office's profitability and revenue in support of any opinions he is permitted to offer to the jury.

/ / /
/ / /
/ / /

## III. CONCLUSION

For the reasons above and in its opening brief, Microsoft respectfully requests that the Mills Report be excluded.

Dated: January 5, 2015                                       FISH & RICHARDSON P.C.

By: *s/ Jonathan J. Lamberson*
         Jonathan J. Lamberson

Attorneys for Defendant
MICROSOFT CORPORATION

*Additional Counsel*

Jonathan J. Lamberson (SBN 239107)
lamberson@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Isabella Fu (SBN 154677)
Isabella.fu@microsoft.com
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
Telephone: (425) 882-8080
Facsimile: (425) 936-7329

50972617.doc

13     DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT
OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF
SENTIUS' DAMAGES EXPERT, ROBERT MILLS
Case No. 5:13-cv-00825 PSG