# EXHIBIT AN

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                                                              Page 1
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5    ------------------------------

 6    SENTIUS INTERNATIONAL, LLC,   )

 7           Plaintiff,             )

 8        vs.                       ) Case No.

 9    MICROSOFT CORPORATION,        ) 5:13-CV-825-PSG

10           Defendant.             )

11    ------------------------------)

12

13        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

14

15        VIDEOTAPED DEPOSITION OF ROBERT MILLS

16              LOS ANGELES, CALIFORNIA

17              TUESDAY, NOVEMBER 18, 2014

18

19

20

21   Reported by:

22   NANCY J. MARTIN, CSR No. 9504, RMR

23   JOB No. 1961772

24

25   PAGES 1 - 244
```

Page 150

1  Q. You have? When have you done that?  15:10:15
2  A. Paragraph 161 of my report. I cite to sworn  15:10:36
3  testimony from a Microsoft witness in the Lucent trial
4  that testified that about half of Office users have
5  historically used Outlook. In particular -- let's
6  see. He testified that "the big dogs" of Office were
7  always Word, Excel, PowerPoint, in that order.
8  Outlook is sort of a distant fourth.
9  Q. That actually reminds me of something I meant  15:11:23
10 to ask you earlier. In this Paragraph 161 --
11 withdrawn.
12      Okay. So you have -- in forming your
13 opinions in this matter, have you taken into account
14 any quantitative data with regard to the frequency at
15 which the accused applications are used, namely
16 Outlook, PowerPoint, Word, Publisher, and OneNote?
17 A. Well, I had some of that information in mind  15:12:25
18 as I was formulating my opinion, certainly, and I
19 recognize that Outlook is not the most used of the
20 products in the Office suite. In fact, it's,
21 according to Microsoft, a distant fourth. And, yet,
22 I've included all of the copies of Outlook in my
23 effective royalty rate calculation. I haven't limited
24 it to just those copies that have been used by
25 someone.

Page 151

1  Q. With regard to the publisher application,  15:13:14
2  have you taken account of the frequency of which
3  Publisher is used in forming your opinions?
4  A. Well, it's my understanding that it's used  15:13:27
5  less frequently than the other four applications that
6  I've mentioned.
7  Q. Is it used more or less frequently than  15:13:33
8  OneNote?
9  A. I think I have seen data that speaks to that,  15:13:47
10 but I don't recall which of those two applications
11 garners more use.
12 Q. Did that matter to you in forming your  15:13:56
13 opinions?
14 A. No, because I haven't identified a different  15:14:00
15 royalty rate for each of the products that form the
16 suite. I had in mind that, as the baseline, I was
17 using a product that was a distance fourth in terms of
18 popularity, and that was something that I certainly
19 considered.
20 Q. So regardless of whether a given application  15:14:29
21 was, in fact, used, you included it within your
22 overall royalty calculation?
23 A. Yes, because I think the parties to a  15:14:43
24 hypothetical negotiation would structure an agreement
25 that way. First of all, I don't know that Microsoft

Page 152

1  can -- in fact, I suspect Microsoft can't tell whether
2  a specific application has been used by a specific
3  user, and the reason I think that's true is because
4  Microsoft conducts its own surveys to learn about
5  that. So I don't know that the parties could actually
6  track a royalty structure that way.
7      And then, of course, you have the issue with
8  people may start using an application -- may not use
9  it when they first purchase Office, but may start
10 using it at some point down in the future, and, you
11 know, how would you handle that in a royalty-based
12 calculation. It becomes unmanageable, essentially.
13 So I think that the most likely outcome would be that
14 the parties would agree to a royalty rate that would
15 be applied to the programs, and with the understanding
16 that not all those programs will be used by every
17 user.
18 Q. And yet, in your view, each of those programs  15:15:47
19 should have the same royalty rate?
20 A. Yes. I think if you were to try to restrict  15:15:52
21 it down to just use, the rate would have to be much
22 higher because I couldn't use, in the effective
23 royalty rate calculation, all copies of Outlook. I
24 would use approximately 50 percent of those copies if
25 I were looking at just the number of people that use

Page 153

1  Outlook. So that in and of itself would double the
2  rate.
3  Q. Sorry. Can you explain that?  15:16:16
4  A. Yes. So Microsoft testified at trial, a  15:16:17
5  Microsoft witness, that historically only half of
6  Office users use Outlook, and if we were going down
7  the line of trying to adjust rates based on usage,
8  then I would also have to consider that fact in my
9  effective royalty rate calculation.
10 Q. How would you do so?  15:16:37
11 A. I would look at the estimated -- I suppose  15:16:39
12 the estimated number of people that have actually used
13 it. I don't think that's the most likely way that the
14 parties would structure an agreement. So I haven't
