1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                         SAN JOSE DIVISION

10

11   SENTIUS INTERNATIONAL, LLC,          )   Case No. 5:13-cv-00825-PSG
                                          )
12                    Plaintiff,          )   **ORDER GRANTING-IN-PART**
                                          )   **MOTION TO EXCLUDE**
13          v.                            )
                                          )   **(Re: Docket No. 131)**
14   MICROSOFT CORPORATION,               )
                                          )
15                    Defendant.          )
                                          )
16   _____ )

17

18          In the aftermath of *ResQNet.com, Inc. v. Lansa, Inc.*,[1] settlement agreements are now

19   indisputably fair game in assessing patent damages.  Despite the suggestions of its own precedent

20   and that of the Supreme Court,[2] the Federal Circuit recognized that "the most reliable license in the

21

22

23

24

25   _____

     [1] 594 F.3d 860, 872 (Fed. Cir. 2010).

26
     [2] *See, e.g.*, *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983); *Rude*
27   *v. Westcott*, 130 U.S. 152, 164 (1889).

28                                              1

record [may be one] that arose out of litigation."[3]  But such licenses are hardly now per se

admissible; the Federal Circuit itself has cautioned as much.[4] This case illustrates why.

Robert Mills is a damages expert.  Plaintiff Sentius International, LLC has tendered Mills

for his opinions regarding the proper measure of damages adequate to compensate Sentius for the

alleged infringement by Defendant Microsoft Corporation.  In calculating patent damages, Mills

not only relied on a settlement agreement, but also a decision in an earlier case regarding a motion

for judgment as a matter of law.  Mills also relies on the so-called "income approach" theory as

well as the overall profitability of the accused products.

Microsoft now brings a *Daubert* motion seeking to exclude Mills' testimony.[5]  Because

Mills' methodology does not entirely pass muster under *Daubert* and Rule 403, the court GRANTS

Microsoft's motion in part, excluding Mills' testimony to the extent that it relies on the *Lucent*

JMOL and the *Arendi* settlement agreement.  Because Mills' income approach theory is

methodologically sound, the court DENIES Microsoft's motions to the extent that it seeks to

exclude Mills' testimony relating to this approach.  Finally, the court GRANTS Microsoft's motion

to exclude Mills' testimony relating Microsoft's and Microsoft Office's overall profitability, such

that Mills may not refer to Microsoft or Office's profitability but may refer to Microsoft's profit

margins.

---

[3] 594 F.3d at 872.

[4] *See LaserDynamics Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 77 (Fed. Cir. 2012) ("The
propriety of using prior settlement agreements to prove the amount of a reasonable royalty is
questionable…The notion that license fees that are tainted by the coercive environment of patent
litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia–Pacific*, the
premise of which assumes a voluntary agreement will be reached between a willing licensor and a
willing licensee, with validity and infringement of the patent not being disputed").

[5] *See* Docket No. 131-4; *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

**I.**

Expert testimony may only be admitted in a manner consistent with the Federal Rules of Evidence, *Daubert*,[6] *Kumho*[7] and more recent appellate court progeny.[8]  Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will help "the trier of fact to understand the evidence or to determine a fact in issue."[9]  When considering expert testimony, the trial court serves "as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."[10]

An expert witness may provide opinion testimony if: (1) "the testimony is based upon sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods; and" (3) "the expert has reliably applied the principles and methods to the facts of the case."[11]  "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony."[12]  The inquiry into the admissibility of an expert opinion is a

---

[6] *Daubert*, 509 U.S. 579.

[7] 526 U.S. 137 (1999).

[8] *See, e.g., Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014).

[9] *See Daubert*, 509 U.S. at 589.

[10] *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).  A district court's decision to admit expert testimony under *Daubert* in a patent case must follow the law of the regional circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit.").

[11] Fed. R. Evid. 702; *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008) ("Patent cases, like all other cases, are governed by Rule 702.  There is, of course, no basis for carving out a special rule as to experts in patent cases.").

[12] *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

"flexible one" where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[13]

A trial court must be sure that its review of expert testimony focuses "solely on principles and methodology, not on the conclusions that they generate."[14] "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder."[15] The Federal Circuit recently clarified that this limitation of the gatekeeping role of the judge to the exclusion of "testimony based on unreliable principles and methods is particularly essential in the context of patent damages."[16] This is because "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"[17]

35 U.S.C. § 284 provides that upon "finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The goal of the damages award is not to punish the infringer, but rather to make the patentee whole by ascertaining what the patent holder would have made had the infringer not infringed.[18] Damages may take the form of "reasonable royalty [the patentee] would

---

[13] *Id.* at 564 (citing *Daubert*, 509 U.S. at 592-96).

[14] *Daubert*, 509 U.S. at 592-94, 596.

[15] *Apple Inc.*, 757 F.3d at 1314.

[16] *Id.* at 1315.

[17] *Id.* ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.") (citing *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010)).

[18] *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

have received through arms-length bargaining" in a hypothetical negotiation.[19]  The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."[20]  No matter the form, "[t]he burden of proving damages falls on the patentee."[21]

A patent holder may use settlement agreements to establish reasonable royalty damages "under certain limited circumstances."[22]  This is because, as the Supreme Court observed over one hundred years ago, settlement agreements have little probative value to establish patent damages:

> It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented in determining the damages sustained by the owners of the patent in other cases of infringement.  Many considerations other than the value of the improvements patented may induce the payment in such cases.  The avoidance of the risk and expense of litigation will always be a potential motive for a settlement.[23]

That said, a settlement agreement may be admissible when "the most reliable license in [the] record [is one that] arose out of litigation."[24]  Accordingly, to rely on a settlement agreement

---

[19] *Lucent*, 580 F.3d at 1324.

[20] *Id.*

[21] *Id.*

[22] *See LaserDynamics*, 694 F.3d at 77 ("Despite the longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages, we recently permitted such reliance under certain limited circumstances.").