15 done that. But that's, I think, the kind of analysis
16 that you would have to consider.
17 Q. Were the claims that were at issue in the  15:18:03
18 Lucent case in the Day patent, were they apparatus
19 claims or were they method claims?
20 A. I would have to look back to be certain. My  15:18:29
21 recollection is that there were method claims
22 involved, but I would have to look back to be certain.
23 I can't attest to that.
24 Q. All right. Let me ask you about the terms of  15:20:04
25 the Lucent agreement. The monetary term of the Lucent

Page 154

1  agreement was a lump sum payment; right?
2     A. Yes.                               15:20:16
3     Q. And what you have done, for purposes of your    15:20:17
4  analysis in this case, is you have taken that lump sum
5  payment and divided it by what you assume to be the
6  count for the products that were at issue in that case
7  to derive an effective per-unit royalty rate; right?
8     A. No, that's not quite correct.      15:20:39
9     Q. What did I get wrong?              15:20:41
10    A. So the Lucent agreement was a lump-sum   15:20:44
11  agreement in which Microsoft agreed to pay
12  ▬▬▬▬. And I have not used the entirety of that
13  payment in my effective royalty rate calculation.
14  I've limited that calculation to the amount that was
15  actually awarded by the Court in the Lucent litigation
16  for the date picker functionality in Outlook.  If I
17  had used the entire ▬▬▬▬ as the basis for
18  calculating an effective royalty rate, the rate would
19  be considerably higher.
20    Q. So thank you for that correction.  So you    15:21:37
21  took the figure that the judge in that case had chosen
22  for the damages amount and you divided -- for Outlook
23  and you divided it by the number of units for Outlook;
24  right?
25    A. Yes, that's, in effect, the calculation.    15:22:16

Page 155

1     Q. Now, is it always appropriate, in your view,    15:22:21
2  where there is a lump-sum agreement of any sort,
3  whether it's in settlement of litigation or otherwise,
4  to take that figure and divide it by the number of
5  units that might be encompassed by that agreement to
6  come up with an effective royalty rate?
7     A. Is the question is that always appropriate?    15:22:54
8     Q. Yes.                               15:22:56
9     A. I can't say that it would always be    15:23:05
10  appropriate.  I mean I would have to think of every
11  conceivable possibility before I could offer that
12  opinion.  But I think in this case, it certainly is.
13    Q. Well, I want to understand your methodology    15:23:15
14  first.  In what situations is it appropriate to take a
15  lump-sum payment amount in a license agreement and
16  divide it by the number of units that would be
17  encompassed by that agreement to arrive at a per-unit
18  effective royalty rate?
19    A. Well, that's something that I commonly do in    15:23:41
20  practice, and other damages experts do as well, but
21  it's not always possible because we don't always have
22  information about the number of units sold, for
23  example.  But in a situation like this, where we do
24  have that kind of information and we have information
25  about the trial testimony, the jury award, and the way

Page 156

1  in which the Court modified that award, that indicates
2  that the amount was a function of the extent to which
3  Microsoft sold Outlook.  In that kind of a situation
4  it's, in my view, appropriate to look at the amount as
5  an effective amount per unit so we can draw
6  comparisons between two settlement agreements that
7  cover different quantities of use.
8     Q. Well, let's turn to the background of the    15:24:54
9  Lucent decision.  The Court in that matter was
10  performing a calculation to arrive at a lump-sum
11  valuation; right?
12    A. I think we need -- given the procedural    15:25:23
13  history of the case, I want to make sure that we're
14  talking about the same -- I think we're talking about
15  the same order, the same situation.  That case was on
16  appeal and remanded, and I suspect you're talking
17  about the order on the JMOL.
18       MR. GLITZENSTEIN: I am.
19       Let me ask the court reporter to mark as
20  Mills Exhibit 7 from the Lucent v. Microsoft case, the
21  order granting in part and denying in part Microsoft's
22  motion for judgment as a matter of trial and the
23  alternative, a new trial with a remittitur.
24       (Deposition Exhibit 7 was marked for
25       identification.)

Page 157

1  BY MR. GLITZENSTEIN:
2     Q. This is the order that you were just    15:26:24
3  referring to?
4     A. Yes.                               15:26:32
5     Q. And turn to Page 5, please, in that order.    15:26:33
6  And do you see in the last full paragraph at the
7  bottom of Page 5 the Court notes that Lucent was
8  seeking a reasonable royalty based on the outcome of a
9  hypothetical negotiation for a lump sum; right?
10    A. I don't know that she's saying that in this    15:27:25
11  paragraph.  She's describing what a lump sum royalty
12  agreement is.  But I don't see her, in that paragraph
13  at least, saying that Lucent was seeking a lump sum