[23] *Rude*, 130 U.S. at 164.

[24] *ResQNet.com*, 594 F.3d at 872; *see also In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."); *GPNE Corp. v. Apple, Inc.*, Case No. 5:12-cv-02885-LHK, 2014 WL 1494247, at *9-10 (N.D. Cal. Apr. 16, 2014) (permitting a damages expert to rely on litigation settlement agreements); *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, Case No. 5:11-5973-PSG, 2013 WL 4537838, at *7 (N.D. Cal. Aug. 22, 2013), (denying motion to exclude settlement agreement and holding that "Under *ResQNet*, there is no basis to prevent Synopsys from using a comparable license like the Axiom settlement agreement amount to assess damages").

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

to establish patent damages, a patent holder "must only show that [its expert's] consideration of [the] patent litigation settlement[] is sufficiently reliable to be admissible under *Daubert*."[25]

Sentius asked Mills to estimate the damages caused by Microsoft's alleged infringement of its United States Reissue Patent Nos. RE 40,731 and RE 43,633 based on certain features of applications within the Microsoft Office suite products.[26] Mills used the *Georgia-Pacific* factors to determine a reasonable royalty to which the parties would have agreed in a hypothetical negotiation for a license to Sentius' patents.[27] To determine damages for Microsoft's use of background grammar and spell checkers, Mills used two main approaches that are at issue here.

First, Mills looked to an earlier patent infringement dispute between Microsoft and Alcatel-Lucent.[28] In that dispute, Lucent alleged that "certain features of [Microsoft's products], when used, practice the methods of [Lucent's patent]."[29] After a jury found infringement and awarded Lucent damages against Microsoft, the Federal Circuit vacated the jury's damages award and remanded the case for a new trial on damages.[30] On retrial, the jury awarded Lucent damages of $70 million and Microsoft moved for judgment as a matter of law.[31] Granting-in-part Microsoft's motion, Judge Huff found that "as a matter of law a reasonable jury could not have returned a

---

[25] *GNPE Corp.*, 2014 WL 1494247, at *9.

[26] *See* Docket No. 153-9 at 2, 12-17.

[27] *See* Docket No. 153-9 at 25-29. The *Georgia-Pacific* factors constitute a non-exhaustive list of fifteen factors to consider in determining what reasonable royalty would result from the hypothetical negotiation. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[28] *See* Docket No. 153-9 at 89-104.

[29] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).

[30] *See id.* at 1309, 1340.

[31] *See Lucent Techs. Inc. v. Microsoft Corp.*, 837 F. Supp. 2d 1107, 1110 (S.D. Cal. 2011).

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

verdict in excess of $26.3 million based on the evidence of record."[32]  Ultimately, the parties

resolved their dispute, entering into a settlement agreement in which Microsoft agreed to pay

Lucent █████.[33]

Mills determined that he could look to the *Lucent* dispute for guidance because Sentius'

technical expert Vijay Madisetti concluded that the technology at issue in *Lucent* was comparable

to the Sentius reissue patents at issue here.[34]  Mills claimed that his report explained how he

"adjust[ed] the █████████ paid by Microsoft to Lucent" to provide "insight into a reasonable

royalty" for Microsoft's use of the asserted patents for the accused spell and grammar check

features.[35]  However, rather than using the ████████ figure Microsoft agreed to pay in the

settlement agreement as the starting point for this analysis, Mills noted that in the *Lucent* JMOL,

Judge Huff awarded Lucent $26.3 million in damages.[36]  Mills used Judge Huff's analysis to

conclude that $24.6 million of those damages were attributable to Microsoft Outlook.[37]  Dividing

that $24.6 million figure by ██████████—the approximate number of Outlook sales made

---

[32] *See id.* at 1126.

[33] *See* Docket No. 153-9 at 41-42 (internal citations omitted).

[34] *See* Docket No. 153-9 at 42 ("I am aware that Dr. Madisetti has reviewed the patent that is the subject of the agreement between Alcatel-Lucent and Microsoft and compared it to the functionality and benefits provided by the '731 patent and the '633 patent. It is my understanding that the technology of the Alcatel-Lucent patent is comparable to the technology of the '731 patent and the '633 patent as they are used for the accused spell checker and the accused grammar checker.") (internal citations omitted); *see also id.* at 89.

[35] *See id.* at 89-90.

[36] *See id.* at 94 n.377.

[37] *See id* at 51, 94 n.378.

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

through the life of the asserted patent—Mills concluded that "Microsoft effectively paid Alcatel-Lucent no less than $0.22 per copy of Outlook sold in the United States."[38]

Mills determined the value consumers place on the accused spelling and grammar check features at issue here is "considerably greater" than the value consumers place on the technology at issue in *Lucent*.[39]  To account for this additional value, Mills said that he needed to make a "significant upward adjustment" to the per-copy amount Microsoft effectively paid Lucent for Outlook when using this account to determine damages for Sentius.[40]  He then increased the per-copy amount Microsoft effectively paid by a factor of two for accused products that include both the accused spell and grammar check features.[41]  Ultimately, even though his calculations were based on the damages Judge Huff calculated in the *Lucent* JMOL, Mills opined that the "financial terms of the settlement agreement" between Microsoft and Lucent indicated that "an effective per-copy royalty of not less than $0.44 is reasonable" for Microsoft's use of the asserted patents here.[42]

Second, Mills used an alternative theory which he called the "income approach" to value damages in relation to the accused spell and grammar check features.[43]  To support this theory, Mills relied on the results of a survey conducted by another Sentius expert, William Wecker.[44]

---

[38] *See id.* at 51.

[39] *See id.* at 102.

[40] *See id.*

[41] *See id* at 102-3.

[42] *Id.* at 103-4.