14  royalty.
15    Q. I'm looking at Lines 21 and 22 on Page 5    15:27:38
16  where she says, "Lucent emphasizes that this is a
17  reasonable royalty case based on the outcome of a
18  hypothetical negotiation for a lump sum; right?
19    A. I see.  That's not the paragraph that I was    15:27:50
20  referring to.  Yes, I see that.
21    Q. All right.  So Lucent, in this case, wasn't    15:27:55
22  seeking a royalty that would be determined on the --
23  on a per-unit basis; right?
24    A. It was seeking a royalty that depended on the    15:28:09
25  number of units sold.

Veritext National Deposition & Litigation Services
866 299-5127

Page 222

1  Q. Have you, in any of your other matters, 18:03:23
2  confronted the situation of a reasonable royalty on a
3  subscription based product or service?
4  A. I can think of examples where software 18:04:22
5  maintenance is part of the case, and that's sold on a
6  subscription basis.
7  Q. And that was -- was there a royalty collected 18:04:32
8  on the maintenance component?
9  A. I don't have a specific recollection of how 18:04:44
10 those agreements worked.
11 Q. Other than that, can you recall any other 18:04:49
12 instance?
13 A. Let me think for just a moment. Again, I 18:04:58
14 reviewed a lot of license agreements.
15     (Pause in proceedings.)
16     THE WITNESS: Nothing is immediately coming
17 to mind, but I haven't committed to memory all of the
18 agreements that I've reviewed, and I haven't thought
19 about that issue in detail.
20 BY MR. GLITZENSTEIN:
21 Q. In reaching your opinions in this matter, did 18:06:35
22 you apply the entire market value rule, and if so,
23 how?
24 A. No, I did not. 18:06:44
25 Q. Why not? 18:06:46

Page 223

1  A. Because I didn't have -- I mean it didn't 18:06:52
2  even occur to me to apply the entire market value rule
3  in this case because the products here are
4  multi-feature products that -- and I can't -- I don't
5  have any evidence that all of the sales of these
6  products are driven by the patented functionality.
7  Q. If you could turn in your report to 18:07:24
8  Paragraph 106, please.
9  A. Yes. 18:07:39
10 Q. You state there that "Microsoft has generated 18:07:39
11 more than         in revenue from" Microsoft
12 Office. How was that relevant to your analysis and
13 opinions in this matter?
14    (The witness further reviewed Exhibit 1.)
15    THE WITNESS: Let me just -- let me just say
16 that the revenue from sales of Office is relevant
17 under the income approach because it's the first step
18 in understanding at-risk profit. Understanding the
19 revenue that's been generated, and how much of that
20 revenue is at risk without the patented functionality
21 is one of the steps in that process.
22 BY MR. GLITZENSTEIN:
23 Q. Is it relevant in any other way? 18:09:03
24 A. I think it's relevant in the sense that it 18:09:27
25 demonstrates the relative importance of Office to

Page 224

1  Microsoft as a product. So it's not so much the
2  dollar amount, but it's the proportion of Microsoft
3  sales that are attributable to Office. That's a
4  relevant factor.
5  Q. What's that relevant to? 18:09:51
6  A. It shows that these -- the products at issue 18:09:52
7  here are of paramount importance to Microsoft. These
8  products account for a significant amount of its
9  revenue and, roughly, half of its operating profit as
10 a company.
11 Q. Again, what is that relevant to as part of 18:10:09
12 the opinions that you offer in this matter on what the
13 appropriate measure of damages is?
14 A. Well, it demonstrates that the products here 18:10:20
15 are extremely important to Microsoft. And so that's
16 something that I think is relevant under my analysis
17 of Georgia-Pacific. If the products were
18 insubstantial and immaterial to Microsoft, then the
19 outcome may be different.
20 Q. Which Georgia-Pacific factor is this relevant 18:10:42
21 to?
22    (The witness reviewed the document.)
23    THE WITNESS: It's relevant to
24 Georgia-Pacific No. 8, which is the established
25 profitability of the product made under the patent.

Page 225

1  So at Paragraph 108 is where I discuss this.
2  BY MR. GLITZENSTEIN:
3  Q. In your view, is it relevant to anything 18:11:14
4  else?
5  A. Not that comes to mind. 18:11:52
6  Q. You mentioned Paragraph 107. So how is 18:11:54
7  Microsoft's total profit relevant to profitability?
8  A. I'm not sure I understand the question. In 18:12:15
9  fact, I don't understand the question.
10 Q. Do you understand that there's a distinction 18:12:19
11 between profitability and profit?
12 A. I think it depends on the context, but there 18:12:31
13 could be a distinction there.
14 Q. What's the distinction? 18:12:35
15 A. I can imagine a situation where profitability 18:12:36
16 refers more to a margin.
17 Q. And for purposes of Georgia-Pacific Factor 8, 18:12:48
18 is profit or profit margin the relevant metric?
19 A. I think it depends on the case. They both 18:12:56
20 could be relevant.
21 Q. How was Microsoft's total profit relevant to 18:13:00
22 any issue in this lawsuit?
23 A. You mean Microsoft's total profit as a 18:13:10
24 company?
25 Q. Well, the profit numbers that you cite in 18:13:12

57 (Pages 222 to 225)