[43] *See id.* at 104. Mills explained that "[i]n the context of patent infringement damages, the income approach involves estimating the anticipated economic income attributable to the use of the patent property." *Id.*

[44] *See id.* at 81-87, 104.

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

Wecker's survey purportedly established that approximately 11.2% of Microsoft consumers who purchased and used the accused products and features would not have purchased the accused products if they had not included the accused spell and grammar check features.[45]  Based on this 11.2% figure, Mills estimated Microsoft would have lost ███████████ if it had removed the accused features.[46] Mills divided the profit Microsoft made on that revenue by the number of accused units sold during the damages period to yield an average at-risk profit per copy of $1.99.[47] Analyzing the relative bargaining power of the parties, Mills determined that Sentius would have been in a position to negotiate for "more than 22% percent and perhaps as much as 50% of the at-risk profit."[48]  He determined that an effective per-copy royalty of $0.44 was a "conservative outcome" because such a royalty would only award Sentius about 22% of the $1.99 average at-risk profit per copy.[49]

　　　Ultimately, Mills concluded that based on the guidance provided by the *Lucent* dispute and by his income approach theory, an effective per-copy royalty of not less than $0.44 was "reasonable" for accused products that included both the accused spell and grammar check features.[50]  For accused products that included only the accused spell checker, Mills opined that "an effective per-copy royalty of not less than $0.22 is reasonable."[51]

---

[45] *See id.* at 85.

[46] *See id.* at 86-87, 104.

[47] *See id.* at 104-5.

[48] *Id.* at 107.

[49] *Id.* at 107.

[50] *Id.* at 108.

[51] *See id.*

9

To calculate a reasonable royalty for Microsoft's use of the accused smart tags feature, Mills looked to a litigation settlement agreement between Microsoft and Arendi for guidance.[52] In actions filed in the United States District Court for the District of Delaware and the District Court in The Hague, Arendi S.A.R.L alleged that Microsoft's inclusion of smart tags in its products infringed Arendi's United States and European patents.[53] Before trial, the parties entered into a settlement agreement in which Microsoft promised pay to Arendi approximately ███████████ ████████████████████████████████████████████████████.[54] Mills used this ████████████ to calculate a $0.03 per-copy royalty rate for Microsoft's use of the accused smart tags feature.[55]

## II.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338. The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

## III.

At issue is whether Mills' survey and opinion should be excluded from trial. The court agrees that Mills' reliance on the *Lucent* and *Arendi* disputes is improper and excludes Mills' testimony to the extent that he relies on these disputes. The court also excludes reference to Microsoft's overall profitability and the profitability of Office as unfairly prejudicial to Microsoft but allows Mills to refer to Microsoft's profit margin to the extent necessary to support his income

---

[52] *See id.* at 108-9.

[53] *See* Docket No. 131-13 at 1; *see also* Docket No. 153-9 at 37.

[54] *See* Docket No. 131-13 at 3-4.

[55] *See* Docket No. 153-9 at 117-8.

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

approach theory.  The court finds that Mills' income approach theory is sufficient to get to the jury and that Mills may apply a royalty to each accused product without showing that someone has used the accused features in in each product sold.

 ***First***, Mills' reliance on the *Lucent* JMOL and the *Arendi* settlement is erroneous.  Sentius creatively argues that Mills primarily relied on the ▮▮▮▮▮▮▮ Microsoft agreed to pay to Lucent in settlement and only used the JMOL for the "limited purpose" of determining what portion of that the amount was attributable to a license for Microsoft Outlook.[56]  But although Sentius mentions the ▮▮▮▮▮▮ in his expert report,[57] both the report and his deposition show that he derived his reasonable royalty rate from $24.6 million damages award Judge Huff granted in the *Lucent* JMOL.[58]  Sentius contends that the court should not fault Mills for his

---

[56] *See* Docket No. 153-8 at 6-7.

[57] *See* Docket No. 153-9 at 42 ("In exchange for the settlement and release, Microsoft agreed to pay Alcatel-Lucent ▮▮▮▮▮."); *see also id.* at 89-90 ("In the sections that follow, I explain how my analysis of the *Georgia-Pacific* factors and other information can be used to adjust the ▮▮ ▮▮▮▮ paid by Microsoft to Lucent.").

[58] In his expert report, Mills described how he used the $26.3 million in damages Judge Huff awarded in the *Lucent* JMOL as the starting point for his analysis, calculated the portion of that award attributable to Outlook, and then divided that figure by the number of Outlook units to arrive at an effective per-copy royalty rate of $0.22. *See* Docket No. 153-9 at 51. Mills then adjusted this $0.22 per-copy royalty rate by a factor of two for accused products that included both the accused spell and grammar check features to yield an effective per-copy royalty rate of $0.44. *See id.* at 102-104. Mills confirmed at his deposition that his calculations were based on the amount Judge Huff awarded in *Lucent* JMOL. *See* Docket No. 161-6 at 154:10-25:

> A. So the Lucent agreement was a lump-sum agreement in which Microsoft agreed to pay ▮▮▮▮▮▮. And I have not used the entirety of that payment in my effective royalty rate calculation. I've limited that calculation to the amount that was actually awarded by the Court in the Lucent litigation for the date picker functionality in Outlook. If I had used the entire ▮▮▮▮▮▮ as the basis for calculating an effective royalty rate, the rate would be considerably higher.
>
> Q. So thank you for that correction. So you took the figure that the judge in that case had chosen for the damages amount and you divided—for Outlook and you divided it by the number of units for Outlook; right?

11

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

"conservative" decision to base damages on the amount Judge Huff awarded in the *Lucent* JMOL.[59] However, the fact that Mills' royalty rate would have been higher if he based his calculations on the ███████ settlement agreement figure does not insulate Mills' use of the *Lucent* JMOL from *Daubert* scrutiny. A damages theory that stems from an erroneous methodology is not admissible even if it results in a low ultimate damages figure.[60]

Sentius has not met its burden to show that Mills' use of the *Lucent* JMOL passes muster under *Daubert* for several reasons. Neither party has cited to a case in which a court addressed whether a patent holder may use a JMOL to derive damages for patent infringement. However, it is clear that use of JMOLs to establish damages based on a reasonable royalty theory presents concerns similar to the issues that make courts wary about using settlement agreements to establish patent damages.

Like settlements agreements, JMOLs occur in a different context than a hypothetical negotiation. As stated above, courts have long been reluctant to allow use of settlement agreements to establish reasonable royalty damages in part because these agreements are made in a different context than the situation in which parties face in a hypothetical negotiation.[61] Similarly,

---

A. Yes, that's, in effect, the calculation.

[59] *See* Docket No. 153-8 at 6-7.

[60] *Ericsson, Inc. v D-Link Sys., Inc.*, 2014 WL 6804864, at *19 (Fed. Cir. Dec. 4, 2014) ("[B]arring the use of too high a royalty base—even if mathematically offset by a '"low enough royalty rate"'—because such a base 'carries a considerable risk' of misleading a jury into overcompensating, stating that such a base '"cannot help but skew the damages horizon for the jury"' and 'make a patentee's proffered damages amount appear modest by comparison.'" (quoting *LaserDynamics*, 694 F.3d at 67-68 (Fed.Cir.2012))); *see also LaserDynamics*, 694 F.3d at 67 ("Importantly, the requirement to prove that the patented feature drives demand for the entire product may not be avoided by the use of a very small royalty rate.").

[61] *See Rude*, 130 U.S. at 164; *LaserDynamics*, 694 F.3d at 77.

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

the difference between the procedural posture of a JMOL and the context of a hypothetical

negotiation cautions against use of JMOLs to establish damages based on a hypothetical

negotiation theory.  The *Lucent* JMOL did not, as Sentius claims, address "the exact same question

that Mr. Mills needs to answer about the outcome of a hypothetical negotiation."[62]  In the JMOL

Judge Huff did not independently assess, as the parties would in a hypothetical negotiation, what

royalty would be reasonable.[63]  Rather, Judge Huff analyzed the more limited question of whether

Lucent had offered sufficient evidence at trial to support the jury's $70 million damages award.[64]

Because the *Lucent* JMOL does not address the "exact same question" Mills faced, it has limited

probative value on the royalty to which the parties would have agreed in a hypothetical

negotiation.[65]

The disparate nature of the questions Judge Huff and Mills sought to resolve is not the only

way in which the *Lucent* JMOL differs from the hypothetical negotiation at issue here.  The *Lucent*

JMOL was a judicial decision from another court regarding a plaintiff who is not involved in this

---

[62] Docket No. 153-8 at 7.

[63] *See LaserDynamics*, 694 F.3d at 77 ("[T]he premise of [a hypothetical negotiation] assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed.").

[64] *See Lucent*, 837 F. Supp. 2d at 1116, 1122 ("The issue is whether the jury's verdict is supported by legally sufficient substantial evidence…The Court determines that a lump-sum reasonable royalty of $26.3 million is the highest damages award that is supported by substantial evidence…"); *see also* Fed. R. Civ. P. 50(a)(1)(A)-(B) ("If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.").

[65] *See* Docket No. 153-8 at 7.

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

case and a patent that Sentius does not assert here.[66] Further, the *Lucent* JMOL concerned a

hypothetical negotiation that did not take place at the same time as the hypothetical negotiation at

issue here.[67] Sentius has not cited to any legal, academic or other authority that says that parties

would have considered a JMOL decision at all when determining reasonable royalties, let alone a

JMOL that occurred in such a different context than the hypothetical negotiation at issue. To the

contrary, courts have found that settlement agreements have limited probative value when they,

like the *Lucent* JMOL, occurred in a different time frame than the hypothetical negotiation at

issue.[68] As a result, these vast differences, coupled with the lack of any authority supporting Mills'

use of the *Lucent* JMOL, establish that Sentius has not met its burden to show that Mills' analysis

---

[66] *See Lucent*, 837 F. Supp. 2d at 1111. The *Lucent* JMOL arose out of Lucent's infringement suit against Microsoft relating to a "date-picker" tool in Microsoft's products. *See id.* Although it is clear that Lucent alleged that Microsoft infringed a different patent than the patents Sentius asserts here, the parties dispute whether Mills adequately accounted for "the technical differences between the asserted patent in the *Lucent* case and the Sentius reissue patents." *See* Docket No. 131-4 at 13; Docket No. 153-8 at 13-6. The court does not address this conflict because, as stated below, it excludes Mills' analysis relating to the *Lucent* JMOL for other reasons.

[67] When Microsoft believes hypothetical negotiation at issue in the *Lucent* JMOL would have occurred is not entirely clear. At oral argument, Microsoft asserted that hypothetical negotiation at issue in the *Lucent* JMOL occurred in 1996. *See Lucent*, 837 F. Supp. 2d 1107, 1115 (noting that plaintiff's damages expert "monetized the time by using $12.09, the average per-hour wage in 1996 for workers at the time of the hypothetical negotiation."). However, in its *Daubert* motion, Microsoft cited to authority from 2011—the time at which Lucent and Microsoft entered into a settlement agreement—to illustrate Lucent's economic circumstances during the "relevant time period" for the *Lucent* JMOL. *See* Docket No. 131-4 at 15-16 (citing Docket No. 136-6 at 8-9). Regardless of whether Microsoft contends that the "relevant time period" is in 1996 or 2011, it is clear that the hypothetical negotiation in *Lucent* did not occur in June 2009, the time period Mills uses for the hypothetical negotiation at issue here. *See* Docket No. 153-9 at 103-4.

[68] *See LaserDynamics*, 694 F.3d at 78 (finding that a settlement "entered into a full three years after the hypothetical negotiation date, is in many ways not relevant to the hypothetical negotiation analysis"); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276-77 (Fed. Cir. 1999) (agreeing with district court that for two licenses negotiated four and five years after the date of first infringement, "the age of the license agreements, in the context of the changing technology and 'financial landscape' at issue, made those agreements irrelevant for the hypothetical negotiation analysis.").

14

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

of the *Lucent* JMOL is sufficiently reliable to be admissible under *Daubert*. Accordingly, Mills'
damages testimony is excluded to the extent that it relies on the *Lucent* JMOL.

Further, even if the court found that Mills' analysis relating to the *Lucent* JMOL passed
muster under *Daubert*, it would still exclude the analysis as unfairly prejudicial to Microsoft under
Rule 403.[69] As stated above, the *Lucent* JMOL has little probative value, and it is clear that its
admission will "cause unfair prejudice, confuse the issues, and waste time."[70] In particular,
admission of the *Lucent* JMOL will almost certainly cause Microsoft to waste time explaining and
re-litigating the issues and circumstances involved in the *Lucent* dispute, confuse the jury about the
facts and circumstances of that dispute and prejudice the jury by suggesting that Microsoft is a
serial infringer that frequently is found liable for damages for patent infringement.[71] Given that the
*Lucent* JMOL is of limited usefulness on the issue of Sentius' patent damages, these dangers
substantially outweigh the *Lucent* JMOL's probative value.[72]

The story is similar with the settlement agreement in *Arendi*. Because the Federal Circuit
"recognize[s] that settlement agreements can be pertinent to the issue of reasonable royalties,"[73] the

---

[69] *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing
the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative
evidence.").

[70] *See Fenner Invs., Ltd. v. Hewlett-Packard Co.*, Case No. 6:08-cv-273, 2010 WL 1727916, at *3
(E.D. Tex. Apr. 28, 2010). *See also id.* at *2 (noting that "[d]istrict courts routinely exclude
settlement licenses because the potential prejudice and jury confusion substantially outweigh
whatever probative value they may have") (internal citations omitted).

[71] *See Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 767 (N.D. Ill. 2010) ("Admitting evidence
of settlement agreements with third parties would 'invite a "mini-trial"' on similarities and
differences in the facts regarding the "same" claims against other defendants' to determine the
value of the claim in the case at hand.") (internal citations omitted).

[72] *See* Fed. R. Evid. 403.

[73] *In re MSTG, Inc.*, 675 F.3d at 1348.

15

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    *Arendi* agreement is not inadmissible merely because it is a settlement agreement.[74] But that does

2    not end the inquiry.  The Federal Circuit also recognizes that "in attempting to establish a

3    reasonable royalty, the "licenses relied on by the patentee in proving damages [must be]

4    sufficiently comparable to the hypothetical license at issue in suit."[75] The "use of past patent

5    licenses under [*Georgia-Pacific*] factors 1 and 2 must account for differences in the technologies

6    and economic circumstances of the contracting parties."[76] A damages expert also may not rely on

7    licenses that are from "vastly different situation[s]."[77]

8

9        Mills has not adequately accounted for the vast differences between the "economic

10    circumstances" of the parties in the *Arendi* settlement agreement and the parties in the hypothetical

11    negotiation at issue here.[78] In the *Arendi* settlement, Arendi alleged that Microsoft had infringed

12    United States and European patents, whereas here Sentius alleges that Microsoft has infringed only

13

14  [74] Microsoft also claims that Federal Rule of Evidence 408 forbids "the admission of settlement orders and negotiations offered to prove the amount of damages owed on a claim." *See*

15  *LaserDynamics*, 694 F.3d at 77.  However, in *In re MSTG, Inc.*, the Federal Circuit held that "settlement *negotiations* related to reasonable royalties and damage calculations are not protected

16  by a negotiation settlement privilege." 675 F.3d at 1348 (emphasis added). Sentius argues that this exception extends to settlement *agreements* as well as *negotiations* because the court noted that

17  Federal Circuit cases "appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties." *See* Docket No. 153-8 at 11; *see also In re MSTG, Inc.*, 675 F.3d at

18  1348. The court need not reach this issue because it excludes Mills' testimony on the *Lucent* and

19  *Arendi* settlement agreements on other grounds.

20  [75] *VirnetX, Inc. v. Apple Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014).

21  [76] *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010); *see also*

22  *ResQNet.com*, 594 F.3d at 870-73 (license comparisons should "account[] for the technological and economic differences between those licenses and the [patents-at-issue].");  *VirnetX*, 767 F.3d at

23  1330 ("[W]e have cautioned that district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patent in suit and

24  must account for differences in the technologies and economic circumstances of the contracting

25  parties.") (internal citations omitted) (emphasis in original).

26  [77] *See Lucent*, 580 F.3d at 1328.

27  [78] *See Finjan*, 626 F.3d at 1211.

28                           16

United States patents.[79]  Further, in settlement, Arendi granted Microsoft ███████

██████████████████████████████████████████████████████████████████████

████████, while in this hypothetical negotiation Sentius would have granted Microsoft rights only

to the two reissued patents it asserts.[80]  Mills recognized that these differences impacted the *Arendi*

settlement because he noted that "███████████████████████████████████████

███████████████████████████████████████████████████"[81]  Yet

after recognizing this, Mills simply concluded that "no further adjustment [was] necessary to

account for this issue" because he calculated a "conservatively low effective royalty rate[]" for the

*Arendi* settlement."[82]  Mills then opined that Microsoft would likely claim that a "downward

adjustment is warranted" to the *Arendi* royalty rate because Microsoft would only receive a United

Stated license to Sentius' two asserted patents ███████████████████████████

███████████████████.[83]  But a simple "downward adjustment" is not sufficient

in light of Mills' failure to quantify the value that ████████████ contributed to the *Arendi*

settlement.[84]  And, like the allegedly "conservative" nature of Mills' use of the *Lucent* JMOL,

---

[79] *See* Docket No. 131-13 at 1; Docket No. 153-9 at 111 ("Arendi accused Microsoft of infringing a European patent in an action filed in the District Court in The Hague.") (internal citations omitted); *Id.* at 13 ("I understand that Sentius maintains that Microsoft…directly infringes various asserted claims of the patents-in-suit through its making, using, selling, importing, and/or offering to sell accused Microsoft products in the United States…").

[80] *See* Docket No. 153-9 at 112 ██████████████████████████████████

████████████████████████████████████████████

[81] *See* Docket No. 153-9 at 111.

[82] *See* Docket No. 153-9 at 111 n.429.

[83] *See* Docket No. 153-9 at 112.

[84] *See* Docket No. 131-14 at 96:1-16:

17

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

Mills' supposed arrival at a "conservative" final number for the effective royalty rate of the *Arendi*

agreement does not cure his failure to use a reliable methodology to arrive at that number.[85]

Sentius contends that Mills' failure to account for Arendi's European infringement claim

and ███████████████████████ is justified in part because Microsoft's Rule

30(b)(6) witness did not know how "any specific facts" impacted negotiation of the *Arendi*

agreement.[86]   Even if Sentius is correct that Microsoft did not provide insight on the impact of

these facts, this does not excuse Mills from his duty to account for the differences between the

*Arendi* settlement and the hypothetical negotiation here.[87]   Mills could still have looked to his own

---

Q. … I guess my question for you is as a matter of the analytical process that you employed here, you did not attempt to quantify or value the fact that Microsoft, as part of the Arendi settlement, ████████████████████████

A. I considered that in reaching my conclusions, but I did not assign a specific value to ██████████████ I wasn't aware of any information that would suggest that Microsoft would ████████████████████.  But having said that, I think that if you consider the differences between the agreements in this respect, that that suggests that there would be some downward influence on the royalty rate that Microsoft would pay Sentius relative Arendi.

[85] *See Ericsson, Inc.*, 2014 WL 6804864, at *19; *LaserDynamics*, 694 F.3d 51 at 67.

[86] *See* Docket No. 153-8 at 17; *see also* Docket No. 153-10 at 80:9-13 ("Q. Do you have any understanding of how [Microsoft agreed to pay Arendi damages of approximately ███████████]? A. No, I don't. I mean other than—I'm sure I would suspect some negotiation took place, but I don't know."). *See also id.* at 88:8-25:

Q. Do you know whether Microsoft believed that ███████████████ that are referenced in this agreement brought value to Microsoft?...

THE WITNESS: I don't know what the value—what—I guess I don't—the question is an odd question to me.  First of all, it's a little confusing to me. I'm not sure if you're asking me whether there's some value associated with ██████████████████████. I don't know what the question really is getting at.  But I don't know the basis for which value is ascribed.

[87] Microsoft noted that its Rule 30(b)(6) witness stated that the comparability of the *Arendi* settlement was "not something that I believe I'm designated to testify to, and I think it's probably

18

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

knowledge and experience to account for how these factors influenced the *Arendi* settlement.

Without an accounting of the effect of the European infringement claims and value of the patents

that Arendi did not assert, Mills could not meet his duty to "account for differences in

the…economic circumstances of the contracting parties."[88]   Accordingly, Mills' analysis is

excluded to the extent it relies on the *Arendi* settlement.[89]

 **Second**, Mills' income approach damages theory is sufficient to get to the jury.  Microsoft

claims that this theory must be excluded because it is "wholly derivative" of Mills' damages

analysis based on the *Lucent* JMOL.[90]  However, to calculate damages based on his income

approach, Mills did not begin with the *Lucent* JMOL or settlement agreement.  Rather, Mills used

Wecker's survey to calculate the revenue and profit that Microsoft would have allegedly lost if it

had not included the accused spell and grammar check features in its accused products.[91]  Mills

then divided this "at risk" profit by the number of infringing units to obtain an average at-risk

profit per copy of $1.99.[92]  Ultimately, Mills opined given the "relative bargaining strengths" of the

---

more appropriate for an expert to testify to something like that than for someone like me in my
role." *See* Docket No. 161-4 at 7 n.4 (citing Docket No. 153-10 at 88:2-6).

[88] *See Finjan*, 626 F.at 1211.

[89] Microsoft also claimed that Mills' opinions regarding the *Lucent* and *Arendi* disputes should be
excluded because Mills had no basis for his conversion of these lump-sum arrangements into
running royalties. *See* Docket No. 131-4 at 11-12. The court need not reach this issue because it has
excluded Mills' opinions regarding these disputes on other grounds.

[90] *See* Docket No. 131-4 at 16.

[91] *See* Docket No. 153-9 at 82-87, 104-105.

[92] *See id.* at 104-5.

19

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

parties, an effective $0.44 per-copy royalty is a "conservative outcome" in part because it gives

Sentius approximately 22% of Microsoft's average at-risk profit per copy.[93]

Mills' income approach theory is connected to his *Lucent* damages analysis in the sense that

Mills ultimately arrived upon the same effective per-copy royalty rate of not less than $0.44 for use

of the accused spell and grammar check feature that Mills had previously concluded was

"reasonable."[94] But Mills' income approach theory did not rely on figures from *Lucent* to yield the

$0.44 per copy royalty rate.[95] To the contrary, Mills used the income approach to independently

arrive at the effective per-copy $0.44 royalty rate by using Wecker's survey results and Microsoft's

revenue and profit to determine Microsoft's at-risk profit per copy and then analyzing how the

parties would divide this at-risk profit based on their relative bargaining positions.[96] Because it

stands on its own ground, Mills' income approach theory is therefore not derivative of his flawed

analysis relating to the *Lucent* dispute.

Microsoft argues that even if Mills' analysis is not derivative of his *Lucent* damages theory,

it is still fundamentally flawed because Mills analysis of the parties' relative bargaining strengths is

"hand-waving at best."[97] However, Mills did not, as Sentius claims, follow an unprincipled "rule

---

[93] *See id.* at 107.

[94] *See id.* at 103-104, 107-108.

[95] *See id.* 104-108. Mills looked to the jury verdict in *Lucent* to analyze the parties' relative bargaining powers. *See id.* at 107-108. However, Mills used the jury verdict merely as "another useful benchmark" of the parties' bargaining power and not as the sole source of support for his claim that Sentius would have been in a position to negotiation "as much as 50% of the at-risk profit." *See id.* at 107-108. Because this analysis is not solely derived from Mills' examination of the *Lucent* dispute, the court's exclusion of the *Lucent* JMOL does not require exclusion of Mills' analysis of the parties' relative bargaining strengths.

[96] *See id.* at 104-108.

[97] *See* Docket No. 131-4 at 17.

20

of thumb" approach similar to the theories that the Federal Circuit rejected in *VirnetX* and *Uniloc* to reach his conclusions about the relative bargaining power of parties.[98]  Unlike in *VirnetX* and *Uniloc*, where the experts relied on "rules of thumb" without establishing that those rules applied to the hypothetical negotiation at issue, here Mills analyzed how the various factors impacted the parties' bargaining strengths.[99]  To accomplish this, Mills' considered a non-exhaustive list of "[p]rinciple factors" relating to the hypothetical negotiation.[100]  Mills then determined that some of the factors favored Microsoft while others favored Sentius.[101]  Ultimately, Mills concluded that Sentius would be in a position to negotiate "more than 22 percent and perhaps as much as 50 percent of the at-risk profit."[102]

Despite Mills' focus on the particularities of the parties' situation, Microsoft argued that Mills' analysis was insufficient because his "bargaining considerations" were either "generic," favored Microsoft or did not support "any quantitative value."[103]  However, these complaints do

---

[98] *See* Docket No. 161-4 at 8-9 (citing *VirnetX*, 767 F.3d at 1332 ("[W]e agree with the courts that have rejected invocations of the Nash theorem without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand.  The use here was just such an inappropriate 'rule of thumb.'…Anyone seeking to invoke the theorem as applicable to a particular situation must establish that fit, because the 50/50 profit-split result is proven by the theorem only on those premises.") and *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("The 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement.  The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party.  Relying on the 25 percent rule of thumb in a reasonable royalty calculation is far more unreliable and irrelevant than reliance on parties' unrelated licenses, which we rejected in *ResQNet* and *Lucent Technologies*.")).

[99] *See VirnetX*, 767 F.3d at 32; *Uniloc*, 632 F.3d at 1317.

[100] *See* Docket No. 153-9 at 105-107.

[101] *See id.* at 107.

[102] *Id.*

[103] *See* Docket No. 131-4 at 17.

21

United States District Court
For the Northern District of California

not warrant exclusion of Mills' income approach theory because they either mischaracterize Mills' analysis or go to weight, not admissibility.[104]   Microsoft's assertion that Mills' analysis is flawed because some of Mills' factors "directionally would favor Microsoft" fails because Mills recognized that some of his factors would decrease Sentius' bargaining power.[105]   And Microsoft's complaint that Mills' analysis used "generic" factors or was not sufficiently quantitative goes to weight, not admissibility.   Microsoft cites to no case in which a court excluded testimony because an expert did not precisely quantify his analysis of parties' relative bargaining positions.[106]   While the court agrees with Microsoft that Mills could have looked to other factors to determine the parties' relative bargaining power or examined his chosen factors in more depth, this is an issue that Microsoft can address at trial through cross-examination.[107]

The court also rejects Microsoft's claim that it must exclude Mills' income approach theory under the entire market value rule.[108]   The Federal Circuit recognizes the entire market value rule as a "narrow exception" to the general rule that "royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"[109]   "A patentee may assess damages based

---

[104] *Apple Inc.*, 757 F.3d at 1315.

[105] *See* Docket No. 131-4 at 17; Docket No. 153-9 at 107 ("The fact that Sentius does not manufacture or sell products and instead relies upon others to monetize its technology would serve to increase Microsoft's bargaining power relative to Sentius…The scope of the license and contributions that Microsoft has made to the development of the accused spell checker and accused grammar checker would favor Microsoft in the hypothetical negotiation.").

[106] *See* Docket No. 131-4 at 16-17; *see also* Docket No. 161-4 at 7-9.

[107] *Apple Inc.*, 757 F.3d at 1319-20 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponent through cross-examination.") (internal citations omitted).

[108] *See* Docket No. 161-4 at 10-11.

[109] *LaserDynamics*, 694 F.3d at 67 (internal citations omitted).

22

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

1  on the entire market value of the patented technology only if the patentee can show that "the

2  patented feature creates the basis for customer demand or substantially creates the value of the

3  component parts."[110]  Mills may not estimate damages based on the entire market value of the

4  accused products here because Mills acknowledges that claimed technology does not drive demand

5  for accused products.[111]

6      Microsoft claims that despite this acknowledgement, Mills nevertheless derived damages

7  from the entire market value of the accused products.[112]  Microsoft contends that Mills violated the

8  entire market value because he calculated the profit Microsoft would have allegedly lost if it had

9  not included the accused features in its products and then concluded that Microsoft would have

10  agreed to pay Sentius 22% of that lost profit.[113]  Put differently, according to Microsoft, Mills

11  applied a running royalty rate to the entire portion of the revenue and profit Microsoft would have

12  allegedly lost if it had not included the patented technology in its accused products.[114]  At oral

13  argument, Microsoft said that this approach would grant Sentius 2.5% of Microsoft's profit on the

14  entire Office suite or entire standalone application.

15      This interpretation not only distorts Mills' analysis, but would require exclusion of any

16  damages analysis that is premised on the income approach theory.  One can characterize any

---

[110] *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (citing *SynQor, Inc. v. Artesyn Technologies, Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013)).

[111] *See* Docket No. 153-9 at 29 ("I further note that my reasonable royalty calculations are not based on a showing that the 'entire market value' of Microsoft's products is attributable to the patents-in-suit."); *see also* Docket No. 161-6 at 223:4-6 ("I don't have any evidence that all of the sales of these products are driven by the patented functionality.").

[112] *See* Docket No. 161-4 at 10.

[113] *See* Docket No. 161-4 at 10.

[114] *See id.*

23

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

damages figure calculated under the income approach theory as a percentage of the defendant's total lost profits or revenue. Mills' income approach theory is not a hidden attempt to avoid the entire market value rule because Mills did not derive damages using Microsoft's revenue and profit from all sales of the accused products.[115] Instead, Mills bases damages only upon Microsoft's profits and revenue that is associated with sales of the accused products that Sentius contents Microsoft would have lost without the inclusion of the accused features in its products.[116]

   *Third*, Mills may apply a royalty to each accused product without showing that someone has used the accused features in in each product sold. It is well-established that a defendant must perform the claimed method in the United States in order to infringe a method claim.[117] Further, a patent holder may not receive damages for "sales of devices merely capable of infringing" without "proof" that those devices are "programmed for and actually executed the claimed method."[118] But a patent holder is not "required to demonstrate a one-to-one correspondence between units sold and directly infringing customers" and "[p]roof of inducing infringement or direct infringement may be shown by circumstantial evidence."[119]

---

[115] *See* Docket No. 153-9 at 104-8.

[116] *See id.*

[117] *See Lucent Techs.*, 580 F. 3d at 1317 (noting that the claims "are method claims; thus, [Defendant]'s sales of its software alone cannot infringe the patent. Infringement occurs only when someone performs the method using a computer running the necessary software."); *see also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021, 1040 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) ("Absent proof that [the accused] devices were programmed for and actually executed the claimed method, [plaintiff] may not recover damages for the sales of devices merely capable of infringing.").

[118] *See Cardiac Pacemakers*, 418 F. Supp. 2d at 1040.

[119] *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indusies., Inc.*, 1 Fed. Appx. 879, 884 (Fed. Cir. 2001) (internal citations omitted).

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California

Mills opined that his royalty rate for each accused feature should be applied to a royalty base of the total number of copies of the accused Office products and applications that contain that feature sold in the United States during the relevant time frame without trying to determine the extent to which consumers actually used each accused feature.[120]  Microsoft claimed that this was improper because Mills had reason to believe that that someone did not use each accused feature in each Office product sold in the United States. To support this claim, Microsoft notes that it had provided in this case ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[121]

Microsoft is correct that Sentius is required to show "proof" that the accused devices "actually executed the claimed method."[122]  But under *Chiuminatta*, a patent holder may show such "proof" through "circumstantial evidence."[123]  Here, the record includes such evidence of circumstantial evidence of demand and use.[124]  As Sentius is not required to show a "one-to-one

---

[120] *See* Docket No. 153-9 at 140-44.

[121] *See* Docket No. 131-16 at 1.

[122] *See Cardiac Pacemakers*, 418 F. Supp. 2d at 1040.

[123] *See* 1 Fed. Appx. at 884.

[124] *See* Docket No. 153-8 at 20; *see also* Docket No. 131-16 at 1 (showing that ████████████); Docket No. 153-9 at 83-84 (showing that ████████████); *See id.* at 81-82 (citing to ████).



Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

correspondence between units sold and directly infringing costumers," this "circumstantial evidence of demand and use" provides sufficient proof to support Mills' use of a royalty base of all accused products that are capable of infringement.[125]

*Finally*, Mills may not refer to the Microsoft's profitability as a whole and to the profitability of Microsoft's Office business at trial but may refer to Microsoft's profit margin to the extent necessary to supports its income approach theory. Microsoft's profitability is relevant to Mills' damages analysis because Microsoft's profitability indicates the importance of Office to Microsoft and the accused spell and grammar check features are components of Office.[126] Mills also uses the profitability of Microsoft Office to calculate his income approach theory.[127] However, presenting such large sums—███████████████████████ ███, respectively—would undoubtedly "skew the damages horizon for the jury."[128]

Mills may not mention Microsoft's profitability at trial. He may use Office's profitability and revenue to the extent necessary to support his income approach theory but must refer only to Microsoft's profit margin and not to Office's overall profitability and revenue at trial. The court appreciates that jurors may be able to derive Microsoft's profits and revenue from its profit margin.

---

[125] *See id.*

[126] *See* Docket No. 153-9 at 61-62.

[127] *See* Docket No. 153-9 at 104-105.

[128] *See* Docket No. 153-9 at 104 ("███████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████"); *see also* *Uniloc*, 632 F.3d at 1320 ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").

26

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

On balance, however, the court concludes that this method will allow Mills to present his damages theory without unfairly prejudicing the jury against Microsoft.

### IV.

The court GRANTS Microsoft's motion in part, excluding Mills' testimony to extent that it relies on the *Lucent* JMOL and *Arendi* settlement agreement. The court finds that Mills' income approach theory is sufficient and DENIES Microsoft's motion to the extent that it seeks to exclude Mills' testimony relating to this approach. Finally, the court GRANTS Microsoft's motion to exclude Mills' testimony relating to Microsoft's and Microsoft Office's profitability in part, holding that Mills may not refer to Microsoft or Office's profitability but may refer to Microsoft's profit margins to the extent necessary to support his income approach theory.

**SO ORDERED.**

Dated: January 27, 2015

PAUL S. GREWAL
United States Magistrate Judge

Case No.: 13-00825
ORDER GRANTING-IN-PART MOTION TO EXCLUDE

United States District Court
For the Northern District of